JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CIV 0256

RECEIVED
JAN 12 2012
U.S.D.C. S.D. N.Y.
CASHIERS

———————————————————— x

CITY OF WESTLAND POLICE AND FIRE
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                             Plaintiff,

      vs.

METLIFE INC., C. ROBERT HENRIKSON,
WILLIAM J. WHEELER, PETER M.
CARLSON, STEVEN A. KANDARIAN and
WILLIAM J. MULLANEY,

                          Defendants.

———————————————————— x

  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :
  :

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

## SUMMARY OF ACTION

1.      This is a securities fraud class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of MetLife, Inc. ("MetLife" or the "Company") between February 2, 2010 and October 6, 2011, inclusive (the "Class Period"). The claims asserted herein are brought against MetLife and certain of its current and former officers and directors, including C. Robert Henrikson ("Henrikson"), Chairman of the Board and former President and Chief Executive Officer, William J. Wheeler ("Wheeler"), the Company's former Chief Financial Officer, and several other key officers and directors as set forth below (collectively, the "Individual Defendants").

2.      During the Class Period, defendants engaged in a fraudulent scheme and multiple violations of §§10(b), 20(a) and 20(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a) and 78t(b)) and Rule 10b-5 promulgated thereunder, by making false and misleading statements concerning the Company's current and future financial condition and its quarterly and year-end financial statements.

## INTRODUCTION AND OVERVIEW

3.      MetLife is a global provider of insurance, annuities and employee benefit programs, serving 90 million customers in over 60 countries. The Company is headquartered in New York, New York and trades on the New York Stock Exchange under ticker symbol "MET."

4.      MetLife has sold and serviced insurance products for more than one hundred years in the United States. A significant amount of the Company's operating income and investment income is inextricably intertwined with historical processes, procedures and policies for investigation and paying claims. For example, the Company has engaged in the use of the Social Security Administration's Death Master File ("SSA-DMF") since the 1980s. The SSA-DMF is a government-maintained database of all deaths recorded in the United States, including demographic

information about decedents, including, for example, their social security numbers. MetLife, since the 1980s, has accessed the SSA-DMF regularly in order to determine whether its annuity policyholders have died so that the Company can immediately stop making annuity payments to deceased policyholders.

5.    The Company did not, however, regularly use the SSA-DMF to determine whether death benefit payments were due under life insurance policies or the Retained Asset Account, which would subject the Company to immediate liabilities and start the clock for escheatment of unclaimed property or benefit funds to relevant state authorities in the event that beneficiaries were either not located or did not submit a claim to the Company within the statutory period.

6.    As a result of these practices and procedures, during the Class Period, defendants caused the Company to issue materially false and misleading statements concerning the Company's current and future financial condition and its potential liability to policyholders, their beneficiaries or relevant state authorities for millions of dollars in benefits that should have been paid out to policyholders or escheated to the states.

7.    On August 5, 2011, the Company filed its Form 10-Q for the period ending September 30, 2011 with the SEC. The Company disclosed that regulatory investigations into its death benefits practices could result in additional escheatment to the states and administrative penalties, the costs of which could be substantial. The August 5, 2011 disclosure in MetLife's Form 10-Q caused the Company's stock price to decline 11% between Friday, August 5, 2011, and Monday, August 8, 2011.

8.    On October 6, 2011, the Company filed a Form 8-K with the SEC, stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF to identify deceased policyholders.

9.    On this news, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.

10.    Defendants' statements during the Class Period were each materially false and misleading in that defendants knew or recklessly disregarded that:

(a)    The Company had not properly or adequately reserved for the payment of benefits to policyholders' beneficiaries when it knew or had reason to know the policyholders were deceased;

(b)    The Company's historical processes, policies and procedures were inadequate to identify current liabilities related to policyholders which had died but whose beneficiary claims had not yet been made;

(c)    The Company knew to be false its assurances that the allegations regarding the Company's Retained Asset Account were without merit;

(d)    Defendants knew that the Company's financial results and guidance for its operating earnings during the Class Period were false; and

(e)    Defendants knew the Company knowingly failed to reserve for losses that it knew it had already incurred.

## JURISDICTION AND VENUE

11.    The claims asserted arise under §§10(b), 20(a) and 20(b) of the Exchange Act and Rule 10b-5. Jurisdiction is conferred by §27 of the Exchange Act. Venue is proper pursuant to §27 of the Exchange Act. MetLife's headquarters are located in New York, New York, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

12.    Plaintiff City of Westland Police and Fire Retirement System purchased MetLife common stock during the Class Period as set forth in the attached certification and was damaged thereby.

13.    Defendant MetLife is a leading global provider of insurance, annuities and employee benefit programs, serving 90 million customers in over 60 countries. The Company is headquartered in New York, New York and trades on the New York Stock Exchange under ticker symbol "MET."

14.    Defendant C. Robert Henrikson ("Henrikson") was at all relevant times during the Class Period, until his retirement on May 1, 2011, President and Chief Executive Officer of the Company. In addition, Henrikson will continue to serve as the Company's Chairman of the Board until January 1, 2012.

15.    Defendant William J. Wheeler ("Wheeler") is currently President of the Company's Americas Division. Prior to his appointment as President, Wheeler served as Executive Vice President and Chief Financial Officer of the Company.

16.    Defendant Peter M. Carlson ("Carlson") was at all relevant times during the Class Period Executive Vice President, Finance Operations and Chief Accounting Officer of the Company.

17.    Defendant Steven A. Kandarian ("Kandarian") is and has been since May 1, 2011, the Company's President and Chief Executive Officer. Prior to May 1, 2011, Kandarian served as the Company's Chief Investment Officer.

18.    Defendant William J. Mullaney ("Mullaney") was at all relevant times during the Class Period President of U.S. Business.

19.    The defendants named in ¶¶14-18 are referred to herein as the "Individual Defendants."

20.     The Individual Defendants controlled the contents of MetLife's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

21.     On February 2, 2010, the Company issued a press release announcing its fourth quarter 2009 ("4Q09") and fiscal year 2009 ("FY09") financial results.  The press release stated as follows:

### METLIFE ANNOUNCES FOURTH QUARTER AND FULL YEAR 2009 RESULTS

\*         \*         \*

MetLife, Inc. today reported fourth quarter 2009 net income of $289 million, or $0.35 per share, which reflects net investment gains and losses.  Operating earnings for the fourth quarter of 2009 were $793 million, or $0.96 per share.

\*         \*         \*

Operating earnings for the full year 2009 were $2.4 billion, or $2.87 per share.

\*         \*         \*

**U.S. BUSINESS**

- U.S. Business premiums, fees & other revenues of $7.8 billion, up 11% with increases of 32% in Retirement Products, 26% in Corporate Benefit Funding and 8% in Insurance Products

\* \* \*

- ***Operating earnings of $882 million, up significantly from $277 million***, largely due to strong business growth, [and] significant equity market improvements . . . .

22.    On February 26, 2010, the Company filed its Form 10-K for the year ending December 31, 2009 with the SEC. The Form 10-K was signed by defendant Henrickson. The Form 10-K repeated in substantial part the financial results reported in the February 2, 2010 press release. In addition to the financial results, the Form 10-K made representations concerning the manner in which the Company set and adjusted its reserves, including liabilities for deaths that had occurred but had not yet been reported.

23.    On April 29, 2010, the Company issued a press release announcing MetLife's 1Q10 financial results. The press release stated as follows:

## METLIFE ANNOUNCES STRONG FIRST QUARTER 2010 RESULTS

\* \* \*

MetLife, Inc. today reported first quarter 2010 net income of $805 million, or $0.97 per share, which reflects net investment gains and losses. ***Operating earnings for the first quarter of 2010 were $834 million, or $1.01 per share***.

\* \* \*

**U.S. BUSINESS**

- U.S. Business premiums, fees & other revenues of $7.4 billion, up 11% largely due to growth in Corporate Benefit Funding and Retirement Products

\* \* \*

- Operating earnings of $757 million, up from $178 million due to significant business growth, equity market improvements, higher net investment income and lower expenses

24.    On July 5, 2011, *Reuters* reported that the New York Attorney General had issued subpoenas to nine life insurance companies, including MetLife, specifically demanding information regarding their procedures for identifying beneficiaries of life insurance policies and compliance with relevant state escheatment laws:

**NY subpoenas nine life insurance companies**

. . . New York's top legal officer has sent subpoenas to nine leading life insurers seeking information about their practices in identifying and paying out policies for deceased customers . . . .

New York Attorney General Eric Schneiderman last month sent subpoenas to units of AXA SA, Genworth Financial Inc, Guardian Life Insurance Co of America, Manulife Financial Corp, Massachusetts Mutual Life Insurance Co, MetLife Inc, New York Life Insurance Co, Prudential Financial Inc, and TIAA-CREF, the source said.

This person requested anonymity because the probe is not public.

The Wall Street Journal first reported the life insurance investigation.

*The investigation is looking into whether insurance companies have done enough to identify beneficiaries of life insurance policies once a customer dies, the source told Reuters on Tuesday.*

*Schneiderman's office is also seeking information about unclaimed policy proceeds that are supposed to be turned over to the state.*

25.    On July 29, 2010, the Company issued a press release announcing its 2Q10 financial results.  The press release stated as follows:

**METLIFE ANNOUNCES STRONG SECOND QUARTER 2010 RESULTS**

\*        \*        \*

MetLife, Inc. today reported second quarter 2010 net income of $1.5 billion, or $1.84 per share.  Net income reflects net investment gains of $767 million, after tax, including gains on derivatives.  Operating earnings for the second quarter of 2010 were $1.0 billion, or $1.23 per share.

\*        \*        \*

**U.S. BUSINESS**

\*          \*          \*

- Operating earnings of $918 million, up 39% due to favorable underwriting, higher net investment income and lower expenses

(Footnotes omitted.)

26.      On August 2, 2010, the Company filed its Form 10-Q for the period ending June 30, 2010 with the SEC.  The Form 10-Q substantially repeated the 2Q10 financial results reported in the July 29, 2010 press release.  In addition, the Company stated that any allegations that its Retained Asset Account or the treatment of funds therein, including disclosures regarding the same, were without merit.

27.      On August 2, 2010, the Company issued a press release announcing that it had priced a secondary offering of 75 million shares of MetLife stock at $42.00 per share to fund the purchase of the American Life Insurance Company from American International Group.

28.      On February 9, 2011, the Company issued a press release announcing its financial results for its 4Q10 and FY10.  The press release stated as follows:

### METLIFE ANNOUNCES FOURTH QUARTER AND FULL YEAR 2010 RESULTS

\*          \*          \*

MetLife, Inc. today reported fourth quarter 2010 net income of $51 million, or $0.05 per share, and operating earnings of $1.2 billion, or $1.14 per share.  Derivative losses drove most of the difference between net income and operating earnings in the fourth quarter of 2010.

MetLife today also reported full year 2010 net income of $2.7 billion, or $3.00 per share.  Operating earnings for the full year 2010 were $3.9 billion, or $4.38 per share.

\*          \*          \*

**U.S. BUSINESS**

\*     \*     \*

- Operating earnings of $841 million, down 5% as strong results in Corporate Benefit Funding earnings were offset by lower earnings in Insurance Products and Retirement Products; increased amortization of DAC and other adjustments as a part of the annual review of DAC assumptions reduced U.S. Business earnings by $17 million ($0.02 per share), after tax

(Footnotes omitted.)

29.     On February 25, 2011, the Company filed its Form 10-K for the fiscal year ending December 31, 2010 with the SEC. The Form 10-K substantially repeated the financial results reported in the February 9, 2011 press release. The Form 10-K was signed by defendant Henrikson. The Form 10-K also made representations concerning the Company's reserve methodologies and compliance with state and regulatory capital requirements.

30.     On March 2, 2011, the Company issued a press release announcing the pricing of its offering of more than 146 million shares of MetLife common stock at $43.25 per share:

**METLIFE ANNOUNCES PRICING OF COMMON STOCK AND COMMON EQUITY UNIT OFFERINGS**

– Offerings Will Eliminate AIG Ownership of MetLife Securities Received in Acquisition of Alico –

. . . MetLife, Inc. announced today that it and ALICO Holdings LLC, a subsidiary of American International Group, Inc. (AIG), have priced their combined offerings of 146,809,712 shares of MetLife common stock at $43.25 per share.

MetLife offered 68,570,000 shares of its common stock to the public for gross proceeds of $2.97 billion. Net proceeds from MetLife's sale of its common stock will be used to repurchase and cancel 6,857,000 shares of contingent convertible preferred stock owned by AIG.

AIG offered 78,239,712 shares of MetLife common stock to the public for gross proceeds of $3.38 billion.

In addition, AIG has priced a public offering of 40,000,000 common equity units of MetLife, each with a stated amount of $75.00 for an aggregate amount of $3.0 billion.

- 9 -

*          *          *

Goldman, Sachs & Co., Citi and Credit Suisse are the book-running managers for the common stock transaction. Goldman, Sachs & Co. and Citi are the book-running managers for the common equity units transaction. A registration statement relating to these securities has been filed with the Securities and Exchange Commission and is effective.

31.     On May 4, 2011, the Company issued a press release announcing its 1Q11 financial results. The press release stated as follows:

### METLIFE ANNOUNCES FIRST QUARTER 2011 RESULTS

*          *          *

MetLife, Inc. today reported first quarter 2011 net income of $830 million, or $0.78 per share, and operating earnings of $1.4 billion, or $1.33 per share.

"With record top-line performance and a 64% increase in operating earnings over the first quarter of 2010, MetLife delivered very strong results in the first quarter of 2011," said Steven A. Kandarian, who became president & chief executive officer of MetLife, Inc. on May 1, 2011. "In addition to benefiting from the acquisition of Alico, we grew operating earnings in our U.S. Business by 15% while total net investment income increased 14% over the first quarter of 2010.

*          *          *

**U.S. BUSINESS**

*          *          *

- Operating earnings of $908 million, up 15% due to increases in Insurance Products, Retirement Products and Corporate Benefit Funding

32.     On May 10, 2011, the Company filed its Form 10-Q for the period ending March 31, 2011. The Form 10-Q repeated, in substance, the financial results reported in the May 4, 2011 press release. The Company maintained that allegations concerning the usage of its Retained Asset Account were without merit.

33.     On July 28, 2011, the Company issued a press release announcing its financial results for 2Q11. The press release stated as follows:

### METLIFE ANNOUNCES SECOND QUARTER 2011 RESULTS

\*        \*        \*

MetLife, Inc. today reported second quarter 2011 net income of $1.2 billion, or $1.13 per share, and operating earnings of $1.3 billion, or $1.24 per share.

"MetLife delivered strong results during the second quarter," said Steven A. Kandarian, president and chief executive officer of MetLife, Inc. "We grew earnings per share by 13% over the prior-year quarter while generating a record $11.8 billion in premiums, fees and other revenues. The fact that we were able to deliver these results despite losses from natural disasters in the United States and Japan is a testament to the earnings power of MetLife's diverse portfolio of businesses."

\*        \*        \*

**U.S. BUSINESS**

- U.S. Business operating earnings of $908 million, up 12% due to increases in Insurance Products, Retirement Products and Corporate Benefit Funding

(Footnote omitted.)

34.     After the July 28, 2011 announcement of its 2Q11 financial results, the Company's stock price spiked from a close of $39.81 on July 28, 2011 to a close of $41.21 on July 29, 2011, on increased trading volume.

### THE RELEVANT TRUTH BEGINS TO BE DISCLOSED

35.     On August 5, 2011, the Company filed its Form 10-Q for the period ending September 30, 2011 with the SEC. The Company disclosed that the regulatory investigations into its death benefits practices had expanded and that it might be subject to additional escheatment to the states and that the costs related to said investigations could be substantial.

36.     The August 5, 2011 disclosures in MetLife's Form 10-Q caused the Company's stock price to decline 11% between Friday, August 5, 2011 and Monday, August 8, 2011.

37.    On October 6, 2011, the Company filed a Form 8-K with the SEC stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF.

38.    On this news, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.

39.    Defendants' statements during the Class Period were each materially false and misleading in that defendants knew or recklessly disregarded that:

(a)    The Company had not properly or adequately reserved for the payment of benefits to policyholders' beneficiaries when it knew or had reason to know the policyholders were deceased;

(b)    The Company's historical processes, policies and procedures were inadequate to identify current liabilities related to policyholders which had died but whose beneficiary claims had not yet been made;

(c)    The Company knew to be false its assurances that the allegations regarding the Company's Retained Asset Account were without merit;

(d)    Defendants knew that the Company's financial results and guidance for its operating earnings during the Class Period were false; and

(e)    Defendants knew the Company knowingly failed to reserve for losses that it knew it had already incurred.

## LOSS CAUSATION/ECONOMIC LOSS

40.    During the Class Period, as detailed herein, defendants made false and misleading statements regarding the Company's current and future financial condition and its quarterly and year-end financial statements. This artificially inflated MetLife's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct

became apparent to the market, MetLife's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of MetLife common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

41. MetLife's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

42. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of MetLife who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

43. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b)    The omissions and misrepresentations were material;

    (c)    The Company's stock traded in an efficient market;

- 13 -

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased MetLife common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

44.     At all relevant times, the market for MetLife common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, MetLife filed periodic public reports with the SEC; and

(b)     MetLife regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MetLife common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, and directors and officers of MetLife and their families and affiliates.

46.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MetLife has over 1 billion shares of common stock outstanding.

47.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of MetLife common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

48.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

49.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

50.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

51.    Plaintiff incorporates ¶¶1-50 by reference.

52.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MetLife common stock during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MetLife common stock. Plaintiff and the Class would not have purchased MetLife common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

55.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MetLife common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against All Defendants

56.     Plaintiff incorporates ¶¶1-55 by reference.

57.     The Individual Defendants acted as controlling persons of MetLife within the meaning of §20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about MetLife, the Individual Defendants had the power and ability to control the actions of MetLife and employees of the Company. MetLife controlled the Individual Defendants

and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violation of §20(b) of the Exchange Act Against All Defendants

58.     Plaintiff incorporates ¶¶1-57 by reference.

59.     The Individual Defendants, acting through employees of MetLife, unlawfully engaged in manipulative practices in violation of §20(b) of the Exchange Act.  By virtue of their positions and their power to control employees of MetLife, the Individual Defendants were able to directly and indirectly engage in unlawful practices which made MetLife's public statements materially false and misleading.  MetLife violated the Exchange Act due to the illegal actions of MetLife employees.  By reason of such conduct, defendants are liable pursuant to §20(b) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 12, 2012

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

- 18 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al.*, No. 08-cv-00969 (D. Del.)
*Frederick v. Mechel OAO, et al.*, No. 09-cv-03617 (S.D.N.Y.)
*NECA-IBEW Pension Fund (The Decatur Plan) v. Northern Trust Corporation, et al.*, No. 1:10-cv-05339 (N.D. Ill.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

METLIFE

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8 day of January , 201 1 .

CITY OF WESTLAND POLICE AND
FIRE RETIREMENT SYSTEM

By: _Robert H. Sumner_

Its: _President Board of Trustee_

METLIFE

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 10/28/2010 | 522 | $40.50 |
| 10/29/2010 | 928 | $40.40 |
| 10/29/2010 | 3,881 | $40.41 |
| 11/10/2010 | 715 | $40.88 |
| 03/03/2011 | 2,486 | $44.52 |
| 08/09/2011 | 361 | $34.36 |
| 08/10/2011 | 407 | $32.94 |