UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | :<br>:<br>: | Civil Action No. 1:12-cv-00256-LAK<br><br>CLASS ACTION |
| | : | |
| Plaintiff, | :<br>: | AMENDED CLASS ACTION COMPLAINT<br>FOR VIOLATION OF THE FEDERAL |
| vs. | : | SECURITIES LAWS |
| | : | |
| METLIFE INC., et al., | : | |
| | : | |
| Defendants. | :<br>: | |
| | x | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND OVERVIEW ............................................................1

II.  JURISDICTION AND VENUE .............................................................9

III.  THE PARTIES.......................................................................10

    A.  Underwriter Defendants.........................................................14

IV.  CONTROL PERSONS ..................................................................15

V.  FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS
    DURING THE CLASS PERIOD .............................................................18

    A.  MetLife Announces Agreement to Purchase AIG's International Life
        Insurance Business "ALICO" for $15.5 Billion .....................................23

    B.  MetLife Prices Secondary Offering of 75 Million Shares at $42.00 Per
        Share to Acquire AIG International Life Insurance Business ALICO .................39

    C.  MetLife and AIG Jointly Offer 146 Million Shares of MetLife Common
        Stock Six Months Earlier than Investors Expected and Contemplated by
        the Agreement with AIG............................................................49

    D.  State and Regulator Investigations into MetLife's Failure to Pay Benefits
        When It Knew Policyholders Were Deceased Begin to Indemnify.......................55

    E.  Top MetLife Officials Testify at Regulatory Hearings Admitting to the
        Company's Knowledge or Reckless Disregard of False Financial
        Statements and Related Representations ...........................................62

    F.  New York State Attorney General and New York State Department of
        Financial Services Issues Subpoenas and Demands Information .......................65

    G.  MetLife Admits for the First Time to the Scope of Regulator Inquiries into
        Its Handling of Death Benefits Which Could Have a Material Impact on
        Its Financial Statements – Stock Price Declines...................................70

VI.  POST CLASS PERIOD EVENTS AND ADMISSIONS ..................................73

VII.  METLIFE REACHES SETTLEMENT AGREEMENT WITH SIX STATES
    VALUED AT $500 MILLION...............................................................79

    A.  New York State Not Signatory to the Multi-State Settlement Agreement
        Announces Progress of Department of Finance Yielding $262 Million...............83

VIII. METLIFE'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES..............84

    A. MetLife Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules....................................................85

        1. *SEC Regulation S-K Item 103 "Legal Proceedings"* ................87

        2. *ASC 450 "Contingencies"* ........................................88

        3. *SEC Regulation S-K Item 303: Management's Discussion and Analysis*................................................................90

    B. MetLife Understated Life Insurance Claim Reserves in Violation of GAAP...........................................................................91

    C. The Misstatements Identified Above Were Material to MetLife's Financial Statements ....................................................................94

IX. LOSS CAUSATION/ECONOMIC LOSS RELEVANT TO SECTION 10(b) EXCHANGE ACT VIOLATIONS ................................................96

X. NO SAFE HARBOR ........................................................99

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET...................................................................100

XII. CLASS ACTION ALLEGATIONS ........................................100

XIII. CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15 OF THE SECURITIES ACT OF 1933...........................................103

    A. False and Misleading Statements and Omissions in the Registration Statements and Offering Materials ....................................104

    B. Material Misstatements and Omissions in the Offering Materials ......108

        1. Metlife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules........................108

        2. MetLife Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules .............110

            a. *SEC Regulation S-K Item 103 "Legal Proceedings"* .................111

b. *ASC 450 "Contingencies"* .......................................................112

c. *SEC Regulation S-K Item 303: Management's Discussion and Analysis* ...................................................................114

C. MetLife Understated Life Insurance Claim reserves in Violation of GAAP.......115

1. The Misstatements Identified Above Were Material to MetLife's Financial Statements ...............................................................117

2. MetLife Admits Investigation of Death Benefit Claims Could Have a Material Impact on Its Financial Statements – Takes After-Tax Charge to Earnings ........................................................119

XIV. SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS ...............128

XV. CLASS ACTION ALLEGATIONS ................................................................128

XVI. PRAYER FOR RELIEF ..............................................................................130

XVII. JURY DEMAND .......................................................................................130

## I. INTRODUCTION AND OVERVIEW

1.      This is a securities class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of MetLife, Inc. ("MetLife" or the "Company") between February 2, 2010 and October 6, 2011, inclusive (the "Class Period"). The claims asserted herein are brought against MetLife and certain of its current and former officers and directors, including C. Robert Henrikson ("Henrikson"), former Chairman of the Board of Directors (the "Board") and former President and Chief Executive Officer ("CEO"), William J. Wheeler ("Wheeler"), the Company's current President of the Company's Americas Division and former Executive Vice President and Chief Financial Officer ("CFO") and William Mullaney, the Company's former President of U.S. Business and several other key officers and directors as set forth below (collectively, the "Individual Defendants").

2.      This action is also brought on behalf of all persons who purchased or acquired MetLife common stock pursuant or traceable to the Company's August 3, 2010 public offering of 75 million shares of its common stock and MetLife's March 4, 2011 public offering of 68.5 million shares of its common stock, respectively (the "Offerings").

3.      MetLife is a leading global provider of insurance, annuities and employee benefit programs, serving 90 million customers in over 60 countries. According to the Company, MetLife holds leading market positions in the United States, Japan, Latin America, Asia Pacific, Europe and the Middle East. The Company is headquartered in New York, New York and trades on the New York Stock Exchange ("NYSE") under ticker symbol "MET." During the Class Period, the Company is organized into five business segments: Insurance Products, Retirement Products, Corporate Benefit Funding and Auto & Home (collectively, "U.S. Business") and International.

4.     MetLife has sold and serviced insurance products for more than one hundred years in the United States. The Company has, in the past, built a reputation based in part upon marketing itself as the Company that "pays" with a catchy slogan, "GET MET IT PAYS." A significant amount of the Company's operating income and investment income is inextricably intertwined with historical processes, procedures and policies for investigation and paying claims. For example, the Company has engaged in the use of the Social Security Administration's Death Master File ("SSA-DMF") since the 1980s. The SSA-DMF is a government-maintained database of all deaths recorded in the United States, including demographic information about decedents, including, for example, their social security numbers. The SSA-DMF is described on the National Technical Information Service website as providing information to help government agencies and private organizations and individuals verify and track death records as follows:

Verify Death

The Death Master File, available as an online search application or as raw data files, is important for death verification. Medical researchers, hospitals, oncology programs all need to track former patients and study subjects. Investigative firms use the data to verify the death of persons, in the course of their investigations. Pension funds, insurance organizations, Federal, State and Local governments and others responsible for payments to recipients/retirees all need to know if they might be sending checks to deceased persons. Individuals may search for loved ones, or work toward growing their family trees. Professional and amateur genealogists can search for missing links.

Data File

The Death Master File (DMF) from the Social Security Administration (SSA) contains over 89 million records of deaths that have been reported to SSA. This file includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, date of death, state or country of residence (2/88 and prior), ZIP code of last residence, and ZIP code of lump sum payment. The SSA does not have a death record for all persons; therefore, SSA does not guarantee the veracity of the file. Thus, the absence of a particular person is not proof this person is alive.

707139_1

5.     MetLife, since the 1980s, has accessed the SSA-DMF regularly or even systematically for purposes beneficial to its bottom line.  For example, the Company had utilized the SSA-DMF in order to determine, among other things, whether its annuity policyholders have died so that the Company can immediately stop making annuity payments to deceased policyholders.  The Company has utilized the SSA-DMF as a valuable and, in fact, reliable tool in that regard and as a practice, once an annuitant was identified in the SSA-DMF, the Company required no further proof of death, *i.e.*, a death certificate, in order to stop annuity payments.  In fact, the Company, through high level executives, has conceded that it views identifications in the SSA-DMF as "substantial evidence" that someone is deceased.

6.     Conversely, however, notwithstanding its utilization of the SSA-DMF to stop payments to deceased annuitants, the Company did not utilize the SSA-DMF, or information known to the Company through its utilization of the SSA-DMF, to identify and locate policyholder beneficiaries, adjust Company reserves or inform state authorities that it was in possession of unclaimed property subject to escheatment pursuant to state unclaimed property laws.

7.     Further, even when the Company learned of the death of a policyholder and confirmed the death through its in-house death indices or through the use of the SSA-DMF, it would not immediately recognize the death as a liability, but instead, would only begin an investigation into the apparent proof of death.  These processes and procedures had the effect of maintaining monies and accounts that could have and likely should have been paid out to beneficiaries of its policyholders or instead escheated to the relevant state authorities after the "dormancy period" expired.

8.     As a result of these practices and procedures, during the Class Period, defendants caused the Company to issue materially false and misleading statements concerning the Company's

current and future financial condition and its potential liability to policyholders, their beneficiaries or relevant state authorities for millions of dollars in benefits that should have been paid out to policyholders or escheated to the states long ago and the Company's exposure to claims of state and federal law violations.

9. Due in part to maintaining funds that properly belong to policyholders' beneficiaries or state unclaimed property funds during the Class Period, the Company reported strong revenue and income and operating earnings as a result of the Company's purportedly strong underwriting and investing activities, while failing to disclose that reported income was materially overstated due to the Company's failure to account and reserve for known liabilities associated with policyholders who had died long ago. For example, throughout the Class Period, the Company bragged to Wall Street securities analysts and investors that operating earnings, underwriting and mortality results were a product of strong leadership and a discipline approach to risk and expense managements:

- *Insurance Products operating earnings were $400 million, up 55%* due in large part to higher net investment income, *solid underwriting results in both group life and individual life* . . . .

- *From an earnings perspective, results came in considerably ahead of expectations, driven mostly by its individual life insurance operations where the company benefited from favorable claims trends*.

- *The growth we're seeing in the bottom line demonstrates the discipline we have maintained in our underwriting, pricing, risk management and expense control*.

- *We experienced excellent mortality results in our group life business due to a decrease in severity, as well as favorable reserve refinements in the current year*.

- *Operating earnings grew by 5%, reflecting solid mortality results*.

10. The Company also falsely reported that its methods for setting loss reserves, and specifically reserves for claims that were incurred but not reported ("IBNR"), were in accordance with Generally Accepted Accounting Principles ("GAAP") and applicable regulatory standards. For

- 4 -

example, during the Class Period, the Company made positive statements about quarterly and annual results as follows:

- *We compute the amounts for actuarial liabilities reported in our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP")*.

- *Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards*. Principal assumptions used in the establishment of liabilities for future policy benefits are mortality . . . .

- *Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established*.

11.     In July 2010, allegations surfaced that MetLife had for years retained monies belonging to policyholder beneficiaries in its retained asset account (also known as the Total Control Account or "TCA"), and the New York State Attorney General announced that he had begun a major fraud probe into whether the Company had routinely, and in violation of relevant law and insurance regulations, retained monies that it knew it had no right to in order to profit from the accumulation and investment of such monies and avoid paying beneficiaries or escheating monies to the relevant state authorities.

12.     Notwithstanding these allegations and the knowledge that the Company was retaining monies in its retaining funds properly belonging to policyholder beneficiaries or that should have been escheated to the states, the Company continued to report false strong financial results, including operating earnings, purportedly based upon strong underwriting and results in insurance products and completed two public offerings of MetLife common stock, raising more than $4 billion.

13.     With respect to whether the Company timely and appropriately paid policyholder beneficiaries and escheated monies to the states, the Company falsely stated as follows:

- 5 -

- • *"**Our priority is to pay insurance benefits to those who are entitled to them . . . . When beneficiaries cannot be located, we turn those benefits over to the state.**"*

14. In addition, the Company in its financial statements filed with the U.S. Securities and Exchange Commission ("SEC") claimed that allegations of fraud or violations of law related to its retained asset accounts were wholly without merit and, in any event, would not affect its financial statements taken as a whole:

- • *"**Management believes that any allegations that information about the TCA [Total Control Account] is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit**."*

15. As a result of the Company's misrepresentations concerning the strength of its business, including reported operating earnings, and the lack of merit related to ongoing regulatory investigations, the Company's stock traded at a Class Period high of $48.72 per share on February 7, 2011.

16. On July 28, 2011, the Company issued its financial results for the second quarter of 2011 ("2Q11"), reporting net income of $1.2 billion or $1.13 per share and operating earnings of $1.3 billion or $1.24 per share. The 2Q11 results were purportedly the result of "[e]xcellent underwriting results" in group life and individual life products.

17. After the July 28, 2011 announcement of its 2Q11 financial results, the Company's stock price spiked from a close of $39.81 on July 28, 2011 to a close of $41.21 on July 29, 2011, on increased trading volume.

18. In truth, defendants' representations in concerning: (i) reported financial results during the Class Period, in particular, reported income and overall segment operating earning; (ii) strong or disciplined underwriting results and expense management; and (iii) reported mortality

results and experience were each knowingly or recklessly false when made for the following reasons:

(a)     The Company failed to account for known incurred liabilities (deaths of policyholders that the Company actually knew of or had reason to know of), causing the Company's income and operating earnings to be materially misstated;

(b)     Through the prior utilization of the SSA-DMF, that the Company was in possession of or had access to information that was strong evidence of death of policyholders and knew that the Company's processes and procedures were designed or implemented to largely ignore that evidence, escheating monies to state agencies or increasing reserves;

(c)     Underwriting results in both group life and individual life were materially misstated due to the Company's known failure to identify, account for and pay beneficiaries of policyholders the Company actually knew had died or had reason to know had died;

(d)     But for the failure to utilize the SSA-DMF to identify deceased policyholders and recognize known incurred liabilities, paid beneficiaries or properly escheated monies to the states as required by state law and insurance regulations, the Company would have reported financial results materially different than those reported during the Class Period; and

(e)     The Company's financial statements failed to comply with and make disclosures required by GAAP and SEC disclosures rules.

19.     Defendants' knowledge or reckless disregard of the material falsity of the statements alleged herein have been largely admitted through a combination of disclosures, including: (i) the testimony of top MetLife executives – Todd Katz ("Katz"), Executive Vice President U.S. Business Insurance Products and Frank Cassandra ("Cassandra"), Senior Vice President Insurance Products Financial; (ii) $143 million charge to earnings for account for liabilities in excess of reserves

identified as a result of utilizing the SSA-DMF; and (iii) settlement with state regulators valued at $500 million, including detailed corporate reforms designed to enhance usage of the SSA-DMF to refine processes for identifying policyholder beneficiaries and escheatment of unclaimed property to states.

20.     On August 5, 2011, only one week after the July 28, 2011 announcement of its 2Q11 results, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2011.  The Company disclosed that:

- The regulatory investigation into its death benefits practices had expanded to more than 30 jurisdictions;

- The investigations could result in additional escheatment to the states;

- The Company could be subjected to administrative penalties; and

- The costs related to said investigations and procedures could be "substantial."

21.     In addition to the disclosures above, the Form 10-Q no longer asserted denials that allegations concerning the Company's retained asset accounts and potential violations of state and federal laws were "without merit":

> *Unclaimed Property Inquiries.*  More than 30 U.S. jurisdictions are auditing MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws. . . . ***It is possible that the audits and related activity may result in additional payments to beneficiaries, additional escheatment of funds deemed abandoned under state laws, administrative penalties, and changes to the Company's procedures for the identification and escheatment of abandoned property***.  ***The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial***.

22.     The August 5, 2011 disclosure in MetLife's Form 10-Q caused the Company's stock price to decline 11% between Friday, August 5, 2011, and Monday, August 8, 2011.  By close of market hours on August 8, 2011, MetLife stock traded down from a close of $36.90 on Thursday, August 4, 2011, to a close of $32.74 on Monday, August 8, 2011.

- 8 -

23.     On October 6, 2011, the Company filed with the SEC a Form 8-K quantifying the impact of the regulatory investigations reported on August 5, 2011, stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF to identify deceased policyholders:

> *MetLife, Inc. . . . has identified the following non-recurring charges that it expects to incur for the third quarter of 2011*:
>
> (1)     *The Company expects to incur a $115 million to $135 million, after tax, charge to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company*.

24.     On this news reported on October 6, 2011, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.

## II.     JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

26.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act [15 U.S.C. §77v], §27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

27.     Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District. MetLife's headquarters are located in New York, New York. The Company's shares are traded on the New York Stock Exchange ("NYSE"), which is based in this District, and the Underwriter Defendants (defined below) maintain executive offices in this District.

28.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephonic communications and the facilities of the NYSE.

## III.    THE PARTIES

29.     Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") purchased MetLife common stock during the Class Period as set forth in the certification previously filed with the Court and was damaged thereby.

30.     Defendant MetLife is a leading global provider of insurance, annuities and employee benefit programs, serving 90 million customers in over 60 countries.  According to the Company, MetLife holds leading market positions in the United States, Japan, Latin America, Asia Pacific, Europe and the Middle East.  The Company is headquartered in New York, New York and trades on the NYSE under ticker symbol "MET."

31.     Defendant C. Robert Henrikson was, at all relevant times during the Class Period, until his retirement on May 1, 2011, President, CEO and Chairman of the Board of Directors of the Company.  In addition, Henrikson continued to serve as the Company's Chairman of the Board until January 1, 2012.  During the Class Period, Henrikson was a Director and Chairman of the American Council of Life Insurers ("ACLI"), a lobbying group for the insurance industry.  During the Class Period, Henrikson was one of the key spokespersons for the Company.  Henrikson was quoted in financial press releases published during the Class Period and led or participated in multiple Company hosted conference calls for analysts and investors during which false and misleading statements alleged herein were made.  During fiscal years 2009, 2010 and 2011, Henrikson was compensated $11.6 million, $13.8 million and $17.8 million, respectively.

32.     Defendant William J. Wheeler is currently President of the Company's Americas Division and has held that position since November 2011.  Prior to his appointment as President, Wheeler served as Executive Vice President and CFO of the Company and was responsible for overseeing financial reporting risk management corporate actuarials.  Wheeler was credited for architecting the acquisition of the American Life Insurance Company ("ALICO").  During the Class Period, Wheeler participated in multiple Company hosted conference calls for analysts and investors during which false and misleading statements alleged herein were made.  For fiscal years 2009, 2010 and 2011, Wheeler was compensated $5.9 million, $4.9 million and $8.9 million, respectively.

33.     Defendant Peter M. Carlson ("Carlson") was, at all relevant times during the Class Period, Executive Vice President, Finance Operations and Chief Accounting Officer of the Company.  Carlson executed certain Forms 10-Q and 10-K and other Company documents which were filed with the SEC during the Class Period.

34.     Defendant Steven A. Kandarian ("Kandarian") is and has been since May 1, 2011, the Company's President and CEO.  Prior to May 1, 2011, Kandarian served as the Company's Chief Investment Officer.  As Chief Investment Officer, Kandarian oversaw the Company's general account portfolio.  For fiscal years 2009, 2010 and 2011, Kandarian was compensated $5.4 million, $4.1 million and $10.6 million, respectively.  Kandarian participated in multiple Company hosted conference calls during the Class Period during which false and misleading statements alleged herein were made.

35.     Defendant William J. Mullaney ("Mullaney") was, at all relevant times during the Class Period, President of U.S. Business.  Mullaney participated in multiple Company hosted conference calls for analysts and investors during which false and misleading statements alleged herein were made.  Mullaney resigned from the Company in or around November 2011.  For fiscal

years 2009, 2010 and 2011, Mullaney was compensated $3.5 million, $4.6 million and $10.3 million, respectively.

36.     The defendants named in ¶¶30-35 are referred to herein as the "Individual Defendants."

37.     Defendant Sylvia Mathews Burwell ("Burwell") is and was a member of the Board of Directors.  Burwell has been a Director since 2004.  During the Class Period, Burwell served on the Company's Governance and Corporate Responsibility Committee of the Board of Directors.

38.     Defendant Eduardo Castro-Wright ("Wright") was a member of the Board of Directors during the Class Period and was a Director since 2008 until he resigned his position on April 24, 2012.  During the Class Period, Wright served on the Governance and Corporate Responsibility and Compensation Committees of the Board of Directors.

39.     Defendant Cheryl W. Grisé ("Grisé") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since February 2004.  During the Class Period, Grisé served on the Audit, Compensation and Governance and Corporate Responsibility Committees of the Board of Directors.

40.     Defendant R. Glenn Hubbard ("Hubbard") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director since 2007.  During the Class Period, Hubbard served on the Finance and Risk Committee of the Board of Directors.

41.     Defendant John M. Keane ("Keane") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director since 2003.  During the Class Period, Keane served on the Audit and Governance and Corporate Responsibility Committees of the Board of Directors.

42.     Defendant Alfred F. Kelly, Jr. ("Kelly") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2009.  During the Class Period, Kelly served on the Audit, Compensation and Finance and Risk Committees of the Board of Directors.

43.     Defendant James M. Kilts ("Kilts") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2005.  During the Class Period, Kilts served on the Compensation Committee of the Board of Directors.

44.     Defendant Catherine R. Kinney ("Kinney") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2009.  During the Class Period, Kinney served on the Audit and Finance and Risk Committees of the Board of Directors.

45.     Defendant Hugh B. Price ("Price") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 1999.  During the Class Period, Price served on the Audit and Compensation Committees of the Board of Directors.

46.     Defendant David Satcher ("Satcher") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2007.  During the Class Period, Satcher served on the Executive and Governance and Corporate Responsibility Committees of the Board of Directors.

47.     Defendant Kenton J. Sicchitano ("Sicchitano") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2003.  During the Class Period, Sicchitano served on the Audit and Compensation Committees of the Board of Directors.

48.     Defendant Lulu C. Wang ("Wang") is and was a member of the Board of Directors at all relevant times during the Class Period and has been a Director of the Company since 2008. During the Class Period, Wang served on the Finance and Risk Committees of the Board of Directors.

### A.     Underwriter Defendants

49.     Defendant Goldman Sachs & Co. ("Goldman") is a financial holding company, which provides global banking, securities, underwriting and investment management services in the United States and internationally.  Goldman also provides debt and equity underwriting, mergers and acquisitions and corporate restructuring advisory services, securities dealing and brokerage, and trade execution services for large-market companies and institutional investors.

50.     Defendant Citigroup Global Markets Inc. ("CGMI") is the brokerage and securities arm of banking Citigroup.  CGMI provides investment banking services to corporate, institutional and government entities including underwriting, structuring, sales and trading across such asset classes as equities, corporate, government and agency bonds, and mortgage-backed securities.

51.     Defendant Credit Suisse Securities (USA) LLC is an investment bank in the United States.  Credit Suisse Securities was formed in 1997 and is based in New York City, and operates as a subsidiary of Credit Suisse (USA), Inc.  Credit Suisse Securities (USA) LLC provides securities underwriting, sales and trading, investment banking, private equity, alternative assets and financial advisory services.

52.     Defendant Wells Fargo Securities, LLC provides banking services in the United States including services related to public offering private placements, debt offering and underwriting.  Wells Fargo Securities, LLC is headquartered in San Francisco, California.

53. Defendant BofA Merrill Lynch, Pierce, Fenner & Smith Incorporated provides securities, brokerage and dealership services as well as investment advisory services.

54. Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that provides financial advisory services. HSBC's services include mergers and acquisitions, capital raising and operates as a subsidiary of HSBC Investments (North America) Inc.

55. The defendants referenced above in ¶¶49-54 are referred to herein as "Underwriter Defendants."

## IV. CONTROL PERSONS

56. Because of the Individual Defendants' executive management positions at the Company, they had access to, and knew of, the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

57. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of MetLife, by virtue of their high-level positions with the Company: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; and (iii) was privy to confidential proprietary information concerning the Company and its

business, operations, products, growth, financial statements and financial condition, as alleged herein. Said defendants: (i) were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (ii) were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company; and (iii) approved or ratified these statements, in violation of the federal securities laws.

58.     As officers and controlling persons of a publicly held Company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

59.     As alleged above, the Individual Defendants: (i) participated in the drafting, preparation and/or approval of the various press releases, shareholder reports, SEC filings and other public statements/communications complained of herein; (ii) were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom; and (iii) were aware of their materially false and misleading nature. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. In fact, the Individual Defendants certified the accuracy of the quarterly results, and consented to the content of

- 16 -

the financials. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

60. Because of their Board membership and/or executive and managerial positions with MetLife, each of the Individual Defendants had access to the adverse undisclosed information about MetLife's business, prospects and financial condition as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MetLife and its business issued or adopted by the Company materially false and misleading.

61. In particular, pursuant to the Audit Committee Charter, the members of the Board who were also members of the Audit Committee of the Board, part of their duties, were to monitor: (i) the Company's accounting and financial reporting processes; (ii) the audits of the Company's financial statements; (iii) the adequacy of the Company's internal control over financial reporting; and (iv) the Company's compliance with legal and regulatory requirements. With respect to compliance with state and regulatory requirements, the Audit Committee was required to do the following:

(a) Periodically discuss the Company's guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management;

(b) Review with management, the internal auditor and the independent auditor, any correspondence with regulators or governmental agencies and any employee complaints or published reports that are brought to its attention that raise material issues regarding the Company's financial statements or accounting policies; and

(c) Receive reports from the Company's General Counsel concerning significant legal and regulatory matters.

62.     During fiscal year 2009 ("FY09"), defendants Sicchitano (Chairman of the Audit Committee), Burwell, Grisé, Keane, Kelly, Kinney and Price served on the Company's Audit Committee and issued a report recommending that the audited consolidated financial results be included in the Form 10-K for the fiscal year ended December 31, 2009.

63.     During FY10, defendants Sicchitano, Grisé, Keane, Kelly, Kinney and Price served on the Company's Audit Committee and issued a report recommending the inclusion of the FY10 audited consolidated financial results to be included in the Form 10-K for fiscal year ended December 31, 2010.

## V.     FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

64.     On February 2, 2010, the Company issued a press release announcing its 4Q09 and FY09 financial results.  The Company's reported 4Q09 results included reported false overall and segment operating earnings of $793 million and $0.96 earnings per share ("EPS") for 4Q09, which beat Wall Street analysts consensus estimates of $0.95 by one penny.  The press release also made false statements concerning purported solid underwriting, including underwriting results in group and individual life products:

**MetLife Announces Fourth Quarter and Full Year 2009 Results**

*        *        *

MetLife, Inc. . . . today reported fourth quarter 2009 net income of $289 million, or $0.35 per share, which reflects net investment gains and losses.  Operating earnings for the fourth quarter of 2009 were $793 million, or $0.96 per share.

*Operating earnings for the full year 2009 were $2.4 billion, or $2.87 per share*.

*        *        *

"*MetLife delivered a very strong fourth quarter, with operating earnings significantly higher than a year ago, and both our fourth quarter and full year 2009 earnings are above the estimates we provided at Investor Day in December,*"

said C. Robert Henrikson, chairman, president & chief executive officer of MetLife, Inc. . . . *Furthermore, in 2009 we had solid underwriting, better expense margins as well as both improving investment income and declining investment losses*."[1]

\* \* \*

## U.S. BUSINESS

\* \* \*

- *Operating earnings of $882 million, up significantly from $277 million*, largely due to strong business growth, [and] significant equity market improvements . . . .

Insurance Products

\* \* \*

*Insurance Products operating earnings were $400 million, up 55%* due in large part to higher net investment income, *solid underwriting results in both group life and individual life* . . . .

Retirement Products

Premiums, fees & other revenues for Retirement Products were $732 million, up 32% on increased sales of immediate annuities and higher fee income.

65. On February 3, 2010, the Company hosted a conference call for analysts and investors

to discuss the 4Q09 and FY09 results. The call was hosted by defendants Henrikson, Kandarian and

---

[1] According to the Company's February 26, 2010 Form 10-K for the period ended December 31, 2009, "operating earnings" is the measure of segment profit or loss the Company uses to evaluate segment performance and allocate resources. Consistent with GAAP accounting guidance for segment reporting, it is the Company's measure of segment performance reported below. Operating earnings is not determined in accordance with GAAP and should not be viewed as a substitute for GAAP income (loss) from continuing operations, net of income tax. However, the Company believes the presentation of operating earnings herein as we measure it for management purposes enhances the understanding of segment performance by highlighting the results from operations and the underlying profitability drivers of the businesses. Operating earnings is defined as operating revenues less operating expenses, net of income tax. According to the Company, operating earnings is also an important feature of the Company's incentive compensation program.

Wheeler.  During the call, defendants repeated the false financial results reported in the February 2, 2010 press release and discussed the false favorable mortality ratios for the quarter and for FY09 in its insurance business, particularly in individual life and group life:

> [WHEELER:] The growth of insurance products revenues of 8% in the fourth quarter reflects across-the-board strength in Group life, Individual Life and non-medical health.

*     *     *

> ***Turning to our operating margins, lets start with our underwriting results. In US business, our mortality results were very strong in both Group Life and Individual Life with full-year mortality ratios coming in below investor day ranges. The Group Life mortality ratio for the quarter was 89.7.%*** bringing the full year ratio to 90.3 % versus our estimated range of 91% to 93%. ***Our individual mortality ratio for the quarter was 81.1%***, bringing the full-year ratio to 82.5% versus our estimated range of 84% to 86%.

66.     Securities analysts and investors viewed the February 2, 2010 financial reports and information provided in the February 3, 2010 conference call as positive news for the Company, which according to defendants had rebounded significantly from the downturn and financial crisis, which began in 2008 and had carried through 2009.  For example, on February 3, 2010, Morgan Stanley published a report entitled "MetLife Regaining Solid Momentum," which substantially repeated the Company's false 4Q09 and FY09 results highlighting performance of the Company's U.S. insurance business, favorable mortality trends in the individual life business and the likely impact of the anticipated acquisition of ALICO, the American International Group, Inc.'s ("AIG") international life insurance business:

**MetLife**

**Regaining Solid Momentum**

***We were encouraged by MetLife's results, with operating earnings beating our expectations, very strong business growth almost across the board*** . . . .

*. . . Operating EPS was $0.96, although excluding a range of abnormal items, management put core EPS at $0.97, beating both our estimate of $0.93 and the consensus at $0.95*.

\*      \*      \*

**Insurance earnings:** *Earnings ran $90 million ahead of expectations, with the largest upside being in individual life insurance on favorable mortality trends in the quarter*.

\*      \*      \*

*From an earnings perspective, results came in considerably ahead of expectations, driven mostly by its individual life insurance operations where the company benefited from favorable claims trends*.

67. After the Company's press release announcing its 4Q09 and FY09 financial results, MetLife's shares traded at prices above $33.00 per share.

68. On February 26, 2010, the Company filed with the SEC its Form 10-K for the year ended December 31, 2009. The Form 10-K was signed by defendant Henrikson and other members of the Board.[2] The February 26, 2010 Form 10-K repeated the false 4Q09 and FY09 financial results reported in the February 2, 2010 press release. In addition to the false financial results, which materially overstated reported income and operating earnings, the February 26, 2010 Form 10-K also misrepresented the Company's compliance with GAAP and failed to account for known liabilities for policyholders, who defendants knew but disregarded had already died, the February 26, 2010 Form 10-K also made the following false representations concerning policyholder funds and

---

[2] The February 26, 2010 Form 10-K for the year ended December 31, 2009 was also signed by Burwell, Wright, Grisé, Hubbard, Keane, Kilts, Kinney, Price, Satcher, Sicchitano, Wang, Wheeler and Carlson.

described the manner in which the Company set and adjusted its IBNR reserves, including liabilities

for deaths that had occurred but had not yet been reported:

> *We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies* or becomes disabled or upon the occurrence of other covered events, or to provide for future annuity payments. *We compute the amounts for actuarial liabilities reported in our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP").*

> *Liability for Future Policy Benefits and Policyholder Account Balances*

> The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities and non-medical health insurance. . . . *Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards*. Principal assumptions used in the establishment of liabilities for future policy benefits are mortality . . . .

> \*    \*    \*

> Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established.

> \*    \*    \*

> *Other Policyholder Funds*

> \*    \*    \*

> The liability for policy and contract claims generally relates to incurred but not reported death, disability, long-term care and dental claims, as well as claims that have been reported but not yet settled. The liability for these claims is based on the Company's estimated ultimate cost of settling all claims. The Company derives estimates for the development of incurred but not reported claims principally from actuarial analyses of historical patterns of claims and claims development for each line of business.

69.     The February 26, 2010 Form 10-K was accompanied by the required certifications of

defendants Henrikson and Wheeler pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002,

which stated as follows:

1.     I have reviewed this annual report on Form 10-K of MetLife, Inc.;

2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** . . . ;

3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** . . .;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

\*       \*       \*

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding ***the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

\*       \*       \*

d) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*** . . . .

### A.   MetLife Announces Agreement to Purchase AIG's International Life Insurance Business "ALICO" for $15.5 Billion

70.   On March 5, 2010, the Company announced that it would enter into an agreement with AIG to purchase AIG's ALICO unit for approximately $15.5 billion. The Company announced that it expected to finance the deal by issuing $8.7 billion in equity and $6.8 billion in cash. On March 8, 2010, the Company issued a press release announcing the same, including describing an Investor Rights Agreement that would require AIG to hold its MetLife stock for a defined time period, later disclosed to be at least nine months:

- 23 -

**MetLife to Acquire American Life Insurance Company from American International Group for Approximately $15.5 Billion**

*       *       *

NEW YORK, Mar 08, 2010 (BUSINESS WIRE) – MetLife, Inc. (NYSE: MET) announced today a definitive agreement to acquire one of American International Group, Inc.'s (AIG) international subsidiaries, American Life Insurance Company (ALICO), for approximately $15.5 billion. The consideration will consist of $6.8 billion in cash and approximately $8.7 billion in MetLife equity securities, subject to closing adjustments.

Specifically, the equity security portion of the purchase price will consist of 78.2 million shares of MetLife common stock valued at $3.0 billion, 6.9 million shares of contingent convertible preferred stock valued at $2.7 billion and 40 million equity units having an aggregate stated value of $3.0 billion.

*       *       *

*MetLife and AIG will enter into an Investor Rights Agreement which will, among other things, require AIG to hold specified amounts of MetLife securities for certain designated periods of time. Certain lock-ups will begin to expire nine months after closing. The ALICO special purpose vehicle intends to monetize the MetLife securities over time, subject to market conditions, following the lapse of agreed-upon minimum holding periods.*

71.    On March 8, 2010, the Company held a conference call for analysts and investors to discuss the agreement and announcement that MetLife would acquire ALICO from AIG for $15.5 billion. The call was hosted by defendants Henrikson, Kandarian and Wheeler. During the call, defendants further explained the terms of the ALICO acquisition and, in particular, the terms of 78.2 million common stock and 6.9 million in convertible preferred shares scheduled to later convert into MetLife common shares and staged lock-up periods to which AIG would be subject. The number of shares to be delivered to AIG would be fixed and, pursuant to the lock-up agreement, AIG would not be permitted to sell any of its MetLife shares acquired in the acquisition until at least nine months after the close of the deal:

[WHEELER:] [W]e are paying approximately $15.5 billion to acquire Alico and it is a mixture of cash and MetLife equity and convertible equity units. . . . 78.2 million common shares and 6.9 million shares of a non-cumulative perpetual preferred stock,

- 24 -

which is convertible into 68.6 million common shares. You should think of these convertible preferreds as common equivalent securities. ***And for both the common and common equivalent securities, these share amounts are fixed***.

\* \* \*

***And with respect to the MetLife equity and mandatory converts held by AIG, these are subject to staged lockups and volume limitations to ensure that they are disposed of in an orderly manner***.

\* \* \*

[ANALYST:] Can you give us a little bit more detail about the staged lockup? . . .

[HENRIKSON:] . . . ***Nine months after closing, they have the ability to sell up to 50% of their holdings and that would – think of that as both the common and the common equivalents***.

\* \* \*

***Then at three months later, they have the right to sell another 50% and these are obviously when they can first do it and the maximum amounts we don't know actually what they will do***.

72.     Between March 5, 2010 and March 9, 2010, MetLife's stock price rose from a close of $38.92 to $40.81.

73.     On March 15, 2010, defendant Wheeler gave a presentation on behalf of MetLife at the UBS Asset Gatherers' Conference. During the presentation, Wheeler bragged (falsely) of the Company's underwriting and expense management including low mortality ratios and, in particular, stating that they were lower than they had been in all of the years he has been CFO:

[WHEELER:] Underwriting experience and expense management, a couple of interesting charts here. We obviously sell a lot of different types of life – or insurance. Both has a mortality or a morbidity angle to it. ***And what's interesting to me about our mortality experience, which is mainly through Group Life or Individual Life*** . . . .

***The mortality experience we had in 2009 was better than any time since I've been CFO*** . . . .

74.     On April 29, 2010, the Company issued a press release announcing MetLife's 1Q10 financial results.  The Company's report of materially false operating earnings of $1.01 EPS beat Wall Street analyst consensus expectations of $0.97 per share.  The press release made materially false and misleading statements regarding the Company's expense savings efforts, and favorable underwriting as contributing factors in its reported financial performance.  The press release stated as follows:

**MetLife Announces Strong First Quarter 2010 Results**

                    *       *       *

MetLife, Inc. . . . today reported first quarter 2010 net income of $805 million, or $0.97 per share, which reflects net investment gains and losses.  ***Operating earnings for the first quarter of 2010 were $834 million, or $1.01 per share***.

        "MetLife delivered very strong first quarter results, generating significant earnings growth . . . "Improved equity market levels, ***solid underwriting results and our expense savings efforts also contributed to our strong performance in the quarter***."

                    *       *       *

**U.S. BUSINESS**

                    *       *       *

<u>Insurance Products</u>

                    *       *       *

        ***Operating earnings for Insurance Products were $298 million, up 92% due in large part to higher net investment income, favorable group life underwriting results and lower expenses***.

<u>Retirement Products</u>

                    *       *       *

        ***Operating earnings for Retirement Products were $159 million, compared with a $118 million operating loss***.

75.     On April 30, 2010, Wells Fargo Securities issued a report entitled "MetLife Inc., MET: Snoopy Gets His Groove; Q1 Results Look Like 'New Normal.'"  The report repeated the false financial results in the April 29, 2010 press release:

**MetLife, Inc.**

- ***MetLife reported Q1 operating earnings of $1.01, higher than our estimate of $0.95 and the consensus of $0.97****. . . .*  We believe MET shares will react positively to the earnings results.

                    *        *        *

- ***MetLife reported U.S. Insurance operating earnings of $298 million, up 92% from Q1 2009 though lower than our $321 expectation****. . . .*

- ***Annuities reported operating income of $159 million in Q1 2010, better than the operation loss produced in Q1 2009****.*

                    *        *        *

  ***Group Life earnings of $118 million were 38.8% higher than Q1 2009 operating earnings and better than our modeled result, primarily due to lower expenses****. . . .*

  ***Individual Life operating earnings of $115 million were meaningfully better than the $20 million reported for the first quarter of last year****. . . .*

76.     On April 30, 2010, after the Company's press release announcing its 1Q10 financial results, defendants held a conference call for analysts and investors to discuss the details of the results.  During the call, in addition to reiterating the Company's financials as reported in the press release, defendants made false and misleading statements concerning the Company's operating earnings and margins, disciplined underwriting, mortality ratios and expense management:

  [HENRIKSON:] Thank you, Connor, and good morning, everyone.  We are off to an excellent start in 2010, delivering strong results across the board.

                    *        *        *

  ***The growth we're seeing in the bottom line demonstrates the discipline we have maintained in our underwriting, pricing, risk management and expense control****.*

- 27 -

\*      \*      \*

[WHEELER:] ***MetLife reported $1.01 of operating earnings per share for the first quarter***.  As Rob mentioned, this strong bottom-line result represents solid business growth, higher investment income, improved equity markets ***and the results of our expense management efforts***.

\*      \*      \*

***Turning to our operating margins, let's start with our underwriting results. In US Business, our mortality results were mixed this quarter.  The Group Life mortality ratio for the quarter was 89.5% versus our estimated range of 90% to 95%, which is an excellent result***.  Our individual life mortality ratio for the quarter was 87.6%, which is slightly below our plan.

\*      \*      \*

[MULLANEY:] ***But I think the real testament to the way that we run our business is in the mortality ratio.  And we had one of the strongest mortality ratios that we've had in Group Life in the first quarter*** . . . .

77.     Similarly, on May 11, 2010, Mullaney gave a presentation at the UBS Global Financial Services Conference.  Mullaney again discussed the Company's 1Q10 false financial results and false strong reported mortality ratios, risk management discipline and the positive impact on the Company's underwriting results:

[MULLANEY:] ***We have also maintained our pricing and risk management discipline***.

\*      \*      \*

***Now let's talk a little bit about underwriting and expense management, because even though we had a strong performance in the first quarter as it relates to investment earnings, we also had very good performance both from an underwriting perspective as well as an expense management***.  And because of that, those were two key areas that really drove the strong performance that we had overall for the quarter.

***. . . [O]ur group mortality ratio for the quarter, 89.5%***.

We typically target to have that ratio somewhere between 90 and 94%.  A number of companies that reported in the first quarter, so [average] mortality in both their group area as well as in their individual business, ***we did not see that at all***.

- 28 -

*We had a very, very strong mortality quarter in our group life business. It may actually be the best mortality quarter that we have had for a first quarter in Group life.*

Group life seasonally tends to be a little higher from a mortality perspective, but *we really had a strong underwriting quarter in the first quarter, and I think that really is reflective of the discipline that we've used in terms of managing that book of business* and pricing new business as well as renewal businesses in our group life (inaudible)[.]

Individual mortality, 87.6%, it's higher than we saw in the first quarter of last year when the mortality was unusually good. But 87.6% is right about at plan. It's right about what we expected in terms of individual mortality for the first quarter, so we were pretty pleased with that result.

78.     On May 12, 2010, MetLife's stock price closed at $43.84 per share.

79.     Defendants' representations in ¶¶64-69 concerning: (i) reported financial results for 4Q09, FY09 and 1Q10, in particular, reported income and overall segment operating earnings for each period; (ii) strong or disciplined underwriting results and expense management (¶64); and (iii) reported mortality results and experience (¶¶65, 66), were each knowingly or recklessly false when made for all the reasons set forth in ¶¶86(a)-(o) below.

80.     On July 29, 2010, the Company issued a press release announcing its 2Q10 financial results. The press release again falsely touted strong net income, operating earnings, strong underwriting results in group life, including operating earnings in insurance products, based in part on the Company's disciplined approach to expense management. The press release stated as follows:

**MetLife Announces Strong Second Quarter 2010 Results**

*          *          *

MetLife, Inc. . . . today reported second quarter 2010 net income of $1.5 billion, or $1.84 per share. Net income reflects net investment gains of $767 million, after tax, including gains on derivatives. *Operating earnings for the second quarter of 2010 were $1.0 billion, or $1.23 per share*.

- 29 -

"MetLife continued to deliver strong . . . and *increased operating earnings by 41% over the prior* year period," . . . "*Highlights of the quarter included strong underwriting results, higher net investment income and our disciplined approach to expense management*."

\*　　\*　　\*

**U.S. BUSINESS**

\*　　\*　　\*

- *Excellent underwriting results in group life; improved experience in dental and solid underwriting results in individual life*

\*　　\*　　\*

- *Operating earnings of $918 million, up 39% due to favorable underwriting, higher net investment income and lower expenses*

Insurance Products

\*　　\*　　\*

*Operating earnings for Insurance Products were $369 million, up 29% due to favorable underwriting, higher net investment income and lower expenses*.

Retirement Products

\*　　\*　　\*

*Operating earnings for Retirement Products were $238 million, up 66%*.

81.　　On July 29, 2010, after the Company reported its financial results, securities analysts raved about the EPS results and specifically about the Company's financial performance including operating earnings above consensus estimates and reported favorable mortality results.  For example, Credit Suisse issued a report entitled "Read On 2Q10," which stated as follows:

**MET reported operating earnings of $1.23, well above the consensus estimate of $1.00**. . . . *[T]he $144 million of "normalized" group life earnings were unusually strong, driven by favorable mortality results*.

\*　　\*　　\*

*[T]he group life mortality ratio was just 86.6%, compared to 89-90% in the past four quarters*.

- 30 -

82.     On July 30, 2010, the Company held a conference call for analysts and investors to discuss the Company's 2Q10 results.  The call was hosted by defendants Henrikson, Kandarian, Wheeler, Mullaney and Carlson.  Defendants reiterated the false financial results in the July 29, 2010 press release and added the following false statements concerning the Company's underwriting results and mortality ratios:

> [WHEELER:] *Operating margins – turning to our operating margins, let's talk about underwriting results.  In US Business, our mortality results were quite strong this quarter*.  *The Group Life mortality ratio for the quarter was 86.6% versus our estimated range of 90% to 95%, which is an excellent result.  Our Individual life mortality ratio for the quarter was 80.4%.  While higher than the exceptionally strong prior-year quarter of 74.9%, the results were quite favorable and well below our plan*.

83.     On July 30, 2010, Morgan Stanley issued a report entitled "Delivering the Results in a Tough Environment," relating to the 2Q10 results which encouraged investors, based upon defendants' reported results, to accumulate their positions in the stock:

**Delivering the Results in a Tough Environment**

*       *       *

**Key Results Highlights:** MetLife reported 2Q10 operating EPS of $1.23, versus both our estimate and the consensus of $1.00.  Excluding a broad range of items, core operating EPS was $1.11.  Among the divisions, there existed solid upside almost across the board, although the insurance products division drove most of the upside surprise.

*       *       *

*Insurance product earnings ran considerably above expectations, reflecting favorable mortality, and to a lesser-extent, strong spreads and tightly controlled expenses*.

84.     After the July 29, 2010 press release and July 30, 2010 conference call, the Company's stock traded at artificially inflated prices upwards of $40.00 per share.

85.     On August 2, 2010, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2010.  The Form 10-Q, signed by Carlson, Executive Vice President of Finance

Operations and Chief Accounting Officer, substantially repeated the false 2Q10 financial results reported in the July 29, 2010 press release. In addition, in discussing the New York Attorney General's investigation and the manner in which the Company treats its retained asset accounts, the Company stated that any allegations that its retained asset accounts or the treatment of funds therein, including disclosures regarding the same, violated any state or federal laws were "*without merit*" and, in any event, would not affect the financial statements taken as a whole:

*Retained Asset Account Matters*

*       *       *

The New York Attorney General recently announced that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts and that subpoenas requesting comprehensive data related to retained asset accounts have been served on MetLife and other insurance carriers. We received the subpoena on July 30, 2010. It is possible that other state and federal regulators or legislative bodies may pursue similar investigations or make related inquiries. We cannot predict what effect any such investigations might have on our earnings or the availability of the TCA, but *we believe that our financial statements taken as a whole would not be materially affected. We believe that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit*.

86. Defendants' representations in ¶¶64-85 concerning: (i) reported financial results for 4Q09, FY09, 1Q10 and 2Q10, in particular, reported income and overall segment operating earnings for each period; (ii) strong or disciplined underwriting results and expense management (¶¶64,65, 76); and (iii) reported mortality results and experience (¶¶81-83), were each knowingly or recklessly false when made for the following reasons:

(a) Defendants knew or recklessly disregarded that 4Q09 financial results and FY09 financial results, as reported in the February 26, 2010 Form 10-K and 1Q10 and 2Q10 reported financial results, particularly reported income and operating earnings were materially misstated both quantitatively and qualitatively. Because the Company, for years prior to the Class

Period and during the Class Period, admittedly failed to account for known incurred liabilities (deaths of policyholders that the Company actually knew of or had reason to know of), which MetLife owed benefits to beneficiaries or state authorities pursuant to unclaimed property laws, defendants knowingly or recklessly caused the Company's income and operating earnings to be materially misstated. *See* ¶¶150-167; *see also* Section VIII, MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules;

(b)     In addition, the Company's 4Q09, FY09, 1Q10 and 2Q10 financial statements were false and misleading for all of the reasons set forth below in Section VIII, MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules;

(c)     Defendants also knew that the Company had, for years, systematically used the SSA-DMF across its business units for purposes beneficial to the Company's bottom line, including stopping payments to annuitants identified in the SSA-DMF, responding to regulatory agency inquiries, and complying settlement agreements in litigation. Defendants also knew, through the prior utilization of the SSA-DMF, that the Company was in possession of, or had access to, information that was strong evidence of death of policyholders and knew that the Company's processes and procedures were designed or implemented to largely ignore that evidence or information to the extent that it would require locating beneficiaries, escheating monies to state agencies or increasing reserves – all of which would negatively impact operating earnings;

(d)     Had defendants utilized the SSA-DMF to identify deceased policyholders ***and*** recognized known incurred liabilities, paid beneficiaries or properly escheated monies to the states as required by state law and insurance regulations, the Company would have reported operating earnings of materially less than $0.96 reported in 4Q09, $2.87 in FY09, $1.01 in 1Q10 and $1.23 in 2Q10;

(e)     Defendants admit, contrary to representations that its financial statements taken as a whole would not be materially impacted by investigations into its retained asset accounts, charges to earnings would do just that.  In October 2011, the Company was forced to disclose that because of its failure to incorporate information known or accessible to the Company through utilization of the SSA-DMF, its liabilities were in excess of its reserves.  Thus, because the Company had failed to properly account for deaths it actually knew, or should have known of, the Company would take a $117 million after-tax charge, and operating earnings were reduced by $0.11 operating earnings per share in 3Q11 alone.  ¶¶135-139;

(f)     Defendants' statements, in ¶¶64, 65, 74, 76, 77, 80, 82, regarding the Company's purported solid underwriting experience and results in group life and individual life products and better expense savings efforts were also knowingly materially false and misleading when they were made.  In truth, defendants knew but failed to disclose that the reported underwriting results in both group life and individual life for 4Q09, FY09 and 1Q10 and 2Q10, to the extent that they contributed to purported strong financial performance was in part due to the Company's known failure to identify, account for and pay beneficiaries of policyholders the Company actually knew had died or had reason to know had died, and died long ago;

(g)     In addition, defendants knew or recklessly disregarded that its statements concerning expense management (¶¶74, 76, 77), July 29, 2010 and July 30, 2010 (¶¶80-84), were false when made.  In truth, as the Company has now admitted, in addition to the reasons set forth above, defendants' reported expense management was in part due to the Company's failure to escheat monies (unclaimed property), belonging to policyholders' beneficiaries, which had not been claimed, and that the Company owed to states pursuant to state unclaimed property laws.  Defendants' knowing failure to recognize and account for known liabilities and expenses caused

- 34 -

their public statements about strong underwriting and expense management and their purported contribution to strong financial results to be knowingly and materially false and misleading;

(h) Defendants' statements on February 2 and February 3, 2010 (¶¶65, 66, 68), March 15, 2010 (¶73), April 30, 2010 (¶¶75, 76), July 29, 2010 and July 30, 2010 (¶¶80-84), concerning the Company's favorable mortality results, including an individual life mortality ratio of 81.1% and group life mortality ratio of 89.7% for 4Q09; 89.5% group life and 87.6% individual life for 1Q10; and 86.6% group life and 80.4% individual life for 2Q10, were also knowingly or recklessly false and misleading when made. In truth, defendants knew or recklessly disregarded that the favorable reported mortality ratios (which were purportedly more favorable than its competitors' reported mortality ratios) were similarly due to the Company's failure to account for known deaths of policyholders or access to evidence of death of policyholders. Defendants' failure to account for and include known evidence of death and liabilities into its risk assumptions and results materially skewed the reported mortality ratios to be favorable for the Company as opposed to the true, less favorable mortality experience. On October 27, 2011, when the Company reported its financial results for 3Q11, which included the $117 million charge to earnings related to the failure to utilize the SSA-DMF, for purposes designed to actually locate and pay policyholder beneficiaries as opposed to avoiding payments, the Company reported sharply increased mortality ratios including *98.5% for group life and 98.5 % for individual life*. The increase in reported mortality ratios was admittedly due to the $117 million reserve charge. ¶142;

(i) As alleged herein, defendants misrepresented the Company's mortality experience throughout the Class Period. The chart below shows reported mortality ratios in group and individual life between 1Q09 and 3Q11, evidencing the long-term favorable impact of undisclosed truth concerning the failure to utilize the SSA-DMF to calculate the true mortality ratios:

| Reported Mortality Ratios During the Relevant Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1Q09 | 2Q09 | 3Q09 | 4Q09 | 1Q10 | 2Q10 | 3Q10 | 4Q10 | 1Q11 | 2Q11 | 3Q11 |
| Reported Mortality Ratio | G 92.2% I 82.6% | G 91.3% I 74.9% | G 92.2% I 91.1% | G 89.7% I 81.1% | G 89.5% I 87.6% | G 86.6% I 80.4% | G 89% I 86.7% | G 89.7% I 82.9% | G 88.2% I 92.5% | G 82.1% I 84.4% | *G 98.5% I 98.5%* |

(j)        In addition to the above, the Company's financial statements for 4Q09, FY09 and 1Q10 and 2Q10 in their entirety, including the consolidated results reported in the February 26, 2010 Form 10-K were knowingly or recklessly false and misleading.  Defendants knew but failed to disclose and have now admitted that monies for years, including the Class Period, effectively reported as assets as opposed to liabilities, likely hundreds of millions of dollars belonging to beneficiaries of policyholders related to its individual life insurance policies, group life insurance policies, annuities, life insurance with retained asset account features or should have been escheated to the states as opposed to being withheld by MetLife, and invested for its own account to inflate the Company's balance sheet.  *See* ¶¶150-167.  MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules;

(k)        Defendants Henrikson's and Wheeler's Sarbanes-Oxley certifications dated February 26, 2010 were also materially false.  Defendants also knew or deliberately disregarded that its internal controls and practices and procedures were designed and/or implemented *to ignore*, for purposes of paying beneficiaries, escheating monies to states or increasing reserves, reliable evidence in the Company's possession or available to it, of death of policyholders, which required the Company to pay.  These deficiencies in the Company's internal controls adversely affected the Company's financial reporting and defendants knew or recklessly disregarded the facts.  The Company has admitted that for at least 30 years it has used the SSA-DMF and for 15 or more years has used it "systematically" for certain parts of its business, in particular its annuities business.  *See* ¶123.  *See generally* Exhibits A and B, attached hereto.  The Company has also admitted in 2007

that it used the SSA-DMF to match individual life policies and that match process revealed that the Company held **at least $80 million** that had belonged to policyholder beneficiaries or should have been escheated to states. Some of those policyholders died in the 1970s;

(l)    Moreover, as further evidence of defendants' knowledge and intent to withhold beneficiaries' monies or ignore evidence of death in its possession, defendants admit even when the Company conducted the 2007 SSA-DMF match, when the Company found a death that had occurred years before 2007 it used June 1, 2007 as the beginning of the dormancy period, which starts the clock for the state escheatment of unclaimed property to states. For example, defendants admitted during testimony before insurance regulators on May 19, 2011 and May 23, 2011 that as part of a 2007 match of individual life policies against the SSA-DMF, when they found and confirmed that the death of a policyholder had occurred in the 1960s or 1970s, the Company generally and intentionally used June 1, 2007 as the date of proof of death to start the dormancy period;

(m)    Defendants knew but failed to disclose that notwithstanding knowledge based upon the running of a SSA-DMF match against its individual life policies in 2007 that the Company had possession of beneficiary monies that should have been reserved for, paid to beneficiaries or escheated to the state, it had never, for purposes of determining whether it was holding monies belonging to policyholder beneficiaries, run a SSA-DMF match against its **group life policies**. *See* ¶123. *See also* Exhibits A and B. Moreover, as of May 2011, the Company still had not used the

SSA-DMF to match against group life policies.[3] Nor did the Company reserve for the reasonable likelihood, based on its knowledge of information available to it that significant money was owed to the beneficiaries of group life policyholders;

(n)     Defendants also knew but failed to disclose that the Company had in its possession monies that had not been paid to beneficiaries and had not been escheated to the states that were due to policyholder beneficiaries of ***industrial policies***; policies, which had been sold door-to-door to low-income families more than 50 years ago that the Company had stopped selling in 1964;

(o)     Defendants admit that the Company had in place written policies about the usage of the SSA-DMF, knew and understood how to access and use the information in the SSA-DMF and how such usage pertained to its businesses. Company executives have testified that the Company understood that making annuity payments to deceased annuitants would result in economic losses to the Company that were likely not recoverable. Thus, the Company instituted or applied policies to match annuity contracts against the SSA-DMF to avoid such losses. Conversely, defendants knew or recklessly disregarded that maintaining or withholding death benefits from beneficiaries even where the Company knew the policyholder was deceased, would be and in fact was financially beneficial to the Company such that reported earnings would be inflated and expenses and liabilities would appear to be less than the Company's actual experience.

---

[3]     As alleged in ¶142 *infra*, when defendants took the charge to earnings of $117 million in 3Q11, 75% was related to group life matches in the SSA-DMF.

707139_1

**B.    MetLife Prices Secondary Offering of 75 Million Shares at $42.00 Per Share to Acquire AIG International Life Insurance Business ALICO**

87.    On August 2, 2010, the Company issued a press release announcing that it had priced a secondary offering of 75 million shares of MetLife stock at $42.00 per share to fund the purchase of ALICO from AIG:

**MetLife Prices Public Offering of Common Stock**

*        *        *

MetLife, Inc. . . . announced today that it has priced a public offering of 75 million shares of common stock at $42.00 per share for gross proceeds of $3.15 billion.  In addition, the underwriters have an option to purchase an additional 11.25 million shares of common stock to cover over-allotments, if any.

Net proceeds from the sale of the common stock will be used to help finance the $6.8 billion cash portion of the purchase price for MetLife's previously announced acquisition of American Life Insurance Company from American International Group, Inc.  In addition to the common stock offering, MetLife also plans to offer approximately $3 billion in senior debt in several series with varying maturities and interest rates.  The remainder of the cash portion of the purchase price will be funded with cash on hand.

88.    On August 3, 2010, the Company filed with the SEC a Form 424(b)(5) Prospectus Supplement (the "August 3, 2010 Registration Statement") setting forth the terms of a common stock, debt and equity offering in connection with the acquisition of AIG's ALICO international life insurance business.[4]   The August 3, 2010 Registration Statement was issued pursuant to the Company's November 6, 2007 Prospectus.[5]

--------------------------------

[4]    The August 3, 2010 Registration Statement incorporated the following documents by reference:

Annual Report on Form 10-K for the year ended December 31, 2009; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010; Definitive Proxy Statement filed on March 23, 2010; Registration Statement on Form

- 39 -

89.     The August 3, 2010 Registration Statement incorporated by reference the Form 10-K

for fiscal year ended December 31, 2009 and Forms 10-Q for periods ended March 31, 2010 and

June 30, 2010, each of which contained knowing or reckless false financial statements as detailed

above at ¶86(a)-(o) and further explained below.  *See* MetLife's Financial Statements Were

Materially Misstated in Violation of GAAP and SEC Disclosure Rules, *infra* ¶¶150-167.

90.     On August 6, 2010, the Company issued a press release announcing that it had

completed the offering of 86.25 million shares of its common stock and raised gross proceeds of

$3.6 billion:

**MetLife Completes Public Offerings**

NEW YORK, Aug 06, 2010 (BUSINESS WIRE) –

MetLife, Inc. (NYSE: MET) announced today that it has closed its recently announced public offering of 75 million shares of common stock and issued an additional 11.25 million shares of common stock pursuant to the exercise in full by the underwriters of their over-allotment option.  The total offering of 86.25 million shares produced gross proceeds of approximately $3.6 billion.

MetLife also has closed its public offerings of $3 billion in aggregate principal amount of senior debt in several series with varying maturities and interest rates.

---

8-A, relating to MetLife, Inc.'s common stock and Series A Junior Participating Preferred Stock purchase rights, filed on March 31, 2000, as amended and restated by the Registration Statement on Form 8-A/A, Amendment No. 1 filed on March 11, 2010; and Current Reports on Form 8-K filed on January 29, 2010, February 22, 2010, March 5, 2010, March 11, 2010, April 13, 2010, May 3, 2010, May 7, 2010, May 17, 2010 and August 2, 2010.

[5]     On November 6, 2007, the Company filed a Form S-3 Registration Statement with the SEC for the offering of securities through underwriting syndicates managed or co-managed by one or more underwriters, through agents or directly to purchasers.

707139_1

Net proceeds from the common stock and senior debt offerings will be used to help finance the company's previously announced acquisition of American Life Insurance Company from American International Group, Inc. . . . .

91. On August 6, 2010, MetLife's share price closed at $41.42.

92. On October 28, 2010, the Company reported its 3Q10 financial results in a press release, boasting of increased operating earnings, strong underwriting and lower expenses, particularly in the Company's insurance business:

**MetLife Announces Third Quarter 2010 Results**

\*     \*     \*

NEW YORK, Oct 28, 2010 (BUSINESS WIRE) –

MetLife, Inc. (NYSE: MET) today reported third quarter 2010 net income of $286 million, or $0.32 per share, which reflects net investment and net derivatives gains and losses. ***Operating earnings for the third quarter of 2010 were $878 million, or $0.99 per share***.

"***MetLife has delivered another strong quarter as we grew our top line and also increased operating earnings 22% over the third quarter of 2009***," . . . ***our focus on disciplined growth and strong underwriting contributed to the earnings increase we reported***.

\*     \*     \*

**U.S. BUSINESS**

\*     \*     \*

- Operating earnings of $764 million, up 21% ***due to solid underwriting, higher net investment income and lower expenses***

. . . ***Operating earnings for Insurance Products were $345 million, up 14% due to favorable underwriting, higher net investment income and lower expenses***.

93. On October 29, 2010, the Company held a conference call for analysts and investors to discuss the 3Q10 results. The call was hosted by defendants Henrikson, Kandarian, Wheeler and Mullaney. During the call, in addition to repeating the false financial results in the October 28, 2010

- 41 -

press release, defendants again boasted falsely of increased operating earnings, strong underwriting results, expense management and very good mortality ratios:

> [HENRIKSON:] Turning to our domestic business segment results, US business generated premium fees and other revenues of $7.1 billion, flat over the prior year period though up modestly excluding the impact of lower pension close out activity which as you know can vary from quarter to quarter.
>
> *Operating earnings grew by 21% with significant increases in each of the major segments, largely driven by very strong underwriting results as well as the benefits of ongoing expense management*.
>
> In our insurance products segment . . . . And operating earnings grew 14%, up in each product line. *Group life premiums grew 2% and operating earnings were up 6% compared with the prior year period*.
>
> *The group life mortality ratio was very good at 89%, and has remained* below investor day guidance each quarter this year. . . .
>
> . . . Individual life premium fees and other revenues were down, due to unusual items in the year ago period and flat when normalized. *Operating earnings grew by 5%, reflecting solid mortality results*.

94. On November 1, 2010, the Company issued a press release announcing the completion of its acquisition of ALICO from AIG for a total of $16.2 billion:

**MetLife Completes Acquisition of American Life Insurance Company**

*       *       *

> MetLife, Inc. . . . announced today that it has completed its acquisition of American Life Insurance Company (Alico) from American International Group, Inc. (AIG) for $16.2 billion.

*       *       *

> Consideration paid by MetLife to AIG for the acquisition of Alico consisted of $7.2 billion in cash consideration after adjustments and $9.0 billion in MetLife equity and other securities, subject to closing adjustments. The securities portion of the purchase price consisted of 78.2 million shares of MetLife common stock, 6.9 million shares of contingent convertible preferred stock and 40 million equity units. The values of the common and preferred stock are based on the closing price of MetLife's common stock on October 29, the trading date prior to closing.

95.    On November 30, 2010, the Company filed a Form S-3 Shelf Registration Statement and Prospectus for the purposes of offering securities through underwriting syndicates managed or co-managed by one or more underwriters, through agents or directly using a prospectus supplement in remarketing or other resale transaction.[6]

96.    On February 9, 2011, the Company issued a press release announcing its 4Q10 and FY10 financial results.  The press release boasted of strong overall operating earnings, insurance products operating earnings and solid group life underwriting results:

**MetLife Announces Fourth Quarter and Full Year 2010 Results**

\*      \*      \*

MetLife, Inc. . . . today reported fourth quarter 2010 net income of $51 million, or $0.05 per share, ***and operating earnings of $1.2 billion, or $1.14 per share***. . . .

MetLife today also reported full year 2010 net income of $2.7 billion, or $3.00 per share.  ***Operating earnings for the full year 2010 were $3.9 billion, or $4.38 per share***.

"***Our 2010 financial results were strong, including a 65% increase in operating earnings, which is consistent with the guidance we provided in December at Investor Day***," said C. Robert Henrikson . . . .

\*      \*      \*

---

[6]    The November 30, 2010 Form S-3 incorporated by reference, the Company's Annual Report on Form 10-K and Form 10-K/A for the year ended December 31, 2009; Quarterly Reports on Form 10-Q and Form 10-Q/A for the quarter ended March 31, 2010 and Quarterly Reports on Form 10-Q for the quarters ended June 30, 2010 and September 30, 2010; the Registration Statement on Form 8-A, dated March 31, 2000, relating to registration of shares of MetLife Inc.'s common stock; Definitive Proxy Statement filed on March 23, 2010; and Current Reports on Form 8-K filed January 29, 2010, February 22, 2010, March 5, 2010, March 11, 2010, April 13, 2010, May 3, 2010, May 7, 2010, May 17, 2010, August 2, 2010, August 5, 2010, August 6, 2010, August 16, 2010, October 18, 2010, October 28, 2010, October 29, 2010, November 2, 2010, November 15, 2010 and November 30, 2010.

**U.S. BUSINESS**

\* \* \*

- *Operating earnings of $841 million, down 5% as strong results in Corporate Benefit Funding earnings were offset by lower earnings in Insurance Products and Retirement Products; increased amortization of DAC* and other adjustments as a part of the annual review of DAC assumptions reduced U.S. Business earnings by $17 million ($0.02 per share), after tax

Insurance Products

\* \* \*

*Operating earnings for Insurance Products were $309 million, down 23% as higher net investment income was more than offset by increased amortization of DAC and other adjustments*. *In addition, group life underwriting results remained solid and were consistent with fourth quarter 2009 results*.

Retirement Products

\* \* \*

*Operating earnings for Retirement Products were $175 million, down 17% as higher net investment income and separate account fees were more than offset by the impact of the company's variable annuity hedge program described above as well as less favorable unlocking of DAC and other adjustments*.

97. On February 10, 2011, after the report of the 4Q10 and FY10 financial results, the Company held a conference call for analysts and investors to discuss the results. During the call, defendants made false positive statements concerning operating earnings, purportedly favorable mortality results, underwriting and expense management. The call was hosted by Henrikson, Kandarian, Wheeler and Mullaney:

[HENRIKSON:] In US business, premiums, fees, and other revenues were $7.2 billion, down from the prior year and flat versus the prior quarter. *Operating earnings grew by 10% over the prior quarter and we were down slightly over the prior-year period. I am pleased with the financial results in US business, a direct result of our disciplined pricing and continued focus on risk management*.

. . . Group life earnings were down somewhat year-over-year as expected. Individual life earnings were down $74 million versus the prior year. The earnings

decline is almost entirely attributable to the net difference in DAC unlocking and other adjustments between years.

* * *

[WHEELER:] *MetLife reported $1.14 of operating earnings per share for the fourth quarter and $4.38 per share for the full year 2010*.

* * *

*Turning to our operating margins let's start with our underwriting results. In US business our mortality results were favorable across the board this quarter. The group life mortality ratio for the quarter was 89.7%, which was flat versus the prior-year period and in line with our expectations. For the full year group life's mortality ratio was 88.7%, right in the middle of the 2010 investor day guidance range of 88% to 90%, which is a good result*.

*Our individual life mortality ratio for the quarter was 82.9%. This quarter's results were a little higher than the very favorable prior-year quarter of 81.1%, but it's still very favorable to our plan*.

* * *

Our investment performance continued to improve, *our operating margins remained strong driven by disciplined underwriting and expense management*, and our earnings continued to grow.

98.     On February 15, 2011, defendant Wheeler spoke at the Bank of America Merrill Lynch Insurance Conference. Wheeler was a stand in for Henrikson who was in Tokyo handling matters pertaining to the ALICO acquisition. During the conference, Wheeler discussed more details concerning the 4Q10 and FY10 financial results that were announced on February 9, 2011. In addition, Wheeler made very specific comments about the Company's underwriting results and its mortality ratios:

[WHEELER:] Underwriting this quarter was only okay. It can clearly get better. Insurance product, this says from higher mortality. I think that should actually be higher morbidity. Mortality was decent for the quarter – not extraordinary, but decent.

* * *

- 45 -

Underwriting. Now, I'm going to spend a second on this chart, because these are our four most important underwriting ratios. Obviously, in almost every product we sell there is some kind of an underwriting margin element. But I picked the most important four.

*So Group Life mortality, steady. And that is just always steady for us. Our peers, not so much. But we are very disciplined about how we price product*. . . .

. . . This is clearly one of our strongest businesses and it is a very steady business for us.

*Individual Life mortality, it was up a little bit year-over-year, but you can tell – but if you look at the overall last three years, it was still a very good quarter for us*. You know, this number can move around a little bit, depending on high life claims generally. But we've kind of shown over time that *we've remained pretty disciplined here in terms of our loss experience*.

99.     On February 25, 2011, the Company filed with the SEC its Form 10-K for the fiscal year ended December 31, 2010. The Form 10-K substantially repeated the false 4Q10 and FY10 financial results reported in the February 9, 2011 press release. The Form 10-K was signed by defendants Henrikson, Burwell, Grisé, Hubbard, Keane, Kelly, Kilts, Kinney, Price, Satcher, Sicchitano, Wang, Wheeler and Carlson. In addition to the false financials, the Form 10-K also made the following false purported warning representations concerning the Company's reserve methodologies, mortality results (which were regularly reviewed) and compliance with state and regulatory capital requirements:

*We experienced excellent mortality results in our group life business due to a decrease in severity, as well as favorable reserve refinements in the current year*.

\*      \*      \*

*Liability for Future Policy Benefits and Policyholder Account Balances*

The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities, certain accident and health, and non-medical health insurance. . . . *Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards. Principal assumptions used in the establishment of liabilities for future policy benefits are mortality* . . . .

- 46 -

*    *    *

*Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established.*

*    *    *

*Other Policy-Related Balances*

*    *    *

*The liability for policy and contract claims generally relates to incurred but not reported death, disability, long-term care and dental claims, as well as claims which have been reported but not yet settled. The liability for these claims is based on the Company's estimated ultimate cost of settling all claims. The Company derives estimates for the development of incurred but not reported claims principally from actuarial analyses of historical patterns of claims and claims development for each line of business.*

100. Finally, the February 25, 2011 Form 10-K again purported to disclose that the New York Attorney General had in July 2010 launched an investigation into the manner in which the Company keeps and reports the value of its retained asset accounts. The retained asset accounts were subject to state unclaimed property laws and included monies that had not been claimed by policyholders or their beneficiaries and had not been escheated to the relevant state authorities which defendants knew based on prior utilization of the SSA-DMF to match retained asset accounts but failed to disclose these facts. Nevertheless, the Company continued to falsely assure investors, however, that while the investigations were ongoing and certain other regulatory bodies might join said investigations, any allegations that any information concerning the retained asset accounts was not disclosed or that it violated any state or federal laws were simply "*without merit*." Moreover, defendants knew but did not disclose that other state regulations had *already* initiated investigations and had developed into market conduct examinations or related inquiries into the Company's overall payment of death benefits (or failure to pay death benefits to policyholders, including holders of

- 47 -

retained assets accounts who had died long ago), regulatory investigations it was cooperating with

and producing documents:

*Retained Asset Account Matters*

The New York Attorney General announced on July 29, 2010 that his office had launched a major fraud investigation [TCA] into the life insurance industry for practices related to the use of retained asset accounts as a settlement option for death benefits and that subpoenas requesting comprehensive data related to retained asset accounts had been served on MetLife and other insurance carriers. . . . ***Management believes that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit***.

101.     The February 25, 2011 Form 10-K also purported to make the following warnings

concerning policyholder liabilities, underwriting, claims and reserve experiences and litigation

contingencies:

<u>Policyholder Liabilities</u>

***We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies. . . . We compute the amounts for actuarial liabilities reported in our consolidated financial statements in conformity with GAAP***.

102.     The February 25, 2011 Form 10-K was accompanied by the required certifications of

defendants Wheeler and Henrikson pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002,

which stated as follows:

1.     I have reviewed this annual report on Form 10-K of MetLife, Inc.;

2.     Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary*** to make the statements made, in light of the circumstances under which such statements were made, not misleading . . .;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, ***fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** . . .;

- 48 -

4.	The registrants other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

*	*	*

b)	Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

*	*	*

5.	The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrants board of directors (or persons performing the equivalent functions):

a)	All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information . . . .

103.	Each of the statements in, and in connection with, the February 25, 2011 Form 10-K was false and misleading because defendants failed to disclose material facts described in ¶¶150-167.

**C.	MetLife and AIG Jointly Offer 146 Million Shares of MetLife Common Stock Six Months Earlier than Investors Expected and Contemplated by the Agreement with AIG**

104.	On March 2, 2011, the Company issued a press release announcing the pricing of its offering of more than 146 million shares of MetLife common stock at $43.25 per share.  MetLife announced that it was offering more than 68 million of the shares for proceeds of $2.97 billion and AIG was offering more than 78 million of the shares:

**MetLife Announces Pricing Of Common Stock And Common Equity Unit Offerings**

- 49 -

– Offerings Will Eliminate AIG Ownership of MetLife Securities Received in Acquisition of Alico –

MetLife, Inc. . . . announced today that it and ALICO Holdings LLC, a subsidiary of American International Group, Inc. (AIG), have priced their combined offerings of 146,809,712 shares of MetLife common stock at $43.25 per share.

MetLife offered 68,570,000 shares of its common stock to the public for gross proceeds of $2.97 billion. . . .

AIG offered 78,239,712 shares of MetLife common stock to the public for gross proceeds of $3.38 billion.

105.    The timing of the announced 146 million share offering was a surprise to analysts and investors as it was delivered many months before an offering to sell the AIG shares was contemplated, in particular, in light of the reported Investor Rights Agreement and nine month lock-up agreement with AIG.  *See* ¶70.  Though securities analysts were initially dismayed by the announcement they concluded that the March 4, 2011 offering appeared to be designed to simply allow AIG to dispose of its MetLife shares in an orderly fashion as defendants had previously indicated was the plan.  The truth, however, which had not been disclosed, but was later admitted by the Company during testimony on May 19, 2011, was that the Company was in discussions with state regulators in the summer of 2010 concerning the Company's use or non-use of the SSA-DMF, which led to changes in the utilization of the SSA-DMF later in the year.  Company executives have testified, in particular Todd Katz, Executive Vice President U.S. Business Insurance Products, that in the summer of 2010, the Company in part due to discussions with regulators began to devise a plan toward making a decision to utilize the SSA-DMF more regularly across its business units.  According to Katz, the summer 2010 discussions and decisions to devise a plan to use the SSA-DMF regulatory were lead by his "leadership team" and then President of the U.S. Business, Mullaney, who reported directly to the CEO Henrikson.  Indeed, according to Katz, the Company had developed knowledge based upon prior and even systematic usage of the SSA-DMF that it was an

- 50 -

effective tool for identifying deceased policyholders and helpful in identifying their beneficiaries to whom benefits were owed or designating funds for escheatment to the relevant states.

106.    In December 2010, top executives at the Company, including defendant Mullaney, had decided to adopt and begin to implement internal policies that would include the utilization of the SSA-DMF in all business units on a regular basis, at least annually.  Defendants knew that such implementation would undoubtedly identify deceased policyholders and help identify their beneficiaries as it had, for example, in 2007.  This SSA-DMF matching utilization would in turn result in additional expenses, higher reported mortality rates, lower underwriting results and lower operating earnings.  Moreover, disclosure of the new procedures would highlight historical failures and falsity of prior statements including the Company's financial statements and would likely have a negative impact on MetLife's stock price.  However, MetLife consideration in the form of stock delivered to AIG to complete its consideration for ALICO was at risk of MetLife stock price declining before AIG could sell.  But AIG was subject to a nine month lock-up agreement beginning from the close date of the transactions in November 2010.

107.    Knowing these facts, defendants thus hurriedly, on March 1, 2011, entered into a "Coordination Agreement" with AIG, which would relieve AIG from its nine month lock-up restrictions, allowing for AIG to offer and sell *all 78 million shares* of MetLife common stock immediately, and require MetLife to use all of the net proceeds from the March 4, 2011 offering to fund the repurchase of the 78 million shares of common stock from AIG.[7]  The Coordination

---

[7]    The March 1, 2011 Coordination Agreement would be attached to the March 4, 2011 Registration Statement.

Agreement set the stage for the March 4, 2011 offering of 146 million shares to the public in order to raise money and pay AIG the remaining consideration for ALICO.

108.     In light of facts later disclosed, the most plausible inference to be drawn is that the MetLife defendants under intensifying scrutiny of state regulators, particularly the states of Illinois and Florida, needed to both raise cash and allow AIG to dispose of its shares prior to internal and regulator findings being publicly disclosed.  Had the true facts, which were known to defendants but concealed from the public, concerning the Company's usage and failure to use the SSA-DMF and the impact on MetLife's financial condition and financial impact of the investigations, and plan to implement new controls and usage of the SSA-DMF been disclosed, the Company and AIG risked a steep decline in the Company's stock price and thus, the value of the consideration provided to AIG. Because the number of shares MetLife delivered to AIG in November 2010 were "fixed," the Company could not fill the gap with new shares.

109.     On March 2, 2011, Janney Capital Markets issued a report entitled "MetLife . . . Thoughts on Common Stock Offering."  Janney Capital Markets, unaware of the undisclosed facts, highlighted that the offering appeared to be occurring several months in advance of previous expectations:

**MetLife (MET: Buy) - Thoughts on Common Stock Offering**

MET and AIG are selling common equity (147M shares, 14% of outstanding shares) and common equity units (40M units) this week.  As stated in MET's press release, "*The offerings are intended to provide for an orderly disposition of the MetLife securities owned by AIG.*" *We (and the rest of the world) had expected these sales to occur beginning in August of this year, the time given when AIG sold its subsidiary, Alico, to MET for cash/stock/securities in November 2010*.

110.     On March 2, 2011, Morgan Stanley issued a report entitled "MetLife Inc. Quick Comment: Surprising AIG Early Disposal Likely to Weigh on Stock."  The Morgan Stanley report

similarly discussed investor surprise at the timing of the offering, noting that it was indeed "significantly earlier" than expected:

**MetLife Inc.**

**Quick Comment: Surprising AIG Early Disposal Likely to Weigh on Stock**

*Impact on our views: **The surprising announcement that MetLife is allowing AIG to sell its entire ownership stake earlier than originally agreed upon is a sizable surprise that has the potential to meaningfully pressure MetLife's stock. Not only is the proposed sale significantly earlier than we originally expected, but we were also expecting the sale to occur in smaller amounts over an extended time frame*. . . .*

*What's new: **AIG announced its plans to sell its entire stake in MetLife, which includes 78.2 million shares** and its $3 billion of equity units. Further, it also plans to sell its contingent convertible preferred stock to MetLife, who will fund the acquisition with an equally sized common stock offering of 68.6 million shares. The net result is a pending sale of 146.8 million shares of common stock (roughly $6.8 billion based on last night's closing price) in addition to the $3 billion of equity units.*

111. On March 4, 2011, the Company filed a Form 424 (b)(5) Prospectus Supplement to the shelf registration statement and prospectus filed with the SEC on November 30, 2010 ("March 4, 2011 Registration Statement"). The March 4, 2011 Registration Statement offered 146 million shares of common stock of Met Life, including 68 million shares of the Company's common stock at $43.25 per share and AIG offering another 78 million shares of MetLife common stock. The March 4, 2011 Registration Statement, incorporated by reference, the Company's Annual Report on Form 10-K for the year ended December 31, 2010 and in Amendment No. 1 to the Form 10-K filed with the SEC on March 1, 2011. The March 4, 2011 Registration Statement also incorporated by reference, the Company's Forms 8-K filed on August 2, 2010, November 30, 2010 and March 2, 2011, each of which contained false financial statements and other misrepresentations discussed above.

112. The March 4, 2011 Registration Statement, by virtue of incorporating the February 25, 2011 Form 10-K and other financial statements, included false financial statements, in particular,

- 53 -

income, operating earnings, underwriting and mortality results. The March 4, 2011 Registration Statement made additional misrepresentations of fact and made purported warnings and repeated the disclosures concerning the New York Attorney General's investigations, and maintained false statements that the Company's retained asset accounts were adequately disclosed and any suggestion of fraud or violations of law were "without merit."

113.    On March 8, 2011, the Company issued a press release announcing that it had completed the public offering of more than 146 million shares of its common stock, raising gross proceeds of $2.97 billion and that AIG had sold all of its MetLife securities received in the ALICO acquisition:

### MetLife Announces Completion of Common Stock and Common Equity Unit Offerings

NEW YORK, Mar 08, 2011 (BUSINESS WIRE) –

MetLife, Inc. (NYSE: MET) announced today that it and ALICO Holdings LLC, a subsidiary of American International Group, Inc. (AIG), have closed their recently announced offering of 146,809,712 shares of MetLife common stock.

MetLife offered 68,570,000 shares of its common stock to the public for gross proceeds of $2.97 billion. Net proceeds from MetLife's sale of its common stock were used to repurchase and cancel 6,857,000 shares of contingent convertible preferred stock owned by AIG.

AIG offered 78,239,712 shares of MetLife common stock to the public for gross proceeds of $3.38 billion. In addition, AIG has completed its public offering of 40,000,000 common equity units of MetLife for gross proceeds of $3.32 billion. *MetLife did not receive any proceeds from the offerings of the MetLife common stock or common equity units that were owned by AIG*.

*As a result of the offerings, AIG has sold all of the MetLife securities it received in MetLife's acquisition of American Life Insurance Company (Alico)*.

Goldman, Sachs & Co., Citi and Credit Suisse were the book-running managers for the common stock transaction. Goldman, Sachs & Co. and Citi were the book-running managers for the common equity units transaction.

- 54 -

114.    Defendants' statements, in ¶¶92-102, concerning key business metrics in 3Q10, 4Q10 and FY10, including the respective financial statements filed with the SEC were knowingly or recklessly false and misleading for all of the reasons set forth below in ¶¶120(a)-(l).

115.    On March 21, 2011, the MetLife Board announced that defendant Kandarian, then current Executive Vice President and Chief Investment Officer, would become the Company's new CEO, effective May 1, 2011.

### D.    State and Regulator Investigations into MetLife's Failure to Pay Benefits When It Knew Policyholders Were Deceased Begin to Indemnify

116.    On April 25, 2011, the California Insurance Commissioner issued a press release announcing that it had issued a subpoena to MetLife pertaining to an investigation into MetLife's practices regarding the withholding of death benefits, even after having notice that a policyholder had died.  The press release noted that based upon its preliminary findings, developed through an investigation that began in 2008 by the California Insurance Commission, that for two decades MetLife failed to pay life insurance benefits even after learning that a policyholder had died:

**Insurance Commissioner Jones, Controller Chiang Launch Investigation Into Death Payment Practices**

*        *        *

Insurance Commissioner Dave Jones and State Controller John Chiang today announced the issuance of a subpoena and joint investigative hearing into the practices of Metropolitan Life Insurance Company (MLIC), also known as MetLife. ***The hearing will focus on MetLife's practices regarding payment of benefits under life insurance policies after MetLife learns of an insured's death*** – either to the beneficiaries or, if they cannot be located for three years or more, to the State's Unclaimed Property program. ***MetLife learned of the deaths of insureds through a database prepared by the Social Security Administration called "Death Master," which lists all Americans who die***.

***The Commissioner and the Controller are responding to preliminary findings from an audit the Controller launched in 2008, indicating that for two decades, MetLife failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured had died***. . . . ***The Controller's unclaimed property audit indicates that MetLife did not take steps to determine***

- 55 -

*whether policy owners of dormant accounts are still alive, and if not, pay the beneficiaries, or the State if they cannot be located*.

*Simultaneously, the preliminary findings show, when MetLife knew that an owner of an annuity contract – which generates income for the policy owner at the time the annuity matures – had died, or the annuity had matured, the company did not contact the policy holder or beneficiary, even though it subscribed to the "Death Master" database. Furthermore, MetLife continued making premium payments from the policy holder's account until the cash reserves were used up, and then cancelled the contract*.

117.    On May 4, 2011, the Company issued a press release announcing its false 1Q11 financial results noting an increase in operating earnings of 64% year-over-year and 15% in insurance products.  The press release stated as follows:[8]

## METLIFE ANNOUNCES FIRST QUARTER 2011 RESULTS

\*        \*        \*

MetLife, Inc. . . . today reported first quarter 2011 net income of $830 million, or $0.78 per share, and operating earnings of $1.4 billion, or $1.33 per share.

*"With record top-line performance and a 64% increase in operating earnings over the first quarter of 2010, MetLife delivered very strong results in the first quarter of 2011,"* said Steven A. Kandarian, *[W]e grew operating earnings in*

---

[8]    As reported in the Company's Form 10-K for the period ended December 31, 2010:

Operating earnings is the measure of segment profit or loss we use to evaluate segment performance and allocate resources and, consistent with GAAP accounting guidance for segment reporting, is our measure of segment performance.  Operating earnings is also a measure by which our senior management's and many other employees' performance is evaluated for the purposes of determining their compensation under applicable compensation plans.

\*        \*        \*

[T]he presentation of operating earnings and operating earnings available to common shareholders as we measure it for management purposes enhances the understanding of our performance by highlighting the results of operations and the underlying profitability drivers of our businesses.

- 56 -

*our U.S. Business by 15% while total net investment income increased 14% over the first quarter of 2010*.

* * *

**U.S. BUSINESS**

* * *

- *Operating earnings of $908 million, up 15% due to increases in Insurance Products, Retirement Products and Corporate Benefit Funding*

118. On May 5, 2011, the Company held a conference call for analysts and investors to discuss the 1Q11 financial results. The call was hosted by Henrikson, Kandarian, Wheeler and Mullaney. Defendants again discussed the Company's mortality rate experience, including that in 1Q11 individual life mortality ratio was 92.5%, higher than its plan and unfavorable. Defendants failed to disclose, however, that it was not necessarily increased severity experience in 1Q11 that resulted in higher reported mortality ratios, but instead, as later admitted by Katz and Frank Cassandra on May 19, 2011 and May 23, 2011, the implementation of processes to include SSA-DMF matching in its life insurance business, which, according to Katz, was begun in May 2011:

> [WHEELER:] Turning to our operating margins, let's start with our underwriting results. In U.S. Business, overall results were generally positive in the quarter with the exception of individual life. *The group life mortality ratio for the quarter was 88.2% as compared to 89.5% in the prior-year quarter and at the low end of our 2011 guidance range of 88% to 93%.*
>
> *Our individual life mortality ratio for the quarter was 92.5%. This is higher than plan and unfavorable compared to the prior-year quarter. This quarter's results were negatively impacted by higher claims incidence in large face amount policies*.

119. On May 10, 2011, the Company filed its Form 10-Q for the period ended March 31, 2011. The Form 10-Q repeated, in substance, the financial results reported in the May 4, 2011 press release. The Company again purported to disclose on the investigations of the state regulatory agencies into its death benefit practices and the usage of its retained asset accounts. Notwithstanding

- 57 -

ongoing audits and the preliminary findings by the California Insurance Commission and State

Controller (which it did not disclose), the Company maintained that allegations of fraud concerning

the usage of its retained asset accounts and violations of *state or federal laws were without merit*:

### Retained Asset Account Matters

> The New York Attorney General announced on July 29, 2010 that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts [TCA] as a settlement option for death benefits and that subpoenas requesting comprehensive data related to retained asset accounts had been served on MetLife and other insurance carriers. . . . Management believes *that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit*.

120.    Defendants' representations in ¶¶92, 93, 96-103 concerning: (i) reported financial

results for 3Q10, 4Q10, FY10 and 1Q11, in particular, reported income and overall segment

operating earnings for each period; (ii) solid underwriting results and expense management (¶¶92,

93); and (iii) reported mortality results and experience (¶¶93, 97, 99), were each knowingly or

recklessly false for the following reasons:

(a)    Defendants knew or recklessly disregarded that 3Q09, 4Q09, FY09 and FY10,

as reported in the February 25, 2011 Form 10-K for the period ended December 31, 2010, and 1Q11

financial results, particularly reported income and operating earnings, were materially misstated both

quantitatively and qualitatively. Defendants admittedly failed to account for known incurred

liabilities (deaths of policyholders that the Company actually knew of or had reason to know of),

which MetLife owed benefits to beneficiaries or state authorities pursuant to unclaimed property

laws. As such, defendants knowingly or recklessly caused the Company's income and operating

earnings to be materially misstated. *See* ¶¶150-167. MetLife's Financial Statements Were

Materially Misstated in Violation of GAAP and SEC Disclosure Rules.

(b)      The Company's 3Q10, 4Q10, FY10 and 1Q11 financial statements were false and misleading for all of the reasons set forth in Section VIII, MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules.  ¶¶150-167;

(c)      Defendants also admittedly knew that the Company had for years systematically used the SSA-DMF across its business units for purposes beneficial to the Company's bottom line, including stopping payments to annuitants identified in the SSA-DMF, responding to regulatory agency inquiries, and complying settlement agreements in litigation.  Defendants also knew, through the prior utilization of the SSA-DMF, that the Company was in possession of or had access to information that was strong evidence of death of policyholders and knew that the Company's processes and procedures were designed or implemented to largely ignore that evidence or information to the extent that it would require locating beneficiaries, escheating monies to state agencies or increasing reserves – all of which would negatively impact operating earnings. Defendants admit to the material impact of its failure to utilize the SSA-DMF on its financial statements and particularly, reserves and operating earnings.  In October 2011, the Company was forced to disclose that because of its failure to incorporate information known or accessible to the Company through utilization of the SSA-DMF its liabilities were in excess of its reserves.  *See* ¶¶135, 136;

(d)      Had defendants utilized the SSA-DMF to identify deceased policyholders ***and*** recognized known incurred liabilities, paid beneficiaries or properly escheated monies to the states as required by state law and insurance regulations, the Company would have reported operating earnings of materially less than $0.99 reported in 3Q10, $1.14 in 4Q10, $4.38 in FY10 and $1.33 in 1Q11;

(e)     Defendants' statements, in ¶¶92, 96, 97, regarding the Company's purported strong or favorable underwriting experience and results in group life and individual life products and better expense savings efforts were also knowingly materially false and misleading when they were made.  In truth, defendants knew but failed to disclose that the reported underwriting results in both group life and individual life for 3Q10, 4Q10, FY10 and 1Q11, to the extent that they contributed to the Company's financial performance, was in part due to the Company's known failure to identify, account for and pay beneficiaries of policyholders the Company actually knew had died or had reason to know had died and died long ago;

(f)     In addition, defendants knew or recklessly disregarded that its statements concerning lower expenses and expense management, in ¶¶92, 93, 97, were false when made.  In truth, as the Company has now admitted, in addition to the reasons set forth above, defendants' reported expense management was in part due to the Company's failure to escheat monies (unclaimed property), belonging to policyholders' beneficiaries, which had not been claimed, and that the Company owed to states pursuant to state unclaimed property laws;

(g)     Defendants' statements concerning the Company's mortality ratios including a 3Q10 group life ratio of 89% and individual life ratio of 86.7%; 4Q10 group life ratio of 89.7% and individual life ratio of 82.9%; 1Q11 group life ratio of 88.2% and individual life ratio of 92.5% were also knowingly or recklessly false and misleading when made.  *See* ¶¶93, 97, 99,118.  In truth, defendants knew or recklessly disregarded that the favorable reported mortality ratios were similarly due to the Company's failure to account for known deaths of policyholders or access to evidence of death of policyholders.   In fact, on October 27, 2011, when the Company reported its financial results for 3Q11, which included the $117 million charge to earnings related to the failure to utilize the SSA-DMF, for purposes designed to actually locate and pay policyholder beneficiaries as

opposed to avoiding payments, the Company reported sharply increased mortality ratios including *98.5% for group life and 98.5 % for individual life*. The increase in reported mortality ratios was admittedly due to the $117 million reserve charge. ¶142;

(h) As alleged herein, defendants misrepresented the Company's mortality experience repeatedly during the Class Period. The chart in ¶143 shows reported mortality ratios in group and individual life between 1Q09 and 3Q11, evidencing the long-term favorable impact of undisclosed truth concerning the failure to utilize the SSA-DMF to calculate the true mortality ratios;

(i) Defendants Henrikson's and Wheeler's February 25, 2011 Sarbanes-Oxley certifications were also materially false. Defendants also knew or deliberately disregarded that the Company was not designed to assure the reliability of the financial statements, nor did the financial statements fairly present the financial condition of the Company. Indeed, the report omitted material facts alleged herein. The Company's internal controls, practices and procedures were designed and/or implemented *to ignore*, for purposes of paying beneficiaries, escheating monies to the state or increasing reserves, reliable evidence in the Company's possession or available to it, of death of policyholders, which required the Company to pay beneficiaries or states as described;

(j) As further evidence of defendants' knowledge or reckless disregard of the falsity of the alleged misrepresentations, and in addition, their intent to withhold beneficiaries' monies or ignore evidence of death in its possession, defendants admit even for the 2007 match process, when the Company found a death that had occurred years before 2007 it used June 1, 2007 as the beginning of the dormancy period, which starts the clock for the state escheatment of unclaimed property to states. For example, defendants admitted during testimony before insurance regulators on May 19, 2011 and May 23, 2011 that as part of a 2007 match of individual life policies against the SSA-DMF, when they found and confirmed that the death of a policyholder had occurred

in the 1960s or 1970s, the Company generally and intentionally used June 1, 2007 as the date of proof of death to start the dormancy period.  ¶123 and Exhibits A and B;

(k) Finally, defendants knew but failed to disclose that notwithstanding knowledge based upon the running of a SSA-DMF match against its individual life policies in 2007 that the Company had in possession of beneficiary monies that should have been reserved for, paid to beneficiaries or escheated to the state, it had never, up through May 2011 for purposes of determining whether it was holding monies belonging to policyholder beneficiaries, run a SSA-DMF match against its *group life policies*.  *See* ¶123 and Exhibits A and B.

(l) Defendants also knew but failed to disclose that the Company had in its possession monies that had not been paid to beneficiaries and had not been escheated to the states that were due to policyholder beneficiaries of *industrial policies*; policies, which had been sold door-to-door to low-income families more than 50 years ago that the Company had stopped selling in 1964.

### E. Top MetLife Officials Testify at Regulatory Hearings Admitting to the Company's Knowledge or Reckless Disregard of False Financial Statements and Related Representations

121. On May 19, 2011, certain of MetLife's executive officers testified pursuant to a subpoena issued by the State of Florida Office of Insurance Regulations.  MetLife's Executive Vice President, Todd Katz, and its Senior Vice President, Frank Cassandra, gave live testimony, under oath, before the Commission concerning the Company's use and/or non-use of the SSA-DMF and the Company's processes and procedures for locating and paying beneficiaries for deceased policyholders and compliance with Florida unclaimed property laws.  Prior to the May 23, 2011 hearing, MetLife spokesperson Chris Breslin reportedly made the following false statement,

published in Fox Business, My Money, which was knowingly or recklessly false and misleading for the reasons set forth in ¶¶86(a)-(o), 123:

- "*Our priority is to pay insurance benefits to those who are entitled to them . . . . When beneficiaries cannot be located, we turn those benefits over to the state*."

122.    During the May 19, 2011 hearing, MetLife, through Katz and Cassandra, admitted that the Company in fact has used the SSA-DMF since the 1980s for many of its businesses along with other databases and systematically matched against annuities to prevent payments to reportedly deceased policyholders who were identified in the SSA-DMF. Katz and Cassandra also admitted that the Company did not systematically use the SSA-DMF to help identify beneficiaries of policyholders who had died, nor use it to systematically designate to identify property that was unclaimed for purposes of starting the escheatment of the unclaimed property to relevant state agencies. *See* ¶123 and Exhibits A and B.

123.    On May 23, 2011, MetLife executives Robert Sollmann, Jr., Executive Vice President of Retirement Products, Katz and Cassandra testified pursuant to a subpoena issued by the State of California Insurance Commissioner, Dave Jones. Among other things, during the testimony on May 19, 2011 and May 23, 2011, MetLife, through top executives, admitted to the following:

- Upon receiving an indication of death, MetLife would suspend annuity payments and did not require a death certificate before suspending annuity payments.

- The Company has maintained a "Metropolitan Unclaimed Fund System" since 1987. The Unclaimed Property system tracks the date on which funds are put into the system and calculates the date of escheatment. However, the date on which money is entered into the Unclaimed Property system is administrative and not necessarily when a person is identified as deceased in the SSA-DMF.

- In 2007, the Company used the SSA-DMF to do a sweep and learned of deaths that had occurred as early as 1965 as a result of using the SSA-DMF index, yet only started the dormancy period for escheatment from June 2007,

meaning that defendants knew that the liability had been incurred, and in fact had been incurred years earlier, but specifically intended to hold the money for an additional period (or relevant state escheatment period).

- The Company admitted that even if it found during its SSA-DMF matches in 2010 that a person died in 2005, it would start the dormancy period as of the date of the match as opposed to the date of the death.

- The Company ran the vast majority of policies in the individual life business against the SSA-DMF in 2007 but not other blocks of business, for example group life.

- Prior to 2010 and through May 2011, the Company had not run SSA-DMF matches for its group life policies.

- In 2007, the Company recognized that utilizing the SSA-DMF was an effective tool in determining identities of deceased policyholders and their beneficiaries, and it was an effective tool for match sweeps against retained asset accounts, individual life business, general annuities and group life business.

- In 2006, the Company ran a SSA-DMF match against its retained asset account and learned of 1300 matches, which resulted in payments to beneficiaries and escheatments to the states. The Company did not run a SSA-DMF match again until 2010 against its retained assets account.

- MetLife used the SSA-DMF in its annuity business, retained asset account business and for group annuities. MetLife was matching once a month to suspend payments to annuitants matched in the SSA-DMF. The Company began using the SSA-DMF systematically in its annuities business in the mid-90s.

- The Company used the SSA-DMF in 2004 and 2005 to provide data to certain states about how the SSA-DMF was being used and understood thereafter that it was a useful tool to help find policyholders.

- The Company began examining processes and procedures for using the SSA-DMF more broadly and more frequently in the Summer of 2010 as part of discussions with state regulators. Katz and Mullaney were involved in the 2010 discussions and decision making and made a decision to use the SSA-DMF more frequently and broadly in December 2010.

- MetLife understood that retained asset accounts are subject to unclaimed property laws.

124.    On May 24, 2011, Henrikson gave a presentation to institutional investors at the Barclays Capital Americas Select Conference.  During the conference, Henrikson spoke directly about the Company's acquisition of ALICO, the book value of the Company relative to the share price, and suggested to investors that it was a good time to invest in the Company in light of increases in operating earnings, net income and the attractiveness of the Company's financial statements:

> [HENRIKSON:] Okay.  Financial review, you can see the numbers.  They are what they are, and I think they're pretty attractive.  I'll talk about this in another way in a second, but *you can see the increase in the premium fees and other revenues, the operating earnings, net income available, book value numbers, and so forth. Book value numbers, I'm not supposed to ever say this is good time, and so forth and so on, but it's important that – where the stock is trading relative to the book value, as people remind me*.

*        *        *

> So, we're financially strong.  *I would say everything we do in one way or another is about maintaining and increasing our financial strength, and that includes topline growth.  We're disciplined in our growth.  We're diversified by product, geography, distribution, all of this with an eye to shareholder value*.

## F.    New York State Attorney General and New York State Department of Financial Services Issues Subpoenas and Demands Information

125.    On July 5, 2011, *Reuters* reported that the New York Attorney General had issued subpoenas to nine life insurance companies, including MetLife, specifically demanding information regarding their procedures for identifying beneficiaries of life insurance policies and compliance with relevant state escheatment laws:

> **NY Subpoenas Nine Life Insurance Companies**
>
> New York's top legal officer has sent subpoenas to nine leading life insurers seeking information about their practices in identifying and paying out policies for deceased customers . . . .
>
> New York Attorney General Eric Schneiderman last month sent subpoenas to units of AXA SA, Genworth Financial Inc, Guardian Life Insurance Co of America, Manulife Financial Corp, Massachusetts Mutual Life Insurance Co, MetLife Inc,

New York Life Insurance Co, Prudential Financial Inc, and TIAA-CREF, the source said.

*　　　*　　　*

*The investigation is looking into whether insurance companies have done enough to identify beneficiaries of life insurance policies once a customer dies, the source told Reuters on Tuesday.*

*Schneiderman's office is also seeking information about unclaimed policy proceeds that are supposed to be turned over to the state.*

126.　　On July 5, 2011, the New York State Insurance Department, *also known as* the New York State Department of Financial Services, sent a letter to all insurers doing business in the State of New York, including MetLife, directing each to identify deceased policyholders and pay unpaid benefits by using an official government death list and make payments to their beneficiaries.  The letter expressed concerns that insurance companies, doing business in New York State, may have been aware of death through utilization of the SSA-DMF, but continuing to deduct premiums until the policy lapses.  In addition, the Department of Financial Services was concerned that life insurers were using the SSA-DMF to stop annuity payments, but not to locate beneficiaries.  The letter was comprehensive and set forth the requirements and procedures for life insurance companies to follow to comply with the directive to cross-check policyholders or annuity contracts, insurance policies and retained asset accounts:

> The Department is investigating allegations of unfair claims and trade practices by authorized life insurers and fraternal benefit societies (collectively, "life insurers"). . . .  In particular, there may be instances where a death has occurred and no claim has been filed, but premiums continue to be deducted from the account value or cash value until the policy lapses.  In other instances, life insurance policies, annuity contracts, or retained asset accounts may simply remain dormant after death.  In these instances, a valid death benefit is either not paid or the payment is delayed.
>
> . . . *Some life insurers have utilized the U. S. Social Security Administration's Death Master File ("SSA Master File") to stop annuity payments once a contract holder dies, but do not use the SSA Master File to determine if any death benefit payments are due under life insurance policies, annuity contracts, or retained asset accounts.*

- 66 -

\* \* \*

To address the Department's concerns, life insurers should cross-check all life insurance policies, annuity contracts and retained asset accounts on their administration data files, including group policies for which a life insurer maintains detail insured records, with the latest updated version of the SSA Master File, or another database or service that is at least as comprehensive as the SSA Master File, to identify any death benefit payments that may be due under life insurance policies, annuity contracts, or retained asset accounts as a result of the death of an insured or contract or account holder.

\* \* \*

*Each report and update submitted to the Superintendent shall be subscribed and affirmed as true under penalty of perjury by a senior officer of the life insurer.*

127. On July 28, 2011, the Company issued a press release announcing its financial results for 2Q11. The Company's press release again touted record financial results driven in part by record underwriting results in group life and 48% increase in U.S. annuity:

**MetLife Announces Second Quarter 2011 Results**

\* \* \*

MetLife, Inc. . . . today reported *second quarter 2011 net income of $1.2 billion, or $1.13 per share, and operating earnings of $1.3 billion, or $1.24 per share*.

\* \* \*

**U.S. BUSINESS**

- *U.S. Business operating earnings of $908 million, up 12% due to increases in Insurance Products*, Retirement Products and Corporate Benefit Funding

  \* \* \*

- *Excellent underwriting results in group life* . . . .

  \* \* \*

Insurance Products

Operating earnings for Insurance Products – which includes group life, individual life and non-medical health insurance – were $449 million, up 22% due to increases in all three business lines. *In particular, the rise in earnings was driven by record underwriting results in group life, solid underwriting in non-medical*

*health and higher net investment income. Premiums, fees & other revenues for Insurance Products were $5.0 billion, relatively unchanged.*

Retirement Products

> *Operating earnings for Retirement Products – which includes the company's U.S. annuity products – were $201 million, up 48% driven by higher separate account fee income.* Total annuity sales increased 48% to $7.3 billion, driven by strong growth in variable annuities across all distribution channels.

128. On July 28, 2011, Morgan Stanley issued a report entitled "MetLife Inc. Quick Comment: 2Q11 Earnings First Glance." The report discussed the 2Q11 results and noted the "highly favorable" results in mortality rates reported in group life:

> **MetLife Inc.**
>
> **Quick Comment: 2Q11 Earnings First Glance**
>
> **Earnings well above**: MetLife reported 2Q11 operating EPS of $1.24, substantially above our estimate of $1.08. After adjusting for a broad-range of abnormal items, we put core run-rate EPS at $1.37, similarly well above our core estimate of $1.28 on a comparable basis.
>
> Highlights include:
>
> - **US Businesses –** . . . Adjusted earnings of $980 million ran considerably above our expectations by $117 million. *Every division contributed to the upside, but highly favorable mortality in group life was the single largest variance*.

129. On July 29, 2011, the Company held a conference call for investors and analysts to discuss the financial results for its 2Q11. The conference call was hosted by defendants Kandarian, Wheeler and Mullaney. During the call, defendants made the following representations, in particular about the Company's U.S. insurance business, including *"excellent" mortality ratios for 2Q11*, while failing to disclose known facts concerning the Company's claims practices or their impact on the Company's financial statements:

> [KANDARIAN:] *Another area strong performance is in US business insurance products where we grew earnings by 22% in the quarter on strong underwriting results and higher net investment income.*

- 68 -

\* \* \*

[WHEELER:] *Thanks, Steve, and good morning, everybody. MetLife reported operating earnings of $1.3 billion or $1.24 per share for the second quarter, which, when added to our first-quarter earnings, results in an annualized ROE of 11.8% for the first six months of this year*.

\* \* \*

*Insurance products' strong performance was driven by a significant increase in group insurance underwriting margins and continued improvement in investment margins. The group life mortality ratio for the quarter was an excellent 82.1% as compared to 86.6% in the prior year quarter and well below our 2011 guidance range of 88% to 93%.*

*This result represents group life's best ever mortality quarter*. . . .

\* \* \*

[MULLANEY:] *Colin, it's Bill Mullaney, let me start on the mortality question. Yes, we had an excellent quarter as it relates to group life mortality. As Bill said in his remarks, it was the best quarter we ever had. Second quarter tends to be a better quarter for us seasonally historically.*

*I think in terms of thinking about the group life mortality going forward, obviously we don't think it will stay at 82%*, it was –like I said, quite a good quarter. But I would think more toward the low end of the range for the balance of the year. *We gave a range at Investor Day of 88% to 93% and I think modeling toward the low end of the range is probably the best way to think about it*.

130. After the July 28, 2011 announcement of its 2Q11 financial results, and the July 29, 2011 conference call, the Company's stock price spiked from a close of $39.81 on July 28, 2011 to a close of $41.21 on July 29, 2011, on increased trading volume.

131. Each of the statements alleged in ¶¶127-129 above were knowingly or recklessly false and misleading because defendants knew or recklessly disregarded for all of the reasons set forth herein, each of the following facts:

(a)    Operating earnings were materially overstated;

(b)    Mortality ratios were materially misrepresented;

(c)    Underwriting margins were materially misrepresented; and

- 69 -

(d)     Defendants failed to disclose that material reserve charges were imminent and as a result of its failure to account and reserve for death it knew of or had reason to know of.

### G.     MetLife Admits for the First Time to the Scope of Regulator Inquiries into Its Handling of Death Benefits Which Could Have a Material Impact on Its Financial Statements – Stock Price Declines

132.    Just one week later, on August 5, 2011, the Company filed its Form 10-Q for the period ended June 30, 2011 with the SEC.  The Company disclosed that the regulatory investigations into its death benefits practices had *expanded to more than 30 jurisdictions*.  In addition, gone from the Form 10-Q were the previously reported denials that allegations concerning the Company's retained asset accounts and claims that potential violations of state and federal laws were "without merit."  Instead, for the first time the Company disclosed that it might be subject to *additional escheatment* to the states and that the costs related to said investigations could be "*substantial*":

> *Unclaimed Property Inquiries.  More than 30 U.S. jurisdictions are auditing MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws.  Additionally, MLIC and certain of its affiliates have received subpoenas and other regulatory inquiries from certain regulators and other officials relating to claims-payment practices and compliance with unclaimed property laws.*  On July 5, 2011, the New York Insurance Department issued a letter requiring life insurers doing business in New York to use data available on the U.S. Social Security Administration's Death Master File or a similar database to identify instances where death benefits under life insurance policies, annuities, and retained asset accounts are payable, to locate and pay beneficiaries under such contracts, and to report the results of the use of the data.  It is possible that other jurisdictions may pursue similar investigations or inquiries, or issue directives similar to the New York Insurance Department's letter.  *It is possible that the audits and related activity may result in additional payments to beneficiaries, additional escheatment of funds deemed abandoned under state laws, administrative penalties, and changes to the Company's procedures for the identification and escheatment of abandoned property.  The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial*.

133.    On August 5, 2011, *Bloomberg* issued an article discussing the Company's August 5, 2011 Form 10-Q, which disclosed that 30 jurisdictions were investigating the Company's practices

with respect to paying death benefits.  The article noted the Company's disclosure that the cost of the investigations and additional escheatments to the states could be substantial:

**MetLife Says 30 Jurisdictions Are Auditing Unpaid Benefits**

MetLife Inc. (MET), the largest U.S. life insurer, said more than 30 U.S. jurisdictions are auditing its practices in a review of whether the *industry is holding unclaimed funds owed to policyholders, beneficiaries or states.*

*The audits may lead to more payments to beneficiaries, administrative penalties or changes in procedures*, New York-based MetLife said today in its quarterly filing with the U.S. Securities and Exchange Commission.

"*The company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures," MetLife said.  "It is possible that such costs may be substantial*."

134.    The August 5, 2011 disclosures in MetLife's Form 10-Q concerning the possibility of additional investigations, audits and related activity that may result in administrative penalties, additional payments and escheatment of abandoned property, caused the Company's stock price to decline 11% between Friday, August 5, 2011 and Monday, August 8, 2011.  By the close of the market on August 8, 2011, MetLife stock was down from a close of $36.90 per share on Thursday, August 4, 2011, to a close of $32.74 per share on Monday, August 8, 2011.

135.    On October 6, 2011, the Company filed a Form 8-K with the SEC quantifying the current impact of its prior failure to report and account for IBNR liabilities, stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF to identify deceased policyholders:

*MetLife, Inc. . . . has identified the following non-recurring charges that it expects to incur for the third quarter of 2011*:

(1)    *The Company expects to incur a $115 million to $135 million, after tax, charge to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts*

- 71 -

*where the covered person may be deceased, but a claim has not yet been presented to the Company*.

136.    On October 6, 2011, Credit Suisse issued a report entitled "Quick Comment on MET's 3Q11."  The report detailed the disclosures in the Company's Form 8-K of the same date concerning the reserve charge resulting from the Company's failure to use the SSA-DMF.  In addition, the report revealed that the internal review resulting in the charge had been done *at least one year earlier*:

**MetLife, Inc.**

**Quick Comment on MET's 3Q11**

▪    **Action/Event:** Today MET disclosed it would incur total charges of $235mm-$275mm (or $197mm-$237mm excluding the normal quarterly catastrophe load) related to three items.  *The charges were due to: (1) a $115-$135mm after tax charge related to claim reconciliation with the US Social Security Administration's Death Master File (11c-13c/sh)* . . . .

▪    *The $115mm-$135mm is an addition to reserves from an internal review that determined future liabilities are in excess of current reserves, reinsurance and IBNR.  MET conducted an internal review in which it matched deceased policyholders with the U.S. Social Security Administration's Death Master File and determined situations where the individual may be deceased but the related claim had not yet been filed. The reserve addition relates 75% to group business and 25% to individual life policies*.

▪    *MET conducted this review over a year ago*.  It is unclear if any fines will come from the individual states.

137.    On October 7, 2011, *Zacks Equity Research* published an article entitled "MetLife's Charges to Dampen 3Q Results."  The article discussed the Company's disclosures of a day earlier and the charges to reserves resulting from its failure to use the SSA-DMF to pay beneficiaries of insurance policies:

**MetLife's Charges to Dampen 3Q Results**

Yesterday, MetLife Inc. (MET-Analyst Report) intimidated [sic] about a string of charges worth about $275 million that it expects to incur in the third quarter

- 72 -

of 2011, as per the statement filed with the Securities and Exchange Commission (SEC) and other federal authorities.

> *The bulk of the extraordinary expenses include a post-tax charge of $115-135 million to make necessary alterations to its insurance reserves. This primarily requires reaching out to those insurance policies and other contracts where the policyholders may have died but a claim is yet to be filed with MetLife.*

138.    On October 7, 2011, *A.M. Best* published an article discussing the expected charges related to the Company's use of the SSA-DMF:

**MetLife to Record Up to $275 Million in Charges; Some on Social Security Death Master File**

> *MetLife Inc. will post up to $275 million in third-quarter charges, in part, on adjusting reserves related to its use of the U.S. Social Security Administration's Death Master File and similar databases.*

> In a Form 8-K, MetLife . . . said it expects to incur a $115 million to $135 million charge, after tax, related to the death master file, which lists the name of every Social Security number holder who has died.  The databases will identify some group life insurance certificates, individual life insurance policies and other contracts where a covered person may be dead but a claim hasn't yet been made.

139.    As a result of the news that the Company would have to increase its reserves to cover IBNR losses, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.

## VI.    POST CLASS PERIOD EVENTS AND ADMISSIONS

140.    On October 11, 2011, *Bloomberg* published a report discussing MetLife's reported after-tax charge to increase reserves as a result of death benefits investigation:

**MetLife Joins AIG Taking Benefit Charge Amid Regulatory Probes**

> MetLife Inc. (MET), the largest U.S. life insurer, has joined American International Group Inc. (AIG) by taking a charge tied to reserves for death benefits as regulators probe the industry's practices for unclaimed funds.

> MetLife said last week that it will take a third-quarter charge of $115 million to $135 million as it uses data such as Social Security Administration death records to identify cases where it hadn't paid claims.  AIG said in August that it added about

- 73 -

$100 million to reserves in the second quarter after changing its process for determining when policyholders die.

*     *     *

MetLife began using the Social Security Death Master File to stop some annuity payouts starting in the late 1980s, Todd Katz, an executive vice president at the New York-based insurer, said at a May hearing in Florida.

*     *     *

**MetLife's Change**

*MetLife checked group life policies for the first time against the databases, which contributed to the charge announced last week, said Christopher Breslin [Vice President Corporate Media Relations], a spokesman.*

141. On October 27, 2011, the Company issued a press release announcing its 3Q11 financial results noting that as a result of the reserve charges announced on October 6, 2011, *operating earnings for insurance products were down 23%.* The press release stated as follows:

**MetLife Announces Third Quarter 2011 Results**

*     *     *

MetLife, Inc. today reported third quarter 2011 net income of $3.6 billion, or $3.33 per share, and operating earnings of $1.2 billion, or $1.11 per share.

*     *     *

**THIRD QUARTER 2011 SUMMARY**

- Operating earnings of $1.2 billion, or $1.11 per share, reflecting:

  - *a $117 million ($0.11 per share), after tax, charge to increase reserves in connection with the company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify potential life insurance claims that have not yet been presented to the company; the charge mostly impacted the Insurance Products segment*

*     *     *

**U.S. BUSINESS**

*     *     *

- 74 -

- Premiums, fees & other revenues of $7.7 billion, up 9% primarily due to growth in Corporate Benefit Funding and Retirement Products

Insurance Products

*Operating earnings for Insurance Products – which includes group life, individual life and non-medical health insurance – were $265 million, down 23% largely due to the previously mentioned reserve adjustment, which impacted group and individual life results*.

142.   On October 28, 2011, the Company held a conference call for analysts and investors to discuss the Company's 3Q11 financial results.  The call was hosted by defendants Wheeler and Kandarian.  During the call, defendants explained the impact of the $117 million after-tax charge related to the death benefit and SSA-DMF issues alleged herein.  In addition, the Company reported that its individual life mortality rate was a whopping 98.5% and group life mortality ratio was also 98.5%:

[KANDARIAN:] As noted in the 8-K we filed October 6, MetLife recorded a number of one-time charges in the third quarter.  *Absent these charges and some other one-time items, MetLife's earnings would have been $1.28 per share, which we believe is closer to the Company's true earnings power*.

\*       \*       \*

[WHEELER:] There were several unusual items in this quarter.  *First, we have taken an after-tax charge of $117 million or $0.11 per share to increase reserves in connection with our use of the US Social Security Administration's Death Master File and similar databases to identify potential life insurance claims for pending and incurred, but not reported claim liabilities referred to as IBNR – over 70% of the charges in our Group Life business, nearly 25% in Individual Life with the balance in Corporate Benefit Funding*.

\*       \*       \*

*The Group Life mortality ratio for the quarter was 98.5%.  It's elevated due to the reserve strengthening related to the life insurance claims adjustment* that I mentioned previously.  Adjusting for this item, the loss ratio was 88.9%, near the low end of the 2011 guidance range of 88% to 93% and in line versus the prior-year quarter of 89%.

\*       \*       \*

- 75 -

*Our Individual Life mortality ratio for the quarter was 98.5%, elevated due to the reserve strengthening* related to the life insurance claims adjustment that I mentioned previously. On the normalized basis, the mortality loss ratio was 89%, up from the prior-year quarter of 86.7% and above plan due to higher large face claims in the quarter.

*      *      *

*While reserve adjustments go through the income statement*, the hedges in our derivatives portfolio do not go through the income statement, but are rather reflected in unrealized gains.

143.     In addition to the details of the financial impact of the reserve charge, the report stated that both group life and individual life mortality ratios had skyrocketed to 98.5%, higher than had been reported at any time since 1Q09:

| Reported Mortality Ratios During the Relevant Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **1Q09** | **2Q09** | **3Q09** | **4Q09** | **1Q10** | **2Q10** | **3Q10** | **4Q10** | **1Q11** | **2Q11** | **3Q11** |
| Reported Mortality Ratio | G 92.2% I 82.6% | G 91.3% I 74.9% | G 92.2% I 91.1% | G 89.7% I 81.1% | G 89.5% I 87.6% | G 86.6% I 80.4% | G 89% I 86.7% | G 89.7% I 82.9% | G 88.2% I 92.5% | G 82.1% I 84.4% | *G 98.5% I 98.5%* |

144.     On December 5, 2011, the New York State Department of Financial Services issued an Interim Report of the Superintendent pursuant to §308 of the New York Insurance Law. The report confirmed that insurers, including MetLife, have retained monies for years that they knew or had reason to know should have been paid to beneficiaries on policyholders' deaths, some dating back to the 1970s:

<strong>Interim Report of the Superintendent<br>Pursuant to Section 308 of the New York Insurance Law<br>Relating to Investigating Claims and Locating Beneficiaries Owed Death Benefits<br>Under Life Insurance Policies, Annuity Contracts, and Retained Asset Accounts</strong>

December 5, 2011

*Summary*

LIFE INSURERS SHOULD REGULARLY MATCH life insurance policies against a reliable death list, rather than just waiting for claims to be filed. The technology exists, and *it is clear that some insurers have been utilizing such death list databases in determining whether to curtail annuity payments*. In response to

the Department's investigation, life insurers that have undertaken the prescribed matching efforts have made $52.6 million in payments to almost 8,000 beneficiaries that would not have otherwise been made. About $16.9 million of that sum has been paid to New York payees. Moreover, matching done as a result of the Department's review has already produced another almost 28,000 matches for which claims processing has been initiated and located another almost one million initial matches that need further checking, but will likely result in substantial additional payments.

### Background

THE DEPARTMENT OF FINANCIAL SERVICES (the "Department" or "DFS") has been conducting an inquiry into allegations of unfair claims and trade practices by authorized life insurers and fraternal benefit societies (collectively, "insurers") based on concerns that insurers may not be adopting and implementing proper standards for investigating claims and locating beneficiaries with respect to death benefits under life insurance policies, annuity contracts, and retained asset accounts. *In particular, there may be instances where a death has occurred and no claim has been filed, but premiums continue to be deducted from the account value or cash value until the policy lapses*. In some instances beneficiaries may be unaware that they have been named as a beneficiary and not realize that they need to file a claim. *In the context of retained asset accounts, funds may simply remain dormant after the death* . . . .

Recently, the Department issued a letter pursuant to Section 308 of the New York Insurance Law ("308 letter") advising all insurers that a cross-check of all life insurance policies, annuity contracts, and retained asset accounts on their administration data files, including group policies for which an insurer maintains detailed insured records, should be performed with the latest updated version of the U. S. Social Security Administration's Death Master File ("SSA-DMF") – or another database or service that is at least as comprehensive as the SSA-DMF – to identify any death benefit payments that may be due under life insurance policies, annuity contracts, or retained asset accounts as a result of the death of an insured or contract or account holder. . . .

### Findings to Date

BASED ON THE DEPARTMENT'S INVESTIGATION, including responses to the Department's 308 requests, *it appears that some insurers have utilized the SSA-DMF to stop annuity payments once a contract holder dies, but have not used the SSA-DMF to determine if any death benefit payments are due under life insurance policies, annuity contracts, or retained asset accounts*.

\*     \*     \*

*The earliest year of death for which a benefit payment has been made thus far is 1970* . . . .

| Type of Business | Earliest Date of Death | Largest Amount Paid | Average Amount Paid |
|---|---|---|---|
| Individual Life | 1970 | $673,485 | $6,994 |
| Group Life | 1989 | $199,827 | $2,786 |
| Individual Annuity | 1994 | $365,264 | $36,363 |
| Group Annuity | 1988 | $167,821 | $6,978 |
| Retained Assets | 2005 | $137,690 | $17,836 |

\* \* \*

Overall, insurers report that they have cross-checked approximately 79.22 million policy records against the SSA-DMF. *This has resulted in approximately 2.68 million initial matches*. Many initial matches have been eliminated for reasons such as: policies not in force at time of death, match is not with the same person, and claim already submitted. *Insurers are still in the process of validating and/or investigating approximately 950,000 initial matches. Approximately 7,934 payments have already been made to individuals totaling approximately $52.6 million, including about 1,209 payments made to New York payees totaling approximately $16.9 million*. Insurers have also initiated claims processing for approximately 27,889 other matches.

\* \* \*

With regard to specific practices involving utilization of the SSA-DMF, there are a small number of insurers that have been performing regular SSA-DMF cross-checks for a number of years including Massachusetts Mutual Life Insurance Company and Prudential Insurance Company of America. Some other insurers have more recently adopted regular cross-check procedures, including Metropolitan Life Insurance Company. However, *many insurers have not made regular use of SSA-DMF cross-checks to pay unreported insurance benefits*.

145. On February 28, 2012, the Company filed its Form 10-K for the year ended December 31, 2011. The Form 10-K made additional disclosures about the impact of the Company's historical failure to use the SSA-DMF and the effect on the Company's current financial statements:

On an annual basis, we perform experience studies, as well as update our assumptions surrounding both expected policyholder behaviors and the related investment environment. These updates, commonly known as unlocking events, result in changes to certain insurance related liabilities, DAC and revenue

- 78 -

amortization. The impact of updates to our assumptions, in both 2011 and 2010 primarily related to policyholder behaviors, such as projected premium assumptions and various factors impacting persistency, coupled with insurance related refinements, resulted in a net increase to operating earnings of $41 million. ***Partially offsetting these favorable impacts was a $109 million charge, recorded in the third quarter of the current year, related to our use of the Death Master File, in both our group and individual life businesses***.

*    *    *

The Company's use of the Death Master File in connection with our post-retirement benefit business resulted in a charge in the third quarter of the current year of $8 million. Other insurance liability refinements and mortality results negatively impacted our year-over-year operating earnings by $20 million.

## VII. METLIFE REACHES SETTLEMENT AGREEMENT WITH SIX STATES VALUED AT $500 MILLION

146. On April 23, 2012, *Bloomberg* reported that MetLife had agreed with state agencies

and regulators to pay the states a total of $500 million to settle claims related to death benefits:

**MetLife to Pay $500 Million to Settle Death-Benefit Probe**

> ***MetLife Inc. (MET), the largest U.S. life insurer, will pay about $500 million in a multistate settlement after regulators reviewed whether companies were holding funds that should go to beneficiaries.***
>
> ***MetLife said $188 million will be paid in 2012, and remaining funds over the next 17 years***. The New York-based company said it reserved for the expense after taking charges against earnings (MET), including one in the first quarter for $52 million. The insurer said it will use Social Security Administration records to determine when policyholders die.

*    *    *

> Life insurers are generally required to pay claims after being notified of a policyholder's death and receiving a valid death certificate. Chiang said a hearing showed that MetLife didn't use information the insurer had from Social Security data to pay benefits and wasn't forwarding funds to his office as unclaimed property.

*    *    *

**Jones, Cuomo**

*    *    *

. . . An investigation by ***New York's Department of Financial Services into instances where insured parties died and beneficiaries didn't file claims has led to more than 32,000 payments totaling $262.2 million, according to a statement from Cuomo*** today.

147. On April 23, 2012, the Company issued a press release regarding the resolution of the multi-state examination into its use of the SSA-DMF:

**MetLife Resolves Multi-State Examinations**

NEW YORK – (BUSINESS WIRE) – Apr. 23, 2012 – MetLife, Inc. (NYSE: MET) issued the following statement today regarding its resolution of multi-state examinations related to unclaimed property and the company's use of the Social Security Death Master File:

\*    \*    \*

MetLife agrees that periodic matching of administrative records against available external sources such as the Social Security Death Master File is a best practice, ***and the company is implementing a monthly matching process which it believes will be effective in identifying the small proportion of deaths where a claim is not submitted***.

\*    \*    \*

The total insurance in force for these "industrial" policyholders is approximately $438 million, for which the company is appropriately reserved. The company expects that $188 million of the total will be paid out in 2012, with the remainder paid over the next 17 years. In the first quarter of 2012, the company recorded a $52 million post-tax charge representing a multi-state examination payment related to unclaimed property and MetLife's use of the Social Security Death Master File, as well as the expected acceleration of benefit payments to policyholders under the settlement.

148. The Regulatory Settlement Agreement between MetLife and the participating states details that in addition in exchange for the releases of claims, which could have been brought by the states, the Company agreed to wide-ranging corporate reforms, agreed to pay the states $40 million for the cost of their investigations and subject itself to enforcement action for failure to comply with the turn of the agreement. The Regulatory Settlement Agreement, excerpted below, also

memorialized certain of the findings leading to concerns about the Company's death benefit practices:

WHEREAS, based upon the information gathered to date, the Departments have identified concerns regarding:

A.   The adequacy of the Company's policies and procedures to ensure that life insurance and endowment policies, annuities, "Retained Asset Accounts" (hereafter defined) and other funds are either timely paid out to "Beneficiaries" (hereafter defined), or timely reported or remitted in accordance with the "Unclaimed Property Laws" and the "Insurance Laws" (hereafter defined);

B.   The Company's historical use of the DMF to terminate payment under annuity contracts in the "payout" phase to annuitants who have died, but not attempt to locate Beneficiaries to pay out the death benefit under annuity contracts or life policies issued by the Company;

C.   The adequacy of the Company's policies and procedures to ensure that the financial benefits due under matured annuity contracts are paid to annuitants or reported and remitted in accordance with the Unclaimed Property Laws and the Insurance Laws;

D.   The adequacy of the Company's policies and procedures to ensure that assets held in the Company's Retained Asset Accounts are paid to Beneficiaries or "Accountholders" (hereafter defined) or reported and remitted in accordance with the Unclaimed Property Laws, when the Accountholder is listed as deceased on the DMF, or, alternatively, the Accountholder has not initiated a financial or administrative action with respect to the Retained Asset Account for an extended period of time;

\*      \*      \*

WHEREAS, in 2007, the Company matched substantially all of its individual life policies for which it had electronic records, including policies in in-force, terminated and non-forfeiture status against the DMF and identified over $50 million in death benefits, which were paid to Beneficiaries and over $30 million in unclaimed benefits which have been or will be reported and remitted to the appropriate states in accordance with the Unclaimed Property Laws;

WHEREAS, in 2010, *subsequent* to the commencement of the Multi-State Examination, the Company established its Electronic Death Match ("EDM") initiative pursuant to which the Company committed to match its individual life and annuity, group life and annuity and retained asset accounts against the DMF no less

frequently than annually and, *in 2011, in accordance with that initiative, as well as a request for a report by the New York Superintendent of Insurance pursuant to Section 308 of the New York Insurance Law, the Company performed matches of the administrative records for individual and group life, individual and group annuities and retained asset accounts of all of the MetLife affiliated companies for all fifty states, and the Company has to date identified approximately $96 million to be paid to Beneficiaries from these matches, and over $16 million to be paid to the states as unclaimed property*;

*     *     *

**Business Reforms**.  The Company agrees that within sixty (60) days from the Effective Date of this Agreement, the Company shall adopt the following policies and procedures:

a.   Perform comparisons, either directly or indirectly, of all of its in-force Insureds, Accountholders, Annuity Contract Owners, and annuitants, for which the Company provides Recordkeeping services, against the DMF, or an equivalent database containing the same information as the DMF, *on at least a monthly basis in accordance with the transition period set forth in Schedule B*.  The Company shall use the comparison criteria specified in Schedule A.  *In the event that the Company uses different comparison criteria than those specified in Schedule A, the Company may be subject to sanctions to the extent that it obtains five percent (5%)* fewer valid matches than would otherwise have been obtained using Schedule A.

b.   Subject to Schedule B, if the Company is not contacted by a Beneficiary within one hundred twenty (120) days of the Date of Death Notice, the Company shall promptly commence a Thorough Search, which shall be completed within one (1) year from the Date of Death Notice.  At the conclusion of that one (1) year period, if (i) the Beneficiary cannot be located by a Thorough Search and (ii) the Company is unable to establish an Exception, it shall report and remit the death benefit proceeds as Unclaimed Property to the affected state(s) in accordance with the applicable Unclaimed Property Laws. . . .

c.   *For the sole purpose of this Agreement, the Company, within the time period in Schedule B, shall implement policies and procedures establishing a DMF listing as prima facie proof of death and requiring* the Company to initiate its death claims process and conduct a Thorough Search for Beneficiaries in accordance with Section 2(b) of this Agreement. . . .

     d.     Utilize the DMF on all of its Life Insurance Policy, Annuity Contract, and Retained Asset Account product lines using the comparison methodologies . . . .

## A. New York State Not Signatory to the Multi-State Settlement Agreement Announces Progress of Department of Finance Yielding $262 Million

149.     On April 23, 2012, New York State Governor Andrew Cuomo issued a press release announcing that the investigation being done by the New York State Department of Financial Services had recovered more than $260 million from insurance companies, an increase of over $200 million from the reported $52 million in December 2011:

**Governor Cuomo Announces DFS Investigation into Life Insurers Recovers More Than a Quarter Billion Dollars in Unpaid Benefits for Consumers Nationwide**

Investigation Finds Tens of Thousands of Policies Went Unpaid Because Insurance Companies Did Not Check if Policy Holders Had Died; Investigation Helped 7,525 New Yorkers Recover Almost $100 Million in Life Insurance Payouts

Albany, NY (April 23, 2012)

Governor Andrew M. Cuomo today announced that a Department of Financial Services (DFS) investigation into how insurance companies tracked life insurance policy holders has resulted in 32,715 payments to consumers nationwide totaling $262.2 million, including 7,525 payments totaling $95.9 million to New Yorkers.

\*     \*     \*

Meanwhile, the investigation found that insurance companies often used the list of recent deaths to verify the status of people getting annuity checks, and, when a death was verified, the insurance company stopped the annuity payment.

\*     \*     \*

As a result of its investigation, the state demanded that insurers use the U.S. Social Security Administration's Death Master File to investigate policies for which no claims have been made and to find beneficiaries who are eligible for benefits but have not filed claims. ***New York was the first state to order the cross-check policy and will issue a regulation to mandate this action in the future. Following that edict, insurers reported they cross-checked approximately 89.58 million records. Insurers are still investigating more than 445,000 potential matches for unpaid claims***.

Some of the larger individual payments made so far include the following:

- $344,757.37 to a Northport, New York beneficiary on an individual life insurance policy where the insured ***died in 2007***.

- $217,031.88 to a Rockville Center, New York beneficiary on two individual annuities where the annuitant ***died in 2006***.

- $138,051.81 to a Queens, New York beneficiary on an individual life insurance policy where the insured ***died in 1998***.

- $107,399.60 to a Brooklyn, New York beneficiary on an individual annuity where the annuitant ***died in 2005***.

## VIII.  METLIFE'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES

150.    As detailed herein, defendants concealed significant loss exposures stemming from the Company's blatant disregard of the SSA-DMF in its life insurance business for purposes of locating beneficiaries of deceased policyholders recognizing liabilities or escheating unclaimed property to the states.  By concealing these loss exposures, each of MetLife's Class Period financial statements[9] were materially misstated and in violation of GAAP[10] and SEC disclosure rules for the following reasons:

---

[9]    MetLife's Class Period financial statements filed with the SEC include: Forms 10-Q filed on May 5, 2010, August 2, 2010, August 3, 2010 Registration Statement, November 4, 2010, May 10, 2011 and August 5, 2011; Forms 10-K filed on February 26, 2010, February 25, 2011; and the March 4, 2011 Registration Statement.

[10]    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). SEC Regulation S-X, Rule 4-01, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

(a)     MetLife failed to disclose loss contingencies and legal proceedings related to a multi-state investigation concerning the Company's use of the SSA-DMF, in violation of FASB *Accounting Standards Codification* ("ASC") 450, SEC Regulation S-K, Item 103, and SEC Regulation S-K, Item 303; and

(b)     MetLife understated life insurance claim reserves for IBNR claims that had been identified on the SSA-DMF, in violation of ASC 944 and American Institute of Certified Public Accountants ("AICPA") accounting rules.

151.    Both of the above misstatements were material to the Company's Class Period financial statements.  The  multi-state investigation which began in 2009 (that MetLife failed to disclose) resulted in a $500 million settlement (potentially increasing to $700 million) that was revealed after the Class Period while the understatement of claim reserves resulted in over $143 million in after-tax charges that MetLife was forced to record at the end of the Class Period.

A.     **MetLife Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules**

152.    During the Class Period, MetLife concealed material loss exposures relating to a multi-state examination surrounding MetLife's use of the SSA-DMF.  The multi-state investigations began by at least September 22, 2009 when Florida and Illinois launched a joint Market Conduct Examination of the Company's use of the SSA-DMF."[11]  Despite the fact that these investigations began in late 2009, MetLife did not disclose the investigations or the possibility of losses stemming from the investigations until August 2011 when the Company first disclosed it was under

---

[11]     Regulatory Settlement Agreement, dated April 19, 2012.

investigation and disclosed to investors the related costs "*may be substantial*."  The full extent of

MetLife's true loss exposure was eventually revealed after the Class Period when the Company

settled with state regulators for $700 million.

153.    MetLife's failure to disclose these investigations and related loss exposures in its

Class Period financial statements violated GAAP and SEC disclosure rules. As depicted in the chart

below, MetLife failed to make these required GAAP and SEC disclosures in each of its Class Period

financial statements.

| | **Item 103 Reg. S-K: 'Legal Proceedings'** | **Item 303 Reg. S-K: MD&A** | **ASC 450: footnotes to the financial statements** |
|---|---|---|---|
| **Form 10-K** *filed on Feb. 26, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on May 5, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on August 2, 2010* | *none* | *none* | *none* |
| **Prospectus** *filed on  August 3, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on November 4, 2010* | *none* | *none* | *none* |
| **Form 10-K** *filed on Feb. 25, 2011* | *none* | *none* | *none* |
| **Prospectus** *filed on  March 4, 2011* | *none* | *none* | *none* |
| **Form 10-Q** *filed on May 10, 2011* | *none* | *none* | *none* |
| **Form 10-Q** *filed on August 5, 2011* | *partial*[12] | *partial* | *partial* |

--------------------------------------

[12]     MetLife disclosed the multi-state investigation for the first time but did not provide a range
of the possible loss exposure faced by the Company.

*SEC Regulation S-K Item 103 "Legal Proceedings"*

154.    MetLife's failure to make any disclosures regarding the multi-state investigation prior to August 2011 was in direct violation of SEC Regulation S-K, Item 103 "Legal Proceedings," which requires the disclosure of "***proceedings known to be contemplated by governmental authorities***."   For any such contemplated investigation or proceeding, Item 103 requires the following information to be disclosed in the financial statements:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

155.    Clearly, the multi-state market conduct examination that began in late 2009 and escalated throughout the Class Period was the exact type of governmental proceeding described under this SEC disclosure rule.  MetLife's failure to disclose the investigation in any of its Class Period financial statements through August 2011 was a violation of SEC Regulation S-K and rendered the financial statements materially false and misleading.  The fact that the multi-state investigation had not yet resulted in any formal action as of each reporting date did not negate the disclosure requirement as Item 103 clearly covers proceedings "known to be contemplated by governmental authorities."  In fact, MetLife demonstrated its view of the disclosure threshold for this type of contemplated government proceeding when it disclosed a similar investigation beginning in mid 2010.[13]  Notably, this disclosed investigation on MetLife's use of retained asset accounts did not

---

[13]    In its August 2, 2010 Form 10-Q, MetLife disclosed details of an investigation concerning its retained asset account. The disclosure stated*: "*The New York Attorney General recently announced

result in any monetary settlements with New York or other states while the SSA-DMF investigation that went entirely undisclosed has resulted in a $700 million multi-state settlement.

### 2. *ASC 450 "Contingencies"*

156. MetLife's lack of disclosures regarding the SSA-DMF investigations and potential loss exposure stemming from those investigations also violated FASB, ASC 450. In addition to the disclosure requirements found in SEC Regulation S-K, ASC 450 requires disclosure in the footnotes to the financial statements for material loss contingencies and/or significant risks and uncertainties. Notably, the SEC staff has reminded registrants that Item 103 of SEC Regulation S-K and FASB Codification Topic 450, *Contingencies* have different requirements and objectives and should be approached separately to ensure compliance.[14] The occurrence, or non-occurrence, of a future event, such as a possible enforcement action or litigation brought by state insurance commissioners or state attorneys general meets the definition of a loss contingency under GAAP.[15] Under ASC 450, disclosing a loss contingency in the notes to the financial statements is ***required*** when there is more

---

that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts and that subpoenas requesting comprehensive data related to retained asset accounts have been served on MetLife and other insurance carriers."

[14] *AICPA National Conference on Current SEC & PCAOB Development* (December, 2010). Therefore, the statutory requirements that govern SEC Regulation S-K disclosures are independent of the requirement to file financial statements that are in compliance with GAAP. Stressing the importance of this concept, the SEC staff has noted that management needs to "take back the financial statements" (to provide the disclosures required by GAAP) from the lawyers who may want to restrict litigation disclosures.

[15] ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an enterprise that will ***ultimately be resolved when one or more future events occur or fail to occur***."

than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time).[16] In fact, ASC 450 specifically addresses the disclosure of "*Litigation, Claims, and Assessments*" and, notably, the SEC has stated that these GAAP rules apply to pending litigation or proceedings. The SEC has noted that companies often are exposed to financial loss prior to the commencement of a formal claim, *i.e.*, a company may expect a current government investigation to result in a formal claim upon completion of the investigation. ASC 450 states:

> The following factors, among others, must be considered in determining whether accrual and/or disclosure is required with respect to pending or threatened litigation and actual or possible claims and assessments:
>
> > a.  The period in which the underlying cause (i.e., the cause for action) of the pending or threatened litigation or of the actual or possible claim or assessment occurred.
> >
> > b.  *The degree of probability of an unfavorable outcome*.
> >
> > c.  The ability to make a reasonable estimate of the amount of loss.
>
> > *       *       *
>
> With respect to unasserted claims and assessments, an enterprise must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. . . . [A]n investigation of an enterprise by a governmental agency, if enforcement proceedings have been or are likely to be instituted, is often followed by private claims for redress, and the probability of their assertion and the possibility of loss should be considered in each case.

---

[16]     It is clear that the threshold for disclosure of a loss contingency (as opposed to a higher threshold for the *accrual* of a loss contingency) is very low – GAAP requires disclosure if, "*[t]he chance of the future event or events occurring is more than remote but less than likely*." Under ASC 450: "*The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made*."

157.     Once again, it is clear that the multi-state market conduct examination that began in late 2009 and escalated throughout the Class Period met the disclosure criteria under this GAAP disclosure rule.  MetLife's failure to disclose the investigation in any of its Class Period financial statements through August 2011 was a violation of ASC 450 and rendered the financial statements materially false and misleading.[17]  Similar to the disclosure rules of SEC Regulation S-K described above, the fact that the investigation had not yet resulted in any formal action as of each reporting date did not negate the disclosure requirement as ASC 450 clearly covers "*pending or threatened litigation*" and "*unasserted claims*."   Notably, MetLife disclosed the retained asset account investigation, referred to above, in the footnotes to its financial statements under the heading "Contingencies, Commitments and Guarantees," beginning in August 2010, but failed to disclose the more material SSA-DMF investigation.

**3.**     *SEC Regulation S-K Item 303: Management's Discussion and Analysis*

158.     Similar to the disclosure requirements of ASC 450 which pertain to the footnotes of the financial statements, SEC Regulation S-K, Item 303, requires disclosure of contingent liabilities in the "Management's Discussion and Analysis" section of the financial statements. Specifically, Item 303 requires a company to disclose "*uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . income.*"  The SEC has consistently commented that these disclosure rules cover contingent liabilities such as government investigations and contemplated legal proceedings.  For example, in a speech during the 2004 AICPA National

---

[17]     SEC Regulation S-X, Rule 4-01, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading.

Conference on Current SEC and PCAOB Developments,[18] Scott A. Taub, Deputy Chief Accountant in the SEC's Office of the Chief Accountant noted the following regarding the disclosure requirements of ASC 450-20-50 and SEC Regulation S-K, Item 303:

> Given these requirements, the recording of a material accrual for a contingent liability related to an event that occurred several years before should not be the first disclosure regarding that contingency. Rather, disclosures regarding the nature of the contingency and the amounts at stake should, in most cases, have already been provided. Disclosures should discuss the nature of the contingency and the possible range of losses for any item where the maximum reasonably possible loss is material. Vague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific kinds of loss contingencies being evaluated are not sufficient.

The SEC's Taub completed his point by commenting: "*I find it somewhat surprising how often 'zero' is the recorded loss [i.e., a no loss exposure at all has been disclosed] right up until a large settlement is announced*." This was precisely what occurred in MetLife's financial statements during the Class Period – the Company made no disclosures prior to August 5, 2011 and then, just seven months later, investors were blindsided by the announcement of the $700 million multi-state settlement.

### B. MetLife Understated Life Insurance Claim Reserves in Violation of GAAP

159. MetLife was also required under GAAP to record a liability, also known as a reserve, for expected payouts related to life insurance benefits. More specifically, MetLife was required to reserve for death benefits that had been incurred (*i.e.*, the claimant had already died) but not yet reported (*i.e.*, a beneficiary had not yet notified MetLife). Under GAAP, these reserves are referred

---

[18]     Similar remarks were made at subsequent conferences, including the 2010 AICPA National Conference on Current and SEC and PCAOB Developments.

to as "incurred but not yet reported" or "IBNR" and are fundamental to the financial statements of insurance companies. ASC 944 states:

> *A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer)… shall be accrued when insured events occur.*

160.     *The Audit and Accounting Guide for Life and Health Insurance Entities* ("AICPA Audit and Accounting Guide"), which was applicable to MetLife during the Class Period, contains similar accounting guidance, including: "*Insurance entities [are required to] set up estimated reserves for unreported claims [or] Incurred but not reported claims:* . . .claims relating to insured events that have occurred (*the insured has died or become disabled so that payment under the terms of an insurance contract* is due ) *but the entity has not yet received notice of the claim* as of the date of the financial statements."

161.     In violation of these essential and fundamental GAAP provisions for the insurance industry, MetLife blatantly ignored information it knew or had available to it through utilization of the SSA-DMF and failed to record liabilities (reserves) for life insurance claims that had clearly been incurred (and were easily identifiable using the SSA-DMF) but had not yet been reported. As a result, MetLife understated its life insurance claim reserves and overstated its earnings in its Class Period financial statements. MetLife's financial statements also included the false representation that:

> The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities, certain accident and health, and non-medical health insurance . . . . *Such liabilities are established based on methods and underlying assumptions in accordance with GAAP* . . . .

162.     As alleged herein, defendants knew or recklessly disregarded, during the Class Period, that MetLife's reserves were not adequate to cover all incurred claims indentified or identifiable in the SSA-DMF. For example, according to the multi-state Regulatory Settlement

- 92 -

Agreement, in 2007 MetLife performed a match across certain of its insurance records using the SSA-DMF and had discovered over $80 million in IBNR claims that had not been reserved for. In 2010, after the multi-state examination had began, MetLife performed additional matches using the SSA-DMF and discovered additional IBNR claims that had not been reserved for. Despite these red flags, defendants continued to understate claim reserves throughout the Class Period until recording charges totaling $143 million after tax (approximately $220 million before tax) in late 2011 and early 2012.

163. The charges recorded by MetLife included a $117 million after-tax charge in 3Q11, equal to $0.11 per share, to "increase reserves in connection with the company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify potential life insurance claims that have not yet been presented to the company." After the Class Period, in 1Q12, MetLife announced an additional $26 million after-tax charge related to IBNR claims associated with the SSA-DMF. In total, the estimated claims to be paid as a result of the SSA-DMF settlements with the states is $667 million with $188 million to be paid out by the end of 2012. As part of the settlement, MetLife also admitted that by failing to use the SSA-DMF during the Class Period, the Company had failed to "identify liabilities" (and therefore failed to record adequate claim reserves) in its Class Period financial statements[19] and the Company was fixing the problem going forward.

_____

[19] Pursuant to the settlement to resolve the audits, the Company will, among other things, **take specified action to identify liabilities under life insurance, annuity, and retained asset contracts**, and, to the extent that it is unable to locate owners of amounts payable, to escheat these amounts with interest at a specified rate to the appropriate states. Additionally, the Company has agreed to accelerate the final date of certain industrial life policies and to escheat unclaimed benefits of such

164.    Based on the above charges MetLife was forced to record in order to establish its reserves in accordance with GAAP, MetLife's Class Period reserves were understated by at least the following amounts:

| (in $millions) | **December 31, 2009** | **December 31, 2010** |
|---|---|---|
| ***Group Life:*** Liability for Future Policy Benefits | $2,981 | $2,717 |
| minimum additional reserve required | $154[20] | $154 |
| % understated | 5.2% | 5.7% |

### C.    The Misstatements Identified Above Were Material to MetLife's Financial Statements

165.    MetLife's disclosure violations and understatement of claim reserves were both material misstatements in the Company's Class Period financial statements.    In SEC Staff Accounting Bulletin No. 99 ("SAB 99"), the SEC makes clear that any determination of materiality hinges on both qualitative and quantitative factors.    The SEC notes that "*exclusive reliance on . . . any percentage or numerical threshold has no basis in the accounting literature or the law.*"

---

policies. Pursuant to the settlements, ***the Company will, among other things, adopt specified procedures for identifying liabilities under life insurance, annuity, and retained asset contracts***, for seeking to contact and pay beneficiaries under such liabilities, and for escheating unclaimed property to appropriate states.

[20]    Calculated based on after-tax charges of $117 million in 3Q11 and $26 million in 1Q12, a tax rate of 35% (which was the effective tax rate for MetLife's insurance products business segment at 3Q11 and 1Q12), and 70% of the charges being allocated to group life (which was the disclosed 75% for the 3Q11 charge).

Instead, SAB 99 cites to the concept of materiality from FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*.[21]

166.    The disclosure (or lack of disclosure) of the investigation and associated loss contingencies surrounding the multi-state conduct examination into MetLife's use of the SSA-DMF was clearly qualitatively and quantitatively material during the Class Period. There are several qualitative factors including the egregiousness of the practices MetLife was engaged in (including the fact that MetLife was using the same SSA-DMF to promptly stop making annuity payments to deceased customers) and the fact that state government investigations are serious events that are clearly important to investors regardless of size. Quantitatively, the size of the eventual settlement, $700 million settlement, is clear evidence that the disclosure of the investigation and associated loss exposures faced by the Company would have been material to investors during the Class Period.

167.    The understatement of life insurance claim liabilities and reserves was also qualitatively and quantitatively material. Qualitatively, claim reserves are one of the most important components of an insurance company's financial statements and closely watched by investors. For example, the Company has stated:

> *Our earnings significantly depend upon the extent to which our actual claims experience is consistent with the assumptions we use in setting prices for our products and establishing liabilities for future policy benefits and claims*.

*       *       *

---

[21]    "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

> *The Company's principal cash outflows primarily relate to the liabilities associated with its various life insurance*, property and casualty, annuity and group pension products, operating expenses and income tax, as well as principal and interest on its outstanding debt obligations. *Liabilities arising from its insurance activities primarily relate to benefit payments* under the aforementioned products, as well as payments for policy surrenders, withdrawals and loans.

Quantitatively, as shown below, the $143 million in after-tax charges recorded by MetLife in 2011-2012 to correct for the understatement of claim reserves would have materially impacted MetLife's reported results in each of the quarters during the Class Period:

| (in $millions) | 4Q09 | 1Q10 | 2Q10 | 3Q10 | 4Q10 | 1Q11 | 2Q11 |
|---|---|---|---|---|---|---|---|
| Originally Reported Net Income | $289 | $805 | $1,526 | $286 | $51 | $830 | $1,206 |
| additional reserve requirement as a % of reported net income | 50% | 18% | 9% | 50% | 280% | 17% | 12% |

## IX. LOSS CAUSATION/ECONOMIC LOSS RELEVANT TO SECTION 10(b) EXCHANGE ACT VIOLATIONS

168.    During the Class Period, as detailed herein, defendants made false and misleading statements concerning the current and future financial condition of the Company and engaged in a scheme to deceive investors regarding the same. Specifically, as alleged herein, the Company qualitatively and quantitatively misstated its financial results for each of the reporting periods alleged herein.

169.    In addition to the false financial statements the Individual Defendants and MetLife represented the overall strength of the Company's business by falsely and repeatedly stating that the Company's mortality and underwriting experience were more favorable than they were in truth, and failing to disclose that its mortality underwriting and overall operating results were materially misstated because the Company ignored evidence of known policyholder deaths and failed to pay

- 96 -

beneficiaries monies owed to them or escheat unclaimed property to states.  These materially false representations caused MetLife's stock to trade at an inflated level and operated as a fraud or deceit on the Class (defined below).

170.    Later, when the relevant truth regarding financial impact of the Company's flawed processes and procedures of utilization or non-utilization of the SSA-DMF and exposure to beneficiaries of deceased policyholders and state agencies, MetLife's stock price declined, as the prior artificial inflation came out of the stock price.

171.    Throughout the Class Period, it was part of defendants' scheme to present a misleading picture of MetLife's financial condition and prospects by failing to truthfully disclose that the Company's true financial condition, earnings, reserves, expenses, losses, underwriting and mortality experience and exposure to states for escheatment of unclaimed property.  Defendants' financial reports were in violation of GAAP and/or SEC disclosure rules and inconsistent with the Company's representations concerning its true financial condition processes and procedures for assessing and reserving for claims, its reported income and earnings results.

172.    Defendants' false and misleading statements concerning its operational financial statements had the intended effect as they each and together caused MetLife's stock to trade at artificially inflated prices throughout the Class Period, causing MetLife's stock to trade as high as $47.72 per share on February 7, 2011.  When the relevant true facts of the Company's financial and operating conditions, which had been concealed by defendants' fraudulent scheme, began to be revealed to the market, MetLife's stock price declined as the prior artificial inflation began to come out of MetLife's stock price.

173.    For example, during the Class Period defendants misrepresented the Company's true financial condition.  Notwithstanding that the Company, in May 2011, through certain of its senior officers, testified that its processes and procedures prior to and during the Class Period knowingly did not include the broad utilization of the SSA-DMF to determine liabilities to beneficiaries and states, and that the Company had been in discussion with state regulators surrounding its usage or

non-usage of the SSA-DMF, defendants maintained that with respect to inquiries concerning retained asset accounts (which were subject to unclaimed property laws). Moreover, on July 28, 2011, the Company announced its 2Q11 financial results with no mention of the ongoing investigations or known financial impact of the internal findings or findings by regulators. *See* ¶¶127-129. The Company's positive 2Q11 financial results, which again boasted of highly favorable mortality ratios in group life, strong underwriting results and operating earnings (¶¶127-129) caused the stock price to remain artificially inflated.

174.    On August 5, 2011, MetLife filed its Form 10-Q for the period ending June 30, 2011, MetLife disclosed for the first time that regulators from *30 jurisdictions* had begun to investigate, not only its handling of retained asset accounts, but its overall handling of unclaimed property and failure to cross-check its policies with the SSA-DMF. This was new information that included financial exposure, the breadth and depth of which were not previously disclosed. In fact, the August 5, 2011 Form 10-Q disclosed for the first time the regulatory investigation would result in: (i) additional payment to beneficiaries; (ii) additional escheatment of funds to states; (iii) administrative penalties; and (iv) changes to the Company's internal procedures for compliance with state escheatment laws.

175.    There was more, while the Company had previously contended that disclosures related to the handling of retained assets were sufficient and that allegations of fraud were without merit, those blanket denials were removed and instead replaced with a warning that costs associated with the investigations and payments related to unclaimed property inquiries could be substantial.

176.    The August 5, 2011 disclosures in MetLife's Form 10-Q caused the Company's stock price to decline 11% between Friday, August 5, 2011, and Monday, August 8, 2011. By close of market hours on August 8, 2011, MetLife stock traded down from a close of $36.90 on Thursday, August 4, 2011, to a close of $32.74 on Monday, August 8, 2011.

177.    On October 6, 2011, MetLife filed with the SEC a Form 8-K quantifying the impact of the regulatory investigations reported on August 5, 2011, stating among other things that it would

take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF to identify deceased policyholders. *See* ¶¶135-139.

178.    As a result of the October 6, 2011 news that the Company would have to increase its reserves to cover IBNR losses, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011. ¶¶135-139.

179.    Like other members of the Class of purchasers of MetLife stock who purchased at artificially inflated prices during the Class Period, lead plaintiff suffered an economic loss, *i.e.*, damages, under the Federal Securities Laws when MetLife's stock price continued to decline following the Company's disclosures on August 5, 2011 and October 6, 2011 regarding defendants' scheme to conceal MetLife's true financial condition.

## X.    NO SAFE HARBOR

180.    MetLife's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

181.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of MetLife who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

707139_1

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

182. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

     (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

     (b) The omissions and misrepresentations were material;

     (c) The Company's stock traded in an efficient market;

     (d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

     (e) Plaintiff and other members of the Class purchased MetLife common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

183. At all relevant times, the market for MetLife common stock was efficient for the following reasons, among others:

     (a) As a regulated issuer, MetLife filed periodic public reports with the SEC; and

     (b) MetLife regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## XII. CLASS ACTION ALLEGATIONS

184. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MetLife common stock during the Class

Period (the "Class"). Excluded from the Class are defendants and their families, and directors and officers of MetLife and their families and affiliates.

185. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MetLife has over 1 billion shares of common stock outstanding.

186. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a) Whether the Exchange Act was violated by defendants;

> (b) Whether defendants omitted and/or misrepresented material facts;

> (c) Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

> (d) Whether defendants knew or recklessly disregarded that their statements were false and misleading;

> (e) Whether the price of MetLife common stock was artificially inflated; and

> (f) The extent of damage sustained by Class members and the appropriate measure of damages.

187. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

188. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

189.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Individual Defendants

190.    Plaintiff incorporates ¶¶1-190 by reference.

191.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MetLife common stock during the Class Period.

193.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MetLife common stock.  Plaintiff and the Class would not have purchased MetLife common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

- 102 -

194.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MetLife common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants Except the Underwriter Defendants

195.     Plaintiff incorporates ¶¶1-194 by reference.

196.     The Individual Defendants acted as controlling persons of MetLife within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about MetLife, the Individual Defendants and directors had the power and ability to control the actions of MetLife and did control communications made to the public and investors, including, but not limited to, the Offering Materials.  MetLife controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  CLAIMS FOR VIOLATIONS OF SECTIONS 11, 12 AND 15 OF THE SECURITIES ACT OF 1933

197.     The Securities Act claims set forth herein below are based on strict liability and negligence and are not based on any allegation that any defendant engaged in fraud or intentional misconduct.  Plaintiff specifically disclaims any reference to or reliance on allegations of fraud.

198.     This claim is brought on behalf of all persons who purchased or acquired the common stock of MetLife pursuant or traceable to the Company's false and misleading August 3, 2010 Registration Statement and the March 4, 2011 Registration Statement (collectively, the "Offering Materials").  The Offering Materials were issued in connection with MetLife's August 3, 2010

public offering of 75 million shares of MetLife common shares and MetLife's March 4, 2011 offering of 68.5 million shares of MetLife common shares, respectively (the "Offerings").

199.     Plaintiff seeks to recover damages under §§11 and 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, for untrue statements of material fact, the omission of facts necessary to make statements not misleading and the omission of material facts required to be stated in the Offering Materials.

### A.     False and Misleading Statements and Omissions in the Registration Statements and Offering Materials

200.     The August 3, 2010 Offering:  On August 3, 2010, the Company filed the August 3, 2010 Registration Statement with the SEC setting forth the terms of MetLife common stock, offering of 75 million shares of its common stock in connection with the acquisition of AIG's ALICO international life insurance business.[22]  Through the August 3, 2010 Registration Statement, MetLife as the issuer would offer 75,000,000 (seventy-five million) shares of MetLife common stock $0.01 a value per share.  If the underwriters sold more than 75,000,000 shares of the common stock, the

---

[22]     The August 3, 2010 Registration Statement included the August 3, 2010 Prospectus Supplement, which was issued pursuant to MetLife's November 6, 2007 shelf registration statement and prospectus and incorporated the following documents by reference:

> Annual Report on Form 10-K for the year ended December 31, 2009; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010; Definitive Proxy Statement filed on March 23, 2010 Registration Statement on Form 8-A, relating to MetLife, Inc.'s common stock and Series A Junior Participating Preferred Stock purchase rights, filed on March 31, 2000, as amended and restated by the Registration Statement on Form 8-A/A, Amendment No. 1 filed on March 11, 2010; and Current Reports on Form 8-K filed on January 29, 2010, February 22, 2010, March 5, 2010, March 11, 2010, April 13, 2010, May 3, 2010, May 7, 2010, May 17, 2010 and August 2, 2010.

- 104 -

underwriters would have the option to purchase 11.25 million additional shares to cover the over-allotments.

201.    The August 3, 2010 Registration Statement by reference the February 26, 2010 Form 10-K for fiscal year ended December 31, 2009 and Forms 10-Q for periods ended March 31, 2010 and June 30, 2010, each of which contained false financial statements as detailed below at ¶¶207-224.  In addition, the August 3, 2010 Registration Statement purported to warn investors in its common stock of certain risks connected to the August 3, 2010 offering.  Each of the purported warnings were false however because they omitted material facts:

> *We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies* or becomes disabled or upon the occurrence of other covered events, or to provide for future annuity payments. *We compute the amounts for actuarial liabilities reported in our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP")*.

*       *       *

> *Liability for Future Policy Benefits and Policyholder Account Balances*
>
> The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities and non-medical health insurance. . . .  *Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards. Principal assumptions used in the establishment of liabilities for future policy benefits are mortality* . . . .

*       *       *

> *Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established*.

202.    On August 6, 2010, the Company issued a press release announcing that it had completed the offering of 86.25 million shares of its common stock, which included the over allotment provided to underwriters and raised gross proceeds of $3.6 billion:

**MetLife Completes Public Offerings**

NEW YORK, Aug 06, 2010 (BUSINESS WIRE) –

MetLife, Inc. . . . announced today that it has closed its recently announced public offering of 75 million shares of common stock and issued an additional 11.25 million shares of common stock pursuant to the exercise in full by the underwriters of their over-allotment option. The total offering of 86.25 million shares produced gross proceeds of approximately $3.6 billion.

MetLife also has closed its public offerings of $3 billion in aggregate principal amount of senior debt in several series with varying maturities and interest rates.

Net proceeds from the common stock and senior debt offerings will be used to help finance the company's previously announced acquisition of American Life Insurance Company from American International Group, Inc. . . . .

203.    The March 4, 2011 Offering:  On March 4, 2011, the Company filed the March 4, 2011 Registration Statement, which included the March 4, 2011 Form 424 (b)(5) Prospectus Supplement to the shelf registration statement and prospectus filed with the SEC on November 30, 2010.[23]

204.    In addition to the false financials, the March 4, 2011 Registration Statement also made the following false purported warnings representations concerning the Company's reserve methodologies, mortality results and compliance with state and regulatory capital requirements:

*We experienced excellent mortality results in our group life business due to a decrease in severity, as well as favorable reserve refinements in the current year*.

---

[23]    The March 4, 2011 Registration Statement offered 146 million shares of common stock of Met Life, including 68 million shares of the Company's common stock at $43.25 per share and AIG offering another 78 million shares of MetLife common stock. The March 4, 2011 Registration Statement, incorporated by reference, the Company's Annual Report on Form 10-K for the year ended December 31, 2010 and in Amendment No. 1 to the Form 10-K/A filed with the SEC on March 1, 2011. The March 4, 2011 Registration Statement also incorporated by reference, the Company's Forms 8-K filed on August 2, 2010, November 30, 2010, March 1, 2011 and March 2, 2011, each of which contained false financial statements and other misrepresentations discussed above.

*      *      *

*Liability for Future Policy Benefits and Policyholder Account Balances*

The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities, certain accident and health, and non-medical health insurance. . . . ***Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards. Principal assumptions used in the establishment of liabilities for future policy benefits are mortality*** . . . .

*      *      *

***Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established.***

*      *      *

*Other Policy-Related Balances*

*      *      *

***The liability for policy and contract claims generally relates to incurred but not reported death, disability, long-term care and dental claims, as well as claims which have been reported but not yet settled. The liability for these claims is based on the Company's estimated ultimate cost of settling all claims. The Company derives estimates for the development of incurred but not reported claims principally from actuarial analyses of historical patterns of claims and claims development for each line of business.***

205.    The March 4, 2011 Registration Statement also purported to make the following warnings concerning policyholder liabilities, underwriting, claims and reserve experiences and litigation contingencies. Each of the following statements were false and misleading because the Registration Statements omitted material facts:

<u>Policyholder Liabilities</u>

***We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies. We compute the amounts for actuarial liabilities reported in our consolidated financial statements in conformity with GAAP.***

- 107 -

206.    On March 8, 2011, the Company issued a press release announcing that it had completed the public offering of more than 68 million shares of its common stock, raising gross proceeds of $2.97 billion:

**MetLife Announces Completion of Common Stock and Common Equity Unit Offerings**

NEW YORK, Mar 08, 2011 (BUSINESS WIRE) –

MetLife, Inc. . . . announced today that it and ALICO Holdings LLC, a subsidiary of American International Group, Inc. (AIG), have closed their recently announced offering of 146,809,712 shares of MetLife common stock.

MetLife offered 68,570,000 shares of its common stock to the public for gross proceeds of $2.97 billion. Net proceeds from MetLife's sale of its common stock were used to repurchase and cancel 6,857,000 shares of contingent convertible preferred stock owned by AIG.

**B.      Material Misstatements and Omissions in the Offering Materials**

**1.      MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules**

207.    The Offering Materials omitted facts concerning significant loss exposures stemming from the Company's disregard of the SSA-DMF in its life insurance business for purposes of locating beneficiaries of deceased policyholders recognizing liabilities or escheating unclaimed property to the states. By omitting these loss exposures, each of MetLife's Class Period financial

statements[24] were materially misstated and in violation of GAAP[25] and SEC disclosure rules for the following reasons:

(a)     The Offering Materials omitted loss contingencies and legal proceedings related to a multi-state investigation concerning the Company's use of the SSA-DMF, in violation of ASC 450, SEC Regulation S-K, Item 103, and SEC Regulation S-K, Item 303; and

(b)     The financial statements incorporated in the Offering Materials understated life insurance claim reserves for IBNR claims that had been identified on the SSA-DMF, in violation of ASC 944 and AICPA accounting rules.

208.     The above omissions and misstatements were material to the Company's Class Period financial statements. The  multi-state investigation which began in 2009 (that MetLife failed to disclose) resulted in a $500 million settlement (potentially increasing to $700 million) that was revealed after the Class Period while the understatement of claim reserves resulted in over $143 million in after-tax charges that MetLife was forced to record at the end of the Class Period.

---

[24]     MetLife's Class Period financial statements filed with the SEC include: Forms 10-Q filed on May 5, 2010, August 2, 2010, August 3, 2010 Registration Statement, November 4, 2010, May 10, 2011; and August 5, 2011 Form 10-K filed on February 26, 2010, February 25, 2011; and the March 4, 2011 Registration Statement.

[25]     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X, Rule 4-01 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

### 2. MetLife Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules

209. The Offering Materials omitted material loss exposures relating to a multi-state examination surrounding MetLife's use of the SSA-DMF. The multi-state investigations began by at least September 22, 2009 when Florida and Illinois launched a joint Market Conduct Examination of the Company's use of the SSA-DMF."[26] Despite the fact that these investigations began in late 2009, The Offering Materials did not disclose the investigations or the possibility of losses stemming from the investigations until August 2011 when the Company first disclosed it was under investigation and disclosed to investors the related costs "***may be substantial***." The full extent of MetLife's true loss exposure was eventually revealed after the Class Period when the Company settled with state regulators for $700 million.

210. The omissions of these investigations and related loss exposures in its Class Period financial statements and Offering Materials violated GAAP and SEC disclosure rules. As depicted in the chart below, MetLife's financial statements in the Offering Materials failed to make these required GAAP and SEC disclosures in each of its Class Period financial statements.

---

[26] Regulatory Settlement Agreement, dated April 19, 2012.

|  | Item 103 Reg. S-K: 'Legal Proceedings' | Item 303 Reg. S-K: MD&A | ASC 450: footnotes to the financial statements |
|---|---|---|---|
| **Form 10-K** *filed on Feb. 26, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on May 5, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on August 2, 2010* | *none* | *none* | *none* |
| **Prospectus** *filed on August 3, 2010* | *none* | *none* | *none* |
| **Form 10-Q** *filed on November 4, 2010* | *none* | *none* | *none* |
| **Form 10-K** *filed on Feb. 25, 2011* | *none* | *none* | *none* |
| **Prospectus** *filed on March 4, 2011* | *none* | *none* | *none* |
| **Form 10-Q** *filed on May 10, 2011* | *none* | *none* | *none* |
| **Form 10-Q** *filed on August 5, 2011* | *partial*[27] | *partial* | *partial* |

a.     *SEC Regulation S-K Item 103 "Legal Proceedings"*

211.    The Offering Materials omitted any disclosures regarding the multi-state investigation

prior to August 2011 was in direct violation of SEC Regulation S-K, Item 103 "Legal Proceedings,"

which requires the disclosure of "***proceedings known to be contemplated by governmental***

***authorities***."   For any such contemplated investigation or proceeding, Item 103 requires the

following information to be disclosed in the financial statements:

---

[27]     MetLife disclosed the multi-state investigation for the first time but did not provide a range
of the possible loss exposure faced by the Company.

Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

212.    The omissions of these investigations in any of its Class Period financial statements through August 2011 was a violation of SEC Regulation S-K and rendered the financial statements, incorporated into the Offering Materials, materially false and misleading.

### b.    *ASC 450 "Contingencies"*

213.    The omission of the SSA-DMF investigations and potential loss exposure stemming from those investigations also violated FASB, ASC 450. In addition to the disclosure requirements found in SEC Regulation S-K, ASC 450 requires disclosure in the footnotes to the financial statements for material loss contingencies and/or significant risks and uncertainties. Notably, the SEC staff has reminded registrants that Item 103 of SEC Regulation S-K and FASB Codification Topic 450, *Contingencies* have different requirements and objectives and should be approached separately to ensure compliance.[28] The occurrence, or non-occurrence, of a future event, such as a possible enforcement action or litigation brought by state insurance commissioners or state attorneys general meets the definition of a loss contingency under GAAP.[29] Under ASC 450, disclosing a loss

---

[28]    *AICPA National Conference on Current SEC & PCAOB Development* (December, 2010). Therefore, the statutory requirements that govern Regulation S-K disclosures are independent of the requirement to file financial statements that are in compliance with GAAP. Stressing the importance of this concept, the SEC staff has noted that management needs to "take back the financial statements" (to provide the disclosures required by GAAP) from the lawyers who may want to restrict litigation disclosures.

[29]    ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of

contingency in the notes to the financial statements is **required** when there is more than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time).[30] In fact, ASC 450 specifically addresses the disclosure of "***Litigation, Claims, and Assessments***" and, notably, the SEC has stated that these GAAP rules apply to pending litigation or proceedings. The SEC has noted that companies often are exposed to financial loss prior to the commencement of a formal claim, *i.e.*, a company may expect a current government investigation to result in a formal claim upon completion of the investigation. ASC 450 states:

> The following factors, among others, must be considered in determining whether accrual and/or disclosure is required with respect to pending or threatened litigation and actual or possible claims and assessments:

> a. The period in which the underlying cause (i.e., the cause for action) of the pending or threatened litigation or of the actual or possible claim or assessment occurred.

> b. ***The degree of probability of an unfavorable outcome***.

> c. The ability to make a reasonable estimate of the amount of loss.

> \*       \*       \*

> With respect to unasserted claims and assessments, an enterprise must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. . . .

---

circumstances involving uncertainty as to [a] possible . . . loss to an enterprise that will ***ultimately be resolved when one or more future events occur or fail to occur***."

[30] It is clear that the threshold for disclosure of a loss contingency (as opposed to a higher threshold for the ***accrual*** of a loss contingency) is very low – GAAP requires disclosure if, "***[t]he chance of the future event or events occurring is more than remote but less than likely***." Under ASC 450: "***The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made***."

[A]n investigation of an enterprise by a governmental agency, if enforcement proceedings have been or are likely to be instituted, is often followed by private claims for redress, and the probability of their assertion and the possibility of loss should be considered in each case.

214. The omission of the of the investigation in any of its Class Period financial statements of the Offering Materials was a violation of ASC 450 and rendered the financial statements materially false and misleading.[31]

        **c.**    *SEC Regulation S-K Item 303: Management's Discussion and Analysis*

215. Similar to the disclosure requirements of ASC 450 which pertain to the footnotes of the financial statements, SEC Regulation S-K, Item 303, requires disclosure of contingent liabilities in the "Management's Discussion and Analysis" section of the financial statements. Specifically, Item 303 requires a company to disclose "***uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . income.***" The SEC has consistently commented that these disclosure rules cover contingent liabilities such as government investigations and contemplated legal proceedings. For example, in a speech during the 2004 AICPA National Conference on Current SEC and PCAOB Developments,[32] Scott A. Taub, Deputy Chief Accountant in the SEC's Office of the Chief Accountant, noted the following regarding the disclosure requirements of ASC 450-20-50 and SEC Regulation S-K, Item 303:

---

[31]    SEC Regulation S-X, Rule 4-01, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading.

[32]    Similar remarks were made at subsequent conferences, including the 2010 AICPA National Conference on Current and SEC and PCAOB Developments.

Given these requirements, the recording of a material accrual for a contingent liability related to an event that occurred several years before should not be the first disclosure regarding that contingency. Rather, disclosures regarding the nature of the contingency and the amounts at stake should, in most cases, have already been provided. Disclosures should discuss the nature of the contingency and the possible range of losses for any item where the maximum reasonably possible loss is material. Vague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific kinds of loss contingencies being evaluated are not sufficient.

The SEC's Taub completed his point by commenting: "*I find it somewhat surprising how often 'zero' is the recorded loss [i.e., a no loss exposure at all has been disclosed] right up until a large settlement is announced*."

### C.   MetLife Understated Life Insurance Claim reserves in Violation of GAAP

216.   MetLife was also required under GAAP to record a liability, also known as a reserve, for expected payouts related to life insurance benefits. More specifically, MetLife was required to reserve for death benefits that had been incurred (*i.e.*, the claimant had already died) but not yet reported (*i.e.*, a beneficiary had not yet notified MetLife). Under GAAP, these reserves are referred to as "incurred but not yet reported" or "IBNR" and are fundamental to the financial statements of insurance companies. ASC 944 states:

> *A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer)... shall be accrued when insured events occur*.

217.   *The Audit and Accounting Guide for Life and Health Insurance Entities* ("AICPA Audit and Accounting Guide"), which was applicable to MetLife during the Class Period, contains similar accounting guidance, including: "*Insurance entities [are required to] set up estimated reserves for unreported claims [or] Incurred but not reported claims:* . . .claims relating to insured events that have occurred (*the insured has died or become disabled so that payment under the*

***terms of an insurance contract*** is due ) ***but the entity has not yet received notice of the claim*** as of the date of the financial statements."

218. In violation of these essential and fundamental GAAP provisions for the insurance industry, the Offering Materials omitted material information concerning utilization of the SSA-DMF and that liabilities (reserves) were not recorded for life insurance claims that had been incurred (and were easily identifiable using the SSA-DMF) but had not yet been reported in the Offering Materials omitted that MetLife's financial statements understated the Company's life insurance claim reserves and overstated its earnings in its Class Period financial statements. MetLife's financial statements and Offering Materials also included the false representation that:

> The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities, certain accident and health, and non-medical health insurance . . . . ***Such liabilities are established based on methods and underlying assumptions in accordance with GAAP*** . . . .

219. The Offering materials omitted that MetLife's reserves were not adequate to cover all incurred claims indentified or identifiable in the SSA-DMF. The Company ultimately too charges totaling $143 million after tax (approximately $220 million before tax) in late 2011 and early 2012.

220. The charges recorded by MetLife included a $117 million after-tax charge in 3Q11, equal to $0.11 per share, to "increase reserves in connection with the company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify potential life insurance claims that have not yet been presented to the company." After the Class Period, in 1Q12, MetLife announced an additional $26 million after-tax charge related to IBNR claims associated with the SSA-DMF. In total, the estimated claims to be paid as a result of the SSA-DMF settlements with the states is $667 million with $188 million to be paid out by the end of 2012.

221.     Based on the above charges MetLife was forced to record in order to establish its

reserves in accordance with GAAP, MetLife's Class Period reserves were understated by at least the

following amounts:

| (in $millions) | **December 31, 2009** | **December 31, 2010** |
|---|---|---|
| ***Group Life:*** Liability for Future Policy Benefits | $2,981 | $2,717 |
| minimum additional reserve required | $154[33] | $154 |
| % understated | 5.2% | 5.7% |

### 1.     The Misstatements Identified Above Were Material to MetLife's Financial Statements

222.     MetLife's disclosure violations and understatement of claim reserves were both

material misstatements in the Company's Class Period financial statements.  In SEC SAB 99, the

SEC makes clear that any determination of materiality hinges on both qualitative and quantitative

factors.  The SEC notes that "***exclusive reliance on . . . any percentage or numerical threshold has***

***no basis in the accounting literature or the law***."  Instead, SAB 99 cites to the concept of

materiality from FASB Statement of Financial Accounting Concepts No. 2, *Qualitative*

*Characteristics of Accounting Information*.[34]

---

[33]     Calculated based on after-tax charges of $117 million in 3Q11 and $26 million in 1Q12, a tax rate of 35% (which was the effective tax rate for MetLife's insurance products business segment at 3Q11 and 1Q12), and 70% of the charges being allocated to group life (which was the disclosed 75% for the 3Q11 charge).

[34]     "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

223.    The disclosure (or lack of disclosure) of the investigation and associated loss contingencies surrounding the multi-state conduct examination into MetLife's use of the SSA-DMF was clearly qualitatively and quantitatively material during the Class Period. There are several qualitative factors including the egregiousness of the practices MetLife was engaged in (including the fact that MetLife was using the same SSA-DMF to promptly stop making annuity payments to deceased customers) and the fact that state government investigations are serious events that are clearly important to investors regardless of size.  Quantitatively, the size of the eventual settlement, $700 million settlement, is clear evidence that the disclosure of the investigation and associated loss exposures faced by the Company would have been material to investors during the Class Period.

224.    The understatement of life insurance claim liabilities and reserves was also qualitatively and quantitatively material.  Qualitatively, claim reserves are one of the most important components of an insurance company's financial statements and closely watched by investors.  For example the Company has stated:

> *Our earnings significantly depend upon the extent to which our actual claims experience is consistent with the assumptions we use in setting prices for our products and establishing liabilities for future policy benefits and claims*.

> \*        \*        \*

> *The Company's principal cash outflows primarily relate to the liabilities associated with its various life insurance*, property and casualty, annuity and group pension products, operating expenses and income tax, as well as principal and interest on its outstanding debt obligations.  *Liabilities arising from its insurance activities primarily relate to benefit payments* under the aforementioned products, as well as payments for policy surrenders, withdrawals and loans.

Quantitatively, as shown below, the $143 million in after-tax charges recorded by MetLife in 2011-2012 to correct for the understatement of claim reserves would have materially impacted MetLife's reported results in each of the quarters during the Class Period.

| (in $millions) | 4Q09 | 1Q10 | 2Q10 | 3Q10 | 4Q10 | 1Q11 | 2Q11 |
|---|---|---|---|---|---|---|---|
| Originally Reported Net Income | $289 | $805 | $1,526 | $286 | $51 | $830 | $1,206 |
| additional reserve requirement as a % of reported net income | 50% | 18% | 9% | 50% | 280% | 17% | 12% |

      2.      **MetLife Admits Investigation of Death Benefit Claims Could Have a Material Impact on Its Financial Statements – Takes After-Tax Charge to Earnings**

225.    On August 5, 2011, only one week after the July 28, 2011 announcement of its 2Q11 results, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2011. The Company disclosed that:

- The regulatory investigation into its death benefits practices had expanded to more than 30 jurisdictions;

- The investigations could result in additional escheatment to the states;

- The Company could be subjected to administrative penalties; and

- The costs related to said investigations and procedures could be "substantial."

226.    The August 5, 2011 disclosure in MetLife's Form 10-Q caused the Company's stock price to decline 11% between Friday, August 5, 2011, and Monday, August 8, 2011. By close of the market on August 8, 2011, MetLife stock traded down from a close of $36.90 per share on Thursday, August 4, 2011, to a close of $32.74 per share on Monday, August 8, 2011.

227.    On October 6, 2011, the Company filed with the SEC a Form 8-K quantifying the impact of the regulatory investigations reported on August 5, 2011, stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use or failure to use the SSA-DMF to identify deceased policyholders:

MetLife, Inc. . . . has identified the following non-recurring charges that it expects to incur for the third quarter of 2011:

> (1) The Company expects to incur a $115 million to $135 million, after tax, charge to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company.

228. On October 6, 2011, Credit Suisse issued a report entitled "Quick Comment on MET's 3Q11." The report detailed the disclosures in the Company's Form 8-K of the same date concerning the reserve charge resulting from the Company's failure to use the SSA-DMF:

**MetLife, Inc.**

**Quick Comment on MET's 3Q11**

▪ **Action/Event:** Today MET disclosed it would incur total charges of $235mm-$275mm (or $197mm-$237mm excluding the normal quarterly catastrophe load) related to three items. The charges were due to: (1) *a $115-$135mm after tax charge related to claim reconciliation with the US Social Security Administration's Death Master File (11c-13c/sh)* . . . .

▪ *The $115mm-$135mm is an addition to reserves from an internal review that determined future liabilities are in excess of current reserves, reinsurance and IBNR.* MET conducted an internal review in which it matched deceased policyholders with the U.S. Social Security Administration's Death Master File and determined situations where the individual may be deceased but the related claim had not yet been filed. *The reserve addition relates 75% to group business and 25% to individual life policies.*

229. On the October 6, 2011 disclosures, the Company's stock price declined from $30.69 on October 6, 2011 to $28.80 on October 7, 2011.

230. On October 27, 2011, the Company issued a press release announcing its 3Q11 financial results. The press release stated as follows:

**METLIFE ANNOUNCES THIRD QUARTER 2011 RESULTS**

\* \* \*

MetLife, Inc. . . . today reported third quarter 2011 net income of $3.6 billion, or $3.33 per share, and operating earnings of $1.2 billion, or $1.11 per share.

*       *       *

**THIRD QUARTER 2011 SUMMARY**

- Operating earnings of $1.2 billion, or $1.11 per share, reflecting:

  - *a $117 million ($0.11 per share), after tax, charge to increase reserves in connection with the company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify potential life insurance claims that have not yet been presented to the company; the charge mostly impacted the Insurance Products segment*

231.    On October 28, 2011, the Company held a conference call for analysts and investors to discuss the Company's 3Q11 financial results and explain the impact of the $117 million after-tax charge on earnings, its group and individual life business and mortality ratios. The Company reported that its individual life mortality rate was a whopping 98.5% and group life mortality ratio was also 98.5%:

[KANDARIAN:]  As noted in the 8-K we filed October 6, MetLife recorded a number of one-time charges in the third quarter. *Absent these charges and some other one-time items, MetLife's earnings would have been $1.28 per share, which we believe is closer to the Company's true earnings power*.

*       *       *

[WHEELER:]  There were several unusual items in this quarter. *First, we have taken an after-tax charge of $117 million or $0.11 per share to increase reserves in connection with our use of the US Social Security Administration's Death Master File and similar databases to identify potential life insurance claims for pending and incurred, but not reported claim liabilities referred to as IBNR – over 70% of the charges in our Group Life business, nearly 25% in Individual Life with the balance in Corporate Benefit Funding*.

*       *       *

*The Group Life mortality ratio for the quarter was 98.5%. It's elevated due to the reserve strengthening related to the life insurance claims adjustment* that I mentioned previously. . . .

*       *       *

*Our Individual Life mortality ratio for the quarter was 98.5%, elevated due to the reserve strengthening* related to the life insurance claims adjustment that I mentioned previously.

*         *         *

*While reserve adjustments go through the income statement* . . . .

232.     In addition to the details of the financial impact of the reserve charge, the report stated that both group life and individual life mortality rates had skyrocketed to 98.5%, higher than had been reported at any time since 1Q09:

| Reported Mortality Ratios During the Relevant Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **1Q09** | **2Q09** | **3Q09** | **4Q09** | **1Q10** | **2Q10** | **3Q10** | **4Q10** | **1Q11** | **2Q11** | **3Q11** |
| Reported Mortality Ratio | G 92.2% I 82.6% | G 91.3% I 74.9% | G 92.2% I 91.1% | G 89.7% I 81.1% | G 89.5% I 87.6% | G 86.6% I 80.4% | G 89% I 86.7% | G 89.7% I 82.9% | G 88.2% I 92.5% | G 82.1% I 84.4% | *G 98.5% I 98.5%* |

233.     On February 28, 2012, the Company filed its Form 10-K for the year ended December 31, 2011.  The Form 10-K made additional disclosures about the impact of the Company's historical failure to use the SSA-DMF and the effect on the Company's financial statements:

On an annual basis, we perform experience studies, as well as update our assumptions surrounding both expected policyholder behaviors and the related investment environment.  These updates, commonly known as unlocking events, result in changes to certain insurance related liabilities, DAC and revenue amortization.  *The impact of updates to our assumptions, in both 2011 and 2010 primarily related to policyholder behaviors, such as projected premium assumptions and various factors impacting persistency, coupled with insurance related refinements, resulted in a net increase to operating earnings of $41 million. Partially offsetting these favorable impacts was a $109 million charge, recorded in the third quarter of the current year, related to our use of the Death Master File, in both our group and individual life businesses*.

*         *         *

The Company's use of the Death Master File in connection with our post-retirement benefit business resulted in a charge in the third quarter of the current year of $8 million.  *Other insurance liability refinements and mortality results negatively impacted our year-over-year operating earnings by $20 million*.

## COUNT III

### Violations of Section 11 of the Securities Act
### Against All Defendants

234.     Plaintiff repeats and reallege each and every allegation contained above in ¶¶197-233 as if fully set forth herein.

235.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all defendants on behalf of themselves and all persons who purchased or acquired MetLife common stock pursuant or traceable to the August 3, 2010 Registration Statement Offering and the March 4, 2011 Registration Statement Offering.  For purposes of this Count, plaintiff affirmatively states that it does not allege that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

236.     Lead Plaintiff Central States purchased 8,394 shares of MetLife common stock on August 3, 2010 at $42.00 pursuant to and traceable to the August 3, 2010 Registration Statement and was damaged thereby.  Central States also purchased 72,120 shares of MetLife common stock on March 3, 2011, at $43.25 and 51,800 shares on March 4, 2011, pursuant to and traceable to the March 4, 2011 Registration Statement has been damaged thereby.

237.     The August 3, 2010 Registration Statement and the March 4, 2011 Registration Statement were both defective and inaccurate, contained untrue statements of material fact and omitted to state facts necessary to make the statements in the Offering Materials made not misleading, and omitted to state material facts required to be stated therein.

238.     The August 3, 2010 Registration Statement was signed by Henrikson, Wheeler, Burwell, Grisé, Hubbard, Keane, Kilts, Price, Satcher, Sicchitano and Wang.

239.     The March 4, 2011 Registration Statement was signed by Henrikson, Wheeler, Carlson, Burwell, Wright, Grisé, Hubbard, Keane, Kelly, Kilts, Kinney, Price, Satcher, Sicchitano and Wang.

240.     Defendant MetLife is the registrant and issuer for both the Offerings.  As such, MetLife is strictly liable for the materially false statements contained in the August 3, 2010 Registration Statement and the March 4, 2011 Registration Statement.

241.     Credit Suisse Securities (USA) LLC, Wells Fargo Securities, LLC, BofA Merrill Lynch, Pierce, Fenner & Smith Incorporated and HSBC participated in and served as underwriters to the August 3, 2010 Offering.

242.     Goldman Sachs, CGMI, Credit Suisse (USA) LLC, Wells Fargo Securities, LLC, BofA Merrill Lynch, Pierce, Fenner & Smith Incorporated and HSBC participated in and served as underwriters to the March 4, 2011 Offering.

243.     The Underwriter Defendants helped draft and disseminate the August 3, 2010 Offering Materials and failed to conduct an adequate due diligent investigation, which was a substantial factor leading to the harm complained of herein.

244.     Defendant MetLife and the Individual Defendants who signed the August 3, 2010 Registration Statement and/or March 4, 2011 Registration Statement are strictly liable for the false and misleading statements and omissions incorporated into the registration statements.

245.     These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.  In the exercise of reasonable care, the Individual Defendants knew or should have known of the material misstatements and omissions contained in

- 124 -

the Offering documents and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. As such, the Individual Defendants are liable to Lead Plaintiff Central States and the Class.

246. The Underwriter Defendants were each underwriters, as that term is used in §11(a)(5) of the Securities Act, and were sellers of MetLife common stock with respect to the Offerings and the Company's common stock sold through the Offering Materials. The underwriters were paid more than $93 million in connection with the August 3, 2010 offering and more than $31 million in connection with the March 4, 2011 offering. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the August 3, 2010 Registration Statement and the March 4, 2011 Registration Statement were true, were without omission of any material facts, and/or were not misleading.

247. None of the untrue statements of omissions alleged herein was a forward-looking statement, but rather, each concerned exiting facts.

248. Lead Plaintiff Central States purchased or acquired MetLife common stock in the Offerings or traceable thereto in reliance upon the defective August 3, 2010 Registration Statement and March 4, 2011 Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the Class sustained damages when the price of MetLife common stock declined substantially due to material misstatements and/or omissions in the Offering Materials.

249. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §11 of the Securities Act.

250. This action was brought within one year after the plaintiff discovered or reasonably could have discovered the untrue statements and omissions. Less than three years has elapsed from the date of the Offerings.

## COUNT IV

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

251. Plaintiff incorporates ¶¶197-250 by reference herein.

252. This claim is brought by lead plaintiff pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. 77l(a)(2), on behalf of all purchasers of MetLife common stock pursuant to the Offering Materials and is asserted against all defendants. For purposes of this Count, plaintiff does not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

253. Defendants were sellers and offerors and/or solicitors of purchasers of the MetLife common stock offered pursuant to the Offering Materials for financial gain. Defendants issued, caused to issue, and/or signed the August 3, 2010 Registration Statement and/or the March 4, 2011 Registration Statement. The Offering Materials each contained a prospectus and prospectus supplements used to induce investors, such as plaintiff and the other members of the Class, to purchase MetLife common stock.

254. The prospectus supplements and documents incorporated by reference into the Offering Materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements therein made not misleading and omitted material facts required to be stated therein.

255. Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

256.     At the time of their purchases or acquisition of MetLife shares, lead plaintiff and other members of the Class did not know of, or in the exercise of reasonable diligence could not have known the facts concerning the false statements/omissions alleged herein and could not have reasonably discovered those facts prior to the Offerings.

257.     Less than one year has elapsed between the time that plaintiff discovered or reasonably could have discovered the facts upon which this claim is based and the time that plaintiff filed this allegation of violations of §12(a)(2) of the Securities Act.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this claim.

258.     By reason of the false statements/omissions alleged herein, defendants violated §12(a)(2) of the Securities Act and are liable to lead plaintiff and the Class members who purchased or acquired MetLife common stock pursuant to the Offering Materials, each of whom has been damaged as a result of such violation.

## COUNT V

### Violation of Section 15 of the Securities Act
### Against All Defendants Except the Underwriter Defendants

259.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶197-258 above, as if fully set forth herein.

260.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiff Central States and other members of the Class who purchased or otherwise acquired MetLife common stock pursuant to the Offering Materials and who were damaged thereby against all defendants except the underwriter defendants.  For purposes of this Count, Plaintiffs affirmatively state that they do not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

- 127 -

261.   Each of the defendants except the underwriter defendants acted as controlling persons of MetLife within the meaning of §15 of the Securities Act by virtue of his position as a director and/or senior officer of MetLife.   By reason of their senior management positions and/or directorships at the Company, as alleged above, all defendants except the underwriter defendants, individually and acting pursuant to a common plan, had the power to influence and exercise the same to cause MetLife to engage in the conduct complained of herein.   Defendants were able to and did control the contents of the Offering Materials, which contained materially false statements and financial information and were culpable participants in the violation of §§11 and 12 of the Securities Act alleged herein.   By reason of such conduct, each of the defendants except the underwriter defendants are liable pursuant to §15 of the Securities Act jointly and severally to plaintiffs and other members of the Class.

## XIV.   SAFE HARBOR IS INAPPLICABLE TO INITIAL PUBLIC OFFERINGS

262.   Defendants are liable for any false and misleading forward-looking statement issued in the August 3, 2010 Registration Statement and/or March 4, 2011 Registration Statement.   The Safe Harbor provision of §27A of the Securities Act, 15 U.S.C. 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements at issue.

## XV.   CLASS ACTION ALLEGATIONS

263.   Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who acquired shares of MetLife common stock traceable to the Company's false and misleading August 3, 2010 Registration Statement and March 4, 2011 Registration Statement for its IPO (the "Class"), and who were damaged thereby.   Excluded from the Class are defendants and their families, the officers and

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

264.     The members of the Class are so numerous that joinder of all members is impracticable.  MetLife stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MetLife or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  MetLife has more than 11.5 million shares of stock outstanding.

265.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

266.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

267.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Securities Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public in the Offering Materials misrepresented material facts about the business, operations and management of MetLife; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

268. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVI. PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such equitable/injunctive or other relief as deemed appropriate by the Court.

## XVII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 14, 2012

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS

_____
       SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Lead Counsel for Plaintiff

# CERTIFICATE OF SERVICE

I, Kelly A. Stadelmann, hereby certify that, on May 14, 2012, I caused a true and correct copy of the attached:

Amended Class Action Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail and electronic mail on the following counsel:

Maeve O'Connor
Elliot Greenfield
Kaitlin T. Farrell
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
mloconno@debevoise.com
egreenfield@debevoise.com
ktfarrell@debevoise.com

Kelly A. Stadelmann

# EXHIBIT A

FLORIDA OFFICE OF INSURANCE REGULATION

MEDIA ADVISORY

# COPY

IN RE:  METROPOLITAN LIFE INSURANCE COMPANY (METLIFE)


**********

| | |
|---|---|
| IN RE: | Public Hearing |
| DATE: | May 19, 2011 |
| TIME: | Commenced at 9:30 a.m.<br>Concluded at 12:45 p.m. |
| LOCATION: | Pat Thomas Committee Room<br>Tallahassee, Florida |
| REPORTED BY: | SANDRA L. NARGIZ<br>Certified Realtime Reporter<br>Certificate of Merit Holder<br>snargiz@comcast.net |

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308   850.878.2221
asreporters@nettally.com

---

APPEARANCES:

THE PANEL:

KEVIN M. McCARTY
Insurance Commissioner
State of Florida

JEFF ATWATER
Chief Financial Officer
State of Florida

P.K. Jameson
General Counsel
FL Department of Financial Services

BELINDA MILLER
Acting General Counsel
FL Office of Insurance Regulation

MARY BETH SENKEWICZ
Deputy Insurance Commissioner
FL Office of Insurance Regulation

TRISH CONNORS
Associate Deputy Attorney General
State of Florida

CHRIS HUNT
Assistant Attorney General
State of Florida

ANOUSH BRANGACCIO
Executive Senior Attorney
FL Office of Insurance Regulation

RHODA JOHNSON
Senior Attorney
FL Office of Insurance Regulation

KENNETH TINKHAM
Senior Attorney
FL Office of Insurance Regulation

TIM GRAY, Senior Attorney
FL Office of Insurance Regulation

JIM PAFFORD
Director of Market Investigations
FL Office of Insurance Regulation

---

CRISTI OWEN, Insurance Examiner
FL Office of Insurance Regulation

JUSTIN DURRANCE
Chief Deputy Commissioner
FL Office of Insurance Regulation

RALPH T. HUDGENS
Insurance Commissioner
GA Office of Insurance

JIM MUMFORD
First Deputy Commissioner
Iowa Insurance Division

ROBERT WAGNER, General Counsel
Illinois Insurance Division

STEPHEN W. ROBERTSON
Insurance Commissioner
Indiana Department of Insurance

DENISE BRIGNAC
Chief Deputy Commissioner

MARY McAUSLAND
Chief Market Conduct Examiner
Maryland Insurance Administration

MARTY FLEISCHHACKER
Audit Director
Minnesota Department of Commerce

JIM MEALER
Chief Market Conduct Examiner
Missouri Department of Insurance

ADAM HAMM, Insurance Commissioner
North Dakota Insurance Department

DOUG WHEELER, Director
NJ Division of Insurance

MARY TAYLOR
Lt. Governor/Director of Insurance
OH Department of Insurance

---

ELLEN EDWARDS
Assistant General Counsel
OK Insurance Department

MICHAEL F. CONSEDINE
Insurance Commissioner
PA Insurance Department

JULIE MIX McPEAK
Commissioner of Insurance
TN Department of Commerce/Insurance

JOHN COX, ATTORNEY
VA State Corporation Division

YEN LUCAS, Chief Counsel
PA Department of Insurance

STEVE PARTON, Special Examiner
IL Department of Insurance

DR. THERESE "TERRI" VAUGHAN
Chief Executive Officer
NAIC

SCOTT HOLEMAN
Director of Communications
NAIC

KERI KISH, Antifraud Counsel
NAIC


ON BEHALF OF METLIF:

Teresa Wynn Roseborough, Counsel
Joy Ryan, Counsel
Todd Katz
Frank Cassandra
Larry Vranka

P R O C E E D I N G S

COMMISSIONER McCARTY: Good morning. My name is Kevin McCarty. I am an Insurance Commissioner with the State of Florida.

This hearing is being held today on behalf of the Office of Insurance Regulations in cooperation and in conjunction with the National Association of Insurance Commissioners. I hereby call this hearing to order.

For the record, today's date is May 19, 2011, and we are conducting this public hearing in Room 412 of the Knott Building in Tallahassee, Florida. Notice of this hearing was previously published in the Florida Administrative Weekly in accordance with Florida law.

Members of the public may offer comments about this hearing today by sending an e-mail to the address: Public Hearings@FLOIR.com.

Please include in the title of your e-mail that this is the subject matter of life insurance companies so that we can relate your comments to today's hearing.

I would like to personally thank all of the people who have taken time out of your busy schedules to attend our hearing. We want to thank

the staff members of Florida's Chief Financial officer, Jeff Atwater, who may be joining us during this proceedings, and representatives of his office, as well as Florida Attorney General Pam Bondi's office.

I am very appreciative of the leadership of both the General as well as the CFO in addressing these very important issues concerning fair claim practices for insurance policies.

We'd also like to take this opportunity to thank the number of insurance commissioners and their staffs for making the trip across the country to Tallahassee to be here today to address this very important public policy issue.

Again, I would also like to express my appreciation to the National Association of Insurance Commissioners, its chief executive officer, Dr. Vaughn, and it's chief operating officer, Andy Beal, whose assistance in setting this up has been invaluable.

And I especially would like to thank the Florida Channel for providing a live telecast of our hearng today as well as a web stream of the hearing and providing access to the hearing at its conclusion.

I would like to note that the National Association of Insurance Commissioners has formed a task force on investigations of life and annuity claims settlement practices. As many of us are keenly aware, there are various state officials in a number of states that have initiated audits, examinations, and investigations of a group of large insurance companies regarding the claims settlement practice with a particular focus on unclaimed property.

One of the main questions at issue is the ways in which insurance companies are using information they secure from the Social Security Administration's Death Master File. The NAIC task force is actively working on these issues and is developing a work plan for handling ongoing investigations in process as well as engaging in additional multistate market conduct examinations covering most of the insurance industry.

Before I begin, I would like to clarify about what are today's objectives.

The purpose of this hearing is to learn about life insurance industry's policies, practices, and procedures regarding claims settlement and unclaimed property.

Specifically, we want to know how life insurance companies utilize the Death Master for Social Security and process notice of an insured or annuity's death.

We want to be sure that the public is educated in general about the life insurance industry and their practices. We know that life insurance companies work very hard to sign up people to purchase their products and accept billions of dollars a year in premium dollars. We also know, based on information widely available in the public domain, that many beneficiaries go unpaid for a variety of reasons.

We are hopeful that by engaging in a discussion in this public forum, more people are encouraged to have conversation with their children, their grandchildren, and other beneficiaries about life insurance policies that are currently in place so that payments that are promised under the policies reach their intended beneficiaries.

We want to ensure that companies work as hard to find beneficiaries and pay money owed as they have worked to sign up the policyholders to purchase their products in the first place.

1  We also want to ensure that if beneficiaries
2  cannot be found, that the proceeds of life
3  insurance policies and annuities are reported and
4  properly remitted to the appropriate state for
5  safekeeping until the rightful owners are found.
6  Florida has an outstanding record for
7  returning unclaimed property to their rightful
8  owners. My fellow insurance commissioners are
9  dedicated to ensuring that promises made are
10  promises kept, and that death benefits are paid to
11  their consumers.
12  To be very clear, this is not a hearing on any
13  examination that may be going on or underway in any
14  state at this time. It is not an adversarial
15  hearing, but it is an evidentiary hearing. No
16  decisions will be made today.
17  I have subpoenaed two market leaders here
18  today so they can tell us in an open and
19  transparent forum about claims settlement practice
20  and identify any misunderstandings or explain what
21  they are doing to find as many people as possible
22  to fulfill their legal obligations.
23  I appreciate very much the companies coming
24  forward for this hearing and wish to emphasize that
25  multistate examinations of the majority of the

1  insurance industry are forthcoming.
2  At this time, I would like to recognize P. K.
3  Jameson, General Counsel for Jeff Atwater, our CFO,
4  for a brief comment.
5  MS. JAMESON: Thank you, Commissioner McCarty.
6  I just want to say I appreciate the
7  opportunity you offered to the Department of
8  Financial Services and Chief Financial Officer Jeff
9  Atwater to participate in the hearing today. We
10  are very interested in hearing the discussions
11  today. And the CFO's definitely concerned that the
12  citizens of Florida are receiving the benefits that
13  they are due. Thank you.
14  COMMISSIONER McCARTY: And possibly we will be
15  joined later during our questioning session by CFO
16  Atwater, and we certainly welcome his
17  participation.
18  At this point I would like to recognize the
19  representative of the Florida Office of the
20  Attorney General, Trish Connors.
21  Deputy attorney General Connors.
22  MS. CONNORS: Good morning. My name is Trish
23  Connors. I am the Associate Deputy Attorney
24  General for the Office of the Attorney General. On
25  behalf of the Attorney General, Pam Bondi, I would

1  like to thank Commissioner McCarty for the
2  tremendous leadership he has shown regarding this
3  extremely important and, frankly, more than
4  unsettling matter, and for facilitating what
5  continues to be comprehensive multiagency review.
6  The Office of Attorney General is charged with
7  protecting the public interests with various civil
8  enforcement tools that ensure, among other things,
9  that our citizens are protected from unscrupulous
10  business practices.
11  Some of our most vulnerable citizens are the
12  elderly; they and many other Floridians have paid
13  premiums over decades for life insurance policies
14  with an expectation that their rightful
15  beneficiaries would receive the funds owed them in
16  a timely manner.
17  We have been a partner in this matter with the
18  Office of Insurance Regulation and the Department
19  of Financial Services and with Commissioner
20  McCarty's strong leadership from the beginning.
21  As Commissioner McCarty has noted, this is not
22  an advisory process, but it is an examination
23  hearing and it's an opportunity for the companies
24  here today to explain in a very transparent way
25  their policies, practices, and procedures regarding

1  claims settlement and unclaimed property.
2  In that regard, the Florida Attorney General's
3  office looks forward to hearing firsthand your
4  companies' candid testimony and complete answers
5  today if there are any questions regarding these
6  matters, answers that we hope will inform us as an
7  enforcement agency regarding our responsibilities
8  so that the Attorney General can make the
9  appropriate decision.
10  It is imperative that companies doing business
11  in the state observe and follow Florida law. In
12  particular, it is important that companies doing
13  business in Florida exercise the utmost due
14  diligence in fulfilling their contractual and
15  regulatory obligations.
16  Our senior citizens and other life insurance
17  policyholders have every expectation, when they
18  enter into a contract as significant as a life
19  insurance policy, that their insurance companies
20  will perform the appropriate due diligence expected
21  in a fiduciary relationship to locate and properly
22  notify beneficiaries in a timely manner upon the
23  policyholder's death.
24  The ongoing cooperative work of the Florida
25  agencies in this multiagency review operates not

only to the benefit of Floridians, but as
demonstrated by these proceedings today, also
provides your companies with an opportunity to
address our collective concerns.

It is my hope and the Attorney General's hope
that MetLife and Nationwide will fully avail
themselves of this opportunity today by providing
full and complete testimony.

Thank you, Commissioner.

COMMISSIONER McCARTY: Thank you, Deputy
Attorney General Connors. Thank you.

Next on our program and part of the hearing, I
would recognize our general counsel for the Office
of Insurance Regulation, Ms. Belinda Miller. She
is going to do a PowerPoint presentation that will
further explain the topics of today's hearing.

Ms. Miller.

MS. MILLER: Thank you, Commissioner. Thank
you to everyone who came today. We do appreciate
it.

This PowerPoint will be posted on our website
so I am not going to belabor this because the
purpose of this is really to give you an overview
of what the issues are and what we want to go
through today.

The purpose of this hearing is Florida and the
NAIC are holding this hearing to evaluate existing
industrywide practices related to life insurance
and annuities claims settlement issues, the use of
the Social Security Administration's Death Master
File, compliance with Florida's Unclaimed Property
laws, and areas where those practices can be
improved.

What we are going to talk about are life
insurance policies and annuity policies. Life
insurance includes both the individual policies and
group policies.

Annuities were talked about. There are a lot
different of annuities, but what we are going to
focus on is -- basically, there are two typos.
There are annuities that are in the pay-in phase
and there are annuities that are in the pay-out
status. The policyholders are paying premium to
the insurance company or the insurance company is
paying out on the annuity to their beneficiary.

We know from public sources that there is an
issue with unpaid benefits. That's been commented
on in the press, in a variety of places. The first
quote, I think the life insurance goes unclaimed
each year for one simple reason: Beneficiaries

don't know that the money exists. It's difficult
to estimate the extent of this and the
recordkeeping I think may or may not be strong.

Florida has an unfair claims settlement
practice law, and this is not substantially
different than other states.

We are looking at this issue in terms of
whether the companies have implemented standards
for the proper investigation of claims, whether
they are denying claims or withholding benefits
without conducting a reasonable investigation.

The insurance companies cannot fail to
identify deceased insureds and settle claims for
death benefits which they can do under information
in their books and records, when they can find
those people when it benefits them. They also
can't lawfully terminate policies or continue to
pay premiums when they know or have reason to know
or it's in their records that the insureds have
already died.

A related issue is whether companies are
complying with obligations to report and remit
unclaimed death benefits for the Unclaimed Property
law.

Under Florida's Unclaimed Property law, all

funds due are owing under an life insurance policy
or annuity contract which has matured or terminated
or presumed unclaimed if they are unclaimed for
more than five years after the funds become due and
payable.

And the fact that the State is the best
repository for unclaimed property has been
established by a Supreme Court case, Connecticut
Mutual Life versus Moore. It's established law.
And that is the purpose of the unclaimed property
area which in Florida has a tremendous track record
for actually getting that property back to the
people who it belongs to.

The Unclaimed Property law is even more
specific. The life insurance policy or annuity
contract not matured by actual proof of death of
insured or annuitant is deemed mature and the
proceeds due and payable if the company knows the
insured or annuitant has died.

What are the issues? We want to know if
insurance companies fail to initiate claim
processes or thwart to remit unclaimed death
benefits in situations where individuals have died
with in-force policies or accounts but
beneficiaries have not filed claims because they

were unaware of the policy?

Do insurance companies have information in books and records identifying when lost customers are deceased, with active policies or accounts, but then fail to act on this information, except when it is in their best interest to do so: For example, in the pay-out annuity or a company-owned life insurance policy, et cetera?

Do companies have adequate controls to monitor when retained asset accounts have been dormant for years so they can locate the account holder and report and remit proceeds to Unclaimed Property?

Do companies routinely fail to pay out annuity contracts after maturity date or report and remit unclaimed property to divisions of states if the owners cannot be located?

These are some of the issues.

There are a variety of ways insurance companies become aware of death of their insureds. We are not just talking about the Death Master File. They might get a call from a relative or a representative of the decedent. They might perform a search for a new address if they get returned mail.

Or companies might actually receive a claim

form and/or death certificate in connection with one insurance policy and then have other insurance policies on the same decedent. They also can use information contained in or derived from publicly available databases such as the Social Security Administration Death Master File.

This is the Death Master File. It's available on the internet. The Death Master File has a list of all the people who have died as reported to the Social Security Administration.

According to Congressional testimony, the Death Master File is very accurate. In other words, people aren't on there who aren't really dead. The only indication that they have had of errors are occasionally there are people who are not reported in the Death Master File who have, in fact, died. So it may be there is somebody not on there who is actually dead because they didn't have a Social Security number or other identifying information.

Companies access the Death Master File in a variety of different ways. There are a number of places that they can either buy access to it or -- well, they can buy access to it. The Accurint is used by a lot of companies. They can go to

rootsweb.com, and we understand there are many different ways they can access this data.

Again, insurance companies can use the Death Master File for a variety of purposes. They can use it to perform antifraud procedures, verify dates of death prior to paying out on a policy, perform death sweeps of company-owned life insurance policies. So if they have a company-owned life insurance policy, we know that companies expect the insurance company to occasionally look and see if any of their employees have died or any of the people who are covered under that policy.

And they can perform regular comparisons against their records to identify deceased annuitants in the pay-out phase so that they stop making payments to the annuitants. So the question is do they run the Death Master File on a regular basis against annuities in the accumulation phase -- in other words, where the person is paying in -- or against their life insurance policies?

What happens when a company finds one of their insureds on the Death Master File and makes a match? If the death is identified on the Death Master File, will they allow death benefits to go

unpaid and escheated or remitted to the State?

Do they require a certified death certificate and completed claim form before settling a claim?

Do they close claim files if they don't receive the required information, if they got a claim form and not the death certificate or if they get the call and not the claim form?

Do companies drain policies and allow them to lapse after the death of the insured?

Many policies have a feature where, of course, the premium continues to be paid out of the cash value of the policy until the cash value is exhausted and then the policy lapses. One of the issues here is whether that happens after the company has notice of a death.

And will companies report and remit death benefits to the State without a death certificate?

There are a variety of scenarios that we can talk about and I am sure that the companies will raise.

A death certificate and claim form may be received by one beneficiary but not all beneficiaries. A phone call or a letter is received from a relative reporting the death, but a claim is never filed or perfected. A search for a

now address following receipt of returned mail
indicates the insured is deceased, but a claim is
never filed.

Do companies allow this built-up cash value of
life policies to be used to keep policies in force
after the insureds have died or allow the policies
to terminate or lapse after the cash value has been
drained?

Here's an example: The insured dies in 1995,
policy is in force, but no claim is ever filed.
Six months later, the policy is set to expire due
to failure to pay premiums. Although the insured
is listed in the Death Master File as deceased, the
insurance company begins using automatic premium
loans to keep the policy in force. Five years
later, the cash value of the policy has been used
up and the policy is allowed to expire without any
value.

Antiforfeiture provisions are a consumer
protection device. They should not be used to
usurp the value of a policy after death or result
in people not getting the proceeds of the policy
when the person has actually died, the insured.

Another issue is whether the dormancy period
is accurately calculated.

Here's an example: The dormancy period is the
time that the claim remains unpaid before it is
required to be submitted to Unclaimed Property. So
an insured dies in 1989, the policy is in force and
a claim is never filed.

The Death Master File comparison is performed
in 2009 and it identifies the death of the insured
that happened back in 1989.

The insurance company verifies the insured
died while the policy was in force and no benefits
have ever been paid.

Does the company wait for five more years or
do they go ahead and remit that to the Unclaimed
Property division of the State?

We have an issue of small face values policy
or industrial life policies which we know years ago
in Florida were actually quite a large part of the
market. These policies were marketed door to door,
and consumers bought them and paid premiums over
long periods of time, sometimes paying more than
the policies were worth. And this is not unique to
the companies who are represented here, this is
just in general.

Millions of these industrial policies remain
in force. Some of them were written in the 1930s

and '40s.

Did the companies try to find out if the
people who bought these policies were deceased?
And what have they done to find out if they are
deceased, and have they remitted the benefits or
the unclaimed property related to those policies?

Retained asset accounts: This is handled
differently by different insureds, but a lot of
insurers set up retained asset accounts in order to
pay beneficiaries through a retained asset account;
in other words, that account is set up for that
beneficiary without just sending them a check.

There are estimates -- this is from
Bloomberg -- 28 billion is held by life insurance
companies industrywide in this form. Many
companies use this as a default settlement payment
option. Companies also describe this as an option
that allows beneficiaries to have time to decide
what to do with this money following the death of
the insured.

And companies sometimes hold these in their
general corporate accounts where they are not
guaranteed by the FDIC.

The question is what are companies doing to
monitor these retained asset accounts to ensure

that they do not become lost?

Do they attempt to contact the owners of these
accounts if they have not heard from them for a
period of years?

Do they take any steps to determine if the RAA
owners have died?

Or do they have written report remittance
policies for those for unclaimed property?

A similar question arises about matured
annuities.

What are companies doing to locate owners of
these annuities and remit unclaimed payments to the
State if the owners cannot be located?

In conclusion, we want to be find out and
discuss what insurance companies are doing to meet
their obligations to report and remit unclaimed
property in their possession. What are they doing
to utilize available information and methodologies
to identify customers who are deceased and
beneficiaries who are due money?

Those are the issues.

COMMISSIONER McCARTY: Thank you, Ms. Miller.

Today, as I mentioned previously, we are
receiving testimony from two insurance companies
that have been subpoenaed to be here, Metlife and

MR. KATZ: I believe we do, yes.

COMMISSIONER McCARTY: If so, when were those policies and procedures implemented?

MR. KATZ: I do not know.

COMMISSIONER McCARTY: And we would like to know that answer.

MR. KATZ: We can follow up and get you that. I just want to make sure I give a complete answer. So I don't know exactly what was written --

COMMISSIONER McCARTY: We also would like to know how the policies and procedures evolved over time.

MR. KATZ: Most definitely.

COMMISSIONER McCARTY: How long has Metlife systematically matched up group annuities against the Death Master File?

MR. KATZ: So, we began using the Death Master File for our group annuity business, as I said previously, in the '80s.

If your question gets at at what point was that -- did that go from a paper process to a system process, is that --

COMMISSIONER McCARTY: Actually, if you start -- let's just say it's late, sometime in the late '80s. Do you use it like quarterly to do

match-ups? Or --

MR. KATZ: Excuse me. I don't know the frequency that we did in the late '80s. I can certainly tell you the frequency we do today and have done in recent years. We certainly can follow up and give details of what exactly was done.

COMMISSIONER McCARTY: What is the match-up rate timeline for today?

MR. KATZ: Currently, for group annuities, we are matching once a month.

COMMISSIONER McCARTY: Once a month. Okay.

What do you do when you get a match? I presume you would stop making the annuity payment.

MR. KATZ: For a group annuity, we consider a match an indication of death. We suspend the annuity payment. We write to the family indicating that we have done that.

Should, for whatever reason, the family or someone contact us and indicate that was an error and that the individual is still alive, we would obviously reverse that transaction.

And it's important to point out in some cases it results in stopping a payment, and some cases it results in the change of the individual to whom the annuity is going to. And in some cases it will

result in a death benefit ultimately to be paid.

And all of those are examples of some of the actions that we take, we take there.

COMMISSIONER McCARTY: Do you require a death certificate before stopping payments?

MR. KATZ: We do not.

And I think the key to that, just to give you a little more color, is just the fact that the individual is dead is an indication that additional payments aren't appropriate at that point in time. I will juxtapose that later to life insurance.

COMMISSIONER McCARTY: Do you pay and remit death benefits or death payments due based on the Death Master File?

MR. KATZ: I am sorry, please repeat your question.

COMMISSIONER McCARTY: Do you remit unclaimed property based on the Death Master File?

MR. KATZ: Yes, we do. And just again for completeness, we have a very robust unclaimed property system for each of our administrative units. They will have specific procedures for their product, and those procedures articulate how unclaimed property is determined and how it should be put into the Unclaimed Property system.

MS. MILLER: And that system is available for group annuities? It's used for group annuities, the robust system you described, unclaimed property, is used for group annuities if you find out someone is dead but you can't locate the beneficiary?

MR. KATZ: Let me answer in general.

In any situation where we determine there is unclaimed property, it would be our intent to move that into the Unclaimed Property system, and that could emerge from any place in the company.

And I am trying to think of a scenario in a group annuity that could be a situation where a beneficiary couldn't be reached, additional funds are due, and that beneficiary can't be located.

MS. MILLER: Are there any policies that you have that are not included in your Unclaimed Property system or that are not over run through that or remitted?

MR. KATZ: I am not aware of situations where we identify unclaimed property and don't put it through our Unclaimed Property system.

Essentially, the process is pretty comprehensive for the company. And if we determine there is unclaimed property that's due, we put it

1  maintain up-to-date processes for us.

2     MR. KATZ: I think, to the extent we have

3  historical items on record, we absolutely will

4  share that.

5     MS. JAMESON: Thank you.

6     MR. KATZ: I want to share one other piece on

7  escheat in Florida because I gave an aggregate

8  number for the country.

9     I just did want to share that in Florida in

10  2010, we escheated over $2.7 million, so it's not

11  an insignificant number. And I am just sharing

12  that in the context of the processes are there and

13  I am certain we'll work very closely with your

14  department to make sure you are getting the money.

15     MS. JAMESON: That's on your latest report

16  that you just filed? Is that the number that you

17  just --

18     MR. CASSANDRA: I am not sure.

19     MR. KATZ: We can verify where that number

20  came from.

21     MS. JAMESON: Okay.

22     COMMISSIONER McCARTY: Ms. Miller.

23     MS. MILLER: I know you are going to get to

24  the rest of the questions, but this has left me

25  with a question.

1     Your Unclaimed Property system tracks, then,

2  the date of death and then five years after date of

3  death for Florida, or three years for other states,

4  then it would alert you that you need to remit that

5  property to Unclaimed Property. That's what it's

6  for, right?

7     MR. KATZ: The Unclaimed Property system will

8  track the date that the funds are put in the

9  system, and then the appropriate timing for which

10  the claim needs to be paid. The actual time in

11  terms of when it goes into the specific -- into the

12  system would be driven by the administrative

13  processes for any given product.

14     MS. MILLER: So if I have a relative who died

15  in 1995 and you were already using Death Master

16  list in 1995, you would have picked that up and put

17  it in unclaimed property if you didn't know how to

18  contact me?

19     MR. KATZ: It's hard for me to respond to a

20  hypothetical, but I think you are getting at a

21  question which I think deserves some good

22  discussion, which is what is the appropriate date

23  to be used for the period of dormancy? Is it the

24  date of death? Is it the date of notice? And how

25  does that work?

1     And the answer really is going to vary for us

2  based on the specifics of any given product and the

3  jurisdiction and the rules that apply in that

4  jurisdiction.

5     MS. MILLER: I think we are getting to the

6  heart of it.

7     Date of notice, though, would be when you get

8  notice from the Death Master File that person has

9  died, right?

10     MR. KATZ: Yes. So we are getting to the

11  heart of the issue. So we should probably spend a

12  few minutes on it.

13     When we get the Death Master Index and we use

14  it, and we match and find someone is dead, we begin

15  an investigation process around that notice.

16     And we would start the clock; we contact, we

17  would reach out to the assumed beneficiary and

18  attempt to get clarity that there was a real death,

19  get proof of death. And it's an important

20  distinction in the life insurance versus the

21  annuity business.

22     So that in the life insurance business, our

23  liability begins when there's a proof of death,

24  which is different than, let's say, in the annuity

25  business, when -- I think it's important to explain

1  why. Because just because someone is dead in a

2  life insurance business doesn't necessarily mean

3  that that individual or the beneficiary should be

4  due a benefit.

5     MS. MILLER: Just because somebody is dead

6  doesn't mean they are due a benefit. But just

7  because somebody is dead does mean the clock starts

8  ticking for unclaimed property.

9     MR. KATZ: Yes. I think what you are asking

10  me to do is testify to the interpretation of a law,

11  and I am probably not the best to do that. I can

12  testify to the facts on how we do it, but not to

13  whether the clock ticks one way or the another.

14     MS. MILLER: Okay. But how you do it, does

15  Metlife -- if you can't find somebody -- you made a

16  match, you got your Social Security Death Master

17  File, and in your record you got evidence somebody

18  died.

19     Do you try to look for their beneficiaries? I

20  am hearing yes. And if you don't find them, then

21  you put it in the system and wait five years for

22  the unclaimed property dormancy period and then

23  turn it over. Is that the way it works?

24     MR. KATZ: Let's talk -- it's easier for me to

25  talk about a practical example.

1    So we shared that we use the Social Security
2  Death Index in our life business.
3    In 2007, we ran the death index against a
4  majority of our individual life business, and just
5  to give you a sense of how that worked.
6    At that point in time, we identified about
7  $84 million of deaths, claim values of deaths, and
8  we began a process then to investigate those
9  deaths.
10    Since 2007, we have paid out about
11  $51 million, and we set up about another
12  32 million -- let's call these round numbers, I
13  don't want to quote them exactly.  On a
14  going-forward basis, I am going to ask my
15  colleagues the date we set up that for escheat was?
16    MS. ROSEBOROUGH:  For the purposes of the 2007
17  match against most our life systems, we used
18  June 1st, 2007, as the initial date of dormancy.
19    MS. MILLER:  When you say it's "most" of your
20  life business, what part of your life business was
21  not included in that?
22    MR. KATZ:  For most of the individual business
23  that was in our records, and it's a big chunk of it
24  that we used, we had some assumed businesses that
25  were relatively small that might not have been

1  included.  And then we also have some business
2  where a lot of business we don't have a Social
3  Security number.  So we don't have a Social
4  Security number, matching it against the death
5  index is a less effective tool.  That will get at
6  the industrial block which I would like to spend a
7  little bit of time on; I am sure you have questions
8  about that.
9    MS. MILLER:  Okay.  We can go on the agenda.
10  At some point we want to know if you can match that
11  with the date of birth or some other -- you got the
12  name of the person.  And would you have a date of
13  birth in your records?
14    MR. KATZ:  We might; we might not.
15    When we did the match, keep in mind that most
16  industrial policies were issued a long time ago.
17  In some cases, the records were not particularly
18  good.
19    I should probably make a point that in the
20  early '80s, we made a decision to take the entire
21  industrial life block and convert it to paid up.
22  So no individual policyholder, to best of my
23  knowledge, has had to make a premium payment as
24  long as they had a premium paying policy in 1981.
25    So that kind of creates a bit of a challenge

1  because one of the ways you stay in contact with
2  your customers is you collect premium from them,
3  and we told them then in 1982 you no longer have to
4  remit any more premium to us.
5    What happened after that is in the late '80s
6  into the early '90s, we began aggressive efforts
7  through a campaign called our Family Reunion
8  Program to really reach out and try to connect with
9  those policyholders.
10    And if you think back to that time, late '80s
11  or early '90s, the technology wasn't all that great
12  then.  And we were actually able to reunit about
13  half a million policyholders.  And it probably
14  makes sense to spend a little time on that because
15  I think it's relevant in the context of how we are
16  trying to connect with beneficiaries, if you would
17  like us to.  Would that be okay?
18    COMMISSIONER McCARTY:  Deputy General, she has
19  a follow-up question.
20    MS. MILLER:  Can you go ahead?
21    MS. CONNORS:  It is just one, and it may be my
22  ignorance of how the process works.  What prompted
23  the search in 2007?
24    MR. KATZ:  That's a great question.  So it's
25  probably worthwhile to go back a little further

1  because that wasn't the first time we used the
2  death index in our life business.
3    So I shared in the late '80s we kicked off a
4  ten-year program to search out beneficiaries we
5  thought -- search out policyholders that we thought
6  was quite effective; and still today, some of the
7  policyholders we connected with back then are
8  submitting claims.
9    Around 2000, in connection with our
10  demutualization, we felt it was important to update
11  address records for our clients.  So we went
12  through a pretty aggressive process to update
13  address records.  And even still today, we use the
14  post office electronic adjust change records and
15  match that against our system; again another way to
16  keep in touch with our clients.
17    Around 2004, 2005, a few specific states had
18  expressed an interest in understanding how the
19  death index was being used.  And we did a match or
20  gave those states data to do a match at that time
21  in '04 and '05.  And subsequent to that, it became
22  apparent to us that this may be a useful tool that
23  would enable us to find policyholders.  And so in
24  '06, we made the decision to apply that as I
25  described.

they can make a claim.

MR. KATZ: That's correct.

MS. MILLER: -- and a settlement process happen.

MS. ROSEBOROUGH: While you are collecting your thoughts, this is probably a good moment, we've got a more precise dollar figure for Florida escheat as of December 2010.

MR. CASSANDRA: Yes, Ms. Jameson. I think the number I provided was 2-1/2. It's actually 2.0.

COMMISSIONER McCARTY: Let's go now to does Metlife use the Death Master information for corporate-owned life insurance?

MR. KATZ: I didn't come prepared to talk about corporate-owned life insurance.

MR. CASSANDRA: I think I can answer.

COMMISSIONER McCARTY: Would you please come up. Thank you very much.

MR. CASSANDRA: Yes, sir.

As you know corporate-owned life insurance, the connection with the -- potentially can be lost between the employee and employer. So, yes, I believe it has been our practice to use the Social Security Death Master File on our --

COMMISSIONER McCARTY: Can you tell a date on

or about when you started using the Death Master with regards to corporate-owned life insurance?

MR. CASSANDRA: I am sorry, I don't know that date, but we can follow up and get that for you.

COMMISSIONER McCARTY: Do you have written policies and procedures with regard to the use of the Death Master?

MR. CASSANDRA: I believe that to be the case, but I don't have personal knowledge of it. I have not seen them.

COMMISSIONER McCARTY: So then we would not know when those policies and procedures were first implemented?

MR. CASSANDRA: I think we have to follow up on that.

MR. KATZ: Generally speaking, we definitely should keep going through this. One of the notes we discussed, we can put together for you a pretty comprehensive chart that lays out policy type by policy type that really gets at all the stuff. We are going to do our best to continue to answer your questions, but given the level of detail you are looking for, we want to make sure we give you comprehensive information, and we can certainly do that in writing.

COMMISSIONER McCARTY: But you do use it currently for corporate-owned life insurance policies?

MR. KATZ: We do.

COMMISSIONER McCARTY: What is the frequency you match the Social Security Death Master against the --

MR. KATZ: I don't know.

MR. CASSANDRA: I believe we do that monthly.

COMMISSIONER McCARTY: Do monthly, as is the case with the annuities?

MR. CASSANDRA: Yes, with some annuities.

COMMISSIONER McCARTY: With some annuities?

MR. KATZ: Let me give a clarification to another question you asked previously about annuities and paid-out status.

Around 2000 is when we began using the Death Master Index for payouts. The payout, individual pay-out annuities and the frequency is monthly for that.

COMMISSIONER McCARTY: Let's now turn our attention to individual life policies.

Does Metlife use the Social Security Death File information with respect to individual life policies?

MR. KATZ: Yes, we do.

COMMISSIONER McCARTY: If so, how long have you been using the Death Master?

MR. KATZ: I described a little bit of history before. You want me -- I can repeat it.

We used it initially in the early part of the last decade. '04, '05 is probably a proximity.

COMMISSIONER McCARTY: Approximately 2004, 2005, you began to use it for individual life policies?

MR. KATZ: For portions of our business in certain jurisdictions.

COMMISSIONER McCARTY: And how often did you apply that?

MR. KATZ: We applied it once -- I should be clear.

In that situation, we provided a very diverse jurisdiction, and in the records to some of those jurisdictions, and they actually did the match themselves. So it really varies by jurisdiction.

COMMISSIONER McCARTY: Do you have policies and procedures in place for utilizing the Social Security Death Master as it relates to individual life insurance policies?

MR. KATZ: Yes.

COMMISSIONER McCARTY: When were those policies and procedures first established?

MR. KATZ: I can't tell you an exact date.

COMMISSIONER McCARTY: But when you referred back to the dates of the mid-2004, 2005, that was not a systemic, ongoing quarterly or monthly match-up that we have testimony as with regard to the annuities?

MR. KATZ: That's correct. That's correct.

COMMISSIONER McCARTY: Okay.

MS. ROSEBOROUGH: Let me clarify. There may have been some instances in the early 2000s where the use of the Death Master File for limited --

MS. JOHNSON: Commission, we have been informed by the Florida Channel that they must speak at --

COMMISSIONER McCARTY: Please speak up at the mic.

MS. ROSEBOROUGH: I just want to clarify that there may have been isolated incidents in early 2000s when the Death Master was run against small pockets or limited pockets of policies on a regular basis approximately annually before we got to the more broad types of uses that Mr. Katz is

testifying to.

COMMISSIONER McCARTY: Okay. Let's try and nail that down.

You had access to, some access to the Social Security Death Master approximately the late 1980s. Is that correct?

MR. KATZ: Yes.

COMMISSIONER McCARTY: The company had access to information with regard to Social Security Death Master in the late 1980s, 1990s or thereabouts.

MR. KATZ: That is correct.

COMMISSIONER McCARTY: And the company systemically and actively used the Social Security Death Master to make a match with regard to group annuities, some collies, and other annuities.

MR. KATZ: I think a little later probably mid-'90s.

COMMISSIONER McCARTY: Mid-'90s. You first utilized the Social Security Death Master on an ad hoc basis for life policies somewhere on or about mid-2000, 2004, 2005?

MS. ROSEBOROUGH: I would say on an ad hoc basis by early 2000.

MS. MILLER: I need to interrupt here. If you want to give testimony, that would be great. But

we would need to swear you in as a fact witness if you are going to give testimony. I know you are trying to clarify, but that's not just legal.

MS. ROSEBOROUGH: I was just trying to clarify.

MS. MILLER: Okay.

COMMISSIONER McCARTY: What has been the scope of comparison of in-force, out-of-force policies with regard to the Social Security information?

MR. KATZ: Let me speak specifically to the more comprehensive match we did in 2007. And the scope of that would have been policies that were in force, cancelled, in nonforfeiture status including last --

COMMISSIONER McCARTY: What is your current process, policy and procedure with regard to running the Social Security Death Master with respect to individual life policies?

MR. KATZ: So, after 2007, we have random match, and we got a lot of learnings from that, and it led us to believe it made sense to run that match more frequently.

And more recently, in 2010, we made the decision to run that match against our individual life business no less frequently than once a year.

But the first of these matches for -- I should say that's for all of our life business.

The first of those matches took place just this past month.

MS. MILLER: When you ran a match in 2007 against most of your policies, how much, then, did you turn over to Unclaimed Property? You would have found people who at that point had been dead for years? We would have expected a spike, and I didn't really see that.

MR. KATZ: Yes, as we talked earlier, we found about $84 million in deaths as a result of the dollars. 51 million were paid out. 32 million, again, approximately, were set up into our unclaimed fund system. They were set up with the 2007 date to begin the 3- or 5-year period.

MS. MILLER: Okay. So those were people who died before 2007, so you are not using the date of death to determine that that starts the dormancy period, you are using the date you ran that system?

MR. KATZ: For the purposes of that, that's what we did, that's correct.

MS. MILLER: Is that what you've always done, is not use date of death but use the date you ran it?

MR. KATZ: For the purpose of the match, that
was really the first time we did a full
comprehensive match for our business.

MS. MILLER: When you did the match in 2007,
if somebody had been dead -- say they died in
1995 -- you would have picked it up for the first
time, right?

MR. KATZ: That's correct, they could have
died much earlier. We used 2007 to establish the
dormancy period, that's correct.

MS. MILLER: If they already had been dead for
more than five years, why didn't you just turn it
over to Unclaimed Property?

MS. ROSKDOROUGH: I am going to ask the
witness not to testify to a legal conclusion, but
he's already testified, the fact what we did is we
used the June 2007 date as the date we started the
dormancy period, and we believe that's consistent
with Florida law.

MS. MILLER: Okay.

COMMISSIONER McCARTY: Does Metlife use a
Social Security Death Master for group life
policies?

MR. KATZ: We currently have not. However,
the procedures implemented in 2010 will begin using

group life policies in 2011.

I should make an important caveat as it
relates to group life policies. The vast majority
of group life policies, the records are not
maintained by the insurance company, they are
maintained by the employer. So the complications
of group life are different than what we talked
about up until now.

COMMISSIONER McCARTY: So 2010, did you
establish policies and procedures for the use of
the Social Security Death Master?

MR. KATZ: We did, yes.

COMMISSIONER McCARTY: Does Metlife --

MR. KATZ: I should make a clarification on
that and ask Frank to help me out to be sure.

In terms of the dates that the policies and
procedures around this match was established, am I
giving the accurate date?

MR. CASSANDRA: We began to establish those
policies and procedures around the group insurance
business in late 2010.

And I would make one further clarification
with respect to the question about have we ever
matched group life insurance business.

There were a couple of instances where a group

policyholder who was the keeper of the records
asked for that or had done that sweep on their own.
I was just trying to clarify the process.

MS. MILLER: I think that is all the different
types of policies. And we have a few questions
about retained asset accounts.

But are there any types of policies that we
have missed that we haven't discussed that you use
Death Master to run against?

MR. KATZ: I am not aware of others.
Certainly we can check, and I am sure we'll share
that information with you.

MR. CASSANDRA: I would just add to that --

COMMISSIONER McCARTY: Thank you. I
apologize. We should have made this a little more
convenient.

MR. CASSANDRA: That's quite all right.

I would also say we do use the Social Security
Death Master File on certain other pay-out business
such as group disability and long-term care claims
that are in pay-out status.

MS. MILLER: Now you heard the issue is that
when it's paid-out status, when the company is
stopping a payment, you use that file frequently
and regularly; and then when it is a matter of

paying someone a death benefit, it's later and not
as consistent.

Do you have any response to that? It seems to
me that that's a little offensive to people. When
you are looking for a way to stop paying them, you
can find them? But when you are looking for a way
to pay them, benefit due, you can't find them.

MR. KATZ: I think that is the core of the
issue we talked about, and I think it's important
we articulate -- we articulated the procedures. We
haven't gotten into the whys. I would be happy to
give you some of that.

Assume the policy is in pay-out status, like
annuities we talked about, when we have an
indication of death, in the same way the Social
Security information uses it when they have an
indication of death, it's appropriate at that point
in time not to have a grace period and extend that
by continuing payments. I don't think I heard a
lot of debate about that.

I think the question, then, is well, then what
should you do with your life insurance business?

The life insurance business, as I shared
earlier, we want to make sure that beneficiaries
understand how much life insurance their

MS. ROSEBOROUGH: And I am going to interrupt that because that I think that question calls for a legal conclusion.

I am happy for them to talk to you about what they think our responsibilities are as an insurance company with respect to that, but not focused on a question about fiduciary duty.

MR. KATZ: Our goal is to pay every claim that should be paid, pay it accurately and promptly. So that's not a legal conclusion, but that's our business practice.

MS. CONNORS: When do you feel that that responsibility kicks in in the procedures that you described?

MR. KATZ: So, I think what you are describing now, you are asking a different question which is for each state, how do you interpret given laws. That's not something I can testify to, the interpretation of the laws. They vary by state, too.

MS. CONNORS: What prompted -- what month in 2010 did you change these policies and procedures to more frequency?

MR. KATZ: I am trying to think. It was toward the end of the year.

---

MR. CASSANDRA: We began to examine the process in terms of the entire business in late summer of 2010, and we took the decision to implement the ongoing matches less frequently than annually in December.

MS. CONNORS: What prompted that decision?

MR. CASSANDRA: For all the reasons that we've given you, that we have given; that we think it's a good business practice, and will serve as a very good safety net around our standard process. Metropolitan desires to pay every claim as promptly and accurately as possible.

We felt that technology had progressed to the point where making these matches was not only possible, but efficient, and not as subject to false positives as you may have seen earlier.

So in looking at the totality of the situation, including the improvement in technology, it's very easy I think for us in this technology age in 2011 to sort of impute that technology back in time.

But if you think about that, you realize that we've come a very long way in terms of our ability to do those sort of data manipulations. And I think the sum total of that, and particularly the

---

safety net aspect, our desire to put something around the standard process, which we believe works very well, was the main element of why we decided to do that.

MS. CONNORS: So your decision doesn't have anything to do with the public attention drawn to the issue through the media?

MR. KATZ: I think prior to -- I am not sure there was a whole lot of public attention. I will answer a different question which might be in line which is we were in discussions with regulators about this very topic, and I can assure you we are most interested in what our regulators and what's on their minds.

And part of our decision process was that we had an opportunity to make an improvement, and we made the decision to do that. So I don't want to sit here and tell you that the discussion with our regulators wasn't part of that, too, because it was.

MR. CASSANDRA: I will state the obvious, that the match that we did, particularly with the logic to try to uncover the situation particularly on the cancer policies, occurred back in 2007, I think long before people appreciated this particular

---

topic.

MetLife had a history not only through the late '80s of going out and doing campaigns, including some significant advertising and outreach, particularly to our industrial block in order to find policyholders. We had a history going back all the way to the late 1980s, doing that effective research. We did the match when we felt that technology had progressed to the point where it allowed us to do so. And we did that match in 2007, and so we are proud that we did that early.

MS. CONNORS: Thank you.

MS. MILLER: I think it's good that you did it in 2007. But in 2007, you identified a bunch of policyholders who had died years before that and you need to remit that money to Unclaimed Property.

MR. KATZ: We understand your concern. I should make one -- I want to clarify one other item, but I can pause.

MS. JAMESON: As I understood your testimony, and correct me if I am wrong, you start the dormancy period for your recordkeeping at the time you make the match, is that right?

MR. KATZ: For the 2007 match.

MS. JAMESON: 2007 match. So from your
perspective, we would expect to see in 2012
remittances to Unclaimed Property for Floridians,
and all the states, I assume, would see a large
uptick in unclaimed property remittances to the
state next year?

MR. KATZ: So the total out of that match was
about 32 million. I think about 11 million of that
has already been escheated, and am I getting the
facts right? About 32 million in the '07 match,
about 11 million has already been escheated. And
every state has a different duration. And the
balance would be escheated based on the prospective
durations.

MS. JAMESON: So the 11 million would be to
states that have shorter than five years?

MR. KATZ: That makes sense, yes.

COMMISSIONER JAMESON: Do you --

MR. KATZ: I should say I believe that's the
case. Logically, that makes sense.

MR. CASSANDRA: Yes, where the rules of that
particular state required it to be shorter.

COMMISSIONER JAMESON: Okay.

MR. CASSANDRA: In terms of a specific
different defined date of dormancy when it starts

to run.

COMMISSIONER JAMESON: So I would assume then,
from what you told me, that Florida has not
received any unclaimed property from the 2007 match
because our dormancy period is five years?

MR. CASSANDRA: I am sorry, I don't know I can
answer that question specifically. That's very
specific. But we could go back and say of those
Florida residents identified, what's the status of
those?

COMMISSIONER JAMESON: That would be helpful.

So you have -- do you keep a record, then, in
your accounts by state or by -- you have some way
to track all these accounts while you are waiting
on the dormancy periods to expire or while you are
looking for -- I am assuming during this time you
are actually looking for the heirs or
beneficiaries.

MR. CASSANDRA: Yes. When we can't find a
beneficiary or other rightful owner, we enter it
into Metropolitan's unclaimed system which is the
system that tracks unclaimed property for the
various states.

COMMISSIONER JAMESON: Okay. So you can
identify how much, the dollar value of assets that

you have essentially on hold for Floridians?

MR. CASSANDRA: Again, I don't know that I can
answer that specific question. I believe the
answer to that is yes, I believe that we can. But
I don't have the number here and we would have to
get back to you on that.

COMMISSIONER JAMESON: Okay. Thank you.

COMMISSIONER McCARTY: Turning our attention
to just a few more questions as it relates to
retained asset accounts.

Does Metlife use retained assets accounts?

MR. KATZ: Yes.

COMMISSIONER McCARTY: When did you begin
using retained asset accounts?

MR. KATZ: 1984. Mid-'80s.

COMMISSIONER McCARTY: Do you know how much
assets are retained in these accounts?

MR. KATZ: I did when we talked about this a
lot, not too long ago.

MR. CASSANDRA: The balance at 12-31 was in
the range of about $12 billion.

COMMISSIONER McCARTY: 12 million?

MR. CASSANDRA: Billion.

COMMISSIONER McCARTY: $12 billion?

MR. CASSANDRA: Yes.

COMMISSIONER McCARTY: Is the retained asset
accounts the default options in terms of the
settlement of most policies or certain policies?

MR. KATZ: The default option will vary based
on the policy type.

COMMISSIONER McCARTY: They tend to be lower
value policies?

MR. KATZ: For policies under a certain value,
I think it's 5,000 or 10,000 and check is through
default. The actual default option would vary
based on the election of the policyholder, either
group policyholder or the individual. For
individual business, the policyholder is given the
opportunity to make an election. Sometimes they
do, sometimes they don't.

COMMISSIONER McCARTY: If they don't, the
default is retained, I assume?

MR. KATZ: If they don't, then the beneficiary
will be given an opportunity to make an election.
And if they don't, then the fault, depending on
state requirements -- each state has different
requirements, is typically?

COMMISSIONER McCARTY: On the average, how
long is a retained asset account left open?

MR. KATZ: I don't know. A significant amount

1   of them close very, very quickly.

2       MR. CASSANDRA:  Based on my memory, my

3   recollection, approximately 70 percent of the

4   accounts are closed by the beneficiary within the

5   first year.

6       COMMISSIONER McCARTY:  Where are those

7   retained asset accounts held?

8       MR. KATZ:  They are held at -- our

9   administrator is BFT.  They do the account

10  management.

11      MR. CASSANDRA:  I think, Commissioner McCarty,

12  they are general account assets.

13      COMMISSIONER McCARTY:  So they are not subject

14  to the provisions of the FDIC?

15      MR. CASSANDRA:  They are not.

16      COMMISSIONER McCARTY:  What is, in your view,

17  the benefit of having retained asset accounts as

18  opposed to paying out the claim?

19      MR. KATZ:  So the retained asset account will

20  give the beneficiary the opportunity to take time

21  to make an election.  Their retained asset account

22  will give them a minimum guaranteed interest rate.

23      COMMISSIONER McCARTY:  But that necessarily is

24  not necessarily an interest rate that's competitive

25  in the financial markets, if they had taken it in a

---

1   lump sum?  Not makes some money off maintaining

2   those accounts.

3       MR. KATZ:  We can dimensionalize this a

4   little bit.

5       MR. CASSANDRA:  At this point, a significant

6   portion of our retained asset accounts actually

7   have a minimum guaranteed rate that's much higher

8   than currently available money average.  About

9   one-third of our balances have a 3 percent minimum

10  interest rate guaranty, where if you looked at

11  similarly situated money market accounts available

12  today, you would be talking about single-digit

13  basis point-type yields on money market accounts

14      So individuals who had retained asset accounts

15  with 3 percent minimum interest rate guarantios are

16  faring very well in today's environment.

17      COMMISSIONER McCARTY:  Are retained asset

18  accounts subject to unclaimed property laws?

19      MR. KATZ:  I believe they would be.

20      MR. CASSANDRA:  I believe it is.

21      By the way, Commissioner, you asked a question

22  as to whether or not those funds were covered by

23  FDIC insurance.

24      They are not.  They are covered under the

25  State, various State guaranty association coverage

---

1   which some instances is actually higher than

2   available FDIC coverage.

3       COMMISSIONER McCARTY:  What does the process

4   of procedure have in place to test to determine

5   whether the property should be remitted as

6   unclaimed?

7       MR. KATZ:  So, make a couple of points.

8       One, we contact our policyholders at least

9   quarterly.  If they have activity on their account,

10  it's monthly.

11      It's important to keep in mind that retained

12  asset accounts is control accounts, it's not an

13  active account, they can't put deposits in.  They

14  can only post the account or cut checks.  We also

15  send them a 1099 for any interest earned.

16      If, in fact, we have three pieces of returned

17  mail, we will begin a process to investigate

18  whether or not that individual is alive and try to

19  locate them.  And if, in fact, we can't, then we

20  would --

21      COMMISSIONER McCARTY:  But you attempt to

22  reach them quarterly?

23      MR. KATZ:  We send them statements at least

24  quarterly, yes.  The activity would be more

25  frequent than that.

---

1       I should make one other point about RAAs, now

2   that you've asked.  We've matched the index against

3   RAAs also.  We did it in 2006 and we did it again

4   in 2010.

5       MS. MILLER:  You ran the Death Master File

6   against your RAAs, and anybody that you found on

7   there that was deceased, then what did you do?

8       MR. KATZ:  We began an investigation process

9   of those and attempted to identify a beneficiary.

10  If we couldn't find the beneficiary, we would then

11  begin the process of moving those funds into our

12  unclaimed property system.

13      And I've got a little bit of stats on that.

14  For Florida, in 2010, we escheated 353 items with a

15  value of about 156,000; for the whole company --

16  for the whole country, about 9,000 items in 2010

17  for a balance of 2.8 million.

18      So it's important to note some of these deal

19  with checks, not just closed accounts for the

20  purpose of --

21      COMMISSIONER McCARTY:  Are you aware of any

22  obligation to utilize the Death Master File for

23  Social Security to determine the life insurance

24  policies have insured pursuant to any settlement

25  agreement with any state in which MetLife has

MS. MILLER: Can you include the testimony
you've already given, just to clean up the record?

MS. ROSEBOROUGH: Why don't we have a side bar
whether that would be -- I certainly believe
everything that I said previously is true and
accurate to the best of my ability.

MS. MILLER: That's fine. We just wanted that
acknowledgement.

MS. ROSEBOROUGH: And I wanted to say,
Mr. Cassandra is relying on information that I
provided to him, and I say that to you not in the
context of waiving a privileged communication. He
took -- I took that fact from others and I
communicated that to him.

He is quite right to add the caution that
there may have been instances where we understood
the law of a particular state to require a
different dormancy state than our system, what we
considered to be the appropriate date.

And I may have been too overly general in
applying that date. But that date is the date that
we believe at least was used most of the time to
trigger the dormancy periods and for the results of
the match that went into the escheatment system, to
our MUFS system. If we understood State law to

apply or require a different date, we would have
used a different date.

MR. WAGNER: So if, for example, that 1965
death is -- it still may not be escheated to the
State because the five years haven't run, correct?

MR. CASSANDRA: It would depend on what state
that particular policy is in.

MR. WAGNER: Either three or five years.
Right. If it were for three years, then that
policy would have escheated in 2010, is that
correct?

MR. CASSANDRA: And it would depend on what
the requirements of that particular state required
for the beginning of the dormancy period.

MR. WAGNER: That's a little different?
Because I thought you just said for purposes of
triggering the dormancy period in the 2007 match,
that you used the date of June 1, 2007. Now it
sounds like you are saying it might be a different
date depending upon a given state.

MS. ROSEBOROUGH: Again, let me take
responsibility for that and say that I believe that
as a general matter, the date that we used for
triggering dormancy periods in the 2007 match was
June 1st, 2007.

I cannot represent and I would not want my
witness to represent that we know that to be
perfectly true for every state and jurisdiction
that we apply in our system because the system
rules are intended to try to produce the result
that we believe is required by State law. And the
State laws vary on what's the proper date for
initiating the dormancy period.

So that's why Mr. Cassandra is quite right to
correct me on the information I got by saying that
that would have been generally true, that we would
apply the date that we felt was consistent with
State law, and there may have been different dates
applied for different states if we understood that
a different date was required by the law of that
particular state.

MR. WAGNER: So depending upon the law of the
state that's applicable, this person that died in
1965, that contract may yet -- may not yet have
been escheated, correct?

MS. ROSEBOROUGH: I don't think there has been
testimony to a specific 1965 case. I think there
has been a representation there were deaths
identified in the 1960s that the witness believes
resulted in escheatments.

So I can't represent to you today that we know
exactly where any particular -- where that -- those
particular cases may already have been escheated,
whether they are still in our system or not. It
would depend on what state was involved in those
cases and how the system applied the data it had
about those cases.

MR. WAGNER: I am not asking about a
particular case. I am asking about your policies
and procedures.

And the testimony we have today is that your
policies and procedures were first to run the DMF
against your book in 2007.

And your next policy and procedure was and is
that for purposes of calculating the dormancy
period, the date of June 1, 2007, was used?

MS. ROSEBOROUGH: You said "was and is." So
let me make a clarification.

Again, we were in discussions with the State
of Florida and with the State of Illinois to come
to an agreement about what date we would use on a
go-forward basis as initiation of the dormancy
period for purposes of those states.

And I believe in the context of those
discussions we made a lot of progress on an

record your comments correctly?

MR. KATZ:  We believe we have a liability for a life insurance policy based on the circumstances in any given contract and in any given areas. However, in virtually all of our forms -- and I will ask our experts to help us -- proof of death is a requirement for a liability.

MR. CASSANDRA:  The only -- I would just clarify that the contracts can contain conditions for proof of loss.

COMMISSIONER McPEAK:  And that actually leads me to follow-up questions.

So in 2007, when you did your one-time match and then I guess since you are going to do annual matches with the Death Master File moving forward, does that three-point match through the DMF, does that constitute proof of death on a life policy?

MR. CASSANDRA:  I would like to be a little careful about the terms that we are using here, proof of loss.

We think that entry on the Death Master File is substantial evidence that someone has passed.

Proof of loss I think is a technical term that exists in a lot of states.  I would hesitate to comment on exactly that terminology, proof of loss.

form and provide proof of loss to claim the death

benefits.

So there is a similar analogy I think to the

scenario that you just outlined under the Social

Security program, and that was the original purpose

and intent of the DMF.

MR. KATZ: I think, as Frank said, that

certainly is one of the key reasons why we believe

Social Security implemented the program they did.

We can't testify exactly what they were thinking,

but the nuance here, as Frank points out, is quite

consistent with some of the discussions we have

been having.

COMMISSIONER McPEAK: I appreciate your

response to that. That's very helpful.

I think that you can still, though, draw a

distinction between Social Security death benefits

and a life policy where premiums have been paid, a

contract has been purchased by persons prior to

their death.

But I thank you for your comments. I don't

have any other questions.

COMMISSIONER McCARTY: Commissioner Robinson

who promised to be brief.

COMMISSIONER ROBINSON: Thank you

Can you hear me now?

The question is that when MetLife discovers

incorrect annuity payments when using the Social

Security Death Index, do you attempt to recoup

incorrect payments that you made?

MR. KATZ: Yes, we do. If we discovered we

overpaid on an annuity, we'll attempt to recover

those funds.

COMMISSIONER ROBINSON: That would seem to be

a fairly work-intensive effort, to make those

collections, wouldn't it?

MR. KATZ: That's right. That's really one of

the primary reasons why the Death Index is used to

cease those payments and prevent those errors.

It's not only work-intensive efforts for us, but in

some cases, it will put that family member in a

tough spot.

I should make a point that in many situations,

when an annuitant dies, we get notification from

the family, too. But that doesn't always happen.

So it's a burden on us, it's a burden on the

family. And so that's really the core of why we

have certainly used it for this business and part

of the same reasons why we think the same thing.

COMMISSIONER ROBINSON: Thank you.

COMMISSIONER McCARTY: Okay. No further

questions from the panel.

At this time we want to take this opportunity

to very much thank you, Mr. Katz, and your team for

participating in our hearing today.

We'll be adjourning now, go off the record.

We'll return here in an hour and 15 minutes which

would put us here at 2 o'clock.

Thank you very much.

(Proceedings concluded at 12:45 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF LEON            )

I, SANDRA L. NARGIZ, RMR, CRR, certify that I

was authorized to and did stenographically report the

proceedings herein, and that the transcript is a true

and complete record of my stenographic notes.

I further certify that I am not a relative,

employee, attorney or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

WITNESS my hand and official seal this 22nd

day of May, 2011.

SANDRA L. NARGIZ, RMR, CRR
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL  32308
850-878-2221

# EXHIBIT B

BEFORE THE

INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA

DAVE JONES

---oOo---

IN THE MATTER OF:

METROPOLITAN LIFE INSURANCE          File No.
COMPANY'S PRACTICES AND              IH-2011-00002
PROCEDURES RELATING TO THE
USE OF DEATH MASTER FILE
DATA AND RELATED INFORMATION

_____/

OFFICIAL TRANSCRIPT OF PROCEEDINGS


INVESTIGATIVE HEARING REGARDING PRACTICES OF
METROPOLITAN LIFE INSURANCE COMPANY

CONDUCTED BY THE CALIFORNIA INSURANCE COMMISSIONER
AND THE CALIFORNIA STATE CONTROLLER


May 23, 2011


Secretary of State Building
First Floor Auditorium
1500 11th Street
Sacramento, California 95614
(commencing at 9:37 a.m.)


REPORTED BY:  JANICE M. KNETZGER, CSR NO. 4434

---

1        A P P E A R A N C E S

2

3    QUESTIONING PANEL:

4

5        DAVE JONES, California Insurance Commissioner

6        JOHN CHIANG, California State Controller

7

8        RICHARD CHIVARO, Chief Counsel
         California State Controller's Office

9

10       ADAM COLE, General Counsel
         California Department of Insurance

11

12       PAUL HANSON, Director of Enforcement
         Minnesota Department of Commerce

13

14       BELINDA MILLER, General Counsel
         Florida Office of Insurance Regulation

15

16

17

18

19

20

21

22

23

24

25

---

1        A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF METROPOLITAN LIFE INSURANCE COMPANY:

3

4        TERESA ROSEBOROUGH, Deputy General Counsel
         Legal Affairs

5        METLIFE
         1095 Avenue of the Americas

6        New York, New York 10036

7

8        ROBERT E. SOLLMANN, JR., Executive VP
         Retirement Products

9        METLIFE
         1095 Avenue of the Americas

10       New York, New York 10036

11       TODD B. KATZ, Executive VP

12       US Business Insurance Products
         METLIFE

13       501 U.S. Highway 22
         Bridgewater, New Jersey 08807

14

15       FRANK CASSANDRA, Senior VP
         Insurance Products Financial

16       METLIFE
         501 U.S. Highway 22

17       Bridgewater, New Jersey 08807

18       LAW OFFICES OF SIDLEY AUSTIN, LLP

19       BY:  BRADFORD A. BERENSON, ESQ.
         1501 K Street N.W.

20       Washington, DC 20005

21

22

23

24

25

---

1    May 23, 2011

2                I N D E X

3             ---oOo---

4    EXHIBITS MARKED FOR IDENTIFICATION

5

6    Exhibit No.    Description              Page

7      1      2-pg document entitled        148
             "Death Match - Referral to

8            Life Insurance or Total Control
             Accounts

9

10     2A     8/9/04 letter to Mellon Investor   229
             Services from ACS - Lynden Lyman

11

12     2B     6/2/04 letter to Mellon Investor   229
             Services from ACS - Lynden Lyman

13

14     2C     4/6/04 letter to Michael Cummings  229
             from Richard Chivaro, Chief Counsel

15     2D     12/30/03 letter to Michael Cummings 229
             from Richard Chivaro, Chief Counsel

16

17     2E     12/29/03 letter to Mellon Investor  229
             Services from ACS - Lynden Lyman

18     2F     9/4/03 letter to Lynden Lyman from  229
             MetLife - Michael Cummings

19     3      12/17/96 letter to New York State   230
             Department of Insurance from

20           MetLife - Joseph Reali (4 pgs)

21             ---oOo---

22

23

24

25

1 May 23, 2011

2        ---o0o---

3     P R O C E E D I N G S

4        ---o0o---

5     The above-entitled matter came on this day

6 Monday, May 23, 2011 and the following proceedings were

7 had and taken to wit:

8        ---o0o---

9     COMMISSIONER JONES: Good morning. Thank you

10 for joining us at today's investigatory hearing.

11     My name is Dave Jones. I'm the Insurance

12 Commissioner for the state of California and I want to

13 welcome you to this investigative hearing.

14     Present with me are: State Controller John

15 Chiang. Linda Miller, General Counsel of the Florida

16 Office Department of Insurance. Paul Hanson, Director

17 of Enforcement of the Minnesota Department of Insurance.

18 Adam Cole, General Counsel of the California Department

19 of Insurance.

20     We will be joined shortly by Rick Chivaro,

21 General Counsel of the California Controller's Office.

22     The purpose of today's hearing is to

23 investigate practices in the insurance industry

24 regarding the payment of death benefits under life

25 insurance policies and annuities.

---

1     State controllers and state insurance

2 regulators of a number of states are examining life

3 insurance companies to understand whether they are using

4 information they have that indicates a policyholder has

5 died and whether they are paying out benefits once they

6 have that information.

7     Initial information from publicly available

8 sources suggest some troubling practices in this area.

9     For example, initial information indicates

10 that life insurers who receive detailed information

11 about the death of their policyholders from a database

12 prepared by the Social Security Administration called

13 "Death Master."

14     Insurers use Death Master for a variety of

15 purposes

16     Some insurers appear to use Death Master to

17 cut off payments on annuities when an annuity owner

18 dies, but do not use that information to identify life

19 insurance policyholders who die and pay their

20 beneficiaries.

21     Further, initial information indicates that

22 some insurers pay premium to themselves from the

23 built-up cash value of the policy after a policyholder

24 dies even though the insurer has notice of the death

25 from the Death Master data file or another source.

---

1     In that situation, not only does the

2 beneficiary receive no payment, but the insurer

3 increases its revenues by draining the value out the

4 policy until there's nothing left.

5     We're troubled about the possibility that

6 insurers may be using death information to boost their

7 finances by stopping annuity payments on one side of

8 their house, but not using that same information on the

9 other side of their house to pay policyholders whose

10 beneficiaries are due benefits.

11     More generally, we want to understand what

12 insurers do to investigate the deaths of their

13 policyholders and pay beneficiaries who are owed money.

14     We have subpoenaed Metropolitan Life

15 Insurance, generally known as MetLife, to testify under

16 oath before us today to answer questions about its

17 practices in this and related areas.

18     MetLife is one of the largest life insurers

19 and insurers of annuities in the United States and it

20 has substantial market share in California.

21     I'm very pleased today to be joined by our

22 State Controller John Chiang.

23     I want to commend Controller Chiang for his

24 initiation of an investigation into the death benefits

25 of unclaimed property held at insurance companies and

---

1 for the extraordinary work of his department and his

2 staff and he personally on this issue.

3     We're very excited at the Department of

4 Insurance to be working closely with the State

5 Controller and the State Controller's office on this

6 matter

7     While our focus today is on MetLife, we're

8 looking at practices around the industry. As of today,

9 I have commenced market conduct examinations, which are

10 investigations of ten of the largest life insurers in

11 the United States to investigate their practices as

12 well.

13     My comments this morning are based on

14 preliminary information about practices in the industry.

15 Our purpose today is to get more definitive information

16 about these practices.

17     This hearing today is part of a coordinated,

18 multi-state investigation by insurance departments and

19 controllers around the United States.

20     Minnesota and Florida insurance regulators are

21 participating in this hearing. We will be sharing

22 information from this hearing with other state

23 regulators and continuing to cooperate with them on this

24 multi-state investigation process.

25     Today's hearing will proceed as follows:

1      The insurance company when searching for new
2  addresses gets returned mail.  Claims filed and/or death
3  certificates received in connection with other policies
4  or contracts insuring that same person.  Information
5  from Death Master which has been referred to.
6      What is the Death Master File?
7      Just a few words about this.  It is a very
8  prevalent form of death information available in the
9  United States.
10     It is a product of the Social Security
11 Administration.  It contains today about 87 million
12 records of people who have died.
13     The information in Death Master is quite
14 comprehensive.  It includes Social Security numbers,
15 addresses, names, deaths of birth and other information.
16     Death Master is very, very accurate.  99.5
17 percent accurate, in fact.
18     In Congressional testimony given by the Deputy
19 Commissioner of Systems at the Social Security
20 Administration that oversees Death Master, that person,
21 Bill Gray, has testified that:  "The death data that we
22 maintain is 99.5 percent accurate overall."
23     How is Death Master accessed by entities such
24 as insurance companies?
25     Well, there are a number of available tools

1  commercially available programs and subscription
2  services that insurance companies and others subscribe
3  to.  We've just thrown a few of those on the screen
4  which enable insurance companies to access this
5  information.
6      There is a potential problem which we're
7  looking at today about selective use of the Death Master
8  file.
9      Insurance companies may be using Death Master
10 for certain purposes.
11     For example:
12     To perform anti-fraud procedures.
13     To verify dates of death prior to paying out
14 on a policy.
15     To perform death sweeps of large
16 corporate-owned accounts.
17     Performing regular comparisons against their
18 records to identify deceased annuity holders in the
19 pay-out phase and to stop making payments under their
20 contract.
21     That is, once that pay-out is due, the
22 insurance company looks at Death Master to determine
23 someone has died and stops paying the annuity.
24     The question we are looking at here today --
25 among others -- is whether insurance companies use Death

1  Master regularly against their life insurance policies
2  to determine whether a life insurance policyholder has
3  died to get money in the hands of beneficiaries.
4      What happens when there's a match of a
5  policyholder in the insurance company's files with a
6  reading on Death Master?
7      These are questions that we have.
8      Do insurers allow death benefits to go
9  unreported or unclaimed even when they know through
10 Death Master that an insured has died?
11     Do insurers use policy cash values to pay
12 themselves premium after the death of the insured even
13 if though know from Death Master that the policyholder
14 had died?
15     The other information on deaths that insurance
16 companies have in their files and what do insurance
17 companies do when they have information, but there has
18 not been a formal claim filed by the beneficiary.
19     I want to just give a couple of examples.
20     Example 1: A phone call or letter received
21 from a relative reporting on the death of an insured,
22 but no claim is every formally filed by the beneficiary.
23     What do insurance companies do in that
24 situation?
25     Second example:  A death certificate and a

1  claim are received from one of several beneficiaries,
2  but not all beneficiaries file a claim.
3      What happens in that situation?
4      Third example:  A search for a new address
5  following receipt of returned mail indicates the insured
6  is deceased, but again, no claim has formally been
7  filed.
8      We've questions about whether insurers allow
9  the built-up cash value of their policies -- as
10 Commissioner Jones indicated in his opening statement --
11 to be used to pay for the continued sustenance of the
12 policy, even though a policyholder has died until the
13 policy value is drained.
14     Just to give an example here.
15     Here's the situation.  An insured dies in 2005
16 with her policy in force.  No claim is filed.  Six
17 months later, the policy is set to expire because
18 there's been no premium payments.
19     Although the insured is listed in the Death
20 Master database as deceased, the insurer begins to
21 withdraw premium from the cash value to keep it in
22 force.
23     Five years the later, the cash value of the
24 policy has been used and the policy is allowed to expire
25 without any value.

1     The question: What happens in that situation?
2  Is that happening here with insurance companies such as
3  MetLife?
4     Dormancy Period Calculations For Escheatment.
5     This is the Controller's set of issues.
6     The question is: How do insurers calculate
7  the dormancy period for escheatment?
8     That means the number of years a claim goes
9  unpaid before it is considered unpayable and has to be
10  turned over to the State.
11    Do insurers rely on something other than the
12  actual date of death in calculating that time frame?
13    An example here: An insured dies in 1989 with
14  a policy. No claim is filed. A Death Master file
15  comparison performed in 2009 identifies the death of the
16  insured 20 years earlier.
17    The insurer verified the insured died while
18  his policy was in force and no benefits have ever been
19  paid.
20    When will the insurer consider the proceeds
21  due to be escheated?
22    It should be noted that improper calculation
23  of the dormancy period allows insurers unlawfully to
24  retain millions of dollars in proceeds for years, if not
25  decades, after they are due to be escheated.

1     I want to just mention a few words about a
2  concept: Demutualized Insurance Companies.
3     This may come up in some of the questions.
4     In the late 1990s, many large insurance
5  companies demutualized and that required them to contact
6  all their in-force policyholders.
7     Demutualization means that you are a mutual
8  insurance company, your owners are your policyholders
9  exclusively.
10    A stock insurance company is an insurance
11  company whose owners are members of the public, like any
12  other stock corporation.
13    Insurance companies sometimes convert from one
14  of those forms to the other.
15    In late 1990s, large demutualized insurance
16  companies acknowledged as part of a process of trying --
17  I should say, in this process -- the insurance company
18  when it turns itself into a stock insurance company, it
19  is required to go out and try to locate all of its
20  policyholders because they are going to become
21  stockholders and they need to get their stock or some
22  cash payout.
23    The demutualization process requires a search
24  to find policyholders.
25    Large demutualized companies acknowledge that,

1  they, in fact, lost contact with many, many of their
2  policyholders at the time of demutualization.
3     What searches, including use of Death Master
4  did insurers perform that allowed them to identify which
5  lost policyholders were actually dead?
6     What did the insurers do if they determined
7  that an insured was deceased?
8     Over a decade later, are these insurers
9  holding onto unclaimed death benefits due to any of
10  these lost or dead policyholders?
11    These are questions that we have.
12    I want to mention industrial policies very
13  briefly.
14    An industry policy was a form of policy issued
15  many, many years ago.
16    Small value policies, often sold door-to-door
17  with premiums collected weekly or monthly.
18    The demographic of the owners of these
19  policies typically was lower income individuals.
20    The policies were, as stated here, and
21  sometimes the premiums ended up being more than the
22  actual benefits offered under the policies.
23    There are millions of these policies in force
24  industry-wide today.
25    What is the quality of record keeping for

1  these policies, some of which were issued more than 50
2  years ago?
3     What do insurers do when they determine that
4  an insured was deceased?
5     What have the insurance companies done to
6  determine which of those insureds are deceased and what
7  benefits are due?
8     Last, I just want to mention retained asset
9  accounts very briefly. We referred to it earlier.
10    The retained asset account is, in fact, quite
11  significant.
12    Twenty-eight billion dollars is held in the
13  United States in retained assets accounts by life
14  insurance companies.
15    This is money that's understood by everyone to
16  belong to a beneficiary. It is sitting in insurance
17  companies' accounts.
18    Many insurers use them as their default method
19  of payment.
20    They are a short-term option that insurers
21  refer to enable people to sort of get over a period of
22  grieving and then the money is going to be termed over
23  to them. And there are issues about -- the account's
24  not being guaranteed by the FDIC.
25    The point that we're focused on is a retained

1 asset account held by an insurance company, owned by a
2 beneficiary, the beneficiary does not come forward for
3 some period of time, what does the insurance do with the
4 money in that account?
5          Again, with that brief background
6 introduction, we will then begin to proceed to
7 questions.
8          COMMISSIONER JONES: Thank you very much,
9 Mr. Cole. I think we can have the lights come up now.
10 Good morning. I want to welcome the
11 representatives of MetLife to the hearing.
12          I see that we have five individuals seated
13 before us.
14          In a moment, we'll put those individuals under
15 oath who are planning to testify. I'm wondering if we
16 could proceed from my left to your right. Perhaps you
17 can just identify yourself and your title.
18          MS. ROSEBOROUGH: Good morning. Teresa Wynn
19 Roseborough, Deputy General Counsel for MetLife.
20          MR. SOLLMANN: Good morning, everyone. Bob
21 Sollmann, Executive Vice-President of Retirement
22 Products.
23          MR. KATZ: Good morning. Todd Katz, Executive
24 Vice-President, Insurance Products.
25          MR. CASSANDRA: Good morning. Frank

1 Cassandra, Senior Vice-President, Insurance Products
2 Finance.
3          MR. BERENSON: Good morning. Brad Berenson.
4 I'm with Sidley Austin. I'm outside counsel for
5 MetLife.
6          COMMISSIONER JONES: Welcome. Which of you
7 will be testifying this morning?
8          MR. KATZ: Three of us.
9          COMMISSIONER JONES: Very good. I'm wondering
10 if the individuals who will be testifying -- I believe
11 it's Mr. Sollmann, Mr. Katz and Mr. Cassandra -- if you
12 could raise your right hand and I'll administer the oath
13 to you.
14          Do you solemnly state under penalty of perjury
15 that the evidence you should give in this matter shall
16 be the truth and nothing but the truth?
17          MR. KATZ: Yes.
18          MR. SOLLMANN: Yes.
19          MR. CASSANDRA: Yes.
20          COMMISSIONER JONES: Very good. I understand
21 that counsel wants to put on the record a reservation of
22 rights.
23          MR. BERENSON: Thank you very much.
24          Very briefly, Mr. Commissioner, I appreciate
25 the opportunity.

1          MetLife is here to address all of the topics
2 that were identified in the subpoena and that were the
3 subject of the PowerPoint that has just been presented
4 and is looking very forward to doing that.
5          Prior to this session, there were meetings
6 with your General Counsel -- with Mr. Cole -- at which
7 the scope and format of this hearing were discussed.
8          Following those meetings, MetLife did
9 communicate to the Department certain objections and
10 reservations based in law to the scope and format of the
11 hearings, particularly to the extent that there might be
12 questions that call for the disclosure of information
13 that would ordinarily be protected as a trade secret or
14 that would be private customer information.
15          We don't anticipate any particular problems
16 this morning and MetLife intends to cooperate fully with
17 the hearing, but I did want to make clear that nothing
18 we say or do her today is intended to waive those
19 objections and all of our rights under the law are
20 specifically reserved.
21          If there are questions that get into some of
22 those areas, we'd be delighted to followup with
23 information in the contexts of the market conduct with
24 them. Thanks.
25          COMMISSIONER JONES: Very good.

1          I'm wondering as to each of the sworn
2 witnesses, if you could, starting from my left and
3 moving to my right, briefly describe your current
4 responsibilities at MetLife and past responsibilities.
5          Way don't we start with Mr. Sollmann.
6          MR. SOLLMANN: As executive vice president
7 responsible for retirement products, I have the overall
8 responsibility for our individual annuity business.
9          Prior to that job, I held responsibilities
10 across MetLife in the 37 years I've been with the
11 company in mergers and acquisitions and our
12 institutional business area.
13          COMMISSIONER JONES: Very good. Mr. Katz.
14          MR. KATZ: Good morning. Is my mic working?
15 I'm not sure it is.
16          COMMISSIONER JONES: There should be a little
17 green light lit on it. This gentleman might help you.
18          MR. KATZ: The green light is red. Is that
19 better?
20          COMMISSIONER JONES: That's a lot better.
21          MR. KATZ: I have responsibility for the
22 insurance products area that includes all of our
23 individual life products, our group life products.
24          Prior to that, I held roles similar to that
25 for specific smaller lines of business, like our dental

1 policies, were they also policyholders who had life
2 insurance policies with MetLife?
3 　　　　MR. KATZ: I can't tell you definitively which
4 ones had which, but, if, in fact, we became aware that
5 an individual had life insurance, we certainly would
6 have attempted to reach out to that beneficiary making
7 it good on those claims.
8 　　　　COMMISSIONER JONES: With regard to the group
9 annuity business, is it the case that most of those
10 holders of those policies also hold corporate or group
11 life insurance policies?
12 　　　　MR. KATZ: I don't know the answer to that,
13 but generally speaking I would look at those as a
14 separate entity.
15 　　　　I wouldn't think of it as an employer would
16 buy annuity business and group life business.
17 　　　　Currently, if you think the group annuity
18 business, some of those policies were older in nature
19 and once they are on our books generally would stay on
20 our books.
21 　　　　Group life insurance, generally the employer
22 is managing the records and that business is more
23 inclined to move from company to company.
24 　　　　So if you're theorizing, hey, he's got the
25 group business, you'd generally have the group life

1 insurance business too. I wouldn't say that's usually
2 the case.
3 　　　　COMMISSIONER JONES: Did MetLife on a routine
4 business use Death Master to identify those who had life
5 insurance policies who also had group -- those who had
6 annuities had a group annuity policies?
7 　　　　MR. KATZ: We did not apply the Death Master
8 Index to our group life business.
9 　　　　The main thing I should point out there is,
10 for the group life business for the most part, the
11 employer has the records. It's a very important
12 distinction.
13 　　　　We're not in possession of who is covered. In
14 the vast majority of our group life business, the
15 employer is the one who maintains that information and
16 sharing with us information when an individual is dead.
17 　　　　COMMISSIONER JONES: With regard to annuitants
18 that you were identifying as having a match under Death
19 Master, was any effort made simultaneously to determine
20 whether that annuitant had a life insurance policy,
21 either individual or group, or any other form of
22 placement of that life insurance policy?
23 　　　　MR. KATZ: You're asking back historically?
24 　　　　COMMISSIONER JONES: Let's stick with the
25 period of time we're talking about.

1 　　　　You told us late '80s to mid- or late-'90s,
2 Death Master was used for your group annuity business.
3 I'm asking during that period of time, was Death Master
4 simultaneously used?
5 　　　　If you had identified someone who had annuity
6 on the group side, did you simultaneously look to see if
7 they had a life insurance policy from the company in
8 some way, shape or form?
9 　　　　MR. KATZ: I do not know the specific detailed
10 answer back from that exactly what was done. We
11 certainly can follow up.
12 　　　　COMMISSIONER JONES: You're not aware of a
13 systemic effort by the company to do that sort of match?
14 　　　　MR. KATZ: We certainly have had procedures to
15 share information within the company. Those procedures
16 vary by area and vary over time.
17 　　　　I want to be careful not to lead you down a
18 path that we did something or didn't do something
19 because it was a while ago and it might have been
20 different by area.
21 　　　　COMMISSIONER JONES: Okay. You've testified
22 that the company began using Death Master manually and
23 then in a more systemized way with regard to your group
24 annuity practice.
25 　　　　Did you use Death Master for any other part of

1 your business? If so, when did you start using it for
2 those other parts of your business?
3 　　　　MR. KATZ: So we have used Death Master for
4 other parts of our business.
5 　　　　I think for today, we can talk maybe next
6 about our individual life business, if you'd like, or
7 would you like us to speak to our individual unit
8 business?
9 　　　　COMMISSIONER JONES: What was the first next
10 chronological use of Death Master, if you will?
11 　　　　We talked about your initial use of the group
12 annuity practice. What was the first next chronological
13 use of Death Master?
14 　　　　MR. KATZ: I'm going to ask my team -- let me
15 talk --
16 　　　　MS. ROSEBOROUGH: For business uses and
17 related to litigation --
18 　　　　COMMISSIONER JONES: We should have you on the
19 mic. If you're going to testify, we need to put you
20 under oath or is it that you're just trying to clarify
21 the question?
22 　　　　MS. ROSEBROUGH: It's is a legal point.
23 　　　　I'm just isolating that they are discussing
24 today business use, outside the context of litigation.
25 　　　　With that context in mind, I think the next

1       MR. SOLLMANN: I can't say. We can follow up

2 and give you more specific information on that.

3       COMMISSIONER JONES: Can you tell me whether

4 it was in the last five years?

5       MR. SOLLMANN: I'm not aware of it being in

6 the last five years. I don't know the answer to your

7 question.

8       COMMISSIONER JONES: You don't know whether it

9 was either within the last five years or earlier than

10 the last five years that you began to systematically

11 look to see if a life annuitant for whom you had a Death

12 Master match also had a life insurance policy?

13       MR. SOLLMANN: Systematically on a more formal

14 basis, we began that process within the last year.

15       COMMISSIONER JONES: Within the last year.

16 Okay.

17       Within the last year, what exactly would you

18 do when you found an annuitant -- an individual

19 annuitant whom there had been a Death Master match.

20 What would you do with regard to that annuitant?

21       MR. SOLLMANN: It's my understanding that we

22 would pass that information along through various

23 systems that are available to our product areas.

24       Beyond that, I don't have the detailed

25 information with me as to exactly how that communication

---

1 took place.

2       COMMISSIONER JONES: Is there anybody from

3 MetLife who can tell us with regard to the company's

4 practice in the last year how -- when a match has been

5 made on the individual annuity side -- how the company

6 goes about informing the life insurance policy side that

7 there is such a match?

8       MR. KATZ: I don't think we can.

9       COMMISSIONER JONES: That's very disappointing

10 because our subpoena asked that MetLife provide

11 representatives that can answer these questions.

12       And so, I'm very disappointed that there is no

13 one here from the company that can answer that question

14 since we were very clear in our subpoena that we needed

15 witnesses who can answer those questions.

16       MR. KATZ: Maybe I can try to help. We're

17 trying to answer your questions as best we can and that

18 really is our intent.

19       If your question is: Are their procedures

20 within the organization that share information? The

21 answer to that is yes.

22       What I tried to explain before and I can

23 probably -- Several different business units, several

24 different products, several different geographies, and

25 so the procedures would be different.

---

1 We can't paint a blanket answer for you, which

2 I think is what you're looking for.

3       COMMISSIONER JONES: I'm happy to take them in

4 turn. That's what I've been trying to do.

5       You first testified about group annuities and

6 your practices there.

7       And then, you testified that sometime more

8 recently with regard to individual annuities, you have

9 been doing a match vis-à-vis with life insurance.

10       And so, my question is very specific as to

11 individual annuities and life insurance, what the

12 company does vis-a-vis finding a match on the annuity

13 side, what it does with regard to when it discovers the-

14 a match occurs on the annuity side what it does, if

15 anything, to try to determine if there's a match on the

16 life insurance.

17       MR. SOLLMANN: Commissioner, on the individual

18 entity side, we do have with us I'm told a description

19 of the processes we used in this case which we will be

20 happy to provide at the next break.

21       COMMISSIONER JONES: Okay. And that's the

22 process that's begun in 2011?

23       MR. SOLLMANN: That's correct.

24       COMMISSIONER JONES: All right.

25       MR. SOLLMANN: I should clarify, not 2011,

---

1 earlier 2010.

2       COMMISSIONER JONES: In 2010?

3       MR. SOLLMANN: Correct.

4       MR. COLE: Are you going to testify under oath

5 that everything that appears in that document that you

6 have provided us is absolutely true and correct?

7       MS. ROSEBOROUGH: On behalf of my witness

8 here, I would not allow him to claim that kind of

9 arrogance to purport to speak to 100 percent of the

10 services provided. He will be able to testify that

11 that's the process typically followed.

12       MR. COLE: Well, no.

13       My question was: You were referring to

14 providing us with a document. If you're going to

15 provide us with a document, will one of you testify

16 under oath now that what appears in that document is

17 entirely correct?

18       MS. ROSEBOROUGH: They will be prepared to

19 testify that the document is correct in terms of the

20 documentation of the process that's been settled upon

21 for executing its responsibility.

22       Whether or not your question goes to whether

23 the document is accurate, yes, they will be able to

24 testify that the document is an accurate portrayal of

25 the process.

1 not paid, of what percentage had actually died and you
2 knew that information about their death.
3     MR. KATZ: Sure, so let me --
4     COMMISSIONER JONES: That's a yes?
5     MR. KATZ: No. That is not a yes. I'd like
6 to give you the information and answer your question.
7     COMMISSIONER JONES: Please answer the
8 question.
9     MR. KATZ: Okay. The death match study we did
10 in 2007 identified approximately $80 million in claimed
11 payments for individuals that were not paid through the
12 normal process.
13     Of that $80 million, approximately $50 million
14 we were able to locate the beneficiary and pay that
15 money.
16     For the balance of approximately $30 million,
17 we were not able to locate the beneficiary.
18     In the situations where we were not able to
19 locate the beneficiary, those funds were put through our
20 unclaimed property system, ultimately to be escheated to
21 the states.
22     So about $80 million of funds through the
23 match.
24     Over that same period of time, we paid about
25 $44 billion in claims to individuals through our normal

1 process.
2     COMMISSIONER JONES: What was the 2007 death
3 match study?
4     MR. KATZ: That's what I wanted to explain.
5     In 2007, we ran just about all of our
6 individual life businesses. There was a small segment
7 of the blocks that weren't included, and I can talk more
8 about that if you like, against the Death Master Index.
9     We ran that using a three-point match; Social
10 Security number, date of birth within two years and
11 name.
12     We found out of that approximately 28,000
13 individuals whose information showed up on the Social
14 Security Death Index and our administrative records. Of
15 those 28,000, we found approximately 18,000, there was a
16 liability due for those individuals. That totalled
17 approximately $80 million. I think it was about $84
18 million.
19     As a result of that, we now determined we had
20 an indication of death on those individuals and began a
21 process to search out beneficiaries -- which we did --
22 which ultimately resulted in the $50 million I
23 explained.
24     However, we couldn't find everybody. That
25 resulted in the $30 million that I explained that went

1 into the escheatment process.
2     MR. CASSANDRA: I'd just like to add something
3 to Mr. Katz's statement.
4     In that 2007 match of the Death Master File,
5 we looked at all of the vast majority of the individual
6 business life records from policy statuses that included
7 any policy that may have been cancelled.
8     We did not only match at that point in time
9 for in force cases, we looked back for any case that may
10 have terminated for any reason other than death.
11     COMMISSIONER JONES: Do you know the number of
12 policies you ran Death Master against in 2007 in total?
13     MR. CASSANDRA: We ran it against, I think,
14 approximately a little more than 10 million records --
15 which does not exactly match to -- a policy that does
16 not equate apples to apples to a policy.
17     There may have been more than one record. It
18 was approximate.
19     COMMISSIONER JONES: What was the total number
20 of individual life insurance policy records at that
21 time?
22     MR. CASSANDRA: We have approximately over six
23 million policies in force right now. I don't know
24 exactly what the numbers may have been at that period of
25 time.

1     COMMISSIONER JONES: You mentioned -- I
2 believe Mr. Katz mentioned that in 2007, you ran Death
3 Master against almost all the individual life business.
4 What elements of the business did you not run it
5 against?
6     MR. CASSANDRA: Over time MetLife had acquired
7 through a merger and acquisition process some small
8 assumed cases from insurers that had gone into
9 receivership.
10     Just to give you a sense of the magnitude,
11 we're talking about less than 100,000 policies of a
12 total of 1.6 million.
13     The matching of those policies is in scope for
14 the match that we just conducted for our 2011 match.
15     MR. KATZ: Let me add one more clarification
16 there.
17     We did not run it against policies where we
18 did not have a Social Security number. We only ran it
19 against policies with the Social Security numbers.
20     That's an important distinction.
21     Mr. Cole had his slide about our industrial
22 policies which we would be happy to testify about if
23 you'd like.
24     A significant amount of those do not have
25 Social Security numbers. As such, we've used other

1    In 2004 and 2005, these instances, we were
2 providing records and matches to the best of my
3 knowledge.
4    COMMISSIONER JONES: Then, when they provided
5 you with information after they had done the match, what
6 sort of information did they provide and what did you do
7 with that information?
8    MR. CASSANDRA: To the extent that they
9 provided back information, proof that someone had died
10 in the form of a death certification, we paid benefits
11 to the beneficiary.
12    COMMISSIONER JONES: But you required a death
13 certificate from those three or so states.
14    MR. CASSANDRA: We didn't require it from the
15 -- To best of my knowledge, we didn't require it from
16 them. The regulators provided it to us.
17    COMMISSIONER JONES: Did those regulators
18 provide any other information with regard to whether a
19 match had occurred or not?
20    MR. CASSANDRA: I do not know.
21    MR. KATZ: I think what -- we're prepared to
22 give you exhaustive detail about the '07 match and our
23 current match.
24    For the '04/'05, we're probably not as
25 prepared as you'd like us to be to give you that detail.

1 It's quite a while ago.
2    Certainly, we can attempt to follow up with
3 any requests that you might have on that period.
4    COMMISSIONER JONES: Between the '04/'05 work
5 with the three or so states and the 2007 Death Master
6 study that you testified to, was there any other use of
7 Death Master in addition to what you've already
8 testified to?
9    MR. KATZ: For the individual life business?
10    COMMISSIONER JONES: Anywhere within the
11 company.
12    MR. KATZ: Sure. Yeah. I think -- I've got
13 to remember the dates. You may have it.
14    MR. CASSANDRA: I can take this one.
15    COMMISSIONER JONES: Okay.
16    MR. CASSANDRA: We have used and continue to
17 use the Death Master File in our corporate-owned life
18 insurance products.
19    To the best of my knowledge and belief, we
20 started that in the mid-'90s.
21    And on the corporate and life insurance
22 products, what happens oftentimes is that the policy
23 owners will lose contact with the insured.
24    There's little incentive for the family
25 members of a former employee to notify the former

1 employer of the death.
2    Under those contracts, we use the Death Master
3 File as some evidence that, in fact, someone had passed.
4    And if, in fact, someone had passed, we would
5 seek out a death certificate in order to pay benefits.
6    MR. COLE: Can you please speak closer to the
7 microphone.
8    MR. CASSANDRA: Yes, maybe there's something
9 that I'm not doing.
10    MR. COLE: Keep it really close.
11    MR. CASSANDRA: Okay.
12    COMMISSIONER JONES: So since the funding --
13 Go ahead.
14    MR. KATZ: I don't know. We also use it in
15 our disability business and our long-term care business.
16    I'm not aware of the dates. Either on a break
17 or as a follow-up, we can certainly get you the dates
18 when that commenced.
19    Those businesses weren't articulated in the
20 subpoena, but certainly we have no problem sharing that
21 so I have the dates.
22    In addition, we also use it for our retained
23 asset account, our total control account business.
24    COMMISSIONER JONES: We'll get to each of
25 those in turn in a moment. Let me stick with the

1 corporate-owned life insurance product.
2    You just testified that you began to use Death
3 Master in the mid-'90s. Was that done in a manual
4 fashion or was that done in a more systematic fashion?
5    MR. CASSANDRA: I don't have personal
6 knowledge of exactly how that particular sweep was done.
7 I'm sorry. I can't tell you exactly. I don't have
8 personal knowledge.
9    COMMISSIONER JONES: Get really close. I can
10 hear. It's close.
11    Was there a point at which Death Master was
12 used in a systematic way with regard to the
13 corporate-owned life insurance products?
14    MR. CASSANDRA: It was used monthly. It was
15 part of their standard process.
16    COMMISSIONER JONES: So they would run a match
17 against the corporate-owned life insurance products.
18 They would run the file against the corporate-owned life
19 insurance products. Is that correct?
20    MR. CASSANDRA: To the best of my knowledge.
21    COMMISSIONER JONES: What would they do when
22 they found a match?
23    MR. CASSANDRA: That would be the first
24 indication that someone may have, in fact, had passed.
25 I believe we communicated at that point with the

1 policyholder.

2 COMMISSIONER JONES: And then, what would

3 happen after that?

4 MR. CASSANDRA: We would essentially invite

5 the claim and say: "You need to provide claim form and

6 proof of that."

7 COMMISSIONER JONES: Did you communicate with

8 the beneficiary or did you just communicate directly

9 with the owner of the corporate life insurance product?

10 MR. CASSANDRA: In that instance, the owner of

11 the policy is the beneficiary, the corporate-owned life

12 insurance benefits paid. The company owns the policy.

13 COMMISSIONER JONES: So you'd invite them to

14 make a claim. Have you continued to use Death Master in

15 this fashion?

16 MR. CASSANDRA: I'm sorry?

17 COMMISSIONER JONES: Are you still using Death

18 Master for that corporate-owned life insurance product?

19 MR. CASSANDRA: Yes, sir.

20 COMMISSIONER JONES: Do you know what the

21 number of corporate-owned life insurance products are

22 that were enforce in the '90s?

23 MR. CASSANDRA: I'm sorry. I don't.

24 COMMISSIONER JONES: Do you have any idea what

25 number of corporate-owned life insurance products are in

---

1 force now?

2 MR. CASSANDRA: I do not. I'll have to get

3 back to you on that.

4 COMMISSIONER JONES: All right. You just

5 testified that you've also used it in the disability

6 business. Can you explain how you used it in that line

7 of business?

8 MR. KATZ: Sure. I'm going to speak at a high

9 level only because we didn't prepare exhaustively for

10 that because it was outside the scope, but I have no

11 problem sharing.

12 Generally in a similar way, we talked about

13 using it in the annuity business.

14 Many disability policies are in force and

15 claims are paid until such time as an individual is no

16 longer eligible for the claim.

17 One of the reasons why an individual wouldn't

18 be eligible for a claim would be that they died.

19 So in a similar way that I described the

20 annuity business, we're looking to make sure we're

21 creating duration errors in paying cut benefits longer

22 than is appropriate in the disability phase.

23 COMMISSIONER JONES: Do you know when MetLife

24 began to use it for your disability insurance policies?

25 MR. KATZ: I don't. We can certainly get that

---

1 for you. That's not a hard number to find.

2 MR. CASSANDRA: The earliest that I can

3 remember is the early 2000s as well. We'll have to

4 check that.

5 COMMISSIONER JONES: And then, with regard its

6 utilization for your long-term care insurance, can you

7 explain how the company's used the Death Master File for

8 that line of business?

9 MR. KATZ: A similar type of discussion as to

10 disability.

11 Again, I'm just going to give you the high

12 level, which is in many cases in long-term care when

13 someone is in payment status, payment status may only

14 exist while the individual's alive.

15 We think about the same about logic I just

16 testified to about the other businesses. I don't have

17 the date when we started. We can certainly follow up

18 and get that to you.

19 COMMISSIONER JONES: Do you know which decade

20 it was that you began to use it for the long-term care

21 insurance?

22 MR. KATZ: I do not.

23 COMMISSIONER JONES: Do any of the witnesses

24 know?

25 MR. CASSANDRA: I don't have personal

---

1 knowledge of it.

2 MR. KATZ: That's not a hard one to get you.

3 On a break we can get that for you.

4 MR. COLE: I just want to clarify one thing.

5 The first of our enumerated topics for this hearing in

6 our subpoena is: "Policies and procedures, specific

7 rules, specifications, project descriptions, manuals and

8 instructions concerning the use of Death Master to

9 identify potentially deceased customers across all lines

10 of business."

11 MR. KATZ: Our intent certainly is the best as

12 we can to answer all your questions. If we can't answer

13 them immediately, we will attempt to answer them

14 throughout the day today. That is our intent.

15 COMMISSIONER JONES: We promised a break at

16 11:00.

17 Before we take a break, let me see if the

18 Controller has any questions.

19 Let me see if the Controller has any follow-up

20 questions in this line of questioning and then we'll

21 turn this Ms. Miller and to Mr. Hanson.

22 CONTROLLER CHIANG: One question: This

23 question deviates slightly from the approach that we're

24 taking.

25 You we have been going chronologically via

1  business line.
2  My question regards the use of Death Master
3  from a holistic approach.
4  At what level of management was the decision
5  made to use Death Master and how is the information
6  communicated across business lines?
7  I'm trying to get a sense of why different
8  chronology for the use of Death Master.
9  MR. KATZ: I think I understand your question.
10  Unfortunately, I do not know the answer.
11  Many of these decisions were made well in the
12  past and so, as I sit here today, I can't speak to that.
13  The one thing I can speak to -- which I'd like
14  to get into some depth later on -- is our decision that
15  we made in 2010 to take a more holistic approach to the
16  Death Master Index.
17  I'd be happy to share with you that decision
18  process because I was personally involved in it and talk
19  to you how that was made. I can't speak to what was
20  done historically.
21  CONTROLLER CHIANG: Can anybody provide a
22  better sense of the approach -- not working within the
23  insurance industry or within the insurance industry --
24  is there a lower-level management decision or would that
25  rise to executive management or it could rise to court

1  consideration --
2  Is it viewed as a fundamental change in the
3  operations for a particular product line or was that
4  viewed as impacting company-wide operations?
5  MR. KATZ: Are you asking historically? I
6  just want to make sure I follow.
7  CONTROLLER CHIANG: If you can answer in a
8  historical context, that's s the gist of my question.
9  If not, what would be the current view?
10  MR. KATZ: I can't answer it historically.
11  What I can do is in the context of the current
12  changes, my leadership team and management up to my boss
13  were involved in that dialogue of what we were going to
14  do there.
15  CONTROLLER CHIANG: Your boss held what
16  position at what level and where is that position in the
17  organizational structure of MetLife?
18  MR. KATZ: My boss is the President of the US
19  Business and he reports to our CEO. He was involved in
20  the discussions.
21  COMMISSIONER JONES: Ms. Miller.
22  MS. MILLER: I just have one clarifying
23  question.
24  You testified that you didn't run through
25  Death Master on people without Social Security numbers.

1  I think you said 800,000 industrial life
2  members were in that category. Is that the total number
3  of policies that have never been run through Death
4  Master or is that just industrial life?
5  MR. KATZ: I believe -- and maybe someone can
6  help me -- but I checked that number just to be sure.
7  The number I was attempting to comment on was
8  the industrial life block.
9  I assume your question is: Are there
10  additional policies beyond those that don't have Social
11  Security numbers? I don't know the answer to that. We
12  can certainly find that out.
13  MR. HANSON: In the 2007 Death Master run,
14  will you go over in detail again what the scope of that
15  was and what the specific policies types and periods of
16  periods of time they looked at for that?
17  MR. CASSANDRA: The 2007 run, we matched most
18  of our individual life insurance policies. That would
19  include the industrial, whole life, and any other --
20  universal life, the life insurance products normally
21  manufactured by individual policies.
22  MR. HANSON: That was just the life, business,
23  individual life?
24  MR. CASSANDRA: Specifically with regard to
25  the 2007 match that we discussed, the scope of that was

1  the individual life business, which got materially most
2  of the business.
3  It was small assumed blocks of business which
4  were not matched in 2007 and provided, of course, that
5  we had a Social Security number to match.
6  MR. HANSON: So it's just individual life
7  policies remained where they had a Social Security
8  number. It wasn't group. Was it a whole term?
9  MR. CASSANDRA: Yes, whole life, term life and
10  universal life. But I think you said group life was not
11  in that scope of that.
12  I think group life was not in that scope of
13  that because of a very important distinction between
14  group insurance and individual insurance.
15  In group insurance, the company does not keep
16  records. The group policyholder is the party who
17  generally does the administration of the records.
18  MR. HANSON: Without running Death Master,
19  what happens in any of these lines of business at
20  MetLife? They go until when? What happens to them long
21  after anybody could possibly believe the policyholder is
22  still alive?
23  MR. KATZ: You're hitting on a very good
24  point, which is, is -- does it make sense -- this
25  isn't your question, but is there a place to use Death

1    premise, that when we have a liability, to pay that
2    liability.
3              We paid out over $11 billion in claims.
4    That's what we paid in 2010 in life insurance claims.
5    So we take that very seriously.
6              We also believe the processes around our
7    insurance are quite effective.  They work for 99 percent
8    of the time.  There is a small percent where they don't.
9    We think that index a good safety net.
10             Maybe after the break, we can talk about what
11   we are doing now and where we want to go perspectively.
12             We also think continuously doing things to
13   stay in touch with your customers is also a good idea.
14             COMMISSIONER JONES:  Okay.  You've testified a
15   moment ago that with regard to group life, it's
16   typically the policyholder which is the corporate entity
17   or customer that has the records, but is there some
18   percentage of your group life business where you
19   actually know who the actual individual policyholder is?
20             And if so, what percentage or number of
21   individual members, if you will, in group life policies
22   do you have knowledge about?
23             MR. KATZ:  The answer is:  Yes, there are some
24   group life businesses where we are managing the records.
25             I don't have the percent of that.  We can get

1    you that.
2              What I will tell you is, it's been growing
3    over time where employers may ask us to manage their
4    records.  It's relatively small still.
5              That did lead to our decision in 2010 -- which
6    I think I can talk to -- including the group life
7    business where we have the records as part of our match
8    going forward.
9              It's early days on that work, but we think it
10   makes sense to look at that in the same safety net way
11   that I described before.
12             I should make a point.  The group business is
13   a little different in that in many situations the
14   employer is the one that submits the claim.  So the
15   employer has a role there.
16             We're very conscious on anything we do in our
17   business to work closely with our group customers to
18   make sure what we are doing is also with their
19   expectations.
20             COMMISSIONER JONES:  So prior to 2010, you
21   weren't running Death Master against the records you had
22   of individuals who were members of group life policies?
23             MR. KATZ:  Generally speaking, we were not.
24             COMMISSIONER JONES:  Can you give me the order
25   of the magnitude; 20 percent of the business, 30 percent

1    of the business -- of your group business?
2              MR. KATZ:  I can't.
3              MR. CASSANDRA:  It's a minority of the
4    business, but I don't have the exact history for you.
5              MR. KATZ:  We certainly can get you that.
6              COMMISSIONER JONES:  We would like to know
7    that.
8              MR. KATZ:  I would like to make a point for
9    completeness.  There have been some situations in the
10   group business where a specific group customer has used
11   the match.  And in those situations, obviously, we then
12   were presented with claims.
13             So we wouldn't be the one doing the match, but
14   we're aware of certain group of customers who have taken
15   it upon themselves to use the Death Index for their
16   records.
17             COMMISSIONER JONES:  How many?
18             MR. KATZ:  Not many.
19             MR. CASSANDRA:  A handful.
20             MR. KATZ:  A handful.  It's small.
21             COMMISSIONER JONES:  You testified a moment
22   ago that for a certain period of time, there were two
23   sources for claims; the normal claims process and Death
24   Master.
25             But just to be clear, what period of time are

1    we talking about as it relates to the individual life
2    insurance part of your business, it was 2007 that you
3    first began to use Death Master in a systematic way
4    across life insurance policies to determine if there
5    were matches.  Is that correct?
6              MR. KATZ:  In 2007, we did a systematic match.
7    It was one match, but it went back all the way back on
8    our records.
9              COMMISSIONER JONES:  I understand 2007 was the
10   first time you ran that systematic match across life
11   insurance policies where you had a Social Security
12   number -- excluding some of the policies that you
13   testified to a moment ago in the mergers and
14   acquisitions acquired company policies and some of the
15   other categories, but 2007 was the first time and you
16   ran it once that time?
17             MR. KATZ:  In a comprehensive way, individual
18   businesses with the caveats that you articulated --
19             COMMISSIONER JONES:  That's a yes?
20             MR. KATZ:  Yeah.  You didn't say "individual."
21   That's what I wanted to clarify.
22             COMMISSIONER JONES:  And then, when was the
23   next time that you ran Death Master across your life
24   insurance policyholders policies?
25             MR. KATZ:  In 2010, we initiated a

1  comprehensive death match program – which I'll let
2  Mr. Cassandra talk about which has a running Death Index
3  throughout all of our -- the majority of our business --
4  which I'm going to touch in a minute -- in a systemized
5  way. And some of that kicked off in late 2010 for our
6  retained asset accounts and then it's rolling throughout
7  2011.
8       I believe the individual life piece was just
9  matched this month and that will continue throughout
10  2011.
11       COMMISSIONER JONES: Let's start there after
12  the break. We'll take a 15-minute break. Thank you
13  very much.
14       (Recess was taken from 11:15 a.m. to 11:39 a.m.)
15       COMMISSIONER JONES: We're going to resume the
16  hearing now.
17       I want to begin by asking some additional
18  clarifying questions about some of the things we talked
19  about this morning.
20       Then, we'll give MetLife's representatives an
21  opportunity to talk about what's happening commencing in
22  2010.
23       Before we go there, earlier in the hearing,
24  MetLife testified to its utilization of Death Master for
25  annuities.

1       In the slide presentation earlier, there was
2  some discussion that with an annuity there is what's
3  called a pay-in period and a payout period.
4       I'm wondering if you could describe for us
5  what those two terms mean in the context of an annuity
6  -- if any of the witnesses could.
7       MR. SOLLMANN: I'll be happy to.
8       COMMISSIONER JONES: If you could just get
9  real close to the mic. I'm having some problem.
10       MR. SOLLMANN: As Mr. Cole's presentation
11  outlined, a payout annuity is one where we are making
12  payments to the owner in the form of a monthly income.
13       A deferred annuity is one which is in a pay-in
14  status where the ultimate benefit to the contract holder
15  is at some point in the future.
16       COMMISSIONER JONES: So in your original
17  presentation or testimony, one of the witnesses used the
18  phrase "deferred annuity." That's synonymous with a
19  pay-in period for annuity?
20       MR. SOLLMANN: That's correct. In the trade,
21  those are commonly called "deferred variable annuities."
22       COMMISSIONER JONES: Okay. And with regard to
23  annuities that are in a pay-in period, is there
24  typically a death benefit associated with those
25  annuities?

1       MR. SOLLMANN: There typically is, yes.
2       COMMISSIONER JONES: For MetLife's annuity
3  product, do they typically have a death benefit
4  associated with their specific annuity products that are
5  in the pay-in or deferred status?
6       MR. SOLLMANN: That's typically the status,
7  yes.
8       COMMISSIONER JONES: You testified as well
9  that Death Master was used initially manually and then
10  more systematic with regard to annuities.
11       Was Death Master also used for annuities that
12  are in the pay-in period?
13       MR. SOLLMANN: Yes. The description of the
14  process that I outlined earlier -- that began in the
15  early 2000s -- applied equally to our payout business as
16  well as to a portion of our deferred business. So let
17  we just talked a minute about that.
18       COMMISSIONER JONES: Thank you.
19       MR. SOLLMANN: And so, it was being used in
20  the early 2000s, to the best of my knowledge, for across
21  all of our payout business.
22       For deferred annuities that were on similar
23  administrative systems that support the majority of our
24  older, more mature blocks of business, we used it as
25  well.

1       As I said earlier, as we continued to evolve
2  those processes and procedures this year, we planned on
3  continuing to expand that process to the rest of our
4  deferred annuity business.
5       COMMISSIONER JONES: Prior to this year, what
6  percentage of the deferred pay-in annuity business were
7  using Death Master to do matches for?
8       MR. SOLLMANN: I don't have the exact number.
9       I can tell you, just in a high level, that the
10  majority of our in force business, our book of business,
11  block of business, are those of older contracts.
12       The newer business would be the ones that we
13  plan on extending this process to. I could get you the
14  exact number if that would be helpful.
15       COMMISSIONER JONES: That would be helpful.
16       What I'm interested in is what percentage of
17  deferred annuities you were using Death Master for prior
18  to 2010?
19       MR. SOLLMANN: I don't have that with me, but
20  I can give that to you.
21       COMMISSIONER JONES: As to those annuities
22  that were in pay-in or deferred status when in the
23  utilization of Death Master you reached a match, what
24  was then done with regard to any communication with the
25  annuitant?

1        As a result of that, we paid out $50 million

2  in claim payments.

3        COMMISSIONER JONES: How many policies?

4        MR. KATZ: I'm going to try to see. I don't

5  know if I can be linear on this.

6        So 18,000 policies all of which $50 million

7  were paid to benes in dollars and $30 million --

8        COMMISSIONER JONES: I got that before.

9        MR. KATZ: How many policies? We certainly

10  can get it.

11        MR. CASSANDRA: I don't have the number of

12  policies. I have the dollars.

13        COMMISSIONER JONES: So not all 18,000 were

14  paid out, I take it?

15        MR. KATZ: They were either paid out or they

16  were put into our unclaimed fund system to be escheated.

17        COMMISSIONER JONES: So with regard to the

18  18,000, they were either paid out or escheated?

19        MR. KATZ: I want to be careful in saying

20  "all," but generally speaking, that's what should have

21  happened.

22        COMMISSIONER JONES: Then with regard to

23  39,000 for which you had a one or more match, only 700

24  were either paid out or escheated?

25        MR. KATZ: You got it. Approximately.

1        COMMISSIONER JONES: With regard to the

2  original 28,300 for which you had a three-point match

3  and the 39,000 for which you had a one or more point

4  match, there was no publication of the names of those

5  individuals?

6        You describe what you did with them, but there

7  was no publication of the names of individuals?

8        MR. KATZ: Correct.

9        COMMISSIONER JONES: That was m original

10  question.

11        MR. KATZ: Yeah. So at some point, some

12  segments of them as they funneled through the system may

13  have resulted in some states which required some level

14  of publication prior to funds being escheated, we would

15  have executed our responsibilities to do that.

16        So I'll give you an example. In one state,

17  they may say before you escheat -- this is the way

18  California does it -- in California, California does

19  outreach.

20        In some other states, they may require us to

21  do an outreach and if we were required to do that in a

22  given state, we would have done that.

23        But the segment between the 28 and the 18 or

24  the 39,000 and the 700, there was no outreach because we

25  didn't identify those as lost policies.

1        COMMISSIONER JONES: At the close of the last

2  session, there was some testimony about what the company

3  started to do in 2010 with regard to the utilization

4  with Death Master.

5        Why don't you go ahead and share that with us

6  now.

7        MR. KATZ: Sure.

8        COMMISSIONER JONES: I'm sorry, Mr. Katz. I

9  want to apologize. Ms. Miller has a follow-up question.

10        MS. MILLER: Of the $31 million that was put

11  into your unclaimed property system in 2007, all of that

12  was related to California claims has been escheated.

13  Right?

14        MR. KATZ: I can't testify to that.

15        MS. MILLER: Is there a statute it's three

16  years? In Florida, it's five. We talked about that at

17  our hearing.

18        MR. KATZ: So my understanding is that in

19  California, there is a three-year period. And in the

20  report for 2011, which ultimately will be escheated at

21  the latter part of 2011, you'd see an increase in the

22  amount because of this group.

23        So we can certainly testify to those amounts

24  if you'd like.

25        COMMISSIONER JONES: I think the Controller is

1  going to have a line of questioning about the

2  responsibilities under California law so we can hold off

3  on that for the moment, Ms. Miller.

4        Let me ask, though, if there aren't any

5  follow-up with this line of questioning, we can now go

6  to what the company started doing in 2010.

7        MR. KATZ: Sure. S I think I want to back up

8  just a second to get to what led to what we did in 2010.

9        In 2007, we ran this match and we learned a

10  whole lot of information. We learned about three-point

11  matches. We learned about two-point matches. We

12  learned about processes to connect with policyholders.

13        In fact, some of that learning goes a little

14  bit further back.

15        And throughout 2008 and 2009, we were going

16  through these exhaustive procedures as best we could to

17  locate those policyholders and pay out these

18  beneficiaries, and I kind of gave you the sense of the

19  order of the magnitude.

20        In 2009, we had structural changes in the

21  company, and this may get at Commissioner Chiang's

22  question about the decision-making.

23        We created a US Business at that time. So

24  prior to that, business units were managed separately.

25  We created one US Business at that point in time.

1        Throughout I'd say, the early part of 2010, we
2  began looking at the experiences that emerged out of the
3  '07 match.
4        We also were engaged in discussions with
5  regulators about questions around unclaimed property.
6        And ultimately, we took a look at what we
7  wanted to do across our US Business in this specific
8  area. And I was charged to lead a team to look at this
9  issue holistically.
10       Based on that review, determined that we felt
11  we had an opportunity to use that Master Index more
12  effectively across the US Business to provide the safety
13  net that I've been describing before. Presented a
14  recommendation to my boss to use that universally in a
15  way that we'll describe -- I want to be careful with
16  "universally" -- generally, with the majority of our
17  business.
18       We'll describe that in-depth in a moment.
19       That recommendation was accepted and in late
20  2010, we began the process of executing on that program.
21       So I can certainly now tell you about that
22  program or I can pause and let you ask questions.
23       COMMISSIONER JONES: Why don't you talk about
24  the program.
25       MR. KATZ: Sure. I'll turn it over to

1  Mr. Cassandra.
2       MR. CASSANDRA: So in recognizing the fact
3  that the Social Security Death Master File could be a
4  very effective safety net, we took the decision to match
5  against the Social Security Death Master no less
6  frequently than annually the policies for which we had
7  of records. Okay?
8       So that includes our retain asset accounts,
9  our individual life insurance businesses, our annuities
10  and the group life insurance business where we have the
11  records and are the record keeper.
12       We believe that an annual match will provide a
13  very effective safety net.
14       We will -- those procedures were recommended
15  to include -- as we did in 2007 -- logic to capture not
16  only active policies, but also any policies that may
17  have ended due to expiring of the nonforfeiture option
18  period.
19       So in late 2010, we began our first match
20  consistent with this new policy by matching our retained
21  asset accounts and we have been moving through and, in
22  fact, the individual business has been matched again,
23  and will be completely matched again to the extent that
24  we have to have the records in by the end of this month.
25       COMMISSIONER JONES: So between 2007 and 2010,

1  were there any sweeps of product lines using Death
2  Master?
3       MR. KATZ: Absolutely.
4       COMMISSIONER JONES: Which ones?
5       MR. KATZ: We testified a little bit to what
6  we did in annuities, disability and long-term care and
7  so those processes that we testified to already were
8  going on during those durations.
9       MR. SOLLMANN: Commissioner, I would add on
10  the individual annuity side -- as I testified to earlier
11  -- we have a regular.
12       COMMISSIONER JONES: Can you hold the mic a
13  little closer, sir.
14       MR. SOLLMANN: Sure. In the individual
15  annuity business, we conduct sweeps on a monthly basis
16  for payout business and quarterly for deferred payments
17  business.
18       COMMISSIONER JONES: Okay. So on the annuity
19  side between 2007 and 2010, you're doing monthly for
20  payout annuities and quarterly for pay-in annuities.
21       MR. SOLLMANN: As I said, we began that
22  process in 2000.
23       The only caveat I'd add is that on the sweeps
24  we were doing on our deferred book of business was
25  limited to all older blocks of business.

1       COMMISSIONER JONES: Okay. You then testified
2  earlier about what you did with regard to
3  corporate-owned and group life insurance, disability,
4  long-term care. That work continued between 2007 and
5  2010?
6       MR. KATZ: I believe it did. We want to get
7  you -- certainly you had asked for the dates when we
8  commenced long-term care and disability.
9       I believe those proceeded 2007. We will
10  certainly verify that and get you that information.
11       COMMISSIONER JONES: So on the group life
12  insurance side, are you doing -- during this period of
13  time 2007 to 2010, are you doing quarterly, monthly or
14  annual sweeps using Death Master?
15       MR. KATZ: We were not doing sweeps with group
16  life insurance.
17       COMMISSIONER JONES: Okay. With regard to --
18       MR. KATZ: I'm sorry. For completeness
19  except. For completeness except in those situations
20  which I testified to where specific customers may have
21  done that on their own.
22       COMMISSIONER JONES: Okay. And then with
23  regard to disability insurance 2007 to 2010, monthly,
24  quarterly or annually. Do you know?
25       MR. CASSANDRA: I believe it was monthly.

1      MS. ROSEBOROUGH:  It has not.

2      MR. COLE:  I'd like the court reporter to mark

3  that as Exhibit 1.

4      (Whereupon, Exhibit 1 was marked

5      for identification)

6      MR. COLE:  Just so we're very, very clear on

7  this, would one of the sworn witnesses please testify in

8  just a few sentences as to what this document is.  It's

9  dated September 8, 2010.

10      MR. SOLLMANN:  Sure.  I'll take that question.

11      As I mentioned earlier in the morning, we do

12  have and have had a process, my understanding, to share

13  information with other parts of the company,

14  particularly on this document with our life insurance

15  death claim unit and our total control account.

16      That process was informal and then we began to

17  formalize that process in early 2010, the first part of

18  2010.

19      This version that you see here is the latest

20  version of the current process that we use, and I can

21  answer any other questions you might have on this point.

22      MR. COLE:  Just so I'm clear, this is a

23  two-page document.  Is this the totality of the document

24  or is there more to this document?

25      MR. SOLLMANN:  I'm not sure I have the answer

1  to that question.  I've been told that it is the

2  entirety.

3      MR. COLE:  Okay.  Thank you.  So before the

4  close of this hearing, if you'll make sure to get a copy

5  to the court reporter for marking, we'd appreciate it.

6      COMMISSIONER JONES:  All right.  I believe

7  there was some other questions we had in the first half

8  of the hearing that MetLife might have a chance to do a

9  little more research on.  I think we might actually hear

10  some testimony about that at this moment.

11      MR. KATZ:  I'm going to give the data quickly.

12  It's only a couple of pieces and I'll have some more

13  follow-ups.

14      Toward the end of the testimony, there was a

15  discussion of loss of addresses and in particular -- or

16  bad addresses -- and our procedures around that.

17      I want to give a couple of clarifying

18  statements.

19      First of all, in, in fact, we get returned

20  mail into our individual life unit and it indicates

21  deceased, we will perform an investigation.  Similarly

22  to the investigation I described when we get a phone

23  call that advises that someone is deceased.

24      I'm not going to through that whole

25  investigation process again, but I can if you'd like.

1      Secondly, in our address correction unit, we

2  do have procedures -- and I did confirm that -- to use

3  publicly available sources of data, such as Accurint and

4  Rootsweb to determine if there's any indication if that

5  individual is dead.  Again, that supplements those

6  topics.

7      Any question on those?  There were a few

8  others.

9      COMMISSIONER JONES:  I don't think we have any

10  additional questions.

11      MR. KATZ:  The other ones are very quick.

12      There are dates you asked for about when we

13  began using Death Index and Death Master in various

14  businesses.

15      I'm going to give you some dates.  I would say

16  these are approximates only because I got them from

17  someone else.  I want to validated, but I'm sure the

18  order of magnitude is close.

19      What I'm describing here is for our disability

20  business or for our long-term care business and I'm

21  describing usage for individuals that are in claimed

22  payment status.

23      So for individual disability, we began using

24  the Death Match in 1995.  I was not able to ascertain

25  the frequency of that or any decisions that led to its

1  usage.

2      In 2001, we began using it for group

3  disability and for long-term care.

4      So I believe we testified a little bit to the

5  frequencies on these already in the current state.  So

6  if you have any further questions, I'll be happy to

7  answer them.

8      COMMISSIONER JONES:  I think there are no

9  additional questions.

10      MR. KATZ:  That was really all of the

11  follow-ups that we have.

12      COMMISSIONER JONES:  Okay.  Thank you.

13      Now I want to turn the mic over to the

14  Controller Chiang and afford him an opportunity to ask a

15  series of questions.

16      CONTROLLER CHIANG:  Thank you.

17      Please describe the original structure within

18  the MetLife entity that handles the escheat obligations

19  of the state of California?

20      MR. KATZ:  So I'm going to explain the nuance

21  that I'll need to describe.  We have an unclaimed

22  property organization that is part of an organization,

23  which I can talk about how that works.

24      However, each operation within the

25  organization has responsibilities to determine when it's

1  benefits.

2      So assuming that you fulfilled your

3  obligations under those two particular property tax

4  codes -- or property-type code for 2002. But in 2003,

5  2004, 2005, 2006, we do not have property submitted to

6  the state of California under those property types and

7  that's what's why I'm trying to get to my affirmative

8  question that I asked earlier.

9      Do you have some type of identification at

10  what level of management -- because you may have lines

11  of businesses that are fulfilling your obligations and

12  in other areas you have inconsistent application perhaps

13  of the rules or a change in policy, so I'm trying to get

14  a sense of what is taking place.

15      MR. KATZ: So would you be so kind as to

16  repeat those dates? We're not going to be able to

17  respond to them today, but I want to make sure we have

18  them, and then certainly that on information I'm not

19  familiar with, we'll come back and take a look at it.

20      CONTROLLER CHIANG: Sure. So in 2002, we see

21  escheated property in the categories, two that are

22  identified are annuities and death benefits.

23      However, property escheated by MetLife in

24  those categories we do not appear to have any for the

25  years 2003, 2004, 2005 and 2006.

---

1      MR. KATZ: Okay. So we will take a look at

2  that. The one possibility that I will throw out is the

3  potential that we have some coding issues in our

4  systems. So let us check that out and really make sure.

5      Our intent, obviously, is to submit unclaimed

6  property consistent with what it should be.

7      It's reasonable that if we had a prior issue,

8  it would be on those years, but I want to check that out

9  for you.

10      CONTROLLER CHIANG: And then, following up on

11  your last statement you do want to escheat, how does

12  MetLife determine when it will escheat proceeds due

13  under policies identified by its 2007 comparison?

14      MR. KATZ: So the actual -- so let's -- we're

15  going to talk about individual life.

16      For individual life, we escheat based on our

17  -- typically, it's based on the time we know we have a

18  liability that's due and unpaid and we can't find the

19  rightful owner of that property, then we begin the

20  unclaimed property process, which I believe in

21  California is three years.

22      The 2007 match was somewhat unique in that we

23  made the decision to waive the requirement of proof of

24  death. So one could assume if we had required proof of

25  death, then the escheatment period would have started

---

1  subsequent to 2007, but instead we chose not to require

2  proof of death and, as such, used the 2007 date as the

3  date for purposes of establishing liability for

4  unclaimed property.

5      CONTROLLER CHIANG: Actually, you used the

6  term "to know." Can you further delineate your

7  definition of "to know," so actual versus constructive?

8  If you choose actual or somewhere near there, what

9  constitutes the sufficiency for the policies of MetLife?

10      MR. KATZ: What I prefer to testify to is what

11  we did, which was resume -- when we ran the match in

12  2007 and identified that we had information indicating

13  death, kicking off expectation and investigations that

14  subsequently weren't successful, we selected that data

15  as the date as opposed to using a subsequent date where

16  we have had proof for the purposes of establishing

17  escheatment date.

18      CONTROLLER CHIANG: And which unit within

19  MetLife making that determination.

20      MR. KATZ: That would have been for the

21  purposes of the '07 -- I'm not exactly sure if that was

22  done in the claim area or the unclaimed funds area. We

23  can certainly get you an answer to that.

24      CONTROLLER CHIANG: The variation in 2007, how

25  is that determination made and by whom?

---

1      MR. KATZ: I do not know the answer to that.

2  We can certainly get that and let you know.

3      CONTROLLER CHIANG: I understand that there

4  may be perhaps some shortcomings in the 2007 approach,

5  but I thought the 2007 approach was more constructive

6  and ultimately was resulted in a resolution for the

7  benefit of the beneficiaries.

8      Has there been any discussion as to the action

9  you took in 2007 and perhaps moving to that approach?

10      MR. KATZ: Actually, there has. So for the

11  life business, as with other business, we are -- have

12  implemented a new comprehensive approach that began in

13  late 2010 where no less than annually we will match the

14  Death Index.

15      And we think -- as we described before -- that

16  will provide a valuable safety net for the limited

17  number of policies that don't come in through the normal

18  course.

19      We have not yet perfected all the details

20  exactly how that will work in the context of what would

21  acceptable for proof or not as we talked earlier.

22      CONTROLLER CHIANG: That's the third time one

23  of you has used the term "safety net."

24      I actually don't believe it's the most

25  constructive approach. It is a back-ended approach,

1    CONTROLLER CHIANG:  I sincerely appreciate
2  that because we are trying to do the same thing, reach
3  the best outcomes for people.
4      I'm still not clear.  So you said you did the
5  analytics of 2007.  You did the analytics measuring what
6  exactly?
7      MR. KATZ:  I don't have the numbers in front
8  of me, but when we looked at it from the date someone
9  goes on the Social Security file, what's the proximity
10  of that for death payments --
11      Actually, I want to be careful.  I don't want
12  to testify to a process that I don't have extreme
13  knowledge to.
14      I'd say all the analytics came out of the '07
15  match led us to believe to do it no less than frequently
16  than one year is the right answer.
17      I'd say if there's data available that
18  indicates we have an opportunity to significantly
19  improve the customer's experience by doing this sooner,
20  we would be happy to engage in that dialogue.
21      I also think we just ran it again for
22  individual life business this past month.  And we'll
23  have some learnings that came out of that that we'll be
24  happy to share.
25      I just want to be careful because we're having

1  a discussion about a process that we believe generally
2  works quite well and a change to that it that we believe
3  will make it even better.
4      CONTROLLER CHIANG:  So that's the issue that's
5  unresolved in my mind.  You state it works well, but you
6  don't have criteria and then we don't have outcomes.
7      This could be very easily resolved if you ask
8  the question, you know, across the base, what would be
9  the appropriate time for us to notify you when you're
10  applying to submit the claim, the best way to submit
11  your to submit your claim to get a return of the money,
12  the proceeds.
13      MR. KATZ:  I think you're making a good point.
14  Should we speak to our customers and understand what
15  they want in the context of doing this.
16      There is one thing we just have watch, and I
17  want to make this is point because what I wouldn't want
18  is anything that we do result in beneficiaries believing
19  that they do not need to submit a claim.
20      Because it's very possible that there will be
21  situations that for whatever reason someone doesn't get
22  on the Death Index or gets on the Death Index much
23  later.
24      And sos we want to be very careful that
25  there's nothing that we do, or as an industry

1  collectively decide to do, that leads beneficiaries to
2  believe that they don't have the responsibility to
3  submit claims.
4      It's an important part of the system and it
5  works quite well.
6      So we have been looking at it in addition to
7  what they do, how can we make it even better.  So I just
8  think that's a dialogue we want to be cautious of as we
9  think through this service.
10      CONTROLLER CHIANG:  So if you don't use the
11  actual date of death as triggering the dormancy, what
12  definition does MetLife use so that I have a clear
13  understanding so we can have a further discussion of
14  your escheatment and obligations to the state of
15  California?
16      MR. KATZ:  So I believe for life insurance we
17  use the date due and payable when we are no longer --
18  we're not able to find the beneficiary.
19      CONTROLLER CHIANG:  Could you restate that
20  again?  Due and payable --
21      MR. KATZ:  When we believe we have a liability
22  -- When we believe we have a liability on our books to
23  pay out proceeds and we can't find the beneficiary to
24  whom that money is due to, we would then kick off our
25  unclaimed property process starting with the date that

1  we believe we have that liability.
2      CONTROLLER CHIANG:  So referencing scenarios
3  discussed earlier, an individual calls in believing they
4  may receive some proceeds, and then you start your -- I
5  believe it's the standard operating procedures.
6      You mentioned how you addressed some of the
7  claims.  I don't know if it's scrutinized within
8  MetLife.
9      They do not submit a claim.  They do not
10  submit any information or provide a death certificate.
11      At what point, do you determine that there is
12  a liability due?
13      MR. KATZ:  I think it's at the time when we
14  receive sufficient proof of death and as such approve
15  the claim, that would be the time that we would begin
16  the liability.  And that sufficient proof of death in
17  our standard process does involve getting a death
18  certificate.
19      MR. CASSANDRA:  Could I just make one point
20  that I'm not sure is obvious to folks?
21      There is almost -- the question that's sort
22  of sitting out there is just the fact that someone has
23  died means that the company has a liability.
24      In insurance contracts, there are also --
25  there are contestability periods on life insurance

1  of the 1.1 million lost policyholders using Death

2  Master?

3        MR. KATZ: Not that I'm aware.

4        COMMISSIONER JONES: Was there any effort in

5  2003, outside of the litigation context to do a systemic

6  sweep of the 1.1 million lost policyholders using Death

7  Master?

8        MR. KATZ: Would it be okay if I made a

9  clarifying point here?

10       COMMISSIONER JONES: Certainly.

11       MR. KATZ: A significant chunk of these don't

12  have Social Security numbers.

13       COMMISSIONER JONES: That's fine. Did you or

14  did you not in 2003 sweep those policyholders using

15  Death Master, outside of litigation?

16       MR. KATZ: Not that I'm aware of.

17       COMMISSIONER JONES: Okay. Was there any

18  point in time when you did sweep the 1.1 million lost

19  policyholders using Death Master File, and when was

20  that?

21       MR. KATZ: To the extent that any of the

22  policies had Social Security numbers, those were swept

23  against the Death Index, other than small block we

24  talked about in that 2007 match.

25       COMMISSIONER JONES: They have been swept

1  since then?

2       MR. KATZ: Actually, they were swept this

3  month, but that's the last time.

4       MR. CASSANDRA: Mr. Commissioner, could I make

5  one clarification?

6       So for the purposes of demutualization, we're

7  talking about the policy owners.

8       Under the plan of demutualization, the policy

9  owner would have been the party who was eligible for

10  demutualization proceeds.

11       In many of the cases of the industrial block,

12  the policy owner was not the insured under the contract.

13       So if sort of the line of questioning is

14  implying that with absolute certainty there's a death

15  benefit payable under these "lost policyholders," I

16  don't think that blanket assumption is absolutely

17  correct."

18       COMMISSIONER JONES: What percentage of the

19  1.1 million lost policyholders were -- I'm sorry. What

20  percentage of 1.1 million lost policies were in a

21  situation where the owner was different than the

22  policyholder?

23       MR. CASSANDRA: I don't know that. I don't

24  have that statistic for you, but it's one fact in the

25  context of these policies that should be considered.

1       COMMISSIONER JONES: Some number of the 1.1

2  million policies were policies where the owner and the

3  policyholder was the same. Correct?

4       MR. CASSANDRA: That is possible.

5       COMMISSIONER JONES: And Death Master was not

6  run outside the litigation context against those

7  policies until 2007?

8       MR. CASSANDRA: To the best of my knowledge.

9       MR. KATZ: Other than that, we gave you a few

10  other examples with a couple states, but other than

11  that.

12       COMMISSIONER JONES: Okay. And then was there

13  any effort to do a manual check of the 1.1 million

14  policy files against Death Master other than litigation

15  with the three states you testified to in 2004 that you

16  were engaged in some discussions with, and the 2007

17  sweep? Any manual checking of the 1.1 million policy

18  files?

19       MR. KATZ: Not that I'm aware of.

20       COMMISSIONER JONES: All right. Then you

21  testified a moment ago that with regard to 2007 Death

22  Master sweep, when you identified beneficiaries whose

23  benefits needed to be paid either because you had a

24  three-point match and you filed an investigation to

25  determine the benefit you needed to pay, or you had more

1  than a one-point match and you filed an investigation to

2  decide the benefit you needed to pay.

3       In those circumstances where you determined

4  that either a benefit needed to be paid or there needed

5  to be an escheatment, you chose 2007 as the date of

6  which you would run the date of death for purposes of

7  calculating interest payments owed in those cases.

8       MR. KATZ: No.

9       COMMISSIONER JONES: Can you clarify that?

10       MR. KATZ: Sure. For purposes of claims to be

11  paid to beneficiaries, we pay interest from 30 days past

12  the date of death, as we believe is consistent with the

13  State requirement.

14       In other states, we did what was consistent we

15  believed for those given states.

16       For funds to be escheated, we started the

17  escheatment process for lost property in that 2007 date

18  and did not apply settlement interest, which is also our

19  interpretation of how the law requires us to do it.

20       COMMISSIONER JONES: Even if through a

21  three-point Death Master match there was an indication

22  of the death occurred earlier than 2007, you chose 2007

23  as the date in which the dormancy period began to run

24  for purposes of escheatment?

25       MR. KATZ: Right. We normally do it from the

1 date we have a liability. And that liability happens
2 when there is proof of death, which by nature of the
3 2007 match would be subsequent to 2007.
4 We chose not to require death certificates
5 and, as such, set that 2000 date as the date to begin
6 the unclaimed property process.
7 COMMISSIONER JONES: So you understand why
8 that answer may be less than satisfactory for the
9 Controller and I because you testified earlier that you
10 had Death Master, were using it for certain portions of
11 business, principally annuities.
12 It wasn't used for life insurance benefits in
13 the individual contexts until 2007.
14 So while I respect what you said or
15 understand, rather, what you said in regards to when you
16 believe liability attaches for purposes of escheatment
17 is when you have knowledge, you didn't use a database
18 that was available to you to have knowledge earlier.
19 And so I guess what I find troubling is given
20 that history, why would you choose 2007 as the date of
21 liability and not an earlier date?
22 MR. KATZ: Well, again, it's hard for me to
23 testify exactly what the thinking was and why different
24 options were chosen.
25 I think the point I made earlier which was --

1 our belief is that liability begins -- or I should say
2 the unclaimed property timing begins when liability is
3 established.
4 And while I recognize the fact that in some
5 cases the date of death was earlier in the process, in
6 fact, liability on these cases really wasn't established
7 because there was no proof of death.
8 And so we selected the 2007 date because that
9 was the date that we -- for the purposes of running the
10 match had been the first time we ran the match the match
11 on that block of business and began the process.
12 As an alternative, and I see your point,
13 you're saying why didn't you go back earlier than that.
14 In our interpretation of our responsibility wouldn't
15 have required us to do that.
16 COMMISSIONER JONES: Have you done any
17 analysis of what the interest savings is to MetLife by
18 virtue of choosing 2007 as the date at which liability
19 and dormancy period runs versus choosing the actual date
20 of death as reflected in Death Master on those
21 policyholders for whom you made a match?
22 MR. KATZ: I don't know that I can tell you
23 that information.
24 MR. CASSANDRA: We've not made any such
25 calculation, to my knowledge.

1 COMMISSIONER JONES: Okay.
2 MR. KATZ: I should also make just an
3 important point.
4 During that dormancy period, the dormancy
5 period, we used to the extent we could to search for
6 beneficiaries.
7 I don't know if that's helpful or intuitive,
8 but it's worth noting that in 2007, after we run that
9 match, it wasn't as if, okay, let's just turn the money
10 over.
11 Our understanding of part of why we have a
12 dormancy period is, as an insurance company, it gives us
13 the opportunity to search out beneficiaries to see if we
14 can find them and then escheat only in until situations
15 where we can't. We put in pretty substantive efforts to
16 make that happen.
17 COMMISSIONER JONES: Let me see if either
18 Minnesota or Florida have any questions at this point.
19 MS. MILLER: I have a couple of questions.
20 You mentioned that you have access to other
21 databases and other methods of finding people. We
22 mentioned Accurint.
23 Are there other systems that MetLife uses, for
24 example, when it's underwriting or in other departments
25 to find information about it's own customers?

1 MR. KATZ: What type of customer?
2 MS. MILLER: Your customers?
3 MR. KATZ: So if your question is: Do we use
4 publicly available information in other ways throughout
5 the organization. I'm certain we do.
6 MS. MILLER: So for marketing and those kind
7 of things, you try and market products, there are all
8 kinds of systems out there where you can look and see if
9 you can identify a subset of customers by certain
10 findings. Right?
11 MR. KATZ: That's not the area that I have
12 responsibility for so I can't comment to that, but that
13 sounds logical.
14 MS. MILLER: You're aware of such systems.
15 Correct?
16 MR. KATZ: Give me an example of one?
17 MS. MILLER: Well, I think there are a variety
18 of them. Some of them are call predictive modeling type
19 of systems. Some of them are called, just data mining
20 systems. I don't have trade names, but there are a
21 variety of them.
22 MR. KATZ: I should make a point the majority
23 of our business in the individual space is agent driven.
24 We do have a very small direct marketing arm
25 of our business, but for the most part our business is

1 that safety net process on a perspective basis so that
2 when the core process happens to not work, there's a way
3 to support that.
4          COMMISSIONER JONES: That's where you and I
5 have a disagreement.
6          I think that rather than using it as a safety
7 net, it should be an integral part of the company's
8 effort to try to make sure that beneficiaries get paid.
9 Not an afterthought. Those are my words, of course.
10          MR. KATZ: Can I comment on that?
11          COMMISSIONER JONES: Absolutely.
12          MR. KATZ: I think that would be a great topic
13 for discussion between regulators and the industry.
14 Because this is the type of thing, and we're perfectly
15 comfortable talking about it in a public forum in a
16 hearing, but this industry and the NAIC over the years
17 have enacted substantive change that helps our
18 customers. That's what we're here to do.
19          So we would welcome engaging in a dialogue to
20 determine the best practice across the industry. And if
21 this effort leads to that dialogue and we get to a place
22 where we all feel good, that's what we're trying to do
23 here.
24          COMMISSIONER JONES: You testified to the
25 company's new policy as to 2010. I think you testified

1 as well in April of this year, you did another Death
2 Master sweep against individual life insurance policies.
3 Is that correct?
4          MR. CASSANDRA: It was in June.
5          COMMISSIONER JONES: June of --
6          MR. CASSANDRA: I'm sorry, right. We intend
7 to finish by the end of June.
8          COMMISSIONER JONES: Maybe I better clarify
9 that. Let's go back to 2010.
10          Since 2010, can you describe again the uses to
11 which you put the Death Master File?
12          MR. CASSANDRA: We took the decision that we
13 were going to begin use of the Death Master File no less
14 frequently than annually in the businesses where we had
15 records.
16          We began that process in 2010. It began with
17 the first product that we matched under the process, our
18 retained asset accounts. The second product in the list
19 was our individual life business, which we are doing
20 live in May.
21          COMMISSIONER JONES: That's the part I didn't
22 understand. You're in the midst of doing the individual
23 life business?
24          MR. CASSANDRA: In fact, the raw match -- I'm
25 informed the raw match has been in run now we're

1 beginning the investigatory phase.
2          COMMISSIONER JONES: Can you explain -- will
3 you be using the same protocols that you used in the
4 2007 sweep for this most recent sweep of the individual
5 life insurance policies?
6          MR. CASSANDRA: I would say generally. I can
7 not say absolute, 100 percent certainty every protocol
8 is the same, but the logic and the intent, which is to
9 find every policy that person insured has died, that is
10 our intent.
11          COMMISSIONER JONES: You'll start with the
12 three-point match, and then you'll do a one-point and
13 greater match as you testified to earlier you did in
14 2007?
15          MR. CASSANDRA: I believe that to be the case.
16 I can't say with absolute certainty. The first sweep is
17 to be the three-point.
18          COMMISSIONER JONES: What will you do after
19 that?
20          MR. CASSANDRA: We'll start the investigatory
21 phase to determine if those three-point match hits are
22 actually our insured and begin to find the beneficiary.
23          COMMISSIONER JONES: Is it your intention as
24 to do an additional sweep using one point greater
25 matches?

1          MR. CASSANDRA: I don't know if we've taken
2 that decision yet.
3          COMMISSIONER JONES: What other product lines
4 do you plan to apply Death Master to based on this new
5 2010 policy?
6          You said retained asset accounts, individual
7 accounts. What comes next after that?
8          MR. CASSANDRA: The group life insurance
9 business where we are the record keeping.
10          COMMISSIONER JONES: Just where you are the
11 record keeper.
12          And you're continuing to use it on a monthly
13 or quarterly basis on the annuity product based on
14 whether it's pay-in or a pay-out status. Is that
15 correct?
16          MR. SOLLMANN: Yes. And as I mentioned
17 earlier, the block of the deferred business that we are
18 currently running against, we're running that as a
19 result by the end of this year.
20          COMMISSIONER JONES: Okay. Remind me, which
21 block of deferred business was that?
22          MR. SOLLMANN: I made a distinct earlier today
23 between our older business and our newer generation
24 business. It's about 5050 on the deferred side we will
25 add this year.

1       COMMISSIONER JONES:  Okay.  Now I want to turn
2  our attention to the retained asset accounts because
3  we've had some testimony about that.
4       And you've indicated that you did a Death
5  Master sweep in 2010 -- well, you did a Death Master
6  sweep late 2010 earlier this year against retained asset
7  accounts.
8       Can you describe how you used retained asset
9  accounts, what they are?
10      MR. KATZ:  I'll also clarify we had done a
11  sweep prior to that in 2006, which I can talk to also,
12  but retained asset accounts are a life settlement option
13  available in most policies.
14      They are aimed to enable the policyholder or
15  beneficiary to funds put into a retained asset account
16  to enable them to have time to decide what to do with
17  those funds.
18      Retained asset accounts offer interest rates
19  that are pegged to be above at least one of two market
20  indices.
21      I can give you what those indices are, I just
22  don't have them off the top of my head, and they have a
23  minimum interest rate.
24      The minimum interest rate varies anywhere from
25  three percent to a half a percent.

1       They are insurance contracts that are
2  supplemental contracts and feed back from our customers
3  is extremely positive on our retained asset accounts.
4       One of the stats I think is worthwhile to
5  share with you is about half of our retained asset
6  accounts today are earning an interest rate of three
7  percent.  And in today's environment, we think that's
8  quite competitive.
9       So let me stop there.  That's probably a
10  general answer.
11      COMMISSIONER JONES:  Does MetLife refer to
12  these as total control accounts?
13      MR. KATZ:  That's our product, our total
14  control account.
15      COMMISSIONER JONES:  That's synonymous with
16  retained asset total account?
17      MR. KATZ:  Our version of retained asset
18  account.
19      COMMISSIONER JONES:  You mentioned that it's a
20  life settlement option.  For which of your products is
21  retained asset account or total control account a life
22  settlement option?
23      MR. KATZ:  I believe, I'll ask Mr. Cassandra
24  to help me, it's for individual and life.
25      MR. CASSANDRA:  That's correct.

1       COMMISSIONER JONES:  And with regard to that
2  option, is it an opt-in option or opt-out option?
3       MR. KATZ:  So the optionality would depend on
4  the type of contract that's in place.
5       For individual life insurance, the
6  policyholders will have the option to elect the
7  settlement option.  Typically, either a retained asset
8  account, total control account or a check.
9       The policyholder usually doesn't make an
10  election.  If they don't make an election, then the
11  beneficiary will have the option to make an election.
12  If the beneficiary doesn't make an election, the default
13  will be the total control account.
14      I should make another point about what the
15  total control account is.  It's an account that's
16  interest bearing, but it's also check writing.  So the
17  individual, once they have the account open, if they
18  want to write one check to themselves, they can close it
19  immediately.  And, in fact, a significant amount of our
20  accounts close relatively quickly.
21      COMMISSIONER JONES:  So if I understand
22  correctly, first the policyholder is given the election,
23  so they are given the option to decide whether or not a
24  retained asset account will be utilized in the event of
25  their death and the payment of benefits.

1       MR. KATZ:  We're talking about individual
2  here.  The individual policyholder would have that first
3  option.
4       COMMISSIONER JONES:  And then, if they don't
5  make an election then the beneficiary can make the
6  election.
7       MR. KATZ:  When they fill out the claim
8  form -- I should note, what I'm articulating is a
9  general statement.  There are some state laws that
10  govern how this works, so in certain jurisdictions it
11  may work a little differently.
12      COMMISSIONER JONES:  So does the policyholder
13  at the time they purchase the policy have to
14  affirmatively elect in some way the total control
15  account?
16      MR. KATZ:  They may or they may not.  They
17  don't have to make an election.  In fact, most do not.
18      COMMISSIONER JONES:  So then, it defaults to
19  the beneficiary.  So on your claim form, generally, how
20  is that manifested?
21      Is it a box that has to be checked or
22  unchecked?  Can you explain that for us?
23      MR. KATZ:  There's some indication, I'm not
24  sure if it's a box or if they write it in.
25      We'd be certainly happy to provide you with

1 copies of the forms to give you more details on that, we
2 do ask them to make an affirmative election.
3     COMMISSIONER JONES: So if they don't somehow
4 affirmatively ask for the total control account and the
5 policyholder hasn't asked for it, then it defaults to
6 the total control account?
7     MR. KATZ: Correct. Our thought process there
8 in just about every circumstance that we can think of,
9 the total control account provides more benefits to the
10 individuals than the check.
11     Once they get a check, they are precluded from
12 opening the total control account. It's done.
13     So if we send them a check, they've now lost
14 that option. So we send them the total control account,
15 and we clearly articulate to them, this is an account
16 you can write one check and take all your money out
17 immediately if you wish to do so.
18     COMMISSIONER JONES: What percentage of the
19 individual life insurance policies have either the
20 policyholder -- let's start with the policyholder.
21     What percentage of those in which benefits
22 have not been paid have the policyholders elected the
23 total control account?
24     MR. KATZ: I'll have all of these answers in
25 the fall.

1     COMMISSIONER JONES: Is it a small percentage?
2     MR. KATZ: What percent elect total control
3 account? I don't know. We can follow up.
4     COMMISSIONER JONES: I think you said most
5 don't.
6     MR. KATZ: Policyholders, it's a very small
7 percentage that make an election at all.
8     COMMISSIONER JONES: Have that make any
9 election?
10     MR. KATZ: Correct.
11     COMMISSIONER JONES: Do you have any estimate
12 of the percentage of beneficiaries that make an election
13 one way or the other?
14     MR. KATZ: I don't.
15     COMMISSIONER JONES: Of the life insurance
16 policies in which benefits have been -- let me ask this
17 question in a different way.
18     What number total control accounts do you have
19 open currently in the individual side?
20     MR. KATZ: Do we have more copies? I don't
21 have them right now. So I have it in aggregate. I
22 don't have it broken down between group and individual.
23     It's approximately 500,000, I forget, for a
24 total of about $12 billion in assets.
25     COMMISSIONER JONES: You mentioned the

1 interest that's paid on these accounts.
2     Does the company earn more interest on this
3 money that's held in these accounts than the
4 beneficiaries who now own the accounts earn?
5     MR. KATZ: So we pay out interest on the
6 account consistent with the contract, and that interest
7 has varied over the years. It's been much higher than
8 it is. Right now, it's a very low interest rate
9 environment.
10     The company holds the funds in our general
11 account, and our general account earnings vary based on
12 the risk and duration of any given product.
13     So we certainly do aim to earn more than we
14 credit, but I would suggest to you if you look at the
15 environment right now, the three percent rate is fairly
16 compelling.
17     COMMISSIONER JONES: But if you earn more on
18 the aggregate dollars that are held in total control
19 accounts, if you earn more than the interest rate
20 available to the beneficiaries in those accounts, you
21 don't pass those additional earnings directly on to
22 beneficiaries. Correct?
23     MR. KATZ: We pay out the beneficiaries, the
24 account holders, consistent with our obligations,
25 consistent with the customer agreement and consistent

1 with the way we're supposed to do it.
2     We take risk on our total accounts. We
3 provide guarantees and we invest the money and -- even
4 those these aren't bank accounts, because they are not,
5 you think about it in the context of financial accounts
6 more generally.
7     COMMISSIONER JONES: Fair enough. But the
8 question was: If you earn more by investing the
9 aggregate dollars in the total control accounts than
10 what you have contracted to provide those account
11 beneficiaries by way of interest, you don't pass through
12 to them the additional earnings that you make on their
13 money?
14     MR. KATZ: If we made more, we don't pass that
15 through; and if he we make less, we don't ask them to
16 pay us less.
17     COMMISSIONER JONES: Have you ever made less
18 on their money?
19     MR. KATZ: So we have guarantees out there in
20 today's environment where the rates are pretty good. I
21 don't have the data in front of me, but I believe there
22 are some quarters -- especially at the height of the
23 financial crisis -- where the financials on this
24 business wasn't particularly favorable.
25     COMMISSIONER JONES: But you made less than

1  total control accounts you have, how many are now

2  considered in the dormancy period?

3        MR. KATZ:  How many have moved into the

4  unclaimed property system?

5        COMMISSIONER JONES:  Yeah.

6        MR. KATZ:  I don't know the number.  I can

7  give you some data on the '06 match which might help

8  you.  We may have that, I apologize.

9        MR. CASSANDRA:  It appears the total number of

10  TCA in our unclaimed fund system is about 38,000.

11        COMMISSIONER JONES:  Do you have a figure for

12  California?

13        MR. CASSANDRA:  I'm sorry.  I don't have that

14  detail.  I'm going to check.  We may have.

15        MR. KATZ:  We're going to check.

16        COMMISSIONER JONES:  While you're checking --

17        MR. CASSANDRA:  We reported 776 items for

18  California that well escheat this year.

19        COMMISSIONER JONES:  That's the number that

20  you believe --

21        MR. CASSANDRA:  Not quite the question.

22        COMMISSIONER JONES:  I understand.  But you

23  reported 776 escheating in your most recent report to

24  the Controller's Office?

25        MR. CASSANDRA:  Yes.

1        COMMISSIONER JONES:  Can you share with us

2  what you did in 2006 vis-à-vis the Death Master File and

3  how you used it in relation to total control accounts?

4        MR. KATZ:  Yeah.  It's similar to what we

5  talked about life insurance in 2007.  We ran it against

6  the population of active total control accounts.

7        We identified 1,300 accounts where there were

8  matches.  Went through a process to investigate those

9  matches.  Many of those accounts were closed.

10        Some of those accounts resulted in

11  beneficiaries being located and funds being either paid

12  or transferred to the beneficiaries not being located

13  and escheatment to the states.

14        COMMISSIONER JONES:  And what was the trigger

15  point for deciding that you had a Death Master File

16  match in 2006 with regarding the total control account

17  accounts?

18        MR. KATZ:  I don't know the answer to that.

19        MR. CASSANDRA:  Could you define "trigger

20  points"?

21        COMMISSIONER JONES:  You talked earlier about

22  using the three points and some cases using the one

23  point.  What was the protocol used?

24        MR. CASSANDRA:  In 2006, I believe it was just

25  the Social Security number that triggered the

1  investigation.

2        COMMISSIONER JONES:  Regardless of any other

3  data field match, if you had a match on Social

4  Security --

5        MR. KATZ:  If you think about that in the

6  context of the TCAs, we would -- by definition, we

7  should have a Social on all of these accounts.

8        MR. CASSANDRA:  Because of the tax reporting

9  requirements under the TCA.

10        COMMISSIONER JONES:  Why didn't you require

11  matches on the other as you've been doing on the

12  individual life insurance side?

13        MR. CASSANDRA:  I don't know.  I was not

14  involved in the definition of the 2006 criteria.

15        COMMISSIONER JONES:  Should I ask you?

16        MR. KATZ:  Why in '06 did we only use the

17  one-point match?

18        THE COURT:  Right.

19        MR. KATZ:  Per TCA, we would have assessed for

20  all of those because generally we're sending out 1099s.

21  So if we had an account open --

22        Keep in mind, this account would typically be

23  a beneficiary of a life insurance claim that would have

24  provided us a Social when that claim was filed.

25        We felt that the records on that were pretty

1  good that, and that would in and of itself create a

2  fairly good match.

3        COMMISSIONER JONES:  With regard to those

4  1,300 accounts for which you had a positive match with

5  the Death Master File, do you have a breakout with

6  regard to, you know, the number that were escheated, the

7  number in which amounts were paid to some

8  downstream beneficiary and anything else you might have

9  done with the money.

10        MR. KATZ:  I think the stats we can share with

11  you, but I think they are national and not California.

12        COMMISSIONER JONES:  That's fine.

13        MR. CASSANDRA:  So of the 12, roughly 1,300,

14  791 of them were closed.  362 were closed before a

15  match.  274 paid to a beneficiary, heir, state or trust.

16  155 sent to the unclaimed fund system.

17        COMMISSIONER JONES:  I got lost somewhere.

18  There were 1,300 matches, you said 791 were closed?

19        MR. CASSANDRA:  Right.

20        COMMISSIONER JONES:  Of the 1,300, a total of

21  791 were closed.  And then 362.

22        MR. KATZ:  We're breaking down the 791 is

23  what --

24        COMMISSIONER JONES:  What does the 362

25  represent?

1       MR. CASSANDRA:  Closed by the account holder.
2  There was no balance in it.
3       MR. KATZ:  So we found a match, but there was
4  no money in the account.
5       COMMISSIONER JONES:  Okay.  And then 274 were
6  paid to the other beneficiaries.
7       MR. CASSANDRA:  Beneficiary or on the heir.
8       COMMISSIONER JONES:  155 were unclaimed
9  property.  And then, you said you ran it again in 2010.
10       Could you describe how you used the Death
11  Master File with regard to the total control account in
12  2010?
13       MR. KATZ:  I don't have that handy.  But is
14  your question:  Was it a one-point match?
15       COMMISSIONER JONES:  I'm just generally
16  interested in what you did.
17       Was it the same process that you did in 2006
18  or did you do something different?
19       MR. CASSANDRA:  We did both.  So where we had
20  a Social Security number and the date of birth, we had
21  4,800 accounts.
22       COMMISSIONER JONES:  Social Security alone?
23       MR. CASSANDRA:  2,900.
24       MR. KATZ:  And that process was done really
25  toward the end of the year in 2010.  I don't have stats

1  here for the breakout of that.  It's still being worked
2  on as we speak.
3       MR. CASSANDRA:  Just one point I'd like to
4  make.
5       Two-thirds of those, based on the date of
6  death on file, two-thirds of those happened within the
7  last year -- to the best of our knowledge -- so it's
8  very recent.
9       That goes to the point about if you're
10  matching in real time, most of those accounts generally
11  will resolve themselves by the beneficiary coming
12  forward and claiming the benefits without doing the
13  match.
14       COMMISSIONER JONES:  So with regard to the
15  total control accounts that you paid out as a result of
16  the 2006 or 2010 sweep, did you require a death
17  certificate before you paid out those accounts to give
18  the beneficiary of the beneficiary so to speak, or an
19  heir?
20       MR. CASSANDRA:  I'm sorry.  I don't know that
21  level of detail.  I don't know.
22       COMMISSIONER JONES:  Do you know what, if
23  anything, was required before you closed the account and
24  made a payment to another beneficiary heir?
25       MR. CASSANDRA:  It's just an assumption

1  because I don't have actual knowledge of what those
2  extra steps are.  I don't have that knowledge.
3       COMMISSIONER JONES:  With regard to those
4  accounts that you moved into unclaimed property status
5  based on the 2006 or 2010 sweep, what was the triggering
6  determination that caused you to conclude to move them
7  to the unclaimed property status?
8       MR. CASSANDRA:  I believe it was that we could
9  not find the beneficiary after trying to communicate by
10  a letter.
11       COMMISSIONER JONES:  You had a match on Death
12  Master, couldn't find them, decided to move it into
13  unclaimed property?
14       MR. KATZ:  We tried to find the appropriate
15  beneficiary, couldn't find the appropriate beneficiary
16  and then moved it into unclaimed property.
17       COMMISIONER JONES:  Great.  I'll se if the
18  Controller has any questions.
19       CONTROLLER CHIANG:  Just along the lines of
20  the questioning earlier, I'm not quite clear about the
21  financial vehicles where the Commissioner was asking
22  about the differential, whether if in the event of
23  earning surplus versus actual payments, the use of.
24       Do you have separate financing vehicles for
25  these particular accounts.

1       It's an area of active interest in the
2  financial community for private equity.
3       MR. CASSANDRA:  The TCAs are part of the
4  general account of MetLife.
5       CONTROLLER CHIANG:  Thank you.
6       COMMISSIONER JONES:  We're going to take a
7  break.  But before we do, let me see if Florida or
8  Minnesota have any questions about retained asset
9  accounts.
10       MR. HANSON:  Concerning the general account in
11  the investment, what was the -- in the first quarter
12  this ear, what was the investment in the portfolio?
13       MR. CASSANDRA:  I don't have that level of
14  detail.  I'm sorry.
15       MR. HANSON:  Basically, what you're saying is
16  you make the spread between what you pay out on that
17  investment deal on your general portfolio?
18       MR. CASSANDRA:  Yes, and if the earned rate
19  was lower --
20       COMMISSIONER JONES:  Great.  And so I think at
21  this point, the insurance general counsel can talk to
22  counsel for MetLife about the additional documents that
23  we're going to put in the record.
24       Let's take a 15minute break.  Thank you.
25       (Recess was taken from at 3:38 p.m. to 3:56 p.m.)

1           REPORTER'S CERTIFICATE

2

3           I, JANICE M. KNETZGER, CSR No. 4434, Certified

4    Shorthand Reporter, certify:

5           That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witnesses were put under oath by

8    California Insurance Commissioner Dave Jones;

9           That the testimony of the witnesses, the

10   questions propounded, and all objections and statements

11   made at the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13          That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18          I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21          Dated this 26th day of May, 2011.

22

23

24          JANICE M. KNETZGER, CSR No. 4434

25