UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                           :
CITY OF WESTLAND POLICE AND FIRE                           :
RETIREMENT SYSTEM,                                         :
                                                           :
                              Plaintiff,                   :
                                                           :
              v.                                           :         Case No. 1:12-cv-00256-LAK
                                                           :
                                                           :
METLIFE, INC., et al.,                                     :
                                                           :
                              Defendants.                  :
                                                           :
-----------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE
UNDERWRITER DEFENDANTS TO DISMISS THE AMENDED COMPLAINT**

Timothy E. Hoeffner
John J. Clarke, Jr.
Constance Tse
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel.: (212) 335-4500
Fax: (212) 335-4501

Attorneys for Defendants
  Citigroup Global Markets Inc., Credit Suisse
  Securities (USA) LLC, Goldman, Sachs &
  Co., HSBC Securities (USA) Inc., Merrill
  Lynch, Pierce, Fenner & Smith Incorporated
  and Wells Fargo Securities, LLC

Dated:  August 3, 2012

## **Table of Contents**

**Page**

Table of Authorities.................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................1

SUMMARY OF ALLEGATIONS..............................................................................3

ARGUMENT -- THE SECURITIES ACT CLAIMS AGAINST THE  UNDERWRITER
          DEFENDANTS SHOULD BE DISMISSED .......................................................7

I.      PLAINTIFF HAS NOT ALLEGED A MATERIAL MISSTATEMENT
        OR OMISSION IN THE OFFERING MATERIALS ...........................................7

        A.      Plaintiff Fails to Allege an Actionable Misstatement or Omission
                in MetLife's Financial Statements................................................................7

                1.      Plaintiff Expressly Disclaims Any Allegation of
                          "Subjective Falsity" with Respect to MetLife's
                          IBNR Reserves .............................................................................7

                2.      Plaintiff's Allegations of GAAP Violations
                          Add Nothing to Its Securities Act Claims ...................................10

        B.      The Offering Documents Adequately Disclosed MetLife's
                Interactions with State Insurance Regulators ............................................11

        C.      The Alleged Misstatements or Omissions Were Not Material................15

II.     THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED FOR
        ABSENCE OF LOSS CAUSATION ...................................................................16

III.    THE UNDERWRITER DEFENDANTS CANNOT BE LIABLE FOR
        OFFERINGS IN WHICH THEY WERE NOT UNDERWRITERS ...................16

CONCLUSION ........................................................................................................17

Table of Authorities

Page(s)

Cases

*Acito v. IMCERA Group Inc,,*
    47 F.3d 47 (2d Cir. 1995) ............................................................................. 12, 14

*Basic, Inc. v. Levinson,*
    485 U.S. 224, 108 S.Ct. 978 (1988) ...................................................................... 14

*Belmont Holdings Corp. v. SunTrust Banks, Inc.,*
    No. 1:09-cv-1185-WSD, 2010 WL 3545389 (N.D. Ga. Sept. 10, 2010) ........................ 9, 10

*City of Omaha, Nebraska Civilian Emp. Ret. Sys. v. CBS Corp.*
    679 F.3d 64 (2d Cir. 2012) .................................................................................. 10

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,*
    945 F.2d 1226 (2d Cir. 1991) ................................................................................ 8

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978) ................................................................................ 12

*Fait v. Regions Fin. Corp.,*
    655 F.3d 105 (2d Cir. 2011) ........................................................................*passim*

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.,*
    ___ F. Supp. 2d ___, 2012 WL 1570856 (S.D.N.Y. May 4, 2012).................................. 9

*Gallagher v. Abbott Labs.,*
    269 F.3d 806 (7th Cir. 2001) ............................................................................... 14

*Gustafson v. Alloyd Co., Inc.,*
    513 U.S. 561, 115 S. Ct 1061 (1994) .................................................................... 15

*In re CIT Group, Inc. Sec. Litig.,*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) .............................................................. 10, 11

*In re Citigroup, Inc. Sec. Litig.,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................... 15

*In re Initial Public Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006) .................................................................................. 15

*In re JPMorgan Chase Sec. Litig.,*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................................................................... 7

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................................... 11

Page(s)

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    218 F.R.D. 76 (S.D.N.Y. 2003) ................................................................ 15

*In re Morgan Stanley Info. Fund. Sec. Litig.,*
    592 F.3d 347 (2d Cir. 2010) ................................................................... 6, 7

*Novak v. Kosaks,*
    216 F.3d 300 (2d Cir. 2000) .......................................................... 10, 11, 12

*Pa. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.,*
    ___ F. Supp. 2d ___, 2012 WL 2847732 (S.D.N.Y. July 11, 2012) ...................... 9

*Richman v. Goldman Sachs Group, Inc.,*
    ___ F. Supp. 2d ___ 2012 WL 2362539 (S.D.N.Y. June 21, 2012) ...................... 15

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ................................................................... 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 127 S.Ct. 2499 (2007) ......................................................... 3

*Virginia Bankshares v. Sandberg,*
    501 U.S. 1083, 111 S. Ct. 2749 (1991) ...................................................... 8

Statutes, Regulations and Rules

15 U.S.C. § 77k(a) .................................................................................... 6

15 U.S.C. § 77l(a)(2) .................................................................. 1, 6, 7, 15, 16

17 C.F.R. § 229.103 .................................................................................. 14

Fed. R. Civ. P. 9(b) ................................................................................ 9, 7

Fed. R. Civ. P. 12(f) ................................................................................. 15

Defendants Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC (the "Underwriter Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss all claims asserted against them in the amended complaint.

## PRELIMINARY STATEMENT

In this action, plaintiff asserts claims under the federal securities laws on behalf of a putative class of investors in the common stock of MetLife, Inc. ("MetLife"). The amended complaint describes an allegedly "fraudulent scheme" that spans a two-year period from February 2010 to April 2012, but plaintiff's purported claims against the Underwriter Defendants are far narrower. Against the Underwriter Defendants, the amended complaint asserts claims under sections 11 and 12(a)(2) of the Securities Act of 1933 for alleged misstatements or omissions contained in the offering materials for two offerings of MetLife common stock on August 3, 2010 and March 4, 2011.

Plaintiff's Securities Act claims depend entirely on hindsight. Plaintiff contends that the offering documents contained misstatements or omissions because, much later in 2011, MetLife announced that it was revising its estimate of potential life insurance liabilities due to a change in industry practice that had been requested by various state insurance regulators. Plaintiff does not – and cannot – identify any law, rule, or regulation in existence at the time of the offerings that required MetLife to use the Social Security Administrator's Death Master File ("DMF") (which is the focus of the amended complaint) to estimate potential life insurance liabilities. As a result, plaintiff's claims boil down to the novel theory that MetLife should have utilized a different methodology to estimate its liabilities for life insurance even though that approach was not

required by any prevailing industry standard in existence at the time of the offerings.  This theory does not support an actionable Securities Act claim.[1]

*First*, as the prospectus supplements expressly disclosed, MetLife's reserves for incurred but not reported ("IBNR") life insurance claims were *estimates* based on MetLife's "assumptions."[2]  Such an accounting judgment is not actionable under the Securities Act unless plaintiff can plausibly allege that the issuer did not truly believe it was accurate at the time it was made.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112-13 (2d Cir. 2011).  Here, there are no such allegations in the amended complaint.  To the contrary, in its Securities Act claims "plaintiff affirmatively states that it does not allege that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent."  Compl. ¶ 235.

*Second*, plaintiff's claims based on an alleged failure to disclose state insurance commissioners' inquiries into industry practices in using the DMF depend on MetLife's subsequent disclosures about those matters in August 2011 and April 2012.  This is the type of hindsight pleading strategy that the Second Circuit has rejected for decades.  Contrary to plaintiff's claims, the offering documents expressly disclosed: (1) that in the ordinary course of its business MetLife was "subject to various regulatory inquiries . . . from state and federal regulators"; (2) that MetLife's "pending legal and regulatory actions" included "proceedings specific to us and others generally applicable to business practices in the industries in which we operate"; and (3) that a significant regulatory inquiry "could have a material adverse effect" on

---

[1] The claims against the Underwriters are premised on the same substantive allegations of fraud that are asserted against MetLife and its officers and directors and thus are also subject to dismissal for failure to satisfy the heightened pleading requirement pursuant to F.R.C.P. 9(b). *See infra* at 7 n.6.

[2] *See* Declaration of Timothy E. Hoeffner dated August 3, 2012 ("Hoeffner Decl."), Exh. A at S-47 (August 3, 2010 prospectus supplement), Exh. B at S-34 (March 3, 2011 prospectus supplement).

MetLife's financial results.  Hoeffner Decl., Exh. A at S-53-S-54, Exh. B at S-41-S-42.  Under the facts alleged in the amended complaint, there was no duty to provide more particular disclosure at the time of the offerings in August 2010 and March 2011 about any industry-wide state regulatory "audits" or "inquiries" with respect to the use of the DMF.

*Third*, for the reasons set forth in the MetLife defendants' memorandum of law, which the Underwriter Defendants adopt and incorporate by reference to the extent applicable, any alleged misstatements or omissions in the offering documents were not material for purposes of plaintiffs' Securities Act claims.  Further, plaintiff's own allegations establish the absence of loss causation sufficiently to permit dismissal of the Securities Act claims here.

*Finally*, Goldman, Sachs & Co. and Citigroup Global Markets Inc. were not underwriters of the August 2010 offering, as the amended complaint acknowledges.  *See* Compl. ¶ 241.  For that reason alone, any Securities Act claim based on that offering cannot be sustained against those two defendants under any set of facts.

### <u>SUMMARY OF ALLEGATIONS</u>[3]

MetLife is a leading global provider of insurance, annuities and employee benefit programs, serving 90 million customers.  Compl. ¶ 3.  On March 5, 2010, MetLife announced that it would purchase American Life Insurance Company ("ALICO") from American International Group, Inc. ("AIG") for approximately $15.5 billion, comprised of $8.7 billion in equity and $6.8 billion in cash.  Compl. ¶ 70.  MetLife made two public offerings of its common

---

[3] The well-pleaded allegations of the amended complaint are assumed to be true solely for purposes of this motion to dismiss and only to the extent they are not contradicted by the documents incorporated by reference, including filings with the Securities and Exchange Commission, of which the Court can take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007); *Fait*, 655 F.3d at 107.  In accordance with the Court's individual practices, a copy of the amended complaint is attached as Exhibit C to the accompanying Hoeffner Declaration.

stock in connection with the ALICO transaction, the first of 86.25 million shares in an offering that MetLife announced had closed on August 6, 2010, Compl. ¶ 90, and the second (together with AIG) of approximately 146 million shares in an offering that MetLife announced had closed on March 8, 2011, Compl. ¶ 113.[4]

MetLife issued a prospectus supplement dated August 3, 2010 for the first of these common stock offerings pursuant to a November 6, 2007 shelf registration statement.  Compl. ¶ 88 & n.5; *see* Hoeffner Decl., Exh. A.  The underwriters of the August 2010 offering included defendants Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC.  Compl. ¶ 241.  Defendants Goldman, Sachs & Co. and Citigroup Global Markets Inc. were not underwriters of that offering.

MetLife issued a prospectus supplement dated March 3, 2011 for the second of the two common stock offerings pursuant to a November 30, 2010 shelf registration statement.  Compl. ¶ 111; *see* Hoeffner Decl., Exh. B.  The underwriters of the March 2011 MetLife common stock offering included all of the Underwriter Defendants.  Compl. ¶ 242.

On August 5, 2011, five months after the later of the two challenged offerings, MetLife reported in its Form 10-Q that:

> More than 30 U.S. jurisdictions are auditing MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws.  Additionally, MLIC and certain of its affiliates have received subpoenas and other regulatory inquiries from certain regulators and other officials relating to claims-payment practices and compliance with unclaimed property laws.  On July 5, 2011, the New York Insurance Department issued a letter requiring life insurers doing business in New York to use data available on the

---

[4] In a concurrent offering in March 2011 pursuant to a separate prospectus supplement, AIG offered 40,000,000 MetLife common equity units it received as consideration in the ALICO transaction.  *See* Hoeffner Decl., Exh. B at cover.

> U.S. Social Security Administration's Death Master File or a similar database to identify instances where death benefits under life insurance policies, annuities, and retained asset accounts are payable, to locate and pay beneficiaries under such contracts, and to report the results of the use of the data.  It is possible that other jurisdictions may pursue similar investigations or inquiries, or issue directives similar to the New York Insurance Department's letter.  It is possible that the audits and related activity may result in additional payments to beneficiaries, additional escheatment of funds deemed abandoned under state laws, administrative penalties, and changes to the Company's procedures for the identification and escheatment of abandoned property.   The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial.

Compl. ¶ 132.

According to the amended complaint, in a subsequent Form 8-K dated October 6, 2011, MetLife reported that it expected to incur several one-time charges, including a charge related to its use of the DMF:

> The Company expects to incur a $115 million to $135 million, after tax, charge to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company.

Compl. ¶ 135.   Thereafter, on April 23, 2012, MetLife issued a press release announcing a resolution of a "multi-state examination into its use of the SSA-DMF."  Compl. ¶ 147.  The press release included the following statements:

> MetLife agrees that periodic matching of administrative records against available external sources such as the Social Security Death Master File is a best practice, ***and the company is implementing a monthly matching process which it believes will be effective in identifying the small proportion of deaths where a claim is not submitted***.

*               *               *

> The total insurance in force for these "industrial" policyholders is approximately $438 million, for which the company is appropriately reserved. The company expects that $188 million of the total will be paid out in 2012, with the remainder paid over the next 17 years. In the first quarter of 2012, the company recorded a $52 million post-tax charge representing a multi-state examination payment related to unclaimed property and MetLife's use of the Social Security Death Master File, as well as the expected acceleration of benefit payments to policyholders under the settlement.

*Id.* (emphasis in amended complaint). The Underwriter Defendants are not alleged to have been a party to the settlement.

On the basis of these later disclosures, plaintiff alleges that the offering documents for both the August 2010 and March 2011 offerings contained actionable misstatements or omissions because they allegedly "omitted loss contingencies and legal proceedings related to a multi-state investigation concerning" MetLife's use of the Social Security Administration's DMF in its life insurance business. Compl. ¶ 207(a). Plaintiff further alleges that the offering documents incorporated by reference MetLife financial statements that allegedly "understated life insurance claims reserves for IBNR claims that had been identified on" the Social Security Administration's DMF. Compl. ¶ 207(b).

Based on the alleged misstatements or omissions described above, plaintiff asserts claims on behalf of a putative class against all of the Underwriter Defendants under sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), for both MetLife offerings. Compl. ¶¶ 234-258. [5]

---

[5] "Claims under sections 11 and 12(a)(2) of the Securities Act have 'roughly parallel elements.' *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Section 11 imposes liability on issuers and other signatories of a registration statement that 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability under similar circumstances with respect to, *inter alia*,

## ARGUMENT

### THE SECURITIES ACT CLAIMS AGAINST THE
### UNDERWRITER DEFENDANTS SHOULD BE DISMISSED

To the extent applicable, the Underwriter Defendants join in and incorporate by reference the arguments for dismissal set forth in the MetLife defendants' memorandum of law in support of their motion to dismiss the amended complaint.[6]  The Underwriter Defendants are only named in plaintiff's Securities Act claims, which fail to state a claim against them for several additional reasons.

## I.    PLAINTIFF HAS NOT ALLEGED A MATERIAL MISSTATEMENT OR OMISSION IN THE OFFERING MATERIALS.

### A.    Plaintiff Fails to Allege an Actionable Misstatement or Omission in MetLife's Financial Statements.

#### 1.    Plaintiff Expressly Disclaims Any Allegation of "Subjective Falsity" with Respect to MetLife's IBNR Reserves.

The centerpiece of plaintiff's Securities Act claims is its assertion that MetLife's annual and interim financial statements in periodic filings with the Securities and Exchange Commission, some of which were incorporated by reference into the offering materials, contained material misstatements of MetLife's estimates for "incurred but not reported" life insurance claims because MetLife later revised those estimates after cross-checking against the

---

prospectuses.  [15 U.S.C. § 77l(a)(2)]."  *Fait*, 655 F.3d at 112-13.

[6] Where a Securities Act claim is "premised on allegations of fraud," the plaintiff must satisfy the heightened particularity requirement of Federal Rule of Civil Procedure 9(b).  *Morgan Stanley Info. Fund*, 592 F.3d at 358 (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).  "Plaintiff[] cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness."  *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (citing *Rombach*, 355 F.3d at 170).  Here, the Securities Act allegations in the amended complaint track the section 10(b) claims asserted against the MetLife defendants and therefore are required to satisfy this heightened pleading standard.  They do not meet those requirements as outlined in the MetLife defendants' memorandum of law, which the Underwriter Defendants incorporate by reference.

Social Security Administration's DMF at the urging of the New York Insurance Department and other state regulators.  *See* Compl. ¶ 207(b).  Plaintiff does not allege that MetLife did not actually believe the accuracy of those estimates at the time of the challenged statements, and the absence of such an allegation is fatal to its claims.

As the Second Circuit recently recognized, "when a plaintiff asserts a claim under section 11 or 12 [of the Securities Act] based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait*, 655 F.3d at 110 (citing *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1095-96, 111 S. Ct. 2749, 2759-60 (1991)).

In *Fait*, the Second Circuit applied the principle articulated in *Virginia Bankshares* to Securities Act claims that were based on accounting estimates because it recognized that such estimates were another form of judgment or opinion rather than "objective fact." *Fait*, 655 F.3d at 110, 113.  The accounting judgments at issue in *Fait* were loan loss reserves and goodwill impairments, but *Fait* applies with equal force to MetLife's IBNR reserves, which are also estimates. *See Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991) ("IBNR reserves are sums set aside to cover losses for which claims have not been reported but must be estimated so the company can pay future claims").  Indeed, that is precisely how the two MetLife prospectus supplements described them here. *See* Hoeffner Decl., Exh. A at S-46 ("Our liabilities for future policy benefits and claims are established based on *estimates* by actuaries of how much we will need to pay for future benefits and claims.  For life insurance and annuity products, we calculate these liabilities based on *many assumptions and estimates* . . .") (emphasis added), Exh. B at S-34 (same).

Under *Fait,* when a plaintiff asserts Securities Act claims based on an accounting estimate it must allege not only that the estimate was false but also must "plausibly allege subjective falsity," that is, that defendants did not "honestly believe[]" the estimate when the challenged statements were made. *Fait*, 655 F.3d at 113; *see, e.g., Pa. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.*, ___ F. Supp. 2d ___, 2012 WL 2847732, at *8 (S.D.N.Y. July 11, 2012) (dismissing claims given lack of allegation that defendants did not believe stated reserves). Because plaintiffs do not even attempt to allege subjective falsity with respect to MetLife's IBNR reserves here, its claims do not fall within the "narrow set of circumstances under which statements of opinion may constitute an 'untrue statement of a material fact' . . . and therefore support liability under the Securities Act." *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, ___ F. Supp. 2d ___, 2012 WL 1570856, at *14 (S.D.N.Y. May 4, 2012) (motion for interlocutory appeal pending).

Far from alleging subjective falsity, the amended complaint expressly disclaims any such allegations in an effort to evade the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See* Compl. ¶¶ 235, 252 (plaintiff "does not allege that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent"). But plaintiff cannot have it both ways. Its disavowal of allegations of fraud requires dismissal of the Securities Act claims based on MetLife's IBNR reserves. *See, e.g., Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) ("Plaintiff does not allege – and specifically disavows – that SunTrust did not believe the opinions and judgments . . . with respect to its [loan loss reserves] and loan loss provision. Plaintiff's complaint, therefore, does not state a claim under Sections 11 or 12").

Nor can plaintiff salvage its claims by contending that the Underwriter Defendants should have known that MetLife's IBNR reserves were understated at the time of the offerings merely because MetLife was familiar with the DMF.  In a recent decision applying *Fait*, the Second Circuit held that even plausible allegations that defendants were aware of facts that *should have* led them to begin impairment testing earlier than they did would not state a claim under the securities laws where, as here, the complaint lacked even conclusory allegations that defendants did not believe the challenged accounting estimates for which plaintiffs alleged impairment testing was required at the time the challenged statements were made.  *See City of Omaha, Nebraska Civilian Emp. Ret. Sys. v. CBS Corp.* 679 F.3d 64, 68 (2d Cir. 2012).

Even before *Fait*, the Second Circuit recognized that "corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kosaks*, 216 F.3d 300, 309 (2d Cir. 2000).  The fact that MetLife later revised its estimate for IBNR life insurance claims "provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective."  *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004); *see also Belmont Holdings,* 2010 WL 3545389, at *6 (following district court decision in *Fait* in holding that plaintiffs' "hindsight assessment" that loan loss reserves were misstated because they were increased later "does not permit the court to infer that SunTrust's financial assessments were false or misleading *at the time they were made*") (emphasis in original).

        2.      **Plaintiff's Allegations of GAAP Violations Add Nothing to Its Securities Act Claims.**

Plaintiff attempts to buttress its Securities Act claims by asserting that MetLife's IBNR reserves allegedly violated various guidance under generally accepted accounting principles

("GAAP").  *See* Compl. ¶¶ 216-221.  But the accounting literature quoted by plaintiff merely reiterates that IBNR reserves are estimates of claims that an insurer has not yet received.  *Id.* The GAAP allegations cannot save the amended complaint from dismissal.  *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (dismissing securities fraud claims based on alleged GAAP violations that were a "carbon copy" of other allegations of misstatements in periodic reports); *CIT Group*, 349 F. Supp. 2d at 688 n.3 (dismissing securities claims based on alleged GAAP violations that were "completely dependent upon the underlying statements at issue here," which did not state a claim for securities violations); *see generally Novak*, 216 F.3d at 309 ("allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim") (collecting citations).

### B.     The Offering Documents Adequately Disclosed MetLife's Interactions with State Insurance Regulators.

The other ground asserted for plaintiff's Securities Act claims is that the registration statements and prospectuses for the August 2010 and March 2011 offerings allegedly failed to disclose "loss contingencies and legal proceedings related to a multi-state investigation concerning [MetLife's] use of the [DMF] . . ."  Compl. ¶ 207(a).  Plaintiff alleges that in a Form 10-Q filed on August 5, 2011, MetLife disclosed that "[m]ore than 30 U.S. jurisdictions are auditing MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws," Compl. ¶ 132, in a Form 8-K filed on October 6, 2011 MetLife reported that it expected to incur a $115 million to $135 million after-tax charge to adjust its reserves in connection with its use of the DMF, Compl. ¶ 135, and in a press release issued on April 23, 2012, MetLife announced a multistate settlement with state insurance regulators relating to unclaimed property and its use of the DMF, Compl. ¶ 146.

But there is no allegation in the amended complaint that even suggests that at the time of the offerings in August 2010 and March 2011, it was either known or foreseeable that state regulatory inquiries relating to the DMF would have a material future impact on MetLife's financial condition.  *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (affirming dismissal of securities fraud claim premised on failure to disclose earlier plant inspection report); *Novak*, 216 F.3d at 309 ("corporate officials need not be clairvoyant"); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").

Further, the prospectus supplements for both offerings expressly disclosed that MetLife faced the risk of regulatory investigations, subpoenas, and information requests, that some regulatory actions specific to MetLife were "pending," and that "a significant regulatory action against [MetLife] could have a material adverse effect on [its] business . . . ."  Hoeffner Decl., Exh. A at S-53-54, Exh. B at S-41-42.  In that regard, the "Risk Factors" set forth in the prospectus supplements included the following:

> ### *Litigation and Regulatory Investigations Are Increasingly Common in Our Businesses and May Result in Significant Financial Losses and Harm to Our Reputation*
>
> We face a significant risk of litigation and regulatory investigations and actions in the ordinary course of operating our businesses, including the risk of class action lawsuits.  *Our pending legal and regulatory actions include proceedings specific to us and others generally applicable to business practices in the industries in which we operate.*  In connection with our insurance operations, plaintiffs' lawyers may bring or are bringing class actions and individual suits alleging, among other things, issues relating to sales or underwriting practices, claims payments and procedures, product design, disclosure, administration, denial or delay of benefits and breaches of fiduciary or other duties to customers.  Plaintiffs in class action and other lawsuits against us may seek very large or indeterminate amounts, including punitive and treble damages, and the damages claimed and the amount of any probable and estimable liability, if any, may remain unknown for substantial periods of time.

\*                  \*                  \*

> *We are also subject to various regulatory inquiries, such as information requests, subpoenas and books and record examinations, from state and federal regulators and other authorities.*  A substantial legal liability or *a significant regulatory action against us could have a material adverse effect on our business, financial condition and results of operations.*  Moreover, even if we ultimately prevail in the litigation, regulatory action or investigation, we could suffer significant reputational harm, which could have a material adverse effect on our business, financial condition and results of operations, including our ability to attract new customers, retain our current customers and recruit and retain employees.  Regulatory inquiries and litigation may cause volatility in the price of stocks of companies in our industry.

Hoeffner Decl., Exh. A at S-53-54, Exh. B at S-41-42 (emphasis added).

The amended complaint itself indicates that most of the state regulatory activity concerning insurers' use of the DMF, including the California and Florida regulatory hearings and issuance of subpoenas by the New York Attorney General, did not occur until after the March 2011 offering – the later of the two at issue here – had been completed.[7]  *See* Compl. ¶ 121 (referencing May 19, 2011 testimony before Florida Office of Insurance Regulations), ¶ 123 (referencing May 23, 2011 testimony before California insurance commissioner), ¶ 125 (referencing July 5, 2011 press report regarding subpoenas issued by New York Attorney General).  The only references in the amended complaint to any regulatory activity that preceded the offerings indicate only that a regulatory audit or examination had been commenced; the amended complaint makes no allegation that any disclosable event had occurred before the offerings.  *See* Compl. ¶ 116 (noting that California Controller commenced an audit in 2008);

---

[7]  As the MetLife defendants have explained, plaintiff misleadingly makes numerous allegations concerning earlier, unrelated state investigations of "practices related to the use of retained asset accounts," Compl. ¶ 85, which investigations were  not related to the DMF issues that are the focus of plaintiff's Securities Act claims.  Indeed, the amended complaint acknowledges that the investigation of the retained asset accounts was disclosed by MetLife prior to the offerings on August 2, 2010, in MetLife's Form 10-Q for the period ended June 30, 2010, and on February 25, 2011, in its Form 10-K.  *See* Compl. ¶¶ 85, 100.

¶¶ 152 & 209 (noting that Florida and Illinois "joint Market Conduct Examination" was commenced in late 2009).

Given the amended complaint's allegations concerning the timing of events, there was no duty to provide more specific disclosures concerning any regulatory inquiries into the industry's use of the DMF that might have been ongoing by the time of the offerings.   As Judge Easterbrook has observed, plaintiff's claims read "as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession.  Yet that is not the way the securities laws work.  We do not have a system of continuous disclosure.  Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."  *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (citing, *inter alia*, *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 987 n.17 (1988)); *see Acito*, 47 F.3d at 53 (holding that defendant did not have duty to disclose earlier inspections of plant later cited for FDA violations where, even though a third inspection was inevitable, "one cannot infer that it was a 'foregone conclusion' that the Kansas City plant would fail the inspection and adverse consequences would ensue").

Plaintiff's assertion that SEC rules applicable to "loss contingencies" or "legal proceedings" required more detailed disclosure is also wrong.  *See* Compl. ¶¶ 209-215.  Item 103 of the SEC's Regulation S-K applies only to "proceedings," not ordinary course interactions with regulators, and it expressly states that disclosure is not required for "ordinary routine litigation incidental to the business."  17 C.F.R. § 229.103.

Nor were such interactions required to be disclosed in detail where plaintiff's allegations do not support an inference that any state inquiries related to the DMF presented "significant risks and uncertainties," or "uncertainties . . . that the registrant reasonably expects will have a

material . . . unfavorable impact on . . . income" at the time of the offerings.  *See* Compl. ¶¶ 213, 215 (citing FASB, ASC 450 and 17 C.F.R. § 229.303).   Similarly, there was no disclosure obligation because plaintiff has not alleged that litigation arising from those inquiries was "substantially certain to occur" at the time of the offerings.  *See Richman v. Goldman Sachs Group, Inc.*, ___ F. Supp. 2d ___, 2012 WL 2362539, at *5-6 (S.D.N.Y. June 21, 2012) (collecting cases); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (dismissing securities fraud claims based on assertion that Citigroup allegedly incurred, but failed to disclose, "litigation risks associated with its Enron-related, analysis/investment banking and reporting activities").   Indeed, "Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of Civil Procedure." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (citations omitted).

### C.     The Alleged Misstatements or Omissions Were Not Material.

The Underwriter Defendants adopt and incorporate by reference the materiality arguments set forth by the MetLife defendants in support of their motion to dismiss the amended complaint.[8]

---

[8] There is also doubt that plaintiff can satisfy other elements of its claims under sections 11 and 12(a)(2) of the Securities Act.   Plaintiff alleges that it purchased shares of MetLife common stock "pursuant to and traceable to" the offering documents in the two challenged offerings.   Compl. ¶ 236. Unless plaintiff purchased its shares "in the offering," however, it cannot bring a claim under section 12(a)(2).   *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 577-78, 115 S. Ct 1061, 1070-71 (1994).   Moreover, there is substantial doubt that plaintiff can "trace" its shares to either offering within the requirements of section 11 given the substantial number of MetLife shares that already were trading at the time of the offerings.   *See In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) ("Tracing may be established either through proof of a direct chain of title from the original offering to the [plaintiff] . . . or through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement.").   The Underwriter

II.     **THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED FOR ABSENCE OF LOSS CAUSATION**

The Underwriter Defendants adopt and incorporate by reference the arguments set forth by the MetLife defendants that the Securities Act claims should be dismissed because plaintiff's own allegations establish the absence of loss causation.

III.    **THE UNDERWRITER DEFENDANTS CANNOT BE LIABLE FOR OFFERINGS IN WHICH THEY WERE NOT UNDERWRITERS**

Neither Goldman, Sachs & Co. nor Citigroup Global Markets Inc. was an underwriter for the August 2010 offering that is a subject of plaintiff's Securities Act claims.  The amended complaint acknowledges this, *see* Compl. ¶ 241; yet plaintiff's claims under sections 11 and 12(a)(2) do not distinguish between the two offerings in purporting to assert claims against all of the Underwriter Defendants, *see* Compl. ¶¶ 235, 249, 252, 258.  The Securities Act claims against these two Underwriter Defendants must be dismissed with respect to the August 2010 offering.

---

Defendants reserve their rights with respect to these and related issues should the Securities Act claims against them proceed beyond motions to dismiss, in which defendants are required to accept plaintiff's conclusory allegation as true solely for the sake of argument.

## CONCLUSION

For all of the foregoing reasons, the Underwriter Defendants respectfully request that the claims asserted against them in the amended complaint be dismissed and that the Court grant them such other and further relief as it may deem just and proper.

Dated:  New York, New York                    DLA PIPER LLP (US)
       August 3, 2012

                                                          By:   /s/ Timothy E. Hoeffner
                                                            Timothy E. Hoeffner
                                                            timothy.hoeffner@dlapiper.com
                                                            John J. Clarke, Jr.
                                                            john.clarke@dlapiper.com
                                                            Constance Tse
                                                            constance.tse@dlapiper.com

                                                1251 Avenue of the Americas
                                                New York, New York 10020-1104
                                                Tel.: (212) 335-4500
                                                Fax: (212) 335-4501

                                                Attorneys for Defendants
                                                  Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am one of the attorneys for the underwriter defendants in this action and that on August 3, 2012, I caused a copy of the foregoing to be filed with the Court's ECF system, which will cause notice of its filing to be served electronically upon all counsel who have appeared in this action

        /s/ Timothy E. Hoeffner

        Timothy E. Hoeffner