UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                                             :

CITY OF WESTLAND POLICE AND FIRE         :
RETIREMENT SYSTEM, Individually and on Behalf of   :
All Others Similarly Situated,                  :
                                                             :

                    Plaintiff,                  :
                                                             :

               -against-                  :       12 Civ. 0256 (LAK)
                                                             :

METLIFE, INC., et al.,                     :
                                                             :

                    Defendants.          :
                                                             :
---------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN
## FURTHER SUPPORT OF THE METLIFE DEFENDANTS'
## <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

Maeve L. O'Connor
Elliot Greenfield
Anna A. Moody
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants MetLife, Inc., C. Robert
Henrikson, William J. Wheeler, Peter M. Carlson,
Steven A. Kandarian, William J. Mullaney, Sylvia
Matthews Burwell, Eduardo Castro-Wright, Cheryl
W. Grisé, R. Glenn Hubbard, John M. Keane,
Alfred F. Kelly, Jr., James M. Kilts, Catherine R.
Kinney, Hugh B. Price, David Satcher, Kenton J.
Sicchitano and Lulu C. Wang*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B). ........................... 3

     A.     Plaintiff Does Not Adequately Allege Any Actionable Misrepresentation. ............ 3

          1.     MetLife's Estimates of IBNR Liabilities Are Not Actionable Under the Securities Laws. ......................................................... 3

          2.     MetLife's Statements Regarding "Strong" Financial Results and "Solid" Underwriting are Inactionable Puffery. ........................................... 5

          3.     Plaintiff Does Not Adequately Allege a Duty to Disclose the State Inquiries. ....................................................................................... 5

          4.     MetLife's Mortality Ratios Were Not False When Reported. .................... 6

     B.     The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter. ....................... 7

          1.     Plaintiff Does Not Adequately Plead Motive. .............................................. 7

          2.     Plaintiff Does Not Adequately Plead "Conscious Misbehavior or Recklessness." ....................................................................................... 8

          3.     Plaintiff Fails to Make Particularized Scienter Allegations Against Each Individual Defendant. ...................................................................... 10

     C.     The Section 10(b) Claim Should Be  Dismissed for Failure to Plead Loss Causation. ............................................................................................... 10

          1.     Plaintiff Fails to Plead Loss Causation as to the August 5, 2011 Form 10-Q. ................................................................................... 10

          2.     Plaintiff Fails to Plead Loss Causation  as to the October 6, 2011 Form 8-K. ........................................................................................ 13

II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OR 12(a)(2). ........... 14

III.     PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY. ............................. 15

CONCLUSION .................................................................................................................. 15

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*,
  No. 08 Civ. 7508, 2012 WL 3584278 (S.D.N.Y. Aug. 17, 2012) .............................................3

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  No. 11 Civ. 4544, 2012 WL 3104589 (2d Cir. Aug. 1, 2012) ...............................................14

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
  945 F.2d 1226 (2d Cir. 1991).............................................................................................3, 4

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase & Co.*,
  553 F.3d 187 (2d Cir. 2009)..................................................................................................5

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011).................................................................................................3

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)................................................................................................12

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000)...........................................................................................5, 14

*Garber v. Legg Mason, Inc.*,
  347 Fed. Appx. 665 (2d Cir. 2009)....................................................................................10

*Hinerfeld v. United Auto Group*,
  No. 97 Civ. 3533, 1998 WL 397852 (S.D.N.Y., July 15, 1998) .........................................13

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005)...................................................................................14

*In re Bristol-Meyers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................................8

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009)................................................................................15

*In re Lehman Bros. Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)................................................................................12

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2011) .........................................................................................14

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)..............................................................................................13

ii

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................8

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................12

*Masters v. GlaxoSmithKline*,
    271 Fed. Appx. 46 (2d Cir. 2008)........................................................................13

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*
    No. 2012 Civ. 440(LAK)(HBP), 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012)........................4

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)....................................................................11

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)................................................................................10

*Tasini v. AOL, Inc.*,
    851 F. Supp. 2d 734 (S.D.N.Y. 2012)....................................................................8

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)................................................................................11

OTHER AUTHORITIES

17 C.F.R. § 229.103.............................................................................................5

17 C.F.R. § 229.303.............................................................................................6

FASB Accounting Standards Codification 450-20..................................................6

SEC Staff Accounting Bulletin 99, 64 Fed. Reg. 45150 *et seq.* (1999)....................4, 5

Defendants MetLife, Inc. ("MetLife" or the "Company"), C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian and William J. Mullaney (the "Individual Defendants"), and Sylvia Matthews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang (the "Director Defendants," and collectively with MetLife and the Individual Defendants, the "MetLife Defendants" or "Defendants") respectfully submit this reply memorandum in further support of their motion to dismiss the Amended Complaint ("AC" or "Complaint").[1]

## PRELIMINARY STATEMENT

Plaintiff's Opposition serves only to highlight the insufficiency of Plaintiff's attempt to plead any of the core elements of a securities fraud claim: (*i*) actionable statements of fact that were false when made or omitted facts the Company had a duty to disclose; (*ii*) facts supporting a strong inference that such statements were made with an intent to defraud; and (*iii*) facts showing that the alleged misrepresentations caused losses.

*First*, Plaintiff alleges no actionable misrepresentations. Notwithstanding Plaintiff's core allegation that MetLife failed to search the DMF for evidence of policyholder deaths, Plaintiff repeatedly relies in the Opposition on the same conclusory and self-contradictory assertion that the MetLife Defendants "knew" what the results of that search would have been.

- As to estimates of IBNR liabilities, Plaintiff asserts that MetLife "knew" that by not cross-checking against the DMF, it failed to account for "known" liabilities relating to "known" deaths.

---

[1] Throughout this brief, "MetLife Memorandum" or "Mem." refers to the "Memorandum of Law in Support of the MetLife Defendants' Motion to Dismiss the Amended Complaint" (Docket No. 43), and "Opposition" or "Opp'n" refers to "Plaintiffs' Consolidated Opposition to the MetLife Defendants' and the Underwriter Defendants' Motions to Dismiss the Amended Complaint" (Docket No. 45). All capitalized terms have the definitions set forth in the MetLife Memorandum.

- As to mortality ratios, Plaintiff asserts that MetLife excluded "known deaths" and information "known to the Company."

- As to the State Inquiries, Plaintiff asserts that MetLife failed to disclose material "known uncertainties."

The relentless repetition of these baseless assertions cannot substitute for factual allegations.

*Second*, Plaintiff alleges no facts giving rise to a strong inference of scienter, relying instead on the same conclusory assertions of knowledge. Plaintiff falsely equates access to the DMF with actual knowledge or reckless disregard of the results of a hypothetical cross-check of MetLife's insurance policies against the DMF, ignoring Second Circuit precedent holding that mere access to raw data is insufficient to plead knowledge or recklessness. Plaintiff's assertions of knowledge or recklessness are likewise unsupported by the Company's 2007 cross-check of the bulk of its individual life insurance policies, which identified only $80 million in unclaimed benefits accumulated over several decades – an immaterial amount indicating no significant underreporting of claims.

*Third*, Plaintiff does not plausibly allege that the purported misrepresentations resulted in any losses. MetLife's stock price registered no significant reaction to either of the reports that Plaintiff identifies – neither of which constituted a corrective disclosure. Instead MetLife's stock traded in virtual lockstep with its competitors. Plaintiff's loss causation allegations are rendered even more implausible by the fact that MetLife's stock price *rose* on May 19, 2011, after MetLife executives testified in great detail about virtually all of the facts underlying the Complaint, and again on April 23, 2012, the day that shareholders were allegedly "blindsided by the announcement of the $700 million multi-state settlement." (AC ¶ 158.)

The Complaint should be dismissed in its entirety.

<u>**ARGUMENT**</u>

**I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B).**

    **A.    Plaintiff Does Not Adequately Allege Any Actionable Misrepresentation.**

        **1.    MetLife's Estimates of IBNR Liabilities Are Not Actionable.**

As set forth more fully in MetLife's opening brief, Plaintiff's allegation that MetLife underestimated its liabilities for "incurred but not reported" ("IBNR") life insurance claims – and thereby overstated its net income and operating earnings – fails to state a claim because Plaintiff alleges no facts showing that MetLife's IBNR estimates were "were both false and not honestly believed when they were made." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991) ("IBNR reserves are sums set aside to cover losses for which claims have not been reported but must be *estimated* so the company can pay future claims.") (emphasis added).  (Mem. 15-17.)[2]

Plaintiff attempts to distinguish *Fait* by arguing that the alleged "IBNR misrepresentations pertain to claims where no estimates were required" because MetLife "knew or was substantially certain through the SSA-DMF that an insured event had occurred when a policyholder was listed as deceased."  (Opp'n 11.)  Plaintiff's core allegation, however, is that MetLife "*failed* to use the DMF to identify deceased policyholders."  (*Id.* 12 (emphasis added); *see also id.* 4, 15.)  If MetLife did not use the DMF, it could not have "known" the results of a DMF cross-check.  Plaintiff's conclusory statements regarding purported "known incurred

---

[2]    That an estimate may be based on an analysis of underlying facts – for example, in the IBNR context, historical claims experience or evidence of death – does not transform the estimate into an actionable statement of fact. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, No. 08 Civ. 7508, 2012 WL 3584278, at *10-11 (S.D.N.Y. Aug. 17, 2012) (holding that ratings, although based on an analysis of factual data, are considered opinions under federal law and are governed by *Fait*).  Nor is there is a basis in MetLife's financial reporting or in the case law for dividing the Company's overall IBNR estimate – which is reported as a single number – into pieces to be analyzed under separate legal standards.  (Opp'n 11.)

3

liabilities" from "known deceased MetLife policyholders" cannot transform what was an estimate of IBNR pursuant to GAAP into an actionable statement of fact.  (Opp'n 10.)

Plaintiff is left to fall back on the argument that MetLife should have estimated its IBNR liabilities using a different process – namely, cross-checking its policyholders against the DMF. "In the absence of an allegation by plaintiffs that [defendant] calculated its loss reserves through the use of an objective standard, loss reserves are generally considered subjective opinions." *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No 10 Civ. 440(LAK)(HBP), 2012 WL 3191860, at *12 n.19 (S.D.N.Y. Feb. 9, 2012).  Plaintiff does not allege that MetLife used an objective standard for estimating IBNR liability.  Indeed, Plaintiff fails even to identify such an objective standard, much less one that required MetLife to use the DMF.

As a result, allegations that "disclosed loss reserves were inaccurately stated as compared to the company's internal estimates or *some other method of comparison*" – for example, as compared to an estimate derived from a methodology that included DMF research – are insufficient to state a claim.  *Id.* (emphasis added.)  IBNR liabilities are subjective opinions, and GAAP requires only a "reasonable estimate."[3]  *Delta Holdings*, 945 F.2d at 1229.

### a.   The Alleged Misstatements of IBNR Liabilities Were Immaterial as a Matter of Law.

MetLife's alleged underestimates of its IBNR liabilities were both quantitatively and qualitatively immaterial as a matter of law.  The allegedly underestimated liabilities accumulated over decades, and yet resulted in a charge to MetLife's earnings in October 2011 that represented only 3.3% of its net income for that single quarter, well below the 5% threshold set forth in SEC Staff Accounting Bulletin 99 ("SAB 99").  64 Fed. Reg. 45150 *et seq.* (1999).  (Mem. 19-20.)

---

[3]   Plaintiff identifies no GAAP provision that MetLife violated in its estimation of IBNR liabilities.  (Opp'n 9-13.)  The only GAAP provision cited by Plaintiff, ASC 944, says nothing about the method by which INBR estimates should be calculated and nothing that requires use of the DMF.  (Mem. 17-18; Opp'n 9.)

Plaintiff's attempt to demonstrate quantitative materiality by comparing the entire charge, taken in the third quarter of 2011, to individual prior quarters is illogical and arbitrary. (Opp'n 8, 23-24.) *See Ganino v. Citizens Util. Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (comparing each misstatement separately against the net income for quarter in which it was made). The size of the charge necessarily would have been different in those earlier quarters. To properly account for the accumulation of unreported deaths over decades, the resulting charge should be compared with *total* net income over that period – amounting to a fraction of a percentage. The alleged underestimates are also qualitatively immaterial under the SAB 99 factors. (Mem. 20-21.)

### 2. MetLife's Statements Regarding "Strong" Financial Results and "Solid" Underwriting are Inactionable Puffery.

MetLife's characterization of its financial results as "strong," its underwriting as "solid" and its expense management as "disciplined" are classic examples of inactionable puffery. (Mem. 21.) Plaintiff's argument to the contrary improperly "conflate[s] the importance" of the Company's underwriting, pricing, risk management and expense control "with the materiality of [the Company's] statements regarding" those areas. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase & Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

### 3. Plaintiff Does Not Adequately Allege a Duty to Disclose the State Inquiries.

Plaintiff's argument that MetLife had a duty to disclose the State Inquiries prior to MetLife's August 5, 2011 Form 10-Q fails because Plaintiff alleges no facts regarding the status of the inquiries prior to April 2011, and no facts prior to the date of disclosure that would support a duty to disclose. (Mem. 22-23.) In the Opposition, Plaintiff does not identify any factual allegations showing "pending legal proceedings." 17 C.F.R. § 229.103. Nor does Plaintiff identify any factual allegations indicating that any of the State Inquiries were, in MetLife's reasonable judgment, likely to have a materially negative effect on the Company's financial

5

results. 17 C.F.R. § 229.303; ASC 450.  (Opp'n 19-22.)  Plaintiff instead asserts that "it was plainly foreseeable" – based on a hindsight evaluation of the October 2011 charge to earnings and the April 2012 multi-state settlement – that broader matching against the DMF would have materially affected MetLife's financials.  (*Id.* 21.)  Allegations of knowledge cannot be based on hindsight.  (Mem. 17.)

Plaintiff's argument that MetLife had previously stated in its quarterly filings that the State Inquiries were "without merit" conflates two entirely different matters:  (*i*) a June 29, 2010 subpoena from, and subsequent investigation by, the New York Attorney General's office into the Company's use of retained asset accounts – specifically, the adequacy of the Company's disclosures and other issues challenging the legitimacy of the accounts (Greenfield Supp. Decl. Ex. A.); and (*ii*) the New York Insurance Department's July 5, 2011 letter and the related State Inquiries into death benefit payment practices and the use of the DMF.  (Opp'n 18.)  MetLife disclosed the former investigation under the heading "Retained Asset Account Matters" and stated that it believed the underlying allegations were "without merit."  (AC ¶ 85.)  That disclosure appropriately made no mention of abandoned property.  MetLife disclosed the State Inquiries on August 5, 2011 under the heading "Unclaimed Property Inquiries."  (*Id.* ¶ 132.) Plaintiff's allegation that, prior to August 5, 2011, MetLife had described the State Inquiries as "without merit" is contrary to the plain language of MetLife's disclosures.

### 4.     MetLife's Mortality Ratios Were Not False When Reported.

Plaintiff does not plausibly allege that MetLife's reported mortality ratios were false when reported.  Having failed even to define "mortality ratio" in the Complaint, Plaintiff offers in its Opposition the self-evidently overbroad and incorrect definition of  "*actual number* of deaths in a given period compared to the expected number of deaths" – *i.e.*, that a mortality ratio is "false" to the extent that it fails to account for any "actual" deaths, whether or not known to

the Company.  (Opp'n 13 n.9 (emphasis added).)  Common sense dictates that MetLife's reported mortality ratios can only reflect deaths known to the Company.  The AC includes no factual allegations supporting the conclusion that MetLife knew of any policyholder deaths that were not incorporated into its reported mortality ratios.  Indeed, Plaintiff acknowledges that MetLife's mortality ratio increased in the third quarter of 2011 "once the SSA-DMF . . . was used to identify deceased policyholders." (*Id.* 15.)

Plaintiff's assertion that MetLife "would have reported materially higher mortality ratios during the class period" if it had regularly cross-checked against the DMF is demonstrably false. (*Id.* 13.)  Plaintiff's argument is based entirely on the anomalous, one-time spike reported in the third quarter of 2011, which reflected an accumulation of unreported deaths over a period of decades.  The Complaint makes clear that MetLife's mortality ratio for the third quarter of 2011, factoring out the results of deaths in prior periods, was in line with expectations.  (AC ¶ 142.) MetLife's reported mortality ratio for the fourth quarter of 2011 was likewise in line with prior quarters despite the Company's use of the DMF.  (Greenfield Supp. Decl. Ex. B (81.1% for individual; 85.2% for group).)  Plaintiff alleges no facts to support its assertion that MetLife's reported mortality ratios for earlier quarters would have been materially higher had the Company engaged in consistent DMF cross checks.  (Opp'n 13-14.)

**B.     The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.**

**1.     Plaintiff Does Not Adequately Plead Motive.**

In arguing that the ALICO transaction gave MetLife and the Individual Defendants a motive to defraud, Plaintiff persists in its fundamental misunderstanding of that transaction.[4]

---

[4]     Whether MetLife, the corporate entity, acted with scienter is irrelevant to the Section 10(b) claim because that claim is brought only against the Individual Defendants.  (AC ¶¶ 190-94.; Opp'n 1 n.1.)

(Mem. 9-10 & n.4, 25.)  As the MetLife Defendants' opening brief made clear, the offering price of MetLife's stock was irrelevant:  MetLife agreed to sell 68,570,000 shares of its common stock in order to repurchase from AIG 6,857,000 shares of contingent convertible preferred stock.  (*Id.* 9-10; AC ¶ 113.)  The terms of the Coordination Agreement, which is referenced in the Complaint and submitted herewith, make absolutely clear that the purchase price of the 6,857,000 shares of contingent convertible preferred stock was – by definition – equal to the net proceeds of MetLife's sale of the 68,570,000 shares of its common stock – *irrespective of the offering price*.  (Greenfield Supp. Decl. Ex. C at §§ 1.1 (defining the preferred stock to be purchased), 2.3 (setting forth the purchase price).)  *See Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 737 (S.D.N.Y. 2012) (court may consider documents that are referenced in the complaint).

Plaintiff claims for the first time in the Opposition that MetLife had a fixed $3 billion obligation to AIG in connection with the March Offering, but it does not and cannot cite anything in support of that counterfactual theory.  (Opp'n 33 n.19.)  *See In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (court need not accept as true allegations contradicted by cited documents).

### 2.  Plaintiff Does Not Adequately Plead "Conscious Misbehavior or Recklessness."

Without motive, the strength of circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Plaintiff does not meet this standard.

### a.  Plaintiff Fails to Plead Actual Knowledge or Recklessness in Connection with MetLife's Financial Results.

Plaintiff's allegations that the Individual Defendants knowingly or recklessly misrepresented MetLife's financial results are, from start to finish, entirely conclusory.  Plaintiff identifies no factual allegations in the AC that give rise to an inference of scienter – much less

8

the required strong inference.  (Opp'n 26-34.)  Instead, Plaintiff merely cites to paragraphs of the AC that assert, in purely conclusory fashion, that certain statements were "knowingly false."

In particular, Plaintiff persists in falsely equating access to the DMF with actual knowledge, or reckless disregard of the risk, that a DMF cross-check would have a material impact on the Company's financial results.  (*Id.* 30-31.)  Plaintiff offers no response to Second Circuit case law holding that allegations of access to raw data do not suffice to plead recklessness.  (Mem. 26-27.)  Nor does Plaintiff respond to Second Circuit case law holding that allegations that a defendant would have learned the truth if it had performed additional due diligence are insufficient.  (*Id.* 26.)

Plaintiff's other arguments are similarly unavailing:

- Neither MetLife's use of the DMF in its annuities business nor the Company's 2007 DMF cross-check of life insurance policies support an inference of scienter.  (Opp'n 30-31 & n.16.)  Unlike as to annuities, where reporting a death *ends* payments, MetLife had no logical reason to expect underreporting in its life insurance business, where a reported claim *triggers* a payment.  Indeed, when MetLife performed the 2007 DMF cross-check, the Company found $80 million in unpaid benefits stretching back over decades, confirming no significant underreporting on the life insurance side.  (Mem. 27-28.)

- Defendant Mullaney's alleged participation in the Company's voluntary decision in 2010 to use the DMF more broadly does not establish evidence of an intent to defraud. (Opp'n 31; AC ¶¶ 105-06; Mem. 30.)

- The California Insurance Commissioner's April 25, 2011 press release does not "corroborate" Plaintiff's scienter allegations.  (Opp'n 28.)  Plaintiff does not allege that any of the Individual Defendants ever saw it or were otherwise aware of its contents.  In any case, the statement says merely that the Commissioner, based on "preliminary findings from an audit," was convening "investigative" hearings "to determine whether MetLife . . . engaged in unfair practices."  (*Id.* 27-28; Greenfield Decl. Ex. L.)  The press release says nothing about whether wrongdoing occurred, whether the issue identified was historic or ongoing, or whether it was material in scope.

- Plaintiff's argument that the Regulatory Settlement Agreement supports an inference of scienter is again based on pure hindsight.  (Opp'n 34; Mem. 17, 29.)  That MetLife agreed to adopt certain new practices does not imply that the Company previously conducted itself improperly.  As set out in the agreement itself, much of what MetLife agreed to do was aimed at speeding up the process of escheatment of unclaimed benefits

to state governments, whose interest in accelerating those payments is obvious.  (Mem. 8; Greenfield Decl. Ex. B at §2(b).)

> **b.      Plaintiff Fails to Plead Recklessness in Connection with MetLife's Disclosure of the State Inquiries.**

Plaintiff does not address the MetLife Defendants' argument that Plaintiff failed to allege facts constituting strong circumstantial evidence that any of the Individual Defendants knowingly or recklessly sought to conceal the State Inquiries.  (Mem. 29.)  Plaintiff's failure to identify any such facts is fatal to its allegation of scienter as to disclosure of the State Inquiries.

> **3.      Plaintiff Fails to Make Particularized Scienter Allegations Against Each Individual Defendant.**

The Complaint is devoid of particularized "facts with regard to each Defendant giving rise to a strong inference of fraudulent intent."  (*Id.*)  Plaintiff instead persists in its attempt to plead scienter as to the Individual Defendants via a collective inference.  (Opp'n 25.)  This is insufficient as a matter of law, which requires that plaintiffs allege that *each* Individual Defendant "personally knew of, or participated in, the fraud."  (Mem. 25, 29-31.)

> **C.      The Section 10(b) Claim Should Be Dismissed for Failure to Plead Loss Causation.**

> **1.      Plaintiff Fails to Plead Loss Causation as to the August 5, 2011 Form 10-Q.**

> **a.      The August 5 Statement Was Not a Corrective Disclosure.**

As the MetLife Defendants' opening brief established, the scope of the State Inquiries had been publicly reported for months prior to the August 5 Statement.[5]  (*Id.* 32-34.)  Although Plaintiff asserts in the Opposition that that the August 5 Statement was "in sharp contrast to prior

---

[5]     The Court properly may take judicial notice of the fact of the contents of the publications submitted as Exhibits K-S to the Declaration of Elliot Greenfield.  *See Garber v. Legg Mason, Inc.*, 347 Fed. Appx. 665, 669 (2d Cir. 2009) ("[O]n a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken, including 'the *fact* that press coverage ... or regulatory filings contained certain information, without regard to the truth of their contents.'") (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis in original)).

23763767v1

statements directed at the issue," it identifies no such "prior statements," citing only to a paragraph in the Complaint that contains an unrelated statement. (Opp'n 36 (citing AC ¶ 121).) Additionally, as explained above, MetLife's statement in earlier quarterly reports that certain allegations regarding its retained asset accounts were "without merit" is unrelated to the State Inquiries. (See Section I.A.3 above.)

With respect to state audits and investigations and their potential consequences for the Company, MetLife had expressly warned in its Forms 10-K for 2009 and 2010 that the Company was subject to regulatory investigations and that new "industry-wide regulations" could adversely effect its "business, financial condition and results of operations." (Mem. at 34.) Plaintiff's only response to those risk disclosures is the illogical argument that they somehow implied that no regulatory investigations were ongoing at the time. (Opp'n 37.) There is no basis in the plain language for such an interpretation.

### b. Plaintiff Fails to Disaggregate from Losses Caused by Other Events.

The August 5 Statement, released before the stock market opened on August 5, caused no significant change in the price of MetLife's stock. Compared with its closing price on August 4, MetLife's stock opened $0.59 higher – up about 1.6% – and closed $0.55 lower – down about 1.5%. (Mem. 35.) Apparently recognizing the insignificance of this reaction, Plaintiff improperly resorts to making new allegations in its Opposition about MetLife's stock's intra-day trading and trading volume on August 5. (Opp'n 36-37.) Second Circuit law prohibits courts from considering such allegations. *See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 318 n.9 (S.D.N.Y. 2003) (holding that "Plaintiffs may not amend their complaint through their opposition brief" and refusing to consider new allegations) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

As to the 9.9% drop in MetLife's stock price on August 8 following the downgrade of the credit rating of the United States by Standard & Poor's ("S&P"), Plaintiff reluctantly acknowledges that "the S&P downgrade may have contributed" to that decline.  Plaintiff incorrectly asserts that MetLife has cited no cases from this District or the Second Circuit that require it to "do more" in the Complaint to disaggregate losses purportedly caused the alleged fraud from those caused by the S&P downgrade.  (Opp'n 38.)  In fact, the Second Circuit has made clear that "a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'"  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-75 (2d Cir. 2005) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).  (Mem. 36-37.) The AC fails to even mention the S&P downgrade, much less to allege facts supporting a conclusion that the August 8 decline was caused, in any part, by the August 5 Statement.

*In re Lehman Brothers Securities and ERISA Litigation*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011), relied on by Plaintiffs, is easily distinguished.  In that case, this Court held that although the decline in Lehman's stock from June to September 2008 occurred during the extended market-wide downturn caused by the sub-prime crisis and subsequent credit crisis, it was plausible to conclude that the materialization of concealed risks by Lehman caused an ascertainable portion of the decline in stock price.  *See id.* at 305-06.  Here, MetLife's stock experienced no significant reaction to the release of MetLife's Form 10-Q on August 5, but it suffered a sharp one-day decline on August 8 – along with the entire stock market and especially other life insurers – following the S&P downgrade.  (Mem. 36.)  It is completely implausible to suggest that the sharp decline on August 8 was due to anything other than the S&P downgrade.[6]

---

[6]   Plaintiff correctly points out in a footnote that, in general, loss causation can be based not only on corrective disclosures but also on the materialization of a concealed risk that causes a decline in stock price.  (Opp'n 35

### 2.     Plaintiff Fails to Plead Loss Causation as to the October 6, 2011 Form 8-K.

#### a.     The October 6 Statement Was Not a Corrective Disclosure.

The October 6 Statement, which disclosed that MetLife expected to incur a charge of $115 to $135 million to adjust its reserves, is not a corrective disclosure because it did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint" – *i.e.*, the alleged misstatements of IBNR liabilities, net income, operating earnings, and mortality ratio.  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).  It was not a restatement of prior financial statements, nor did it suggest that MetLife's prior financial statements were false when made.  The one-time charge resulted from *new information* gained from the Company's previously announced DMF cross-check.  (Mem. 37-38.)  Courts have consistently held that the determination that reserves are insufficient does not render previous estimates fraudulent.  *See*, *e.g.*, *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533, 1998 WL 397852, at *7 (S.D.N.Y., July 15, 1998) ("The failure to anticipate the extent of necessary reserves . . . is not actionable under federal securities laws.") (collecting cases).[7]

#### b.     Plaintiff Fails to Disaggregate from Losses Caused by Other Events.

As with the August 5 Statement, Plaintiff fails to disaggregate any alleged losses resulting from the October 6 Statement from losses caused by other events.  Plaintiff ignores the

---

n.20.)  Plaintiff is wrong, however, in asserting that the allegations in the AC support the latter theory.  Insofar as the allegedly "concealed risk" in this case would relate to MetLife's practices with respect to the DMF, Plaintiff alleges that those practices were discussed in great detail by the MetLife executives who testified at the Florida hearings on May 19, 2011.  (AC ¶ 123.)  Any such "risk" indisputably was not "concealed" after that date.  Notably, and inconveniently for Plaintiff, MetLife's stock closed up 1.1% the day of that testimony.  (Greenfield Decl. Ex. G.)

[7]     MetLife's October 28, 2011 statements regarding the one-time spike in its mortality ratios is not a "correction" for the purposes of loss causation because those statements were made after the end of the class period.  (Opp'n 39.)  *See Masters v. GlaxoSmithKline*, 271 Fed. Appx. 46, 51 (2d Cir. 2008).

23763767v1

fact that the October 6, 2011 Form 8-K also disclosed that MetLife would include two other one-time charges of similar size to the charge at issue. (Mem. 38.)

Plaintiff's only response to the stock charts demonstrating that, in both August and October, MetLife's stock traded in virtual lockstep with its competitors (Greenfield Decl. Ex. V) is to argue that, because the Complaint did not refer to the stock prices on which those charts are based, the Court may not take judicial notice of the stock prices. Plaintiff is wrong. (Opp'n 39 n.23.) *See Ganino*, 228 F.3d at 166 n.8 ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."). The fact that MetLife's stock traded in lockstep with its competitors renders Plaintiff's loss causation allegations entirely implausible. (Mem. 38-39.)

### c.  Plaintiff Ignores the Immediate Rebound in MetLife Stock.

Plaintiff has no explanation for the fact that after MetLife's stock declined by 6.2% on October 7, it rebounded 5.6% on October 10 (the next trading day) and was 3.5% higher than its pre-disclosure price by October 12. (*Id.* 39.) The immediate rebound, unexplained by the Plaintiff, renders Plaintiff's loss causation allegations "implausible." *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011); *see also In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588-89 (D. Md. 2005) (same).[8]

## II.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OR 12(a)(2).[9]

In the Opposition, Plaintiff ignores most of the arguments made by the MetLife Defendants as to the Section 11 and 12(a)(2) claims. Plaintiff incorrectly argues that the Court

---

[8]  Plaintiff's argument that *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, No. 11 Civ. 4544, 2012 WL 3104589 (2d Cir. Aug. 1, 2012), applies broadly to any consideration of a stock price rebound misreads that case. The only issue before the court was economic loss, not loss causation, and the court did not consider the type of abrupt rebound in the days following a disclosure that is present in this case. *See id.* at *1-2.

[9]  The MetLife Defendants incorporate, as relevant, the arguments made in the Underwriter Defendants' Reply.

may not consider matters subject to judicial notice – *e.g.*, MetLife's stock prices – in addressing

a negative causation defense.  *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d

404, 420 (S.D.N.Y. 2009) (finding that "absence of loss causation is evident on the face of the

Complaint and documents properly considered on a Rule 12(b)(6) motion").

## III.   PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY.

Plaintiff fails to allege a primary violation, actual control, or culpable participation.  In

the Opposition, Plaintiff fails to identify any facts showing "actual control," as opposed to mere

"officer or director status," and fails to cite any cases supporting the theory that a corporate

entity may be a "control person" as to its employees.  (Mem. 42-44; Opp'n 44-45.)

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice as against the

MetLife Defendants.

| Dated: New York, New York<br>October 17, 2012 | DEBEVOISE & PLIMPTON LLP<br><br>By : /s/ Maeve L. O'Connor<br>Maeve L. O'Connor (*mloconnor@debevoise.com*)<br>Elliot Greenfield (*egreenfield@debevoise.com*)<br>Anna A. Moody (*amoody@debevoise.com*)<br><br>919 Third Avenue<br>New York, New York 10022<br>Tel: (212) 909-6000<br>Fax: (212) 909-6836<br><br>*Attorneys for Defendants MetLife, Inc., C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, William J. Mullaney, Sylvia Matthews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang.* |
| --- | --- |

23763767v1