UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br>              Plaintiff, <br><br> vs. <br><br> METLIFE INC., et al., <br><br>              Defendants. | Civil Action No. 1:12-cv-00256-LAK <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANTS' JOINT MOTION FOR RECONSIDERATION |

824083_1

**I.     INTRODUCTION**

For decades MetLife, Inc. ("MetLife" or the "Company") has unlawfully retained hundreds of millions of dollars belonging to the beneficiaries of its policyholders. That was not by accident. According to the California Insurance Commissioner, "for two decades, MetLife failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured had died." ¶116.[1] Moreover, instead of contacting annuity policy holders or their beneficiaries with knowledge gained from using the U.S. Social Security Administration's Death Master File ("SSA-DMF") that policyholders had died, MetLife "continued making premium payments from the policy holder's account until the cash reserves were used up, and then cancelled the contract." *Id.* All the while, MetLife falsely represented that its financial statements were accurate, reserve setting practices were conservative and its mortality experience was strong. ¶¶76-77, 82.

The Amended Complaint alleged and the Court credited that MetLife "knew that its method for setting reserves ignored facts that strongly suggested that reserves were understated, i.e., knew that use of the SSA-DMF likely would have resulted in higher reserves." February 28, 2013 Memorandum Opinion (Dkt. No. 52) ("February 28 Order") at 10, 18, 20. Now, called to answer claims of investor losses associated with these misrepresentations, defendants seek to reverse the Court's February 28, 2013 findings by shifting the focus from their misconduct to a single sentence in the Amended Complaint. *See* Memorandum of Law in Support of Defendants' Joint Motion for Reconsideration (Dkt. No. 56) ("Def's Mem.").

---

[1]     All paragraph references are to the Amended Class Action Complaint for Violation of the Federal Securities Laws (Dkt. No. 20) ("Amended Complaint"). Citations and footnotes are omitted and all emphasis added unless otherwise noted.

Defendants' motion falls far short, however, of meeting the strict standard articulated in Civil Local Rule 6.3 because it fails to identify any fact or controlling authority that the Court overlooked. *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995) ("reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court"). Defendants' motion must fail for the additional reason that it raises new issues not previously brought before the Court. *See Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 115 (2d Cir. 2001) (a party may not use a motion for reconsideration to advance new issues or theories of relief that were not previously presented to the court). Here, it is clear that defendants simply don't "like the way the original motion was resolved." *Makas v. Orlando*, No. 06 Civ. 14305(DAB)(AJP), 2008 WL 2139131, at *2 (S.D.N.Y. May 19, 2008) (rejecting motion for reconsideration where party did not identify controlling authority or cite facts that would alter prior opinion). For the reasons detailed herein defendants' motion must be denied.

### A. Defendants Avoid the Detailed Allegations Upon Which the Court Relied Each of Which Substantially Undermines Their Motion

Defendants ignore the multiple allegations on which the Court based its conclusions, all of which are supported by sworn testimony of MetLife executives and Company admissions made in conference calls and/or filings with the Securities Exchange Commission. The Court clearly summed up the Amended Complaint's allegations. *See* February 28 Order at 10-11. The Court particularly found that based on the Company's 2007 cross-check, MetLife knew that its method for setting reserves ignored facts that strongly suggested that reserves were understated:

> As a result of its 2007 SSA-DMF cross-check, the company knew that its method of setting reserves ignored facts that ***strongly suggested*** that reserves were understated, i.e., knew that use of the SSA-DMF ***likely*** would have resulted in higher reserves and thus cast doubt on the reasonableness of its estimates. But it failed to make use of the database.

- 2 -

*Id.* at 20; *see also id.* at 18 (citing ¶106).

Additionally, the Court credited particularized allegations that by Summer of 2010 state regulators began pressuring the Company to use the SSA-DMF and that such usage would likely require reserve increase:

> [S]tates had begun to pressure MetLife to use the SSA-DMF in its life insurance business by late summer of 2010. The MetLife Defendants reasonably should have expected that the state investigations would cause MetLife to alter its IBNR reserves. There was potential *also* for state fines for failure to comply with unclaimed property laws. Indeed, once MetLife disclosed the investigations in August 2011, it admitted that it could not predict the exact financial consequences but that they could be substantial. Assuming these facts to be true, plaintiff has alleged adequately that MetLife had a duty under Item 303 to disclose the state investigations before August 2011.

*Id.* at 21 (citing ¶80). As the Court's findings make clear, the Amended Complaint includes Item 303 allegations apart from IBNR-based claims. Thus, the Item 303 claims based on the potential for state fines due to MetLife's failure to comply with unclaimed property laws would stand even without any IBNR-related claims. Irrespective, the factual allegations relied upon by the Court are accurate, particularized and cannot be credibly disputed. Indeed, the allegations contained in the Amended Complaint (e.g. ¶¶86(k), 120-123, 140) suffice. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209(KBF), 2013 WL 1223844, at *14 (S.D.N.Y. Mar. 27, 2013) (finding plaintiffs' allegation that information had been provided to defendant which contradicted their "statements that it had acted conservatively with respect to risk and that it had adhered to conservative lending standards" sufficed to allege objective and subjective falsity). But according to defendants, the Court in denying the motion to dismiss certain of plaintiff's Securities Act of 1933 claims, "relied on a *single* unsupported allegation suggesting that MetLife's 2007 DMF cross-check resulted in an $80 million reserve shortfall." Defs' Mem. at 2, 3 (citing ¶162).

824083_1

Defendants' suggestion that the Court relied wholly on a single allegation in ¶162 for its conclusions is absurd. The February 28 Order cited to ¶162 once in a footnote along with four other paragraphs (¶¶86, 106, 120, 123) for the proposition that "[i]n 2007 MetLife allegedly cross-checked its individual life insurance records against the SSA-DMF and discovered that it held $80 million in benefits that should have [been], but had not been, paid because no claims for them had been filed." *See* February 28 Order at 5 n.15. The Court made a substantially similar finding which again summarized the Amended Complaint: "after running the SSA-DMF against a portion of the life insurance policies in 2007 and discovering a reserve shortfall of $80 million dollars, MetLife knew that its method for setting IBNR reserves . . . had not accounted for all deceased policy holders." *Id.* at 18. Notably, the Court cited ¶106, which alleged that MetLife's use of the SSA-DMF would identify deceased policy holders thereby resulting in additional expenses, higher reported mortality rates, lower underwriting results and lower operating earnings, ***not ¶162***, as defendants incorrectly suggest. Similarly, the court did not mention the Regulatory Settlement.[2]

To be precise, the Court also made it clear that it found "no need to [separately] discuss" plaintiffs' allegations that MetLife's financial statements contained material misstatements which did not comply with GAAP. February 28 Order at 17 n.66. This exclusion explains why the Court did not rely on ¶162 in finding that by failing to use the SSA-DMF, MetLife knew that its method for setting reserves strongly suggested that reserves were understated, which is in the section entitled

---

[2] There is no contradiction between the Amended complaint allegations and the Regulatory Settlement. Defs' Mem. at 2. Neither used the phrase "reserve shortfall." And because the Amended Complaint never mentioned a "reserve shortfall," it is also clear that the Court was not quoting the language of the Amended Complaint as opposed to the "language" of Regulatory Agreement as defendants contend. *Id.* Therefore *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) and *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12 Civ. 847(RWS), 2012 WL 4335164, at *2 (S.D.N.Y. Sept. 21, 2012) are inapposite.

"MetLife's Financial Statements Were Materially Misstated in Violation of GAAP and SEC Disclosure Rules." ¶¶150-167. Defendants' contention that the Court relied solely on the allegations of ¶162 is wholly unfounded.

### B. The February 28 Order Findings Are the Plausible and Reasonable Conclusions Drawn from Undisputable Facts Alleged

Defendants' motion for reconsideration would fail even if the Court had specifically relied only on ¶162's allegation that "in 2007 MetLife performed a match across certain of its insurance records using the SSA-DMF and had discovered over $80 million in IBNR claims that had not been reserved for." ¶162. That's because it is a reasonable and plausible conclusion drawn from the facts. Of course, defendants do not contend that the $80 million in unclaimed benefits actually ***had been reserved for***. Instead of confronting the Court's finding that as a result of MetLife's experience with the SSA-DMF in 2007 "MetLife knew that its method for setting IBNR reserves over the previous several decades had not accounted for all deceased policyholders" (February 28 Order at 18), defendants rest the entirety of their motion on a tortured distinction between the 2007 SSA-DMF match resulting in an $80 million reserve shortfall and $80 million in unclaimed benefits.[3] Defs' Mem. at 2. By retaining $80 million in unclaimed benefits that MetLife knew, or should of known, were liabilities, MetLife artificially inflated its reported assets and financial condition. ¶¶150-167. In any event, defendants' distinction conflicts with MetLife's testimony and subsequent admitted practice. Before the State of Florida Insurance Commission on May 19, 2011, Todd Katz testified on behalf of MetLife that "***in the life insurance business, our liability begins when there's a proof of death***." Amended Complaint, Ex. A at 47, 48. Thus, MetLife has already conceded

---

[3] Defendants' version of the facts conveniently omits that some of these "unclaimed benefits" were for policyholders who had been deceased for decades and their beneficiaries had not been paid.

under oath, that without what it called "proof of death," it would not recognize a liability.  *Id.*  On May 23, 2011, before the California Insurance Commissioner, Katz testified further that the 2007 Match identified 18,000 dead policyholders which indicated that there was a "liability due":

> COMMISSIONER JONES: What was the 2007 death match study?
>
> MR. KATZ: . . .  We ran that using a three-point match; Social Security number, date of birth within two years and name.
>
> We found out of that approximately 28,000 individuals whose information showed up on the Social Security Death Index and our administrative records. Of those 28,000, ***we found approximately 18,000, there was a liability due for those individuals***. That totaled approximately $80 million.

Amended Complaint, Ex. B at 58.

Any doubt as to whether identifying deceased policyholders would result in a liability for which a reserve would be required is removed by MetLife's October 2011 admissions.  *See* ¶142.  On October 28, 2011, when the Company took a $117 million after-tax charge, defendant William J. Wheeler admitted that the $117 million after-tax charge ***to increase reserves*** was "in connection with our use of the U.S. Social Security Administration's Death Master File and similar databases ***to identify potential life insurance claims*** . . . ***incurred, but not reported claim liabilities referred to as IBNR***."  *Id.*  It is clear that the purpose for which the Company increased reserves in 2011 was identical to the 2007 SSA-DMF match where MetLife identified policyholders who had been deceased for years and whose beneficiaries it had not paid.[4]  ¶¶86(k)-(l), 106, 123.

The Court should reject defendants' request that it reverse course and adopt an inference that is implausible, illogical and opposite of what MetLife has already admitted.

---

[4] For the same reasons, defendants' new argument that there is no alleged comparison between the 2007 Match and MetLife IBNR reserves is also unfounded.  Defs' Mem. at 3.

### C. Defendants Motion For Reconsideration Must Fail For the Additional Reason that It Raises New Issues Which Were Never Before the Court

Apart from its lack of merit, defendants have waived any argument that ¶162 was misleading. *Mahadeo v. N.Y. City Campaign Fin. Bd.*, No. 12-772-cv, 2013 WL 1092613, at *5 (2d Cir. March 18, 2013) (a party may not use a motion for reconsideration to advance new issues or theories of relief that were not previously presented to the court). In fact, defendants cited to ¶162 in their motion to dismiss to say that the $80 million in death benefits identified as part of the 2007 Match was small. Memorandum of Law in Support of the MetLife Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 43) at 17 ("In addition, the 2007 DMF research on individual life insurance policies found that only a small fraction of death benefits – $80 million in total – had gone unclaimed over the course of decades. (AC ¶¶86(k), 162.)").[5]

## II. CONCLUSION

For all the reasons set forth above, defendants' joint motion for reconsideration must be denied.

DATED:  March 28, 2013                 ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SHAWN A. WILLIAMS
                                       ARMEN ZOHRABIAN


                                              s/ Shawn A. Williams
                                       _____
                                             SHAWN A. WILLIAMS

---

[5] The February 28 Order adopted defendants' assertion that $80 million was a small amount. *See* February 28 Order at 5, 6 (citing Defs' Mem. at 16-17).

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
azohrabian@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Lead Counsel for Plaintiff

- 8 -

824083_1

CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 28, 2013.

s/ Shawn A. Williams
SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

824083_1

# Mailing Information for a Case 1:12-cv-00256-LAK

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John J. Clarke , Jr**
  john.clarke@dlapiper.com,DocketingNewYork@dlapiper.com

- **Kaitlin Teresa Farrell**
  ktfarrel@debevoise.com

- **Elliot Greenfield**
  egreenfield@debevoise.com

- **Timothy E. Hoeffner**
  timothy.hoeffner@dlapiper.com,gwen.james@dlapiper.com,DocketingNewYork@dlapiper.com,bonita.ortiz@dlapiper.com

- **Maeve L. O'Connor**
  moconnor@debevoise.com,mao-ecf@debevoise.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Shawn Anthony Williams**
  swilliams@rgrdlaw.com,aelishb@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,peterb@hbsslaw.com,reed@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Thomas C. Michaud**

'