UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
CITY OF WESTLAND POLICE AND FIRE : Civil Action No. 1:12-cv-00256-LAK
RETIREMENT SYSTEM, Individually and on :
Behalf of All Others Similarly Situated, : CLASS ACTION
:
:
Plaintiff, : PLAINTIFF'S REPLY MEMORANDUM OF
: LAW IN FURTHER SUPPORT OF MOTION
vs. : FOR LEAVE TO FILE THE [PROPOSED]
: SECOND AMENDED CLASS ACTION
METLIFE INC., et al., : COMPLAINT FOR VIOLATION OF THE
: FEDERAL SECURITIES LAWS
Defendants. :
:
---------------------------------------------------------------x

827918_1

Lead Plaintiff Central States and Southwest Areas Pension Fund ("plaintiff") respectfully submits this reply memorandum of law in support of its motion for leave to file the Proposed Second Amended Complaint of the Memorandum Opinion, dated February 28, 2013 ("February 28 Order").

## I.  STANDARD

Under Federal Rule of Civil Procedure 15(a)(2), """leave [to amend] shall be freely given when justice so requires."""" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (alteration in original)[1]; Fed. R. Civ. P. 15(a)(2).  Defendants cannot and do not contend that there is bad faith at work or undue delay.  And, as set forth in the [Proposed] Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("PSAC"), the amendment directly and fully addresses the deficiencies identified in the February 28 Order.  Defendants claim that amendments would be futile is wholly without merit.  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 115 (2d Cir. 2012).

## II.  ARGUMENT

### A.  The Proposed Second Amended Complaint Adequately Alleges Loss Causation

Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by plaintiff.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  A complaint only needs to "provide a defendant with *some indication* of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634 (2005); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 43774, at *37 (S.D.N.Y. Mar. 27, 2013) (attached as Exhibit A to the Declaration of Shawn A. Williams in Support of Plaintiff's Reply Memorandum of Law in Further

---

[1] All citations and internal footnotes are omitted and all emphasis is added unless otherwise noted.

827918_1

Support of Motion for Leave to File the [Proposed] Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Williams Declaration"). At the pleading stage, plaintiff need not rule out all competing theories for the drop in stock price. *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) (collecting cases). A complaint need not eliminate a competing causal connection between the misrepresentations and plaintiff's losses. *King Cnty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010). The PSAC pleads facts which, if proven, would show that its loss was caused by the alleged misstatements.

### B. The Proposed Second Amended Complaint's New Factual Allegations Address the February 28 Order by Showing that the October 6, 2011 Disclosure Was a Substantial Cause of Plaintiff's Economic Loss

With respect to the October 6, 2011 disclosure, the February 28 Order found, based on a chart submitted by defendants, that "major life insurers" moved in lockstep in October 2011 and that all said insurers lost value in equal proportions on October 6, 2011 and then all recovered in nearly equal proportions:

> Plaintiff's loss causation allegations relating to the October 6, 2011 disclosure fail for similar reasons. A comparison of MetLife's stock performance with that of other major insurers reveals that they traded in lockstep with one another throughout October 2011. The MetLife Defendants submitted with their briefing a chart tracking the stock movements of several major life insurers in 2011. On October 6, all of the insurers' stock lost value in nearly equal proportions. All of the stocks then recovered nearly in full within a matter of days. This lockstep trading decreases the prospect that the loss was caused by the alleged disclosure. ***Without more***, the loss causation allegations are insufficient to withstand the motion to dismiss.

February 28 Order at 15-16.

The PSAC provides the ***more*** necessary to grant leave to amend and withstand a motion to dismiss. The PSAC addresses the concerns related to loss causation identified in the February 28 Order with additional details regarding MetLife, Inc.'s October 6, 2011 Form 8-K announcement of

$275 million in after tax charges, nearly half of which was related to usage of the Social Security Administration's Death Master File ("SSA-DMF"). ¶¶148-151.[2]

First, the PSAC adds that the October 6, 2011 Form 8-K was filed *after market hours* on October 6, 2011 which addresses the Court's earlier concern that it appeared that "*[o]n* October 6, all of the insurers' stock lost value in nearly equal proportions." February 28 Order at 15; *see also* ¶¶140, 142.[3]

Second, the PSAC adds new allegations of news coverage of MetLife, Inc.'s after market report of reserve charges in connection with the usage of the SSA-DMF. ¶¶141-147. The PSAC now includes a *Reuters* article published at 5:08 p.m. which discusses the $275 million reserve charges MetLife, Inc. ("MetLife" or the "Company") announced in its Form 8-K. The first paragraph of the *Reuters*' article ties part of the $275 million in charges to the SSA-DMF, stating "MetLife Inc (MET.N), the largest life insurer in the United States, said on Thursday it would take up to $275 million in third-quarter charges, in part to increase reserves for policies where it may know the holder is dead but no claim has been filed." ¶143. This was the first time the material disclosures in the August 5, 2011 Form 10-Q became quantified. After detailing state regulatory investigations into MetLife's selective use of the SSA-DMF investigation in an additional three paragraphs, the *Reuters*' article states that though MetLife shares were the top gainer among

---

[2] All "¶" and "¶¶" references are to the PSAC.

[3] Defendants again allude to the rebound of MetLife's stock price in October after the October 6, 2011 disclosure. However, notwithstanding that the Second Circuit has very clearly stated that a price rebound does not negate plaintiff's showing of loss causation. *Rosado v. China N. E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012); *see also In re Sanofi-Aventis Sec. Litig.*, No. 07CIV. 10279 GBD FM, 2013 WL 1149672, at *5 (S.D.N.Y. Mar. 20, 2013) (applying *Rosado* and noting that whether "the price rebounded for reasons unrelated to the fraud" is a merit issue).

- 3 -

827918_1

Standard & Poor's ("S&P") insurance stocks on October 6, 2011 prior to the disclosures in the Form 8-K, MetLife stock fell 2.8% to $29.83 in after hours trading "*on the news*." ¶143. "[P]rice changes seen in the after-hours market are generally useful for showing how the regular market reacts to new information released after the market was closed." "How can my stock's price change after hours, and what effect does this have on investors? Can I sell the stock at the after-hours price?" *Investopedia* (Feb. 29, 2009), http://www.investopedia.com/ask/answers/05/saleafterhours.asp.

Third, the PSAC adds the entirety of the October 6, 2011 Form 8-K disclosure, which included non-fraud related factors in addition to the up to $135 million charge, which defendants incorrectly contended were concealed by plaintiff. ¶140. These facts are in addition to the October 6, 2011 Credit Suisse report published after market close that the charges were due "to three items." ¶144. The first item identified in the report was $115-$135 million related to the use of the SSA-DMF that would impact earnings *between $0.11-$0.13* per share. *Id*. As alleged and acknowledged by the Court, this caused a 23% decline in operating earnings for insurance products year over year. ¶153; February 28 Order at 22.

Fourth, the PSAC more clearly ascribes some rough proportion of the whole loss to the alleged misstatements as required by the February 28 Order. February 28 Order at 14-16; *Lentell*, 396 F.3d at 175. The PSAC now specifically alleges that at least 45% of the reserve charge announced on October 6, 2011 was related to the new information quantifying the financial impact of regulatory investigations announced on August 5, 2011. ¶150; *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). Indeed, on October 7, 2011, Zack's Equity Research noted

that the "***bulk of the extraordinary expenses***" were related to the SSA-DMF.  ¶¶145-146.[4]  On October 7, 2011, MetLife stock price fell 6.1%.  ¶147.  Defendants claim that rough proportion of loss of at least 45% is still not enough to grant leave.  Joint Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Replead ("Def's Mem.") at 4.  But plaintiffs are only required to allege a ***rough*** proportion their loss attributable to fraud and "the shorter the trime frame [between the event and the loss], considered, the rougher the proportion need be." *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 370 (S.D.N.Y. 2009).

Fifth, as discussed below, the PSAC adds an event study which specifically disaggregates the losses from market wide phenomenon – far superior than defendants' chart and more than enough to support leave to amend and defeat a motion to dismiss.  ¶¶148-151.

### C.   The Proposed Second Amended Complaint Alleges an Event Analysis that Should Put to Rest Defendants' Argument that Plaintiff's Allegations Fail at the Pleading Stage

As noted above, the PSAC also includes an event study analyzing the October 6, 2011 disclosure and its effect on MetLife stock price.  ¶¶148-151.  The event study set forth in the PSAC analyzes MetLife's October 6, 2011 disclosure using a regression analysis to measure the effect of this new information on MetLife's stock price.  *Id.*  Using the S&P market index and the S&P 500 insurance index both identified in MetLife's annual reports as relevant to its industry, the event study concluded that the decline in the Company's share price on October 7, 2011 was statistically

---

[4] At the appropriate time, an expert would analyze the impact of the admission of wrongdoing and the future risks of fines and the current quantification of charges on the Company's future cash flows. Moreover, the other two "charges" mentioned by MetLife in the October 6, 2011 Form 8-K, do not appear to be fraud-related or to have caused the stock price to decline on October 7, 2011. One charge was for losses in connection with hurricane Irene whose losses impact had been known for months.  The other charge was an estimated $40 million to satisfy previously reported financial obligations for life and health insurance guaranty associations.

- 5 -

significant at the 5% level.  *Id*.  "Event studies are by far the most common test for a causal connection.  An event study attempts to determine whether new information correlates with a price movement – including the price movement's direction and, perhaps, magnitude.  Causation may be inferred from this correlation."  *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *see also Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, slip op. at 2 (N.D. Ill. Mar. 23, 2009) ("[A]n event study is '[t]he gold standard, which is accepted by both courts and economists.'") (quoting Marge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006)) (alteration in original) (attached as Exhibit B to the Williams Declaration).[5]

Defendants do not appear to claim that the event study methodology is flawed but incorrectly contend that statistical significance is a "legal conclusion[]" or an opinion.  Def's Mem. at 4. However, statistical significance identifies a result that is not likely to occur randomly.  *Matrixx Initiatives, Inc. v. Siracusano*, __U.S.__, 131 S. Ct. 1309, 1319 n.6 (2011) (citing Reference Manual on Scientific Evidence 354 at 122-24 (2d Ed. 2000)).  In a clever tactical pivot, defendants contend

---

[5] *See also In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 720 (S.D. Tex. 2006), as follows:

> "An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of 'abnormal returns.' The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors. . . . [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation."

(alterations in original).

that the event analysis does not cure deficiencies identified by the Court because it does not explain the "lockstep trading of MetLife's stock with that of its peer life insurance companies." Def's Mem. at 5.  But the Court's February 28 Order never indicated that MetLife traded in lockstep with "its peer life insurance companies." *Id.*; February 28 Order at 15-16.  The Court found that MetLife traded in lockstep with "major insurers" which defendants "submitted with their briefing." February 28 Order at 15.  And that was not MetLife's peer group.  Defendants only submitted MetLife, Prudential Financial Inc. ("Prudential"), American Family Life Assurance Company of Columbus (AFLAC) and Lincoln Financial Group ignoring the very indices referenced in its SEC filings.

Defendants contend that the PSAC does not disaggregate losses from "external influences" in October 2011 ***but again*** have not and cannot identify the external influences they are referring to. Def's Mem. at 3.  Even at summary judgment, defendants would need to point to a purported external competing cause.  *See, e.g.*, *Vivendi*, 634 F. Supp. 2d at 370.  In any event, plaintiff has alleged facts sufficient to ascribe some rough proportion of the whole loss to defendants' fraud. *Lattanzio*, 476 F.3d at 158.  There is no plausible opposing or coinciding intervening event that would explain MetLife's 6.1% October 7, 2011 stock price decline sufficient to negate that an ascertainable amount of the losses "was attributable to [defendants'] misstatements and omissions." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 306-07 (S.D.N.Y. 2011).

Finally, defendants contest the plausibility of plaintiff's loss causation allegations based on a momentary snapshot of MetLife's stock price when the market opened on August 5, 2011 and October 7, 2011.  But this selective focus on MetLife's opening price alone does not provide any valuable insight into the downward pressure MetLife's disclosure caused.  As shown by the graph attached as Exhibit C to the Williams Declaration, even though on October 7, 2011 MetLife stock "opened up," within mere minutes, it traded down ***below*** its October 6, 2011 closing price and

continued to sink for the remainder of the day coming to rest down 6.1%. ¶147. Moreover, an event study would show MetLife's stock price decline on October 7, 2011 is statistically significant even accepting defendants' makeshift peer group of so-called major insurers.

### D. Defendants Largely Ignore New Facts Alleged in the PSAC Concerning Disclosures on August 5, 2011

The PSAC provides new details concerning the August 5, 2011 disclosures addressing the Court's concern in the February 28 Order that plaintiff failed to acknowledge the U.S. credit downgrade announced after market hours on August 5, 2011. February 28 Order at 14.

First, the PSAC alleges new facts that MetLife's pre-market disclosure in its August 5, 2011 Form 10-Q and that this disclosure *contributed to* the Company's stock price decline on August 5, 2011 and between August 4, 2011 and August 8, 2011. ¶¶133, 135, 139, 189, 239. The PSAC alleges that before the market opened on August 5, 2011, *Bloomberg* published an article about regulatory audits into the unclaimed property practices of MetLife, Prudential and seven other firms. ¶134. Thus, the PSAC alleges that MetLife's August 5, 2011 disclosures and related news coverage contributed to the decline of its stock price from the August 4, 2011 close of $36.90 to the August 5, 2011 intraday low of $34.93 on and its close at $36.35. ¶135.

Second, the PSAC alleges new facts that while MetLife's stock price on August 5, 2011 opened above the prior day's close, as the market digested MetLife's disclosures, MetLife's stock price fell to a low of $34.93, down 5.3% from the prior day's close of $36.90 to close approximately 1.5% down at $36.35. ¶136. Additionally, the PSAC alleges that MetLife's stock traded a whopping 22 million shares on August 5, 2011. ¶135.

Third, the PSAC includes new allegations regarding S&P's announcement, after the markets had closed, that it would downgrade U.S. credit/debt rating. ¶137. The PSAC also includes new

- 8 -

allegations from news outlets including *The Atlantic* and *Forbes* suggesting that the S&P downgrade should not come as a surprise. ¶137 n.10.

Fourth, the PSAC adds new allegations about subsequent updates to the *Bloomberg* article, after the market closed on Friday, August 5, 2011, on MetLife's charges with reporting on a similar reserve charge taken by AIG on August 4, 2011. ¶138. The after market *Bloomberg* article repeated the information concerning MetLife's disclosure earlier in the day and detailed after hours disclosures by Prudential that it too was subject to regulators' investigations into compliance with unclaimed property laws. ¶138. As alleged in the PSAC, these disclosures from MetLife and large insurance company disclosures of Prudential and AIG concerning possible identical fraudulent conduct and announcement of the S&P's downgrade contributed to the Company's stock price decline between Thursday, August 4, 2011 and Monday, August 8, 2011. ¶139.

Finally, plaintiff's loss causation allegations always contemplated both the August 5, 2011 and October 6, 2011 disclosures. *See, e.g.*, ¶¶23, 192. In fact, defendants ignore that in analyzing materiality, the February 28 Order acknowledges allegations and the disclosures of August 5, 2011 and October 6, 2011 and related stock price declines together sufficiently allege both materiality and loss causation:

> Here, the alleged corrective disclosures included the announcement of a nation-wide investigation into one of MetLife's important businesses and an increase in reserves that caused operating earnings for insurance products to be down 23[%] for the quarter. Plaintiff alleges that MetLife's shares dropped in value after the disclosures. This is sufficient.

February 28 Order at 22.[6] It appears that defendants, in arguing that plaintiffs are trying to claim the

---

[6] *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1054, 1058 (9th Cir. 2008) (recognizing the plausibility of a temporal gap between the first fraud related disclosure and a stock price decline following the report of the impact on the financial statements).

- 9 -

"entirety" of stock price drop are more focused on damages than loss causation.  Plaintiff's new allegations clarify that defendants' conduct contributed to and was a substantial cause of the alleged stock price declines as opposed to the entirety of the alleged stock price declines.  ¶192.  As Judge Richard J. Holwell wrote in *Vivendi*, "plaintiffs need only prove that they suffered *some* damage from the fraud. Liability obviously does not hinge on how much damage. . . . when there are two competing causes for a stock decline, it is easy to argue that one caused the entirety of the decline while the other did not cause any of it." *Vivendi*, 634 F. Supp. 2d at 364 (emphasis in original).

The PSAC's new allegations in light of the Court's February 28 Order satisfactorily allege that there is a plausible relationship and causal link between defendants' misrepresentations resulting in investors' losses.  February 28 Order at 22; *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382 (S.D.N.Y. 2010).

### III.   CONCLUSION

For these reasons, plaintiff respectfully requests that the Court grant plaintiff's motion for leave to amend.

DATED:  April 4, 2013

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
ARMEN ZOHRABIAN

            s/ Shawn A. Williams
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
azohrabian@rgrdlaw.com

- 10 -

827918_1

                ROBBINS GELLER RUDMAN
                   & DOWD LLP
                SAMUEL H. RUDMAN
                58 South Service Road, Suite 200
                Melville, NY  11747
                Telephone:  631/367-7100
                631/367-1173 (fax)
                srudman@rgrdlaw.com

                Lead Counsel for Plaintiff

827918_1

CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 4, 2013.

                                                             s/ Shawn A. Williams
                                                             SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

827918_1

# Mailing Information for a Case 1:12-cv-00256-LAK

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **John J. Clarke , Jr**
  john.clarke@dlapiper.com,DocketingNewYork@dlapiper.com

- **Kaitlin Teresa Farrell**
  ktfarrel@debevoise.com

- **Elliot Greenfield**
  egreenfield@debevoise.com

- **Timothy E. Hoeffner**
  timothy.hoeffner@dlapiper.com,gwen.james@dlapiper.com,DocketingNewYork@dlapiper.com,bonita.ortiz@dlapiper.com

- **Maeve L. O'Connor**
  moconnor@debevoise.com,mao-ecf@debevoise.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Shawn Anthony Williams**
  swilliams@rgrdlaw.com,aelishb@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,tcraig@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,peterb@hbsslaw.com,reed@hbsslaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Thomas C. Michaud**

,