UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff, | : | |
| -against- | : | 12 Civ. 0256 (LAK) |
| METLIFE, INC., et al., Defendants. | : | |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE METLIFE DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Maeve O'Connor
Elliot Greenfield
Anna A. Moody
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants MetLife, Inc., C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, William J. Mullaney, Sylvia Mathews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

I. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5. ..... 3

A. The Section 10(b) Claim Should Be Dismissed for Failure to Adequately Allege an Actionable Misrepresentation. ..... 3

1. MetLife's Estimates of IBNR Liabilities Are Not Actionable Under the Securities Laws. ..... 3

2. Plaintiff Fails to Identify a Violation of GAAP. ..... 4

3. The Alleged Misstatement of IBNR Reserves Is Immaterial as a Matter of Law. ..... 5

4. Plaintiff's Allegations Regarding "Strong" Financial Results And "Solid" Underwriting Are Inactionable Puffery. ..... 5

5. Plaintiff Does Not Adequately Allege a Duty to Disclose the State Inquiries. ..... 5

6. MetLife's Mortality Ratios Were Not False When Reported. ..... 6

B. The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter ..... 7

1. Plaintiff Does Not Adequately Plead Motive. ..... 7

2. Plaintiff Does Not Adequately Plead "Conscious Misbehavior Or Recklessness." ..... 8

3. Plaintiff Fails to Make Particularized Scienter Allegations Against Each Defendant. ..... 10

C. The Section 10(b) Claim Should Be Dismissed for Failure to Plead Loss Causation. ..... 11

1. Plaintiff Fails to Plead Loss Causation as to August 5, 2011. ..... 11

2. Plaintiff Fails to Plead Loss Causation as to October 6, 2011. ..... 12

II. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OR 12(a)(2). ..... 14

III. PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY. ............................15

CONCLUSION.......................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012)....................12

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)....................13

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase & Co.*, 553 F.3d 187 (2d Cir. 2009)....................5

*Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011)....................5

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................10

*In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009)....................14

*In re Moody's Corp. Sec. Litig.*, No. 07 Civ. 8375, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)....................14

*In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009)....................14

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)....................8

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011)....................6

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)....................10

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012)....................7

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012)....................11

*Sciallo v. Tyco Int'l Ltd.*, No. 03 Civ. 7770, 2012 WL 2861340 (S.D.N.Y. July 9, 2012)....................13

*S.E.C. v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013)....................13

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)....................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)....................11

*Vining v. Oppenheimer Holdings Inc.*,
No. 08 Civ. 4435, 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010)....................11

**STATUTES**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4....................1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b)....................1

Fed. R. Civ. P. 12(b)(6)....................1

Fed. R. Evid. 702....................13

SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303....................13

SEC Staff Accounting Bulletin 99, 64 Fed. Reg. 45150 *et seq.* (1999)....................5

Defendants MetLife, Inc. ("MetLife" or the "Company"), C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian and William J. Mullaney (the "Officer Defendants"), and Sylvia Mathews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang (the "Director Defendants," and collectively with MetLife and the Officer Defendants, the "MetLife Defendants" or "Defendants") respectfully submit this reply memorandum in further support of their motion to dismiss the Second Amended Complaint ("SAC"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.

## PRELIMINARY STATEMENT

Plaintiff's Opposition serves only to highlight Plaintiff's inability to plead any of the core elements of a securities fraud claim: an actionable misrepresentation, facts supporting a strong inference of scienter, and loss causation. In particular, Plaintiff (*i*) identifies no factual allegations indicating that the MetLife Defendants did not believe the Company's IBNR reserves were adequate and offers no defense of its misleading allegation of an $80 million reserve shortfall; (*ii*) bases its scienter allegations entirely on conclusory assertions that the MetLife Defendants acted "knowingly" or "recklessly" and purported "admissions" that do not exist; and (*iii*) attempts to salvage what the Court found were implausible loss causation allegations by improperly relying on the opinion of an unnamed partisan expert. These conclusory allegations based on hindsight are insufficient to state a claim.

*First*, Plaintiff alleges no actionable misrepresentations. In the Opposition, Plaintiff does not defend its misleading and unsupported allegation of an $80 million reserve shortfall in connection with the 2007 DMF cross-check. Absent that allegation, there is no basis in the SAC to conclude that the MetLife Defendants did not honestly believe, or knew they had no

reasonable basis to believe, that the Company's IBNR reserves were adequate. For the same reason, Plaintiff's contention that MetLife had a duty to disclose the State Inquires is without merit, as there is no basis in the SAC to conclude that the MetLife Defendants reasonably should have expected that broader use of the DMF would materially affect the Company's IBNR reserves or financial results.

*Second*, Plaintiff alleges no facts giving rise to a strong inference of scienter, relying instead on the relentless repetition of conclusory assertions of knowledge and citing to allegations in the SAC that are themselves entirely conclusory. Plaintiff falsely equates access to the DMF with actual knowledge or reckless disregard of the results of a hypothetical cross-check of MetLife's insurance policies against the DMF, ignoring Second Circuit precedent holding that mere access to raw data is insufficient to plead knowledge or recklessness. Plaintiff's assertions of knowledge or recklessness are likewise unsupported by the testimony of MetLife employees regarding the Company's 2007 DMF cross-check: Despite repeated references to so-called "admissions," Plaintiff is unable to cite any testimony even mentioning MetLife's IBNR reserves, much less demonstrating that anyone at MetLife knowingly or recklessly misrepresented the adequacy of those reserves.

*Third*, Plaintiff fails to remedy what the Court found to be implausible allegations that the identified declines in MetLife's stock price were the result of the Company's disclosure, rather than external market forces that caused MetLife's stock to trade in lockstep with that of other large life insurers. In the Opposition, Plaintiff does not even attempt to defend its plainly inadequate loss causation allegation with respect to MetLife's August 5, 2011 Form 10-Q. As to MetLife's October 6, 2011 Form 8-K, Plaintiff is unable to offer any explanation for the fact that MetLife's stock traded in lockstep with other large life insurers, opening *higher* the day after the

release of the Form 8-K, declining in tandem with its peers, and rebounding almost entirely on the next trading day. Plaintiff therefore fails to satisfy the Second Circuit's requirement, clearly articulated by the Court, that Plaintiff allege facts sufficient to disaggregate losses allegedly caused by the purported corrective disclosure from those caused by market-wide or industry-wide events that resulted in comparable losses to other investors. Plaintiff's sole attempt to comply with that requirement – its purported "event study" – is nothing more than the opinion of an anonymous partisan expert that any plaintiff in any securities lawsuit could obtain at the motion to dismiss stage, is not entitled to the presumption of truth, and is insufficient to plead loss causation.

## ARGUMENT

### I. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5.

#### A. The Section 10(b) Claim Should Be Dismissed for Failure to Adequately Allege an Actionable Misrepresentation.

##### 1. MetLife's Estimates of IBNR Liabilities Are Not Actionable Under the Securities Laws.

Plaintiff offers no defense of its baseless allegation that MetLife's 2007 DMF cross-check resulted in an $80 million reserve shortfall – on which the Court appears to have relied – and does not dispute that the Regulatory Settlement Agreement on which that allegation purportedly is based includes no reference to MetLife's reserves. (SAC ¶ 174; Opinion 18-19; Mem. 15-17; Opp'n 25-26.)[1] Without a well-pleaded allegation of an $80 million reserve shortfall in 2007, the SAC contains *no* factual allegations from which to conclude that MetLife did not believe, or knew it had no reasonable basis to believe, its IBNR reserves.

[1] Incredibly, Plaintiff continues to cite this misleading allegation in its Opposition. (Opp'n 26, 29 (citing SAC ¶ 174).) Paragraph 174 of the SAC corresponds to paragraph 162 of the AC.

Having failed to cite any well-pleaded allegation of an $80 million reserve shortfall, Plaintiff falls back on the dubious argument that the Court must have *inferred* the existence of an $80 million reserve shortfall. (Opp'n 26.) That assertion lacks credibility, as the Court expressly stated: "*The amended complaint alleges* that after running the SSA-DMF against a portion of the life insurance policies in 2007 and discovering a reserve shortfall of $80 million dollars . . . ." (Opinion 18 (emphasis added).) Plaintiff alleges no factual basis to infer from MetLife's October 2011 charge to reserves in connection with a DMF cross-check of all of its life insurance policies that the Company had experienced a reserve shortfall in connection with a more limited DMF cross-check four years earlier. (Opinion 5, 9; Opp'n 26.) Instead, Plaintiff asks the Court to infer a 2007 reserve shortfall from the fact of the 2011 reserve shortfall, so that it can then ask the Court to infer that the 2011 reserve shortfall was obvious in light of the supposed 2007 reserve shortfall. This circular bootstrapping cannot satisfy Plaintiff's pleading burden.

Plaintiff's assertion that MetLife employees "admitted" in testimony that the 2007 DMF cross-check resulted in a reserve shortfall or otherwise gave them reason to doubt MetLife's IBNR reserves is unsupported by any factual allegations in the SAC or any quotation from the actual testimony. (Opp'n 18-19, 29-30; SAC ¶¶ 122-24.) In fact, the testimony does not touch on MetLife's IBNR reserves at all. (SAC, Exs. A, B.)

**2. Plaintiff Fails to Identify a Violation of GAAP.**

Plaintiff's GAAP allegations add nothing to their other allegations. (Opinion 17 n.66.) In the Opposition, Plaintiff does not respond to the MetLife Defendants' argument that the SAC fails to allege any GAAP provision that MetLife violated. (Mem. 17-18, Opp'n 14-16.)

### 3. The Alleged Misstatement of IBNR Reserves Is Immaterial as a Matter of Law.

Defendants recognize the Court's finding with respect to materiality but submit that the charge to reserves taken in October 2011 is quantitatively and qualitatively immaterial under Second Circuit case law and the standards set forth in SEC Staff Accounting Bulletin 99, 64 Fed. Reg. 45150 *et seq.* (1999), which the Second Circuit has cited with approval. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011). (Mem. 19-20; Opp'n 34.)

### 4. Plaintiff's Allegations Regarding "Strong" Financial Results and "Solid" Underwriting Are Inactionable Puffery.

Plaintiff's contention that MetLife's characterizations of its financial results as "strong," its underwriting as "solid" and its expense management as "disciplined" constitute an actionable misrepresentation merits little response, as such descriptions are classic examples of inactionable puffery. (Mem. 20; Opp'n 17 n.20, 32.) Plaintiff's argument to the contrary improperly "conflate[s] the importance" of the Company's underwriting, pricing, risk management and expense control "with the materiality of [the Company's] statements regarding" those areas. *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase & Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Plaintiff's alternative argument that MetLife's characterizations, though not actionable themselves, created a duty to "speak truthfully" regarding the Company's underwriting results and financial performance fails because Plaintiff has not identified any false statements of fact on those topics. (Opp'n 32.)

### 5. Plaintiff Does Not Adequately Allege a Duty to Disclose the State Inquiries.

In the Opposition, Plaintiff identifies no factual allegation from which to conclude that MetLife reasonably should have expected that broader use of the DMF "would cause MetLife to alter its IBNR reserves" or have a material effect on its financial condition giving rise to a duty

to disclose the State Inquiries prior to the Company's August 5, 2011 disclosure.[2] (Mem. 21; Opp'n 30, 36.) As a result, Plaintiff's argument that MetLife had a duty in the summer of 2010 to disclose the State Inquiries appears to rest entirely on Plaintiff's misleading and baseless allegation of an $80 million reserve shortfall in connection with the 2007 DMF cross check and fails to state a claim as set forth in the opening brief and Section I.A. above. (Mem. 15-17.)

As the Court has already recognized, there is no merit to Plaintiff's repeated attempt to conflate the NYAG's investigation into the adequacy of MetLife's disclosures and other issues regarding the legitimacy of the Company's use of retained asset accounts – as to which MetLife described the allegations as being "without merit" – and the State Inquiries into MetLife's death benefit payment practices and its use of the DMF. (Mem. 11; Opp'n 33-34; Opinion 6-7.)

**6. MetLife's Mortality Ratios Were Not False When Reported.**

Having failed even to define "mortality ratio" in the SAC, Plaintiff offers in the Opposition the self-evidently overbroad definition of "*actual number* of deaths in a given period compared to the expected number of deaths" – *i.e.*, that a mortality ratio is "false" to the extent that it fails to account for any "actual" deaths, whether or not reported to the Company. (Opp'n 5 n.7 (emphasis added), 16-17.) In fact, mortality ratio provides a measure of the strength of the Company's underwriting by comparing reported deaths during a given quarter to estimated deaths for that period. Although the Company's cross-check of life insurance policies against the DMF resulted in an artificial increase in mortality ratio in the third quarter of 2011 due to deaths identified via DMF searching that were deemed to be "reported" in that quarter, Plaintiff

2 Plaintiff misstates the SEC's commentary on Item 303 as requiring disclosure of an event or uncertainty if it is "reasonably likely to occur" *or* "reasonably likely to have a material effect on the registrant's financial condition." (Opp'n 36.) In fact, that commentary "clarifies that the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management *and* [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (emphasis added).

has not alleged any facts indicating that the commencement of regular DMF matching had any material impact on the strength of the Company's underwriting. (Mem. 14 n.3.) On the contrary, adjusting for those "reported" deaths identified by the DMF, the mortality ratio for the third quarter of 2011 was in line with prior quarters as well as subsequent quarters in which regular DMF matching occurred. (*Id.*)

**B. The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.**

**1. Plaintiff Does Not Adequately Plead Motive.**

In arguing that the ALICO transaction gave the MetLife Defendants a motive to defraud sufficient to establish scienter, Plaintiff persists in its fundamental misunderstanding of that transaction. (Mem. 24.) As the MetLife Defendants' opening brief made clear, there is no factual basis for Plaintiff's contention that MetLife had a motive to "maximize proceeds" from the March 2011 offering because all of the proceeds of that offering of common stock went to AIG to repurchase preferred stock, and those proceeds were, by definition, equal to value of the preferred stock – irrespective of the offering price. (Mem. 24; Opp'n 22.) Plaintiff's assertion that MetLife had a fixed $3 billion obligation to AIG in connection with the March 2011 offering appears nowhere in the SAC, and Plaintiff does not (and cannot) cite any provision of the Coordination Agreement supporting such an obligation. (Greenfield Decl. Ex. O; Opp'n 22.) *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012) (court need not accept as true allegations contradicted by cited documents). Likewise, Plaintiff's new allegation that the MetLife Defendants were motivated to conceal the State Inquiries in advance of the August 2010 public offering – which also appears nowhere in the SAC – is unavailing because the SAC includes no allegations regarding status of the State

Inquiries at the time of that offering, which occurred months before MetLife allegedly decided to adopt policies calling for broader use of the DMF. (Opp'n 21; SAC ¶¶ 106-107.)

### 2. Plaintiff Does Not Adequately Plead "Conscious Misbehavior Or Recklessness."

Without motive, the strength of circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater" in order to establish scienter. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Plaintiff does not meet this standard.

#### a. Plaintiff Fails to Plead Actual Knowledge or Recklessness in Connection with MetLife's Financial Results.

Plaintiff's assertions in the Opposition that the Officer and Director Defendants knowingly or recklessly misrepresented MetLife's financial results are, from start to finish, entirely conclusory. Plaintiff identifies no factual allegations in the SAC that give rise to an inference of scienter – much less the required strong inference. (Opp'n 13-20.) Instead, Plaintiff simply asserts that certain statements were "knowingly false," and purports to support those assertions with citations to paragraphs in the SAC that are themselves entirely conclusory. For example, Plaintiff makes the baseless accusation in the Opposition that "defendants admit they knew of the death of policyholders . . ., yet routinely failed to account or reserve for these known liabilities resulting in materially understated reserves and overstated net income." (Opp'n 15.) Plaintiff's only citations in support of that accusation are a paragraph in the SAC stating in conclusory fashion that MetLife failed to identify policyholders that "the Company actually knew had died or had reason to know had died" and several wholly unrelated allegations. (*Id.*; SAC ¶ 18(c).)[3]

[3] Plaintiff also cites SAC ¶¶ 116 (MetLife announced that defendant Kandarian would become the Company's new CEO); 126 (the NYAG issued subpoenas to nine life insurance companies); 146 (an *A.M. Best* article reported on MetLife's October 6, 2011 Form 8-K); 148 (describing the use of event studies).

Plaintiff persists in falsely equating access to the DMF with actual knowledge, or reckless disregard of the risk, that a DMF cross-check would have a material impact on the Company's financial results. (Opp'n 17-20.) Plaintiff offers no response to Second Circuit case law holding that allegations of access to raw data do not suffice to plead recklessness. (Mem. 26-27.) Nor does Plaintiff respond to Second Circuit case law holding that allegations that a defendant would have learned the truth if it had performed additional due diligence are insufficient. (Mem. 26.)

Plaintiff's arguments with respect to MetLife's 2007 DMF cross-check likewise do not support an inference of scienter. (Opp'n 18-20 & n. 22.) As set forth in the opening brief and Section I.A. above, there is no basis in the SAC for the misleading allegation that the cross-check resulted in an $80 million reserve shortfall, and the SAC includes no well-pleaded allegation indicating how the $80 million in unclaimed benefits compared to the Company's IBNR reserves. (Mem. 15-17.) Nor is there any basis for Plaintiff's claim that the testimony of MetLife employees at the Florida and California hearings regarding the 2007 DMF cross-check "confirm[s] the Company's actual knowledge of falsity," as evidenced by the testimony Plaintiff quotes, which is strikingly devoid of content, much less evidence of fraud: "we learned a lot," "we got a lot of learnings," "we began to examine the process." (Opp'n 16, 18-19.) That testimony indicates only that, in 2007, MetLife voluntarily cross-checked the bulk of its individual life policies against the DMF, and that, in 2010, after consulting with state authorities, MetLife voluntarily decided to regularly cross-check all of its policies against the DMF. (*Id.*)

Plaintiff's other arguments are similarly unavailing:

- MetLife's use of the DMF in its annuities business does not support an inference of scienter. (Opp'n 18.) Unlike as to annuities, where reporting a death *ends* payments, MetLife had no logical reason to expect underreporting in its life insurance business, where a reported claim *triggers* a payment. (Mem. 4; Opinion 5 n.12.) Indeed, the 2007 DMF cross-check confirmed no significant underreporting on the life insurance side. (Mem. 27.)

- The California Insurance Commissioner's April 25, 2011 press release does not corroborate Plaintiff's scienter allegations. (Opp'n 16.) The statement says merely that the Commissioner, based on "preliminary findings from an audit," was convening "investigative" hearings "to determine whether MetLife . . . engaged in unfair practices." (SAC ¶ 117.)[4] The press release says nothing about whether wrongdoing occurred, whether the issue identified was historic or ongoing, or whether it was material in scope.

- Plaintiff's argument that the Regulatory Settlement Agreement supports an inference of scienter is again based on pure hindsight. (Opp'n 23-24; Mem. 8-9.) That MetLife agreed to adopt certain new practices does not imply that the Company previously conducted itself improperly. As set out in the agreement itself, much of what MetLife agreed to do was aimed at speeding up the process of escheatment of unclaimed benefits to state governments, whose interest in accelerating those payments is obvious. (Mem. 8; Greenfield Decl. Ex. J at 7, § 2(b).)

#### b. Plaintiff Fails to Plead Recklessness in Connection with MetLife's Disclosure of the State Inquiries.

Plaintiff does not address the MetLife Defendants' argument that Plaintiff failed to allege facts constituting strong circumstantial evidence that Defendants knowingly or recklessly sought to conceal the State Inquiries. (Mem. 28-29.) Plaintiff's failure to identify any such facts is fatal to its allegation of scienter as to disclosure of the State Inquiries.

### 3. Plaintiff Fails to Make Particularized Scienter Allegations Against Each Defendant.

Plaintiff persists in its attempt to plead scienter by means of a collective inference, failing to identify particularized "facts with regard to each Defendant that give rise to a strong inference of fraudulent intent." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004). (Mem. 29; Opp'n 17-20.) This is insufficient as a matter of law, as Plaintiff is required to allege facts showing that each Defendant "*personally* knew of, or participated in, the fraud." *Id.* (*quoting Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)) (emphasis in original). (Mem. 29.) Plaintiff's assertion that Defendant Mullaney (and non-defendant Katz)

---

4 The full press release is available at http://www.insurance.ca.gov/0400-news/0100-press-releases/2011/release061-11.cfm.

allegedly participated in MetLife's voluntary decision in 2010 to use the DMF more broadly does not, in any way, support an inference of scienter as to the adequacy of MetLife's reserves or the disclosure of the State Inquiries. (Mem. 30; Opp'n 19-20.)

Plaintiff fails to plead corporate scienter as to MetLife because Plaintiff does not allege facts sufficient to "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). (Mem. 30.)[5] Although "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," such an inference is appropriate only where a company's announcement is "so dramatic" that it necessarily "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195-196 (internal quotation omitted) (giving the example: "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero."); *see also Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435, 2010 WL 3825722 at *13 (S.D.N.Y. Sept. 29, 2010) (finding that plaintiff had not alleged a sufficiently "dramatic" corporate statement where defendant misrepresented the risks of auction rate securities).

### C. The Section 10(b) Claim Should Be Dismissed for Failure to Plead Loss Causation.

#### 1. Plaintiff Fails to Plead Loss Causation as to August 5, 2011.

Plaintiff all but concedes that it has not pleaded loss causation as to the August 5, 2011 Form 10-Q, adding nothing in the SAC to remedy the deficiencies identified by the Court and offering no substantive argument as to that disclosure. (Opinion 12-15; Mem. 32-34; Opp'n 7.)

---

5 The case cited by Plaintiff is not to the contrary. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (citing *Teamsters Local 445* and finding that plaintiff had adequately alleged scienter as to non-defendant company executives and general counsel).

### 2. Plaintiff Fails to Plead Loss Causation as to October 6, 2011.

Plaintiff's Opposition does nothing to challenge the Court's conclusion that the "lockstep trading" of MetLife and other major life insurance companies throughout October 2011 renders Plaintiff's loss causation allegations implausible. (Opinion 14-16, Exhibit 1; Mem. 34-39; Opp'n 8-13.) Those allegations are further rendered implausible by the fact that MetLife's stock opened *higher* on the day following the release of the Form 8-K and, after a decline, rebounded almost entirely on the next trading day. (Mem. 35-36.)[6] Plaintiff's allegation that MetLife's stock did not trade in tandem with broad indices, such as the S&P 500, does not undermine the conclusion that the lockstep trading of large life insurers indicates that MetLife's stock was responding to external market forces. (Opp'n 8.) The Court has already rejected Plaintiff's fallback argument that the Court should not take judicial notice of stock prices. (Opinion 13 n.50; Opp'n 9 n.11.) Because Plaintiff alleges no facts to disaggregate losses allegedly resulting from the October 6, 2011 Form 8-K from broader industry or market forces that caused MetLife to trade in lockstep with its peers, Plaintiff fails to plead loss causation. (Opinion 14.)

Plaintiff's acknowledgement in the SAC of two other disclosures in MetLife's October 6, 2011 Form 8-K merely suggests other possible causes of the decline in MetLife's stock on October 7, 2011 and does not disaggregate losses alleged caused by MetLife's DMF-related disclosure from those caused by industry or market forces. (Opp'n 11; SAC ¶ 140.) Plaintiff's unfounded and self-serving assumption that the DMF announcement caused the decline in MetLife's stock because neither of the other two disclosures "were fraud-related, unforeseen, or caused the stock to decline" is entirely circular. (Opp'n 11.)

---

6 Plaintiff's contention that *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012), applies broadly to any consideration of a stock price rebound misreads that case. (Opp'n 12.) The only issue before the court was economic loss, not loss causation, and the court did not consider the type of abrupt rebound in the days following a disclosure that is present in this case. *Acticon*, 692 F.3d at 35-37.

Having failed to allege facts sufficient to plausibly plead loss causation, Plaintiff improperly relies instead on the opinion of its anonymous and partisan "Certified Financial Analyst" that the decline in MetLife's stock "likely was caused by the company specific information . . . contained in MetLife's Form 8-K." (SAC ¶ 149; Mem. 36-38; Opp'n 8-11.) Plaintiff's only response to the fact that its purported "event study" constitutes expert opinion is a conclusory assertion in a footnote. (Opp'n 10 n.14.) Notwithstanding that assertion, there is no question that Plaintiff's purported "event study" – both the ultimate conclusion as to causation and the underlying analysis – does represent expert opinion, not factual allegations. Typically, an event study is offered at the class certification or summary judgment stage of a securities litigation, and the choices made in the underlying analysis are contested by the parties' experts. As the Second Circuit recently stated in discussing event studies, "[w]here the experts' opinions diverge . . . is in their selection of the variables to use in their analysis and the weight to be accorded to such variables." *S.E.C. v. Razmilovic*, 728 F.3d 71, 90 (2d Cir. 2013) (internal quotation omitted); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 208 n.15 (2d Cir. 2008) ("An event study may be rejected, however, if it is methodologically unsound or unreliable.").[7]

Because Plaintiff's purported event study represents expert opinion, it need not be accepted as true and is not sufficient to defeat a motion to dismiss. (Mem. 37-38.) To accept such opinion at the pleading stage would essentially eliminate the requirement of pleading loss causation. (Mem. 38.) Plaintiff is unable to cite any case in which a purported event study has

7 Plaintiff appears to misread *Sciallo v. Tyco International Ltd.*, which clearly refers to event studies as "expert opinions." No. 03 Civ. 7770, 2012 WL 2861340, at *4 (S.D.N.Y. July 9, 2012) ("The so-called 'event studies' are typically performed by experts retained by the parties. Expert opinions proffered to demonstrate loss causation must meet the requirements established by Fed. R. Evid. 702 as well as the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)."). (Opp'n 10 n.13.)

been included in a complaint and considered at the motion to dismiss stage. (Opp'n 10-11.) The cases cited by Plaintiff supporting the use of event studies all address later stages of litigation. *See In re Moody's Corp. Sec. Litig.*, No. 07 Civ. 8375, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) (summary judgment, noting that "plaintiffs may utilize event studies conducted by experts"); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009) (summary judgment); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009) (class certification).

Although Plaintiff emphasizes an October 6, 2011 *Reuters* news article, which summarized the disclosures in MetLife's Form 8-K and noted that the Company's stock traded down 2.8% at one point during the relatively illiquid after-hours trading period that day, Plaintiff offers no coherent reason why the Court should rely on that single data point but ignore the fact that MetLife's stock opened higher the next morning, October 7, 2011, in line with other large life insurers. (Mem. 39; Opp'n 8.) Indeed, Plaintiff directly contradicts that argument by asserting that, to determine the impact (if any) of MetLife's Form 8-K on the Company's stock price, "it is simply improper to select the price of any single trade after the market had closed on October 6, 2011." (Opp'n 11 n.15.) Plaintiff further contradicts itself in arguing that the alleged after-hours dip on October 6, 2011 reflected market reaction to the Form 8-K, yet the opening price the next morning was "set before market participants even have started to trade on the information." (*Id.*)

## II. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 11 OR 12(a)(2).

Plaintiff's Section11 and 12(a)(2) claims should be dismissed because Plaintiff fails to allege an actionable misrepresentation. The alleged misrepresentations in the offering documents are substantially identical to those alleged in connection with Plaintiff's Section 10(b) claims, discussed above in Section I.A. (Mem. 39-40.) Plaintiff does not respond in the

Opposition to the fact that the Court already found that Plaintiff does not adequately allege solicitation as to the Officer and Director Defendants in support of its Section 12(a)(2) claim. (Opinion 23-25; Mem. 40.) To the extent relevant, the MetLife Defendants incorporate by reference the arguments set forth in the Reply Memorandum in Further Support of Underwriter Defendants' Motion to Dismiss.

## III. PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY.

Plaintiff fails to allege a primary violation, actual control, or culpable participation. In the Opposition, Plaintiff fails to identify any facts showing "actual control," as opposed to mere "officer or director status," and fails to cite any cases supporting the theory that a corporate entity may be a "control person" as to its employees. (Mem. 40-43; Opp'n 44-45.)

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice as against the MetLife Defendants.

Dated: New York, New York
November 6, 2013

DEBEVOISE & PLIMPTON LLP

By : /s/ Maeve L. O'Connor
Maeve L. O'Connor (*mloconnor@debevoise.com*)
Elliot Greenfield (*egreenfield@debevoise.com*)
Anna A. Moody (*amoody@debevoise.com*)

919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

*Attorneys for defendants MetLife, Inc., C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, William J. Mullaney, Sylvia Mathews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang.*