UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CITY OF WESTLAND POLICE AND FIRE
RETIREMENT SYSTEM, Individually and on Behalf of
All Others Similarly Situated,

                        Plaintiff,


            -against-                                        12-cv-0256 (LAK)


METLIFE, INC., et al.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## OPINION


            Appearances:


Armen Zohrabian                             Elliot Greenfield
David A. Rosenfeld                          Kaitlin Teresa Farrell
Darren J. Robbins                           Anna A. Moody
Samuel H. Rudman                            Maeve L. O'Connor
Shawn A. Williams                           DEBEVOISE & PLIMPTON LLP
David W. Hall
Thomas C. Michaud                           *Attorneys for Defendants MetLife, Inc., C.*
ROBBINS GELLER RUDMAN & DOWD LLP            *Robert Henrikson, William J. Wheeler, Peter M.*
                                            *Carlson, Steven A. Kandarian, William J.*
                                            *Mullaney, Sylvia Matthews Burwell, Eduardo*
*Attorneys for Plaintiff*                    *Castro-Wright, Cheryl W. Grisé, R. Glenn*
                                            *Hubbard, John M. Keane, Alfred F. Kelly, Jr.,*
                                            *James M. Kilts, Catherine R. Kinney, Hugh B.*
                                            *Price, David Satcher, Kenton J. Sicchitano, and*
                                            *Lulu C. Wang*

Timothy E. Hoeffner
John J. Clarke, Jr.
Constance Tse
DLA PIPER LLP (US)

*Attorneys for Defendants Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Wells Fargo Securities, LLC*

Lewis A. Kaplan, *District Judge.*

The principal issues in this putative class action[1] are whether MetLife, Inc. ("MetLife" or the "Company") misled investors (1) with respect to its financial performance and position because certain reserves underlying its financial statements failed adequately to take account of incurred but not reported ("IBNR") death benefit claims with respect to group life insurance policies, and (2) by making allegedly deceptive statements concerning those reserves.

The Court previously ruled on defendants' motions to dismiss the amended complaint.[2] It later gave Central States leave to file a second amended complaint ("SAC"), which defendants subsequently moved to dismiss. While those motions were pending, however, the Supreme Court granted certiorari in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,[3] which raised questions similar to some of those presented here. Accordingly, the Court awaited the *Omnicare* decision and obtained supplemental briefing in light of that ruling. The motions to dismiss the SAC now are ripe for decision.

---

[1] The case is brought by Central States, Southeast and Southwest Areas Pension Fund ("Central States") on behalf of an alleged class of "all purchasers of the common stock of MetLife, Inc. . . . between February 2, 2010 and October 6, 2011, inclusive (the 'Class Period')," SAC [DI 59, Ex. A] ¶ 1, and "all persons who purchased or acquired MetLife common stock pursuant or traceable to [MetLife's] August 3, 2010 public offering of 75 million shares of its common stock and MetLife's March 4, 2011 public offering of 68.5 million shares of its common stock, respectively," *id.* ¶ 2. Central States purchased shares of MetLife common stock on August 3, 2010, March 3, 2011, and March 4, 2011. *Id.* ¶ 249.

[2] *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705 (S.D.N.Y. 2013) (granting in part and denying in part those motions).

[3] 135 S. Ct. 1318 (2015).

*Omnicare* was a § 11 case. Nonetheless, its reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, § 10(b) and Rule 10b-5, which uses very similar language. *See City of Omaha Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (noting that § 10(b) and § 11 claims, which "share a material misstatement or omission element," involve "the same reasoning").

2

*Background*

I.      *Parties*

The principal defendant here is MetLife, a multinational insurance company.[4]  Also named are (1) a number of individuals who were MetLife executives during all or part of the Class Period (the "Executive Defendants"),[5] (2) MetLife directors (the "Director Defendants"),[6] and (3) several securities firms that underwrote certain MetLife securities during the relevant period (the "Underwriter Defendants").[7]

II.     *Insurance Reserves and Accounting*

It is useful to begin with some general background on accounting, the insurance industry, and IBNR reserves.

---

[4]     SAC ¶ 30.

[5]     The Executive Defendants are C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, and William J. Mullaney.  *See id.* ¶¶ 31-35.

[6]     The Director Defendants are Sylvia Matthews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano, and Lulu C. Wang.  *See id.* ¶¶ 37-48.

[7]     The Underwriter Defendants are Goldman Sachs & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Wells Fargo Securities, LLC, Bank of America Merrill Lynch, Pierce, Fenner & Smith Incorporated, and HSBC Securities (USA) Inc.  *See id.* ¶¶ 50-55.

        Central States' claims against the Underwriter Defendants are premised on those defendants' alleged participation in the August 3, 2010 and March 4, 2011 public offerings of MetLife common stock and their alleged failure reasonably to investigate with due diligence the representations contained within those offerings.  *See id.* ¶¶ 254-256, 259.

Generally accepted accounting principles ("GAAP") typically require a corporation to measure and report its financial performance and position by considering pertinent economic events when they happen, not by waiting for cash inflows or outflows to clear the books.[8]  To ensure compliance with these principles – that is, to assure "that recognition [is] given to income when it is earned, and . . . to expenses when they are incurred," "irrespective of when payment is made or received"[9] – corporations generally eschew cash-based accounting for accrual-based accounting,[10] which provides "a more realistic view" of a given company's financial performance and position by requiring the company to account for *future* expected cash inflows and outflows, in addition to accounting for already-completed cash flows.[11]   In addition, accrual-based accounting deters unscrupulous companies from misrepresenting their financial condition by, among other things, failing to reflect expenses or known liabilities that have been incurred, but that, for one reason or another, have yet to be paid.[12]  As the late Judge Clark wrote, "the fundamental aim of accrual accounting . . . is to match revenues with the expenses incurred in producing such revenues."[13]

---

[8]  See STANLEY SIEGEL & DAVID A. SIEGEL, ACCOUNTING AND FINANCIAL DISCLOSURE 26-27 (1983) ("[T]he events giving rise to the recognition of income or expense are not necessarily tied to the date when cash is paid or received.").

[9]  *Id.* at 27, 31.

[10]  For purposes of GAAP, in fact, "cash basis accounting is not acceptable."  *Id.* at 27, 35.

[11]  *See id.* at 31-32.

[12]  *Id.* at 28 (noting that cash-based accounting often "results in a distortion" of a corporation's financial statements and lends itself to "easy manipulation" by dishonest businesses).

[13]  *See Consol. Edison Co. of N.Y. v. United States*, 279 F.2d 152, 158 (2d Cir. 1960) (Clark, J., dissenting).

4

MetLife, as a publicly held company, of course reports its financial performance and condition on an accrual basis.  Insofar as its policy-based liabilities are concerned, that fact probably does not have a dramatic impact on its reporting of such liabilities in those instances in which the insured loss occurs, the policyholder claim is made, and the claim is paid in the same accounting period.[14]   In other cases, however, significant periods of time may pass between the event creating the insurer's liability and the eventual payment of a claim.  And in some circumstances, no claim may be made for a long time, as for example where the loss-creating event is unknown to the insured or the beneficiary[15] or where the existence of insurance coverage is not discovered for some time.

Whatever the reasons for the lack of temporal coincidence between the liability-creating event and the payment of any eventual claim, GAAP requires insurers to maintain loss reserves – estimates of what they will have to pay to cover insured losses incurred during a given period – regardless of whether claims have yet been made.[16]  These loss reserves, increases in which are charges against income for the periods in which the increases occur[17] – must account for both known and IBNR claims.[18]  Reserves for known claims are "set aside to cover estimated losses based

---

[14]

    A good example might be a hypothetical claim for theft of an automobile, where the loss, the report of the loss, the quantification of the liability, and the payment of the claim can occur in a very short span of time.

[15]

    This might be so, for example, where the loss-creating event is exposure to a toxic substance but the injury remains latent for a lengthy period.

[16]

    See Stephens v. Nat'l Distillers & Chem. Corp., 6 F.3d 63, 65 (2d Cir. 1993).

[17]

    See A.P.N. Holdings Corp. v. Hart, 615 F. Supp. 1465, 1474 (S.D.N.Y. 1985).

[18]

    See Stephens, 6 F.3d at 65.

5

on reported claims" and are thus relatively easy to predict.[19]  IBNR reserves, on the other hand, are

"extremely conjectural"[20] because they are "set aside to cover losses for which claims have not been

reported but must be estimated."[21]  Accordingly, IBNR reserves "may need adjustment as time passes

and their accuracy can be tested in retrospect."[22]

      As the Second Circuit has said, it is "difficult [to] calculat[e] and monitor[] the

accuracy of loss reserves established by insurance companies."[23]  Nevertheless, GAAP does require

insurers to make "a reasonable estimate of IBNR liabilities."[24]  And yet, GAAP do not specify "a

precise actuarial method" for estimating or setting those reserves.[25]

      As relevant to this case, then, the accuracy of a company's loss reserves – that is, the

degree to which the loss reserves correspond to, or vary from, the insurance obligations that

ultimately will be paid out in relation to the claims, known and unknown, covered by the reserve in

question – implicates the accuracy of its financial statements.  If loss reserves are too low and later

---

[19]

    *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991).

[20]

    *Stephens*, 6 F.3d at 65.

[21]

    *Delta Holdings*, 945 F.2d at 1229.

[22]

    *Stephens*, 6 F.3d at 65.

[23]

    *Id.*

[24]

    *Delta Holdings*, 945 F.2d at 1229.

    Indeed, Central States alleges that insurance companies must "set up estimated reserves for
unreported claims [or] incurred but not reported claims."  SAC ¶ 172 (alteration in original)
(emphasis and internal quotation marks omitted); *see also id.* ¶ 230.

[25]

    *Delta Holdings*, 945 F.2d at 1229.

must be increased (resulting in a charge against income), earnings will have been overstated in SEC filings and financial statements.  If reserves are too high and later are decreased (resulting in an increase in income), the excess will have resulted in an understatement of income during the period or periods in which it existed.

*Facts and Prior Proceedings*

I.      *The SSA-DMF and MetLife's IBNR Reserves*

We turn to the controversy at hand, which focuses importantly though not exclusively on Central States' contention that MetLife, during the relevant period, overstated its earnings and its financial strength by maintaining IBNR reserves insufficient to cover life insurance benefits payable in respect of the death of MetLife insureds covered by group life insurance policies for whom no death benefit claims had been received.  That claim depends in substantial part upon MetLife's use (or alleged non-use) of the Social Security Administration Death Master File (the "SSA-DMF"), which is a "database of deaths recorded in the United States."[26]

The SAC alleges that MetLife used the SSA-DMF as early as the mid-1990s to identify – and to halt payments to – deceased annuity recipients, but that it did not then use the database to identify deceased persons whose lives were insured by MetLife ("life insureds").[27]  It

_____

[26]        SAC ¶ 4.

[27]        *See id.* ¶¶ 123-124.

MetLife has justified this alleged practice on the rationale that the beneficiary of a life insurance policy has a financial incentive to submit a claim, whereas relatives of an annuitant have no incentive to notify MetLife of the annuitant's death, which would result in the cessation of annuity payments.  *See* Mem. of Law in Supp. of the MetLife Defs.' Mot. to Dismiss the Second Am. Compl. [DI 74] at 4.

was not until 2007, the complaint alleges, that MetLife for the first time compared the SSA-DMF against its roster of individual – as opposed to group – life insureds in order to identify those individual insureds who had died but for whom death benefit claims had not been submitted.[28]  This cross-check allegedly uncovered $80 million in unclaimed individual life insurance benefits that were due to the deceased life insureds' beneficiaries or, in the absence of identifiable beneficiaries, to various states under abandoned property laws.[29]  While the 2007 cross-check allegedly revealed $80 million in unclaimed benefits, however, there is no allegation that MetLife's IBNR reserves were insufficient to cover those costs.  In any case, MetLife allegedly did not then cross-check the SSA-DMF against its roster of *group* life insureds – a cross-check that, plaintiff argues, would have exposed MetLife's IBNR reserves as inadequate.[30]

Central States alleges that MetLife and its officers, directors or representatives in the years that followed repeatedly and materially overstated the Company's financial condition and performance – including income, operating earnings, and earnings per share – as a result of MetLife's failure adequately to reserve for death benefits due to beneficiaries of group life insurance policies whose insureds the SSA-DMF identified as deceased but for whom MetLife had not

---

[28]
     *See* SAC ¶ 124.

     It is unclear from the SAC whether the fact of MetLife's 2007 SSA-DMF cross-check was public knowledge at the time, or whether it remained undisclosed until some time after the fact, perhaps as late as May 2011, when MetLife executives testified about that cross-check (among other things) at a hearing in California.  *See id.*

[29]
     *See id.* ¶¶ 8, 87(k).

[30]
     *See id.* ¶ 174.

received claims for benefits.[31]   These misstatements allegedly included, among other things, misleading (but more qualitative) assertions about MetLife's "solid underwriting," its "disciplined approach to risk and expense managements," and its "excellent mortality results" as well as assurances not only that its methods for fixing IBNR reserves complied with generally accepted accounting principles ("GAAP"), but also that such reserves were sufficient to cover future claims.[32] Many of these allegedly misleading statements, Central States says, were contained in MetLife press releases,[33] presentations,[34] conference calls,[35] and public filings[36] during the Class Period.   Central States alleges also that MetLife was too cavalier in dismissing as "without merit" various state investigations into its accounting practices.[37]   One of the consequences of these alleged misstatements, Central States avers, is that MetLife stock traded at "artificially inflated prices"

---

[31]

See id. ¶¶ 12, 15-16, 18, 65.

[32]

Id. ¶ 9-10; see also, e.g., id. ¶¶ 65, 69, 74, 75, 81, 93-94, 97-98, 100, 113, 128, 130.  For example, MetLife is alleged to have claimed falsely that its 2009 mortality ratios were strong and to have asserted specific numerical values that were inaccurate due to their failure to include IBNR deaths verifiable through the SSA-DMF.  See id. ¶¶ 66, 77, 83.

[33]

See id. ¶¶ 65, 75, 81, 93, 97, 118, 128.

[34]

See id. ¶¶ 74, 78, 99, 125.

[35]

See id. ¶¶ 66, 77, 83, 94, 98, 119, 130.

[36]

See id. ¶¶ 58, 69-70 (Form 10-K for the year ending December 31, 2009); id. ¶ 86 (Form 10-Q for the period ending June 30, 2010); id. ¶¶ 89-90 (Form 424(b)(5) registration statement for MetLife's acquisition of ALICO); id. ¶ 96 (Form S-3); 100-104 (Form 10-K for the year ending December 31, 2010); id. ¶¶ 112-113 (Form 424(b)(5) registration statement for AIG's earlier-than-expected sale of MetLife stock); id. ¶ 120 (Form 10-Q for the period ending March 31, 2011).

[37]

Id. ¶¶ 86, 101, 113, 120.

during the Class Period.[38]  When those stock prices fell after MetLife's alleged misstatements came to light in August and October 2011,[39] Central States says it suffered economic harm.[40]

## II.     The State Investigations

According to Central States, state investigations into MetLife's accounting practices began as early as 2008, when the California Insurance Commission began to look into MetLife's alleged failure to pay some life insurance benefits even after learning that an insured had died.[41]  In September 2009, Central States alleges, Florida and Illinois launched a joint "Market Conduct Examination" of MetLife's use (or, as the case may be, non-use) of the SSA-DMF.[42]  And in July 2010, Central States says, the New York Attorney General began "a major fraud probe" into MetLife's alleged practice of retaining and profiting from money held in retained asset accounts that arguably should have been disbursed to beneficiaries or escheated to states.[43]

---

[38]

   *Id.* ¶ 85; *see also id.* ¶¶ 15, 17, 68, 73, 79, 131, 182, 185.

[39]

   *See id.* ¶¶ 22, 135-139, 189 (investigations); ¶¶ 24, 147, 151, 191 (SSA-DMF cross-check).

[40]

   *See id.* ¶¶ 192, 206, 249, 261.

[41]

   *See id.* ¶ 117.

[42]

   *Id.* ¶ 164.

[43]

   *Id.* ¶ 11.  MetLife acknowledged this investigation in its Form 10-Q for the second quarter of 2010, but summarily dismissed the allegations therein as being "without merit."  *Id.* ¶ 86.

On May 19, 2011, MetLife officials testified before the Florida Office of Insurance Regulations.[44]  They acknowledged that the Company had used the SSA-DMF systematically since the 1980s to identify, and to stop payments to, deceased annuitants, but that it had not used the database to identify life insureds whose deaths should have triggered either payments to beneficiaries or, in the absence of identifiable beneficiaries, the start of the escheatment process.[45]

Four days later, MetLife executives – having been subpoenaed to testify at a hearing into the Company's benefits payment practices[46] – expanded upon that testimony in California, where they acknowledged, among other things, that the Company (1) cross-checked the SSA-DMF against its retained asset account in 2006 and learned of 1,300 matches, resulting in payments to beneficiaries and escheatment to states; (2) cross-checked the SSA-DMF against its roster of *individual* life insureds in 2007, but had not yet done so for its *group* life insureds, (3) calculated the dormancy period for escheatment purposes from the date it learned of the death, not the actual date of death,[47] and (4) had decided as early as December 2010 to use the SSA-DMF more broadly

---

[44]    *Id.* ¶¶ 122-123.

[45]    *Id.*

[46]    *See id.* ¶ 117.

[47]    Escheatment is the "[r]eversion of property to the state in the absence of legal heirs or claimants."  AMERICAN HERITAGE DICTIONARY 607 (4th ed. 2000) (defining "escheat").  For present purposes, then, escheatment is the process by which a state takes ownership of unclaimed or abandoned life insurance policies.  *See* 1 LIFE & HEALTH INSURANCE LAW § 11:18 (2d ed. 2014) ("The insurer must report abandoned proceeds to the state, and eventually pay them to the state.").  For those policies to escheat to the state, however, they must have "remained inactive," *i.e.*, been unclaimed, for a "period of time specified by state law," after which they will be presumed abandoned.  *Accounts – Abandoned or Unclaimed*, U.S. SEC. & EXCH. COMM'N, http://www.sec.gov/answers/escheat.htm (last visited Jan. 8, 2015).  This period of time, which varies by state, is the "dormancy period."

(*i.e.*, to cross-check the database against its *group* life insureds).[48]

On July 5, 2011, New York officials subpoenaed MetLife for information about its "practices in identifying and paying out policies for deceased customers."[49]  The subpoenas stemmed from a concern that life insurers, including MetLife, were using the SSA-DMF to stop annuity payments upon an annuitant's death, but not to pay out death benefits due under life insurance policies, annuity contracts, or retained asset accounts.[50]  This investigation did not end until after the Class Period.[51]

Notwithstanding the initiation dates of these investigations, Central States alleges, MetLife did not disclose their existence or possible consequences until August 2011 – a delay that

---

[48]

According to Central States, the dormancy period for a life insurance policy should commence, for escheatment purposes, upon the insured's death.  *See* SAC ¶ 87(*l*).  And yet, Central States says, MetLife has acknowledged that it regularly started the dormancy period clock as of the date it learned of a death, not as of the actual date of death – a decision that, in at least some cases, could have meant the difference between a policy being escheatable or not.  *See, e.g.*, *id.*

[48]

*See id.* ¶ 124.

[49]

*Id.* ¶ 126.

[50]

*See id.* ¶ 127.

[51]

The New York investigation concluded in December 2011, when, Central States says, the New York State Department of Financial Services issued a report confirming life insurers' allegedly dubious accounting practices.  *See id.* ¶ 156.  Notably, however, while the report criticized "many insurers" for not cross-checking the SSA-DMF against their life insureds, it noted that MetLife, among others, had "recently adopted regular cross-check procedures." *Id.*

Central States contends "violated GAAP and SEC disclosure rules."[52]  Eventually, Central States alleges, MetLife agreed in April 2012, after the Class Period ended, to pay states "a total of $500 million to settle claims related to death benefits."[53]

### III.   The ALICO Acquisition and MetLife's Decision to Use the SSA-DMF More Broadly

In March 2010 – after the state investigations into MetLife's accounting practices began but before they concluded – MetLife announced its intention to purchase the American Life Insurance Company ("ALICO"), an American International Group ("AIG") subsidiary.[54]  The consideration was to consist of $6.8 billion in cash and $8.7 billion in equity, the latter in the form of 78.2 million shares of MetLife common stock, 6.9 million shares of MetLife contingent convertible preferred stock, and 40 million other "equity units."[55]  All share amounts were fixed, and the shares were subject to a lockup agreement that provided, among other things, that AIG would not sell any of its MetLife stock until nine months after the deal closed and that it would not sell more than 50 percent of its shares until at least a year after closing.[56]

---

[52]

Id. ¶¶ 164-165.

[53]

Id. ¶¶ 158, 164.  This April 23, 2012 multi-state agreement is attached to the declaration of Elliot Greenfield.  See DI 75, Ex. J.  It is available also online at http://www.floir.com/siteDocuments/MetLife_RSA.pdf.  New York was not a signatory to the agreement.  See SAC ¶ 161.  Instead, it announced in April 2012 that its independent investigation into insurers' inconsistent and self-serving use of the SSA-DMF had recovered more than $260 million from various insurance companies.  See id.

[54]

Id. ¶¶ 71-72.

[55]

See id.

[56]

See id. ¶¶ 72, 107.

On August 2, 2010, MetLife announced that it would sell 75 million shares of common stock at $42 per share to help fund the cash portion of the purchase price.[57]  It did so pursuant to an August 3, 2010 registration statement, which incorporated by reference MetLife's Form 10-K for the fiscal year that ended December 31, 2009 and Forms 10-Q for the periods that ended March 31, 2010 and June 30, 2010, and contained representations (or misrepresentations, as Central States alleges) concerning the adequacy of MetLife's IBNR reserves.[58]  MetLife completed its acquisition of ALICO on November 1, 2010 at a total cost of $16.2 billion.[59]

According to Central States, MetLife subsequently decided – amid discussions with state regulators and while the AIG/ALICO lockup was in effect – to start using the SSA-DMF regularly in all business units, including group life.[60]  And on March 1, 2011, four months after the ALICO acquisition closed and five months before the lockup was scheduled to expire, AIG and MetLife allegedly entered into an agreement that relieved AIG of the lockup restrictions.[61]

The next day, MetLife announced a public offering of 146.8 million shares of its common stock, priced at $43.25 per share.[62]  Under its terms, but contrary to the terms of the

---

[57] *Id.* ¶ 88.

[58] *Id.* ¶¶ 90, 214.

Underwriter Defendants Credit Suisse, Wells Fargo, Merrill Lynch, and HSBC allegedly were underwriters of that offering.  *Id.* ¶ 254.

[59] *See id.* ¶ 95.

[60] *Id.* ¶¶ 107, 124.

[61] *See id.* ¶ 108.

[62] *Id.* ¶ 105.

14

original lockup agreement, AIG completed a secondary offering of all 78.2 million shares of MetLife common stock that it had received for ALICO.[63]  In addition, MetLife completed a follow-on offering of 68.5 million shares of its common stock, the proceeds from which it used to repurchase and cancel the 6.85 million shares of MetLife contingent convertible preferred stock that AIG had received as compensation for ALICO.[64]  In a concurrent offering, AIG sold also its 40 million MetLife common equity units, leaving it, upon completion of the sale, with none of the MetLife securities it had received for ALICO.[65]

These offerings were conducted pursuant to a March 4, 2011 registration statement, which incorporated by reference MetLife's Form 10-K for the year that ended December 31, 2010 and its Forms 8-K filed on August 2, 2010, November 30, 2010, March 1, 2011, and March 2, 2011, each of which, Central States says, "contained false financial statements."[66]  The March 4, 2011

---

[63]

See MetLife, Inc., Prospectus Supplement (Form 424(b)(5)) (Mar. 4, 2011).

[64]

See id.; SAC ¶¶ 105, 112, 114.  The March 4, 2011 Registration Statement is alleged to contain material misstatements and to have incorporated the 2010 10-K and other financial statements that included material misstatements.  See SAC ¶ 113.

[65]

See MetLife, Inc., Prospectus Supplement (Form 424(b)(5)) (Mar. 4, 2011); SAC ¶ 114.

[66]

SAC ¶ 216 & n.28; see also id. ¶ 113.

Underwriter Defendants Goldman Sachs, Citigroup, Credit Suisse, Wells Fargo, Merrill Lynch, and HSBC allegedly were underwriters of the March 4, 2011 offering.  See id. ¶ 255.

registration statement contained also (allegedly false) representations about the adequacy of MetLife's IBNR reserves and its "excellent mortality ratios."[67]  MetLife announced that the sales were complete on March 8, 2011.[68]

        Central States alleges that AIG's expedited sale of MetLife stock "was a surprise to analysts and investors" and that it was designed to allow AIG to sell its MetLife shares before MetLife announced publicly that it would use the SSA-DMF to identify additional life insurance liabilities – an announcement that Central States says would have "risked a steep decline in [MetLife's] stock price and thus, the value of the consideration provided to AIG."[69]  In effect, Central States contends, MetLife knew that its stock price would decrease, perhaps dramatically, upon its announcement that it would conduct its first-ever cross-check of the SSA-DMF against its roster of group life insureds. But it gave AIG an opportunity to sell its MetLife stock at what Central States says was an artificially inflated price before that happened.[70]

## IV.    *MetLife's Stock Price Declines Twice, Allegedly Harming Central States*[71]

        On August 5, 2011, Central States alleges, MetLife in its Form 10-Q for the period

---

[67]

    *Id.* ¶¶ 216-218.

[68]

    *See id.* ¶ 114.

[69]

    *Id.* ¶ 109; *see id.* ¶¶ 106-107.

[70]

    *See id.* ¶ 109.

[71]

    Central States says it purchased MetLife stock at "artificially inflated prices" during the Class Period, *id.* ¶ 192, and that it suffered harm when MetLife's share price, allegedly inflated due to MetLife's misrepresentations, fell after the Company's August 2011 and October 2011 disclosures.  *See id.* ¶¶ 192, 206, 249, 261.

ending June 30, 2011 disclosed for the first time the scope and severity of various state "regulatory investigations into its death benefits practices."[72]  MetLife acknowledged that "[m]ore than 30 U.S. jurisdictions are auditing MetLife . . . for compliance with unclaimed property laws" and that those investigations "may result" in administrative penalties, additional payments to beneficiaries and escheatments to states, and changes to MetLife's procedures for identifying and escheating abandoned property.[73]  Further, it admitted that it was "not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial"[74] and, Central States alleges, it no longer dismissed investigations into its retained asset accounts as being "without merit."[75]

These disclosures allegedly caused MetLife's stock price to decline from $36.90 on August 4 to a low of $34.93 on August 5, closing at $36.35.[76]  The stock price fell further to a close

---

[72]

*Id.* ¶ 133.

[73]

MetLife, Inc., Quarterly Report (Form 10-Q) (Aug. 5, 2011); *see also* SAC ¶¶ 20, 133.

[74]

MetLife, Inc., Quarterly Report (Form 10-Q) (Aug. 5, 2011).

[75]

SAC ¶ 133.

Such liability disclaimers – included in previous disclosures, *see, e.g.*, *id.* ¶¶ 86, 101, 120 – were omitted from the August 5, 2011 Form 10-Q.

[76]

*See id.* ¶¶ 135-136.

of $32.74 on August 8,[77] but that drop coincided with news of much broader impact: Standard &

Poor's ("S&P") downgraded the credit rating of the United States for the first time in history after

the market closed on August 5.[78]

On October 6, 2011, MetLife filed a Form 8-K disclosing, among other things, that

it would take a $115-$135 million after-tax charge to "adjust" (*i.e.*, increase) its reserves to account

for additional payments owed to beneficiaries identified as a consequence of its first-ever cross-

check of the SSA-DMF against its roster of group life insureds.[79]   At the same time, MetLife

revealed that it would take two smaller charges, one related to damage from severe storms including

Hurricane Irene ($80-$100 million) and the other related to a September 1, 2011 liquidation plan

for Executive Life Insurance Company of New York ($40 million).[80]   These disclosures collectively

are alleged to have caused MetLife's stock price to decline from a closing price of $30.69 on

October 6 to a closing price of $28.80 on October 7, or 6.16 percent.[81]   By contrast, Central States

---

[77]

      *See id.* ¶ 139.

[78]

      *See id.* ¶ 137.

[79]

      MetLife, Inc., Current Report (Form 8-K) (Oct. 6, 2011); *see also* SAC ¶¶ 23, 140-141, 151. According to Central States, MetLife clarified in an October 27, 2011 press release that the after-tax charge identified in its October 6, 2011 Form 8-K was for $117 million.  *See, e.g.*, SAC ¶ 153.  MetLife's Form 10-Q for the period ending September 30, 2011 stated the same figure.  *See* MetLife, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011).

[80]

      *See* MetLife, Inc., Current Report (Form 8-K) (Oct. 6, 2011); *see also* SAC ¶ 140.

[81]

      *See* SAC ¶ 147.

      Another consequence of MetLife's decision to cross-check the SSA-DMF against its roster of group life insureds, according to Central States, was a sudden spike in the life insurer's mortality ratios – numbers MetLife allegedly trumpeted throughout the Class Period.  *See, e.g.*, *id.* ¶¶ 74, 94, 154, 244-245.

alleges, the S&P 500 and S&P 500 Insurance Indices declined only 0.81 and 3.13 percent, respectively, over the same period.[82]   Relying on an event study referred to in the SAC, Central States alleges that the 6.16 percent decline in MetLife's share price was statistically significant.[83]

MetLife's financial results for the third quarter of 2011, which were released after the end of Class Period, revealed a 23 percent decrease in operating earnings for insurance products, allegedly due at least in part to the $117 million after-tax charge taken as a result of the SSA-DMF cross-check.[84]  Another alleged consequence of the $117 million reserve increase was that MetLife's group life and individual life mortality ratios each climbed to 98.5 percent, a markedly higher figure than those in previous quarters.[85]

V.    *Prior Proceedings*

This action was commenced in January 2012 by Central States, allegedly on behalf of a class of all purchasers of MetLife common stock during the period February 2, 2010 to October 6, 2011, inclusive.   The original complaint alleged claims under Sections 10(b) and 20 of the

---

[82]

*See id.* ¶ 147.

[83]

*See id.* ¶¶ 148-149.

[84]

*Id.* ¶ 153.

[85]

*Id.* ¶¶ 154-155.

Securities Exchange Act of 1934 (the "Exchange Act")[86] and Rule 10b-5[87] thereunder.[88]   It was amended some months later to add claims under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"),[89] among other changes.[90]   Defendants moved to dismiss.

In an opinion dated February 28, 2013 ("Opinion"),[91] the Court granted in part the defendants' motions to dismiss the amended complaint.   It dismissed Central States' Exchange Act claims for failure to plead loss causation and its Section 12(a)(2) Securities Act claims for failure to allege that the defendants had solicited the securities purchases.   It upheld the sufficiency of most of Central States' claims under Sections 11 and 15 of the Securities Act.   Both parties moved for reconsideration.[92]   The Court denied the motions, but granted Central States leave to amend and invited the defendants to incorporate their arguments for reconsideration into motions to dismiss the SAC.[93]   Central States filed its SAC on March 15, 2013, and the MetLife and Underwriter Defendants subsequently moved to dismiss on August 23, 2013.

Not long after those motions were filed, the Supreme Court granted certiorari in

---

[86] 15 U.S.C. §§ 78j(b), 78t.

[87] 17 C.F.R. § 240.10b-5.

[88] *See* Compl. [DI 1] ¶ 2.

[89] 15 U.S.C. §§ 77k, 77*l*, 77o.

[90] *See* Am. Compl. [DI 20] ¶ 25.

[91] *City of Westland Police*, 928 F. Supp. 2d 705.

[92] Pl.'s Mot. for Partial Reconsideration [DI 53]; Defs.' Joint Mot. for Reconsideration [DI 55].

[93] Orders [DI 60, 67].

20

*Omnicare*, which raised questions similar to some of those presented in this case.  Rather than decide defendants' motions to dismiss while *Omnicare* was pending, this Court waited for the Supreme Court to act.  On March 24, 2015, the day *Omnicare* was decided, this Court entered an order (1) affording Central States an opportunity to amend its complaint, (2) denying defendants' motions to dismiss without prejudice to renewal, and (3) seeking supplemental briefing in light of *Omnicare*.[94]   Central States ultimately chose not to amend, and the MetLife and Underwriter Defendants moved to dismiss the SAC on May 21, 2015.[95]  The Court now addresses those motions, which it considers *de novo* so as to take account of the points raised in the parties' respective motions for reconsideration of the February 2013 opinion to the extent those points have been raised by the present motions.

*Discussion*

## I.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."[96] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[97] The Court accepts as true all well pleaded factual

---

[94]

Order [DI 84].

[95]

Underwriter Defs.' Renewed Mot. to Dismiss the Second Am. Compl. [DI 85]; MetLife Defs.' Renewed Mot. to Dismiss the Second Am. Compl. [DI 86].

[96]

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[97]

*Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

allegations and "draw[s] all inferences in the plaintiff's favor."[98]  In deciding a motion to dismiss, a court considers the complaint, "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[99]

To plead fraud under the securities laws, a complaint must "state with particularity the circumstances constituting fraud"[100] and must satisfy also the Private Securities Litigation Reform Act of 1995 ("PSLRA"),[101] which requires, among other things, that a complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[102]

## II.    *Exchange Act Claims*

### A.    *Section 10(b) and Rule 10b-5 Claims*

---

[98]

*Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks and citation omitted).

[99]

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[100]

FED. R. CIV. P. 9(b).

[101]

*ATSI Commc'ns Inc.*, 493 F.3d at 99 ("[P]rivate securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal.").

[102]

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also* 15 U.S.C. § 78u-4(b)(1) (stating that a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[103] SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[104]  To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[105]  The Court dismissed Central States' Exchange Act claims on loss causation grounds in its February 2013 Opinion.[106]

---

[103]

15 U.S.C. § 78j(b).

[104]

17 C.F.R. § 240.10b-5(b).

[105]

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("[T]o succeed on a claim, a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." (internal quotation marks omitted)).

[106]

*See City of Westland*, 928 F. Supp. 2d at 714-16.

1.      *Material Misrepresentations and/or Omissions (and* Scienter*)*[107]

A plaintiff who brings a securities fraud claim under Section 10(b) and Rule 10b-5 must clear a number of hurdles.  In this case, the first hurdle – which requires Central States to allege adequately that MetLife made "a material misrepresentation or omission"[108] – proves insurmountable.

Rule 10b-5 distinguishes between untrue *statements* of material fact and certain kinds of material *omissions*.  That distinction is not trivial.  The question whether a statement of a material fact is untrue "present[s] different issues" than the question whether the speaker has "omit[ted] to state a material fact necessary" to make its statement(s) "not misleading."[109]  Thus, there are two ways for a Section 10(b) plaintiff to state a legally sufficient claim that a defendant has made a material misrepresentation (*i.e.*, a misstatement) or omission.  *First*, such a plaintiff can plead facts that, if true, would be sufficient to show that the defendant made an "untrue statement of a material

---

[107]

The Court in its February 2013 Opinion dismissed Central States' claims based on MetLife's alleged GAAP, Regulation S-K Item 103, and ASC 450 violations.  The SAC contains no new allegations as to those claims.  The Court's analysis of those points remains unchanged.

With respect to GAAP, Central States identifies no specific principle(s) of accounting that MetLife allegedly violated.  Its mere allegations that MetLife violated GAAP in preparing its financial statements are insufficient, standing alone, to state a claim that MetLife's representations of compliance with GAAP are material misstatements.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 303 (S.D.N.Y. 2011).  Central States has alleged no "specific departures from GAAP," nor has it "set forth facts sufficient to warrant a finding that [MetLife] did not actually hold the opinion it expressed."  *Id.*  Central States' threadbare allegations do no more than "recit[e] . . . the statutory language" and assert "conclusory allegations."  *Omnicare*, 135 S. Ct. at 1333. They add nothing to the SAC, and they need not be discussed separately.

[108]

*Erica P. John Fund, Inc.*, 134 S. Ct. at 2407 (internal quotation marks omitted).

[109]

*Omnicare*, 135 S. Ct. at 1325; 17 C.F.R. § 240.10b-5(b).

fact."[110]   *Second*, the plaintiff can plead facts that, if true, would be sufficient to show that the defendant "omit[ted] to state a material fact necessary" to make whatever statement(s) it made "not misleading."[111]

       In either case, the plaintiff must allege adequately that the challenged statement or omission is "material."[112]   Whether a particular statement or omission is material is an "inherently fact-specific" inquiry[113] that asks whether "there is a substantial likelihood that a reasonable shareholder would consider [the fact(s) stated or omitted] important in deciding how to [act]."[114] At the pleading stage, "a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."[115]   In the context of an *omission* specifically, "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" is sufficient.[116]   Materiality, in

---

[110]

    17 C.F.R. § 240.10b-5(b).

[111]

    *Id.*

[112]

    *Id.*; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013); *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197; *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).

[113]

    *Basic Inc.*, 485 U.S. at 236.

[114]

    *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (second alteration in original) (internal quotation marks omitted); *see also Basic, Inc.*, 485 U.S. at 231-32.

[115]

    *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

[116]

    *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197.

other words, is a mixed question of law and fact.  On a Rule 12(b)(6) motion, then, "a complaint may not properly be dismissed . . . on the ground that the alleged []statements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[117]

In addition to alleging that it is material, a Section 10(b) plaintiff who challenges a *statement* must allege adequately that the statement is "untrue."[118]  An untrue statement of *fact* (we'll get to statements of opinion or belief in a moment) is one that was false "*at the time it was made*."[119]  To plead falsity, however, Section 10(b) plaintiffs "must do more than simply assert that a statement is false – 'they must demonstrate with specificity why that is so.'"[120]  And "falsity," in this context, is a bit of a misnomer.  "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."[121]  For that reason, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."[122]

---

[117]     *Id.* (ellipsis in original) (internal quotation marks omitted).

[118]     17 C.F.R. § 240.10b-5(b).

[119]     *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 ("[W]ithout *contemporaneous* falsity, there can be no fraud.").

[120]     *Id.* (quoting *Rombach*, 355 F.3d at 174).

[121]     *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

[122]     *Id.*; *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) ("[The] veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." (internal quotation marks omitted)).

A Section 10(b) plaintiff who alleges harm due to the *omission* of a material fact need not allege falsity to state a legally sufficient claim.  Instead, such a plaintiff must plead facts that, if true, would be sufficient to show that the defendant had a duty to disclose the omitted information and failed to do so.[123]   Such a duty may arise expressly, pursuant to a statute or regulation, or implicitly "as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts."[124]

The SAC is 138 pages long and consists of nearly 300 paragraphs.  It asserts many things but in substance alleges that the financial statements issued by MetLife during the Class Period were misleading – and thus did not reflect accurately the financial condition and performance of the Company – for three reasons, each of which stems from MetLife's alleged failure to cross-check the SSA-DMF against its roster of group life insureds.  But before enumerating those reasons, it is helpful to make one point abundantly clear.

Central States nowhere claims that MetLife made any statement – true or false – as to what its IBNR reserves actually were.  In other words, there is no suggestion that the Company said its IBNR reserves were $X and that such statement was false because those reserves actually were $Y.  Nor is there any suggestion that such a statement was materially misleading because MetLife did not believe its IBNR reserves actually were $X, that MetLife had no reasonable basis

---

[123]

See *Levitt*, 710 F.3d at 465.

[124]

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572; *see also Omnicare*, 135 S. Ct. at 1325 (noting that a statement "may be rendered misleading by the omission of discrete factual representations"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues.").

for saying its IBNR reserves actually were $X, or anything of the sort.  The claims are more subtle than that.

First, Central States asserts that MetLife's financial statements – including, among others, its income statements and balance sheets – were false or misleading because the amount of its allegedly inadequate reserves (whatever those reserves were in quantitative terms) necessarily was reflected in those statements.[125]

Second, Central States contends that MetLife made qualitative statements about its mortality results, its underwriting practices, and its approach to risk and expense management that were false and/or misleading in light of the alleged inadequacy of the Company's IBNR reserves.[126] Of course, all of these claims are derivative of the same question: were MetLife's implicit representations regarding the adequacy of its IBNR reserves either (1) untrue statements of a material fact, or (2) omissions of a material fact that rendered the Company's financial statements throughout the Class Period misleading?

Finally, Central States contends that MetLife falsely stated that investigations into its retained asset accounts were "without merit" and failed timely to disclose the seriousness of state investigations into its death benefits payment practices – a failure that Central States says violated, among other things, SEC Regulation S-K, Item 303.[127]

---

[125]

SAC ¶¶ 69, 162(b), 174.

In addition, Central States asserts that MetLife misstated its mortality ratios, an allegation the Court deals with below.

[126]

See, e.g., id. ¶¶ 65-67, 74, 77-78.

[127]

See, e.g., id. ¶¶ 14, 86, 162(a).

a.      *The Adequacy of MetLife's IBNR Reserves*

In its February 2013 Opinion, the Court noted that MetLife's IBNR reserves "capture 'losses for which claims have not been reported but must be estimated so the company can pay future claims.'   While these estimates involve some factual inputs, they necessarily require judgment"[128] and thus are statements of opinion or belief, not of fact.[129]   The Court's earlier conclusion that MetLife's (explicit or implicit) representations regarding the adequacy of its IBNR reserves were statements of opinion or belief has not changed.   Accordingly, the question now before it is whether those representations were material misrepresentations or omissions for purposes of the securities laws.

i.      *Statements of Opinion or Belief After* Omnicare

Much could be said about the development of the securities laws with respect to whether and when statements of opinion or belief can give rise to liability.  For present purposes, however, it suffices to begin by noting that the Supreme Court in *Virginia Bankshares v. Sandberg*[130] made clear that the securities laws do not impose an absolute bar to liability for statements of opinion or belief.  But the Court in *Omnicare*[131] makes just as clear that it is substantially more

---

[128]

        *City of Westland*, 928 F. Supp. 2d at 716 (quoting *Delta Holdings*, 945 F.2d at 1229).

[129]

        *See Stephens*, 6 F.3d at 65 ("IBNR reserves are extremely conjectural."); *A.P.N. Holdings Corp.*, 615 F. Supp. at 1474 ("[S]etting an IBNR reserve is a matter of judgment based upon historical experience – a projection must be made as to the frequency and severity of future claims.").

[130]

        501 U.S. 1083 (1991).

[131]

        135 S. Ct. 1318 (2015).

difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that such a statement is false than it is to allege adequately (or prove) that a statement of pure fact is false.

To allege adequately that a statement of fact (*e.g.*, "the New York Yankees today have the best record in baseball") is false within the meaning of the securities laws, a plaintiff need plead only facts that, if true, would be sufficient to show, assuming materiality, that the statement is, in fact, false – *i.e.*, that the Yankees today do not have the best record in baseball.  In this context, the speaker's belief as to the accuracy of her statement is irrelevant: if the Yankees do not have the best record in baseball – and they do not – the statement is "untrue" for purposes of Rule 10b-5 regardless of whether the speaker knew it was false or thought, mistakenly, that it was correct.[132]

To allege adequately that a statement of opinion or belief (*e.g.*, "*I believe* the New York Yankees have the best record in baseball") is false within the meaning of the securities laws, on the other hand, a plaintiff must plead facts that, if true, would be sufficient to show, again assuming materiality, one of two things: that (1) the opinion or belief "constitutes a factual *misstatement*" in itself, or (2) the opinion or belief is "rendered misleading by the *omission* of discrete factual representations."[133]  However, while there are two ways for a plaintiff who challenges a statement of opinion or belief to state a legally sufficient claim under Rule 10b-5, courts considering whether such a plaintiff has met the pleading burden must remember that each of these methods is tied to a separate and distinct provision of the Rule.[134]

---

[132]

See *id.* at 1326 (noting that where a "determinate, verifiable statement" is in fact incorrect, it matters not that the speaker's mistaken assertion was "innocent[]").

[133]

*Id.* at 1325 (emphasis added).

[134]

See *id.* (noting that the question whether a statement of a material fact is untrue "present[s] different issues" than the question whether the speaker has omitted to state a material fact

A plaintiff who asserts that a statement of opinion or belief violates the first provision of the Rule – a plaintiff who asserts, in other words, that the opinion or belief itself is an "*untrue statement* of a material fact" – must do more than allege that the underlying fact is false (*i.e.*, that the Yankees do not have the best record in baseball).  Rather, such a plaintiff must plead facts that, if true, would be sufficient to show that the speaker did not "actually hold[] the stated belief" (*i.e.*, that the speaker knew the Yankees did not have the best record in baseball but said they did anyway).[135]

Similarly, a plaintiff who asserts that a statement of opinion or belief violates the second provision of the Rule – a plaintiff who asserts, in other words, that the speaker "*omit*[*ted*] to state a material fact necessary in order to make" its opinion or belief "not misleading" – "cannot state a claim by alleging only that [the] opinion was wrong," for "a statement of opinion is not misleading just because external facts show the opinion to be incorrect."[136]

---

necessary to make its statement(s) not misleading).

[135]

*Id.* at 1326; *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (noting that statements of opinion "not honestly believed when they were made" are actionable).

Unlike with statements of pure fact, it is of no importance that a "sincere statement" of opinion or belief "turn[s] out to be wrong."  *Omnicare*, 135 S. Ct. at 1327.  Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough to survive a motion to dismiss after *Omnicare*.  *Id.* ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong.").  Indeed, the securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments;" they are not, in other words, "an invitation to Monday morning quarterback an issuer's opinions."  *Id.*

[136]

*Id.* at 1328, 1332.

Instead, recognizing that statements of opinion or belief in some circumstances "are reasonably understood to rest on a factual basis that justifies them as accurate,"[137] a plaintiff who asserts that the defendant omitted to state a fact (or facts) necessary to make a statement of opinion or belief "not misleading" must "call into question the issuer's basis for offering the opinion."[138] Before explaining what a plaintiff must plead to satisfy this standard, it is important to explain why the standard exists in the first place.

Rule 10b-5's "omissions clause . . . necessarily brings the reasonable person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning."[139] With respect to statements of opinion or belief, "that means considering the foundation she would expect an issuer to have before making the statement."[140] For example, in the context of "formal documents," like financial statements filed with the SEC, reasonable investors "do not, and are not right to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments."[141] Rather, they properly may assume that expressions of opinion contained therein "convey facts about how the speaker has formed the opinion" – *i.e.*, facts "about the speaker's basis

---

[137]

*Va. Bankshares*, 501 U.S. at 1093; *see also Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006) ("Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis.").

[138]

*Omnicare*, 135 S. Ct. at 1332.

[139]

*Id.* at 1331-32.

[140]

*Id.* at 1332.

[141]

*Id.* at 1330.

for holding that view."[142]   Where they do not, such statements may mislead their audiences in violation of Rule 10b-5.[143]   One or two examples may be illustrative.

If the directors of Company X tell their shareholders that a proposed merger offers a "fair" price for Company X's shares, they have stated their opinion about the deal.   Whether a particular deal is "fair" is, after all, not a determinate, verifiable statement like "this ring is 24-carat gold."   But financial professionals have developed specific metrics – such as the residual income model, the dividend discount model, and discounted cash flow analyses, among others – to perform valuations of companies, their stock prices, and the like.[144]   Thus, a statement that a deal is "fair" reasonably may be understood as a statement, or at least as an implication, that the opinion reflects or is based upon one or more accepted valuation metrics.   In other words, even assuming that the directors actually believe that the offered price is "fair," they arguably may have liability under Rule 10b-5's omissions clause if (1) their opinion rests solely upon subjective views and does not reflect or rest upon an accepted valuation metric, and (2) they fail to disclose that fact.

Similarly, if an appraiser states that a piece of real estate is worth $100,000, the appraiser, in effect, has said that it is the appraiser's opinion or belief that the property is worth $100,000.   But there are widely-accepted methods by which appraisers form judgments as to the value of real estate.[145]   So, just as in the preceding example, an real estate appraiser who offers an

---

142

       *Id.* at 1328.

143

       *See id.*

144

       *See generally* MARIO MASSARI ET AL., THE VALUATION OF FINANCIAL COMPANIES (2014).

145

       *See CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 17 (2007) ("Valuation is not a matter of mathematics . . . .   Rather, the calculation of true market value is an

opinion as to value, depending upon the context, reasonably might be regarded as having said in substance (or implied) that the appraiser's view reflects or is supported by accepted principles of real estate valuation applied to appropriate data.  Liability therefore perhaps could follow on the theory that it was materially misleading for the appraiser to omit the fact that the opinion was unsupported by accepted principles and relevant data if, in fact, that were so.

The point, in each example, is the same.  If the directors' statements about the fairness of the deal or the appraiser's valuation of the real estate are not grounded in "the customs and practices of the relevant industry," they "could be misleadingly incomplete,"[146] at least in some contexts.  That is so because the reasonable person, who "understands a statement of opinion in its full context," would expect "not just that the issuer believes the opinion (however irrationally)," but that the opinion "rest[s] on some meaningful . . . inquiry – rather than, say, on mere intuition, however sincere."[147]

---

applied science, even a craft. Most appraisers estimate market value by employing not one methodology but a combination. These various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available.").

[146]

*Omnicare*, 135 S. Ct. at 1328, 1330.

[147]

*Id.* at 1328-30.

While a reasonable investor undoubtedly expects that an issuer's opinion statement "fairly aligns with the information in the issuer's possession at the time," the reasonable investor "does not expect that *every* fact known to an issuer supports its opinion statement."  *Id.* at 1329.  Thus, an "opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.*

34

So what, then, must a plaintiff plead to state a legally sufficient claim that the defendant "omit[ted] to state a material fact necessary" to make its statement of opinion "not misleading?"[148] *Omnicare* holds that a plaintiff "cannot just say that the issuer failed to reveal [the] basis" for the opinion.[149]  Such a "conclusory assertion[]" may be enough to allege adequately that an omission has occurred, but it offers no reason to think the omission "rendered a published statement misleading."[150]  Nor may the plaintiff merely "recit[e] . . . the statutory language" or offer bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."[151] Rather, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[152]  In the context of a financial statement filed with the SEC, a plaintiff who asserts a claim under the *omissions* clause of Rule 10b-5 must allege, in other words, not only that the financial statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," but also that "those facts conflict with what a

---

[148]

      17 C.F.R. § 240.10b-5(b).

[149]

      135 S. Ct. at 1329.

[150]

      *Id.* at 1332.

[151]

      *Id.* at 1333 (internal quotation marks omitted).

[152]

      *Id.* at 1332.  Indeed, "whether an omission makes an expression of opinion misleading always depends on context," and the securities laws "create[] liability only for the omission of material facts that cannot be squared with" reading an expression of opinion "in its full context."  *Id.* at 1330.

reasonable investor would take from the statement itself."[153]   "That is no small task for an investor."[154]

In sum, then, a plaintiff who asserts that a statement of opinion or belief violates Rule 10b-5 must plead facts that, if true, would be sufficient to show one of two things: (1) if asserting that the statement of opinion or belief "constitutes a factual misstatement" in itself,  that the speaker did not "actually hold[] the stated belief," or (2) if asserting that the statement of opinion of belief is misleading due to the omission of "discrete factual representations," that the statement did not "rest on some meaningful . . . inquiry," rendering it "misleading to a reasonable person reading the statement fairly and in context."[155]

---

[153]

*Id.* at 1329.

Another way of stating this is that the plaintiff must plead facts that, if true, would be sufficient to show (1) that the financial statement omitted facts that would be material to a reasonable investor, and (2) that the omission of those facts rendered the issuer's statements of opinion or belief misleading by revealing that the issuer "lacked the basis for making those statements that a reasonable investor would expect."  *Id.* at 1333.

[154]

*Id.* at 1332.

[155]

*Id.* at 1325-28, 1332.

This Court held more than four years ago that a plaintiff challenging a statement of opinion or belief adequately alleges a violation of the securities laws by pleading facts that, if true, would be sufficient to show that the defendant "either did not in fact hold that opinion or knew that it had no reasonable basis for it."  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d at 302.  Other courts have hinted at the same.  *See, e.g., Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (noting that statements of opinion or belief are "misleading for the purposes of the securities laws if they . . . lacked a reasonable basis when made").  And at common law, a misrepresentation was fraudulent if the plaintiff could show, among other things, that it was made "recklessly, careless whether it be true or false."  *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 502 n.19 (1984) (internal quotation marks omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 526 (1977); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 10 (Tentative Draft No. 2, 2014).

*ii.     Central States Has Not Stated an Actionable Claim*

The $117 million reserve increase MetLife made to cover losses stemming from its 2011 cross-check of the SSA-DMF prompted the Court to hold in its February 2013 Opinion that Central States "ha[d] alleged adequately that MetLife's IBNR reserves proved to be . . . insufficient to meet the company's life insurance policy obligations."[156] That remains true. But as *Omnicare* makes clear, a plaintiff who asserts that a statement of opinion or belief violates Rule 10b-5 must do more than merely allege that the opinion (or one of its underlying facts) was wrong.[157] The securities laws do not permit allegations of "fraud by hindsight,"[158] and "[a] statement believed to be true when made, but later shown to be false" is not an actionable misstatement under Section 10(b) and Rule 10b-5.[159] Thus, the fact that MetLife's IBNR reserves ultimately proved insufficient is not determinative of these motions to dismiss. The critical questions instead are whether Central States has alleged adequately that (1) MetLife did not actually believe its IBNR reserves were adequate but nevertheless said (or implied) they were, or (2) MetLife's (explicit or implicit) representations regarding the adequacy of its IBNR reserves did not rest on a meaningful inquiry,

The Court recognizes that its formulation of the standard in *In re Lehman Brothers Securities & ERISA Litigation* is not as precise as that articulated in *Omnicare*. Nevertheless, the Court believes the two standards are in substance quite similar, if not identical.

[156]
*City of Westland*, 928 F. Supp. 2d at 717.

[157]
*See Omnicare*, 135 S. Ct. at 1326-27, 1332; *see also id.* at 1328 ("[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect.").

[158]
*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (internal quotation marks omitted).

[159]
*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571.

rendering them misleading to a reasonable investor reading MetLife's financial statements in context.[160]  For the reasons stated below, the Court concludes the answer to each of these questions is "No."

In its February 2013 Opinion, the Court accepted as true Central States' argument that MetLife's 2007 cross-check of the SSA-DMF against its individual life insureds uncovered a "shortfall of $80 million" in the Company's IBNR reserves and relied on that to hold that Central States adequately had pleaded that MetLife "knew that its estimated IBNR reserves were insufficient to meet the compan[y's] life insurance policy obligations, or at least was aware that it had no reasonable basis for believing the estimates."[161]  In other words, the Opinion reasoned, because an SSA-DMF cross-check against one type of policy revealed that MetLife's IBNR reserves were insufficient, a trier of fact reasonably could conclude that MetLife should have recognized that its reserves similarly were (or might be) inadequate for another type of policy for which no cross-check had been run.  Though it did not use these words, the February 2013 Opinion in effect concluded

---

[160]

*See Omnicare*, 135 S. Ct. at 1326, 1328.

[161]

*City of Westland*, 928 F. Supp. 2d at 717.

The Court thus framed its decision, issued more than two years before *Omnicare*, in part because it was not yet clear that the misstatement provision of Rule 10b-5 "present[ed] different issues" than the omission provision of the Rule.  *Omnicare*, 135 S. Ct. at 1325.  In light of that distinction, the Court concludes that while what was conveyed by its earlier holding has not changed materially, its prior formulation does not state accurately the law as it stands today.  *See supra* note 155.

that Central States adequately had pleaded either that (1) MetLife did not "honestly believe[]" its representations concerning the adequacy of its IBNR reserves,[162] or (2) those representations did not "rest on some meaningful . . . inquiry."[163]

       The defendants protest this reasoning and now argue that the complaint was and the SAC is misleading as to what MetLife learned as a result of the 2007 cross-check.[164]  The amended complaint alleged, and the SAC continues to allege, that "in 2007 MetLife performed a match across certain of its insurance records using the SSA-DMF and had discovered over $80 million in IBNR claims that had not been reserved for."[165]  Central States frames this allegation – which is derived from a post-Class Period multi-state regulatory agreement to which MetLife was a party[166] – in such a way as to imply that MetLife's 2007 cross-check revealed an $80 million IBNR reserve shortfall. Indeed, that is how the Court (mistakenly) interpreted the amended complaint in its earlier Opinion.[167]

       As defendants now point out, the April 2012 multi-state agreement on which this assertion is based does not bear out the notion that MetLife's 2007 cross-check uncovered an $80

---

[162]

    *Fait*, 655 F.3d at 113.

[163]

    *Omnicare*, 135 S. Ct. at 1328.

[164]

    MetLife did not present this argument in its motion to dismiss the amended complaint.

[165]

    DI 20 ¶ 162; SAC ¶ 174.

[166]

    *See* Greenfield Decl. [DI 75], Ex. J.

[167]

    *See City of Westland*, 928 F. Supp. 2d at 717 (describing the amended complaint as alleging that MetLife discovered "a reserve shortfall of $80 million" after cross-checking the SSA-DMF against its roster of individual life insureds in 2007).

million *shortfall* in MetLife's IBNR reserves.  Rather, it states only that the cross-check "identified over $50 million in death benefits, which were paid to Beneficiaries and over $30 million in unclaimed benefits which have been or will be reported and remitted to the appropriate states in accordance with the Unclaimed Property Laws."[168]  There is no indication – in the SAC, the multi-state agreement, or elsewhere – that the 2007 cross-check and the resulting discovery of unpaid benefits had any impact whatsoever, positive or negative, on MetLife's IBNR reserves or on its financial statements.[169]  And, defendants argue, if the 2007 cross-check in fact did not reveal an $80 million IBNR reserve "shortfall," but rather merely $80 million in unpaid benefits, there is no basis to infer that MetLife did not believe, at the time it cross-checked the SSA-DMF against its roster of group life insureds, that its IBNR reserves were adequate to cover unpaid benefits identified as a result of that cross-check.  Nor, defendants say, is there a basis to infer that MetLife knew – but failed to disclose – material information that contradicted its statements regarding the adequacy of its IBNR reserves such that a reasonable investor would have been misled by the omission of that information.

---

168

     *See* DI 75, Ex. J, at 2.

169

     Reserves, of course, are estimated (*i.e.*, taken as charges against income) *before* they are paid out.  Thus, if MetLife had at least $80 million in reserves when it discovered the unpaid benefits revealed as a result of the 2007 SSA-DMF cross-check, its payment of those benefits would have had no impact on its income statement.  If, on the other hand, MetLife's reserves were insufficient in 2007 to cover those liabilities, it presumably would have had to increase its reserves by taking an additional charge against income – a charge it would have been required to disclose in its SEC filings.

     But MetLife's SEC filings reveal nothing of the sort.  If MetLife took a charge against income to bolster its reserves in 2007, it did not say so at the time.  Neither the facts pleaded in the SAC nor the facts as revealed in MetLife's SEC filings, then, give rise to an inference that the 2007 cross-check revealed an $80 million "shortfall" in MetLife's IBNR reserves.

Stated another way, defendants argue that it says nothing, standing alone, that the 2007 cross-check revealed $80 million in unpaid benefits.  If MetLife's IBNR reserves then were adequate to cover those liabilities – an assumption which Central States does not adopt, but as to which it alleges no contrary facts – there is no reason to think that MetLife did not actually believe, contemporaneously with its representations, that its IBNR reserves later would be adequate to cover liabilities resulting from a cross-check of the SSA-DMF against its group life insureds.  As defendants contend, the SAC identifies no "particular (and material) facts going to the basis for the issuer's opinion" – facts whose omission (had the facts existed) might have made MetLife's representations misleading to a reasonable person – and thus provides no reason to think that MetLife's comments concerning the sufficiency of its IBNR reserves did not "rest on some meaningful . . . inquiry."[170]

Central States now acknowledges that the regulatory agreement does not support directly the alleged $80 million reserve shortfall.  Instead, it asks the Court to infer that there was a reserve shortfall, or notice thereof, based on the existence of $80 million in outstanding death benefits on *individual* life insurance policies in 2007 and the fact that MetLife's IBNR reserves later proved inadequate to cover the unpaid benefits discovered as a result of the Company's 2011 cross-check of the SSA-DMF against its *group* life insureds.

While it is true that on a motion to dismiss a court draws all reasonable inferences in the plaintiff's favor, a claim for relief must be more than merely possible.  It must be plausible.

_____

[170]      *Omnicare*, 135 S. Ct. at 1328, 1332.

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,"[171] or where there are "obvious alternate explanations,"[172] that standard is not met.

   To allege adequately that MetLife's representations regarding the sufficiency of its IBNR reserves were *misstatements* of material fact, Central States had to plead facts that, if true, would be enough to show, assuming materiality, that MetLife did not believe those representations. It could have alleged, for example, facts concerning the size of MetLife's IBNR reserves; the size of those reserves relative to MetLife's existing liabilities; the relative sizes of MetLife's group and individual life insurance pools and how the $80 million in unpaid individual life insurance benefits revealed as a result of the 2007 SSA-DMF cross-check might have affected what estimated reserves should have been preceding the 2011 SSA-DMF cross-check; MetLife's methodology for calculating its reserves; whether MetLife's methodology accounted for unreported deaths; or the impact of various states' policies for collecting unclaimed benefits. Had it done so, it perhaps would have been in a stronger position now (although the Court does not so decide). But it did not.

   In sum, then, it is possible that the 2007 discovery of $80 million in unpaid benefits perhaps might have rendered MetLife's IBNR reserves insufficient, or at least alerted MetLife to the fact that it might be under-reserved in the future. But on the facts alleged in the SAC, it equally would be possible that the discovery had no such impact. Indeed, perhaps MetLife carried extra reserves to account for unanticipated influxes of claims, or perhaps its methodology for estimating reserves took into account certain older policies for which claims never had been filed. Perhaps

---

[171]   *Iqbal*, 556 U.S. at 679 (2009). "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

[172]   *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

MetLife determined IBNR reserves differently for its group life insureds than it did for its individual life insureds.  There may be other innocent explanations.  But the critical point is that Central States has failed to allege facts sufficient to make out a plausible claim that MetLife did not believe, in advance of the 2011 SSA-DMF cross-check, that its IBNR reserves were adequate.[173]  That is fatal to the claims that rest on the proposition that MetLife knew that its financial statements were false because it did not in fact believe that its IBNR reserves were adequate.

To allege adequately that MetLife *omitted* to state a material fact (or facts) necessary to prevent its representations regarding the sufficiency of its IBNR reserves from misleading reasonable investors, Central States had to call into question MetLife's basis for those representations by identifying particular, material facts about the inquiry MetLife "did or did not conduct or the knowledge it did or did not have" – facts the omission of which rendered MetLife's representations misleading to reasonable investors reading the Company's financial statements in context.[174]  In addition to some or all of the facts noted above, it could have alleged, for example, facts tending to show that MetLife ignored (or otherwise misapplied) the "customs and practices" of the insurance industry in estimating its IBNR reserves;[175] that MetLife's estimates did not "fairly align[] with the

---

[173]

       Central States alleges also that MetLife's methods for calculating its IBNR reserves did not comply with GAAP.  As noted in the Court's February 2013 Opinion, this allegation "add[s] nothing," and "[t]here is no need to discuss [it] separately." *City of Westland*, 928 F. Supp. 2d at 716 n.66; *see also In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004) (refusing to address "alleged GAAP violations [that] are completely dependent upon the underlying statements at issue").

[174]

       *Omnicare*, 135 S. Ct. at 1332.

[175]

       *Id.* at 1330.

information in [its] possession at the time;"[176] or that those estimates did not rest upon the kind of "foundation" that a reasonable person would have expected them to rest upon.[177]

The SAC alleges no such facts.  Central States has provided no indication that the stated basis for MetLife's IBNR reserve estimates – namely, "actuarial analyses of historical patterns of claims and claims development"[178] – ran afoul of the customs and practices of the life insurance industry.  Indeed, it has not alleged any facts suggesting that there *is* a particular custom or practice in the life insurance industry for fixing IBNR reserves.  Nor does the SAC allege adequately that either (1) it was a custom or practice among life insurers to estimate IBNR reserves by conducting a cross-check of the SSA-DMF against all life insureds, or (2) the "foundation" upon which MetLife *did* rest its IBNR reserve estimates did not comport with what a reasonable person reading the Company's financial statements fairly and in context would have expected.  And it alleges no facts tending to show that MetLife's IBNR reserves did not fairly align with information it possessed *at the time*.[179]  Central States' argument to the contrary – to the extent it makes one – appears to rely entirely on a premise the Court on reflection has concluded lacks any basis whatsoever: that

---

[176]

Id. at 1329.

[177]

Id. at 1332.

[178]

SAC ¶ 69 (quoting MetLife's Form 10-K for the year ending December 31, 2009).

[179]

To be sure, MetLife's Class Period representations regarding the adequacy of its IBNR estimates may not have fairly aligned with the information it possessed in the wake of its 2011 SSA-DMF cross-check.  But that information was not available to it at the time it made the representations at issue here, and that is all that matters for purposes of the securities laws.  As Justice Kagan wrote, the omissions provision of Rule 10b-5 is not "an invitation to Monday morning quarterback an issuer's opinions."  *Omnicare*, 135 S. Ct. at 1327.

As above, the Court does not now decide whether any allegations such as those enumerated in the text would have sufficed.

44

MetLife's 2007 SSA-DMF cross-check revealed an $80 million *shortfall* in the Company's IBNR reserves.  But MetLife's representations regarding the adequacy of its IBNR reserves were, as the Court has discussed, in no way inconsistent with what that cross-check actually revealed: $80 million in unpaid benefits.  In all the circumstances, Central States has failed adequately to allege that MetLife omitted to state a fact (or facts) necessary to prevent its representations regarding the sufficiency of its IBNR reserves from misleading reasonable investors reading the Company's financial statements fairly and in context.

b.      *Mortality Ratios, Underwriting Practices, & Risk Management*

The SAC alleges also that MetLife made representations regarding its mortality ratios and results, its underwriting strength, and its "disciplined approach to risk and expense managements" that were inaccurate as a result of the Company's alleged failure to estimate properly its IBNR reserves.[180]  These allegations are interrelated and the Court addresses them together.

As the Court alluded to earlier, neither the claim that MetLife misrepresented its reported income, its operating earnings, and its earnings per share nor, for the most part, this claim can survive once Central States' claim respecting the adequacy of MetLife's IBNR reserves has been rejected.  Nearly all of these ancillary claims are derivative of the alleged insufficiency in those reserves, and they depend on the premise that MetLife's Class Period representations regarding the reserves' adequacy violated the securities laws.  That claim has failed, so most of these must as well.  Nevertheless, the Court addresses Central States' claim that MetLife made false or misleading statements regarding its mortality ratios and results, as well as its underwriting and risk management

---

[180]     *See* SAC ¶ 9.

practices, for reasons that will become clear when the Court addresses the Section 11 claims, *infra*.[181]

   As an initial matter, the Court concludes that MetLife's characterizing its underwriting as "solid," its "approach to risk and expense managements" as "disciplined," and its "mortality results" as "excellent,"[182] as well as other such representations are not actionable under the securities laws.  Rather, they are "merely generalizations regarding [MetLife's] business practices" – generalizations of the type that the Second Circuit "consistently [has] held to be inactionable" puffery, in part because they are "too general to cause a reasonable investor to rely upon them."[183] Even if these "conclusory," "qualitative" statements[184] – which, like the Company's representations regarding the adequacy of its IBNR reserves, were characterizations or statements of opinion or belief[185] – could be actionable in some cases, they are not in the circumstances alleged here.  Central

----

[181]

   There is no need to address further Central States' claim that MetLife overstated its reported income, its operating earnings, and its earnings per share.  *See id.* ¶¶ 16, 18.  Those figures are alleged to have been misstated precisely because the Company's IBNR reserves did not provide fully for incurred liabilities for death benefits payable in respect of deaths not yet reported.  Where that claim fails, so to this one.

[182]

   *Id.* ¶¶ 9-10.

[183]

   *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 205-06 (holding that statements regarding, among other things, the defendant's "highly disciplined risk management" were "no more than 'puffery' which does not give rise to securities violations" (internal quotation marks omitted)).

[184]

   *Va. Bankshares*, 501 U.S. at 1087.

[185]

   *See Novak*, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was in 'good shape' or 'under control' *while they allegedly knew that the contrary was true*." (emphasis added)); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) (statements interpreting clinical studies are statements of opinion); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 311-12

States has not alleged adequately either that (1) MetLife did not actually believe the opinions contained therein, or (2) the statements did not rest on a meaningful inquiry, rendering them misleading to a reasonable investor reading them in context.[186]

MetLife did offer specific figures with respect to mortality ratios.[187] Whether those allegedly understated figures are actionable under the securities laws is a closer question.

The SAC does not define what a mortality ratio is, but the Court takes it in this context to be a measure of observed or known deaths compared with expected deaths. The SAC does allege, however, that MetLife's "false strong reported mortality ratios" had a "positive impact on . . . underwriting results"[188] and that MetLife "knowingly or recklessly" misrepresented those ratios throughout the Class Period due to its failure to incorporate unreported deaths that were reflected in the SSA-DMF.[189] Reported mortality ratios for each quarter in 2009 and 2010 and the first two quarters of 2011 hovered between approximately 81 to 92 percent.[190] In the third quarter of 2011, however, after MetLife cross-checked the SSA-DMF against its roster of group life

---

(S.D.N.Y. 2010).

[186]

See *Omnicare*, 135 S. Ct. at 1326, 1328.

Even if MetLife actually understated its mortality ratios, *see infra*, its mortality results may still have been "excellent" in the relevant quarters. "Excellent," of course, is a subjective term. Central States pleads no facts to support a different conclusion.

[187]

See, e.g., SAC ¶¶ 66, 77, 83, 94, 98, 119, 130.

[188]

*Id.* ¶ 78.

[189]

*Id.* ¶¶ 80, 87.

[190]

*Id.* ¶ 155.

insureds, its reported mortality ratio surged to 98.5 percent for both individual and group life insurance.[191]  Had the deaths uncovered by the 2011 cross-check been incorporated into the mortality ratios when those deaths actually occurred, Central States appears to argue, earlier quarters' mortality ratios likely would have been higher.  On this theory, the reported mortality ratios during the Class Period are alleged to have been inaccurate.

In a July 2011 conference call for investors and analysts, MetLife discussed its financial results for the second quarter of 2011.  Among other things, the Company described its group life mortality ratio for that quarter – reported to be 82.1 percent – as "excellent" and called it "group life's best ever mortality quarter."[192]  MetLife said also that it expected its group life mortality ratio, which had not exceeded 90 percent since the third quarter of 2009,[193] to hover around 88 percent moving forward.[194]  On October 28, 2011, however, MetLife held another conference call for investors and analysts to discuss its financial results for the third quarter of 2011.[195]  During that call, MetLife explained the impact of the $117 million increase to its reserves in the wake of its 2011 SSA-DMF cross-check.[196]  At the same time, MetLife reported that its individual and group life

---

[191]

  *Id.*

[192]

  *Id.* ¶ 130.

[193]

  *See id.* ¶ 155.

[194]

  *See id.* ¶ 130.

[195]

  *See id.* ¶ 154.  The fact that October 28, 2011 is outside the Class Period is of no moment. The conference call on that date discussed financial results for the third quarter of 2011, which concluded on September 30, 2011, occurred entirely during the Class Period, and in fairness should be discussed here.

[196]

  *See id.*

48

mortality ratios both had risen to 98.5 percent – rises the Company said were attributable to its $117 million "reserve strengthening,"[197] but which in fact may have had a more logical and straightforward explanation.

When MetLife officials testified in California in May 2011, they acknowledged, among other things, that MetLife (1) decided by December 2010 "to use the SSA-DMF more frequently and broadly," (2) had yet to run "SSA-DMF matches for its group life policies" as of May 2011, and (3) calculated deaths "as of the date of the match [against the SSA-DMF] as opposed to the date of the death."[198]  In other words, some time between May 23, 2011, when MetLife officials testified in California that no group life SSA-DMF cross-check yet had been run, and October 6, 2011, when MetLife filed a Form 8-K disclosing for the first time that it would increase its reserves by at least $115 million to account for additional payments owed to beneficiaries, MetLife cross-checked the SSA-DMF against its roster of group life insureds.  In doing so, it likely "discovered" many deaths – some recent, some older – for the first time.  Given MetLife's admission that it routinely calculated deaths based on the date of discovery, not the actual date of death, it is no surprise that MetLife's *first-ever* cross-check of the SSA-DMF against its roster of group life insureds would have caused a sharp increase in its reported mortality figures.

As noted above, the SAC is woefully vague in its description of what a mortality ratio is.  Nonetheless, the Court assumes, *arguendo*, that such ratios are "determinate, verifiable" facts,

----

[197]

    *Id.*

[198]

    *Id.* ¶ 124.

not statements of opinion or belief.[199]  They appear, after all, to be readily quantifiable by comparing actual or reported deaths with expected deaths.  To state a legally sufficient claim that those ratios were false within the meaning of the securities laws, then, Central States merely had to plead facts that, if true, would be sufficient to show that they were in fact inaccurate.[200]

Though it is not clear (or, for our purposes, important) why MetLife waited until 2011 to cross-check the SSA-DMF against its roster of group life insureds, there is no indication that it could not have done so sooner.  And Central States' allegation that MetLife's reported group life mortality ratio rose after the Company's first-ever cross-check of the SSA-DMF against its group life insureds – from 82.1 percent in the second quarter of 2011 to 98.5 percent in the third quarter of 2011 – is a sufficient basis on which to conclude that some or all of the mortality ratios MetLife reported during the Class Period were inaccurate.  Put another way, the SAC adequately has alleged that at least some of MetLife's reported Class Period mortality ratios were "untrue statement[s] of a material fact."[201]  But that is not the end of the inquiry under Rule 10b-5.

To state a claim under Section 10(b) and Rule 10b-5, unlike under Section 11, a private plaintiff must allege facts that "give rise to a strong inference of *scienter*,"[202] – *i.e.*, that the

---

[199]

    *Omnicare*, 135 S. Ct. at 1326.

[200]

    The Court assumes, *arguendo*, that Central States has alleged adequately that MetLife's stated mortality ratios were material – that is, that "there is a substantial likelihood that a reasonable shareholder would consider [such ratios] important in deciding how to [act]." *Hutchison*, 647 F.3d at 485 (second alteration in original) (internal quotation marks omitted); *see also Basic, Inc.*, 485 U.S. at 231-32.

[201]

    17 C.F.R. § 240.10b-5(b).

[202]

    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (internal quotation marks omitted); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197 (noting that the misrepresentation or omission must be made "with *scienter*" to be

defendant made an untrue statement of material fact or omitted to state a material fact necessary to prevent her statement from misleading a reasonable person with the "intent to deceive, manipulate, or defraud."[203]  Indeed, the facts alleged must present "more than merely reasonable or permissible" evidence of *scienter*; rather, such evidence must be "cogent and compelling."[204]

> Here, the SAC pleads no facts giving rise to a strong inference that MetLife misrepresented its mortality ratios throughout the Class Period with the "intent to deceive, manipulate, or defraud" its shareholders or anyone else.  The *scienter* allegations in the SAC are largely conclusory, and they depend almost entirely on the misguided premise that MetLife knew in advance of its pre-2011 SSA-DMF cross-check that it had misrepresented the adequacy of its IBNR reserves.[205]  The Court has rejected that premise, and now does the same with this argument. Central States has failed to allege facts presenting "cogent and compelling" evidence that MetLife acted with *scienter* to misrepresent its mortality ratios throughout the Class Period.  Its Section 10(b) allegations concerning those ratios thus cannot survive these motions to dismiss.

---

actionable under Section 10(b) and Rule 10b-5 (internal quotation marks omitted)).

[203]

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[204]

*Tellabs*, 551 U.S. at 324 (internal quotation marks omitted).

[205]

*See, e.g.*, SAC ¶¶ 121, 132.

In other words, Central States argues, MetLife knew its reported mortality ratios were inaccurate because those ratios depended upon IBNR reserve estimates that MetLife knew were similarly inaccurate.

      *c.*      *State Investigations: Alleged Non-Disclosure and Item 303*

The SAC makes two somewhat related allegations regarding state investigations into MetLife's accounting practices.  First, Central States says, MetLife repeatedly and falsely claimed in SEC filings throughout the Class Period that an investigation into its retained asset accounts by the New York Attorney General was "without merit."[206]  Second, it alleges that MetLife failed timely to disclose in SEC filings throughout the Class Period the seriousness of other states' investigations into its death benefits payment practices and/or its non-use of the SSA-DMF.[207]  The SAC appears to lump these allegations together in certain respects,[208] but they are different, at least to some degree.[209]  In any event, the SAC does not allege if – or explain how – MetLife's retained asset accounts practices, or the investigations into those practices, overlapped with or differed from its group life insurance and/or death benefits payment practices and the related investigations.  In this way, the SAC at best is unclear and at worst is misleading.  Nonetheless, the Court will address the allegations separately.

---

[206]

      *See id.* ¶¶ 86, 101, 113, 120.

[207]

      *See id.* ¶¶ 164-165.

[208]

      *See id.* ¶ 133 (appearing to conflate the New York investigation into MetLife's retained asset accounts with other states' investigations into the Company's death benefits payment practices).

[209]

      Indeed, the differences are apparent from the face of the SAC.  In paragraph 124, Central States discusses two SSA-DMF cross-checks that MetLife ran against its retained asset accounts, one in 2006 and one in 2010, but notes that MetLife had not run an SSA-DMF cross-check against its group life insureds as of May 2011.  *See id.* ¶ 124.  Paragraph 169 makes the distinction even clearer: "MetLife disclosed the retained asset account investigation . . . , but failed to disclose the *more material* SSA-DMF investigation."  *Id.* ¶ 169 (emphasis added).

*i.     Retained Asset Accounts*

The allegedly untrue or misleading statement with which Central States takes issue appears in at least three SEC filings during the Class Period.[210]  It reads in relevant part: "*We believe that any allegations that information about [our retained asset accounts] is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit.*"[211]

By its terms, this is a statement of opinion or belief about legal compliance.  As with MetLife's representations regarding the adequacy of its IBNR reserves, then, it ran afoul of the Exchange Act only if (1) MetLife did not actually believe, contemporaneously with its statements, that the various allegations were "without merit," or (2) MetLife's opinion – *i.e.*, that the allegations lacked merit – would mislead a reasonable person reading the Company's financial statements "fairly and in context" because it did not "rest on some meaningful legal inquiry."[212]

Central States has alleged no facts suggesting that MetLife did not actually believe its dismissive statements about the New York State Attorney General's investigation.  Nor has it alleged facts that, if true, would be sufficient to show that MetLife's opinion about the merits of that investigation was misleading.  To allege adequately that MetLife's statement of opinion about legal compliance would mislead a reasonable investor reading that statement in context, Central States may not rely on the bare fact that MetLife "failed to reveal its basis" for the opinion.[213]  After all,

---

[210]

See id. ¶ 86 (Form 10-Q for the period ending June 30, 2010); ¶ 101 (Form 10-K for the year ending December 31, 2010); ¶ 120 (Form 10-Q for the period ending March 31, 2011).

[211]

See, e.g., id. ¶ 86 (emphasis added).

[212]

*Omnicare*, 135 S. Ct. at 1328, 1332.

[213]

*Id.* at 1329.

Rule 10b-5 imposes liability not for all omissions, but only for *misleading* omissions.  A conclusory assertion that MetLife failed to reveal the basis underlying its opinion provides no reason to think that MetLife's omission rendered that opinion misleading.[214]  Where, as here, "a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," the plaintiff must plead facts that, if true, would be sufficient to show that "those facts conflict with what a reasonable investor would take from the statement itself."[215]  To do this, Central States would have had to have "identif[ied] particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission ma[de] the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[216]

But Central States has not done this.  In fact, it has alleged no facts whatsoever regarding the basis for MetLife's opinion – no facts about the inquiry MetLife did or did not conduct into the allegations concerning its retained asset accounts, no facts concerning MetLife's understanding of the legality of its relevant practices, and no facts regarding *how* MetLife formulated its legal opinion.  It has not alleged, for example, that MetLife developed its opinion "without having consulted a lawyer" or that it expressed its views "in the face of its lawyers' contrary advice."[217]  Indeed, the fact that MetLife's opinion may have "prove[d] wrong in the end" is not important so

---

[214]   *See id.* at 1332.

[215]   *Id.* at 1329.

[216]   *Id.* at 1332.

[217]   *Id.* at 1328-29.

long as that opinion rested on a "meaningful legal inquiry."[218]  Central States has pled no facts suggesting that it did not.

Ultimately, Central States has not alleged adequately either that MetLife did not believe that various allegations regarding its retained asset accounts were "without merit," or that it omitted to state a fact (or facts) necessary to prevent its view regarding those allegations from misleading reasonable investors reading the Company's financial statements fairly and in context.

ii.      *Death Benefits Payment Practices and Non-Use of SSA-DMF*

The SAC alleges also that "MetLife failed to disclose loss contingencies and legal proceedings related to a multi-state investigation concerning the Company's use of the SSA-DMF, in violation of," among other things, SEC Regulation S-K, Item 303.[219]

SEC Regulation S-K, Item 303, requires disclosure of "any known . . . uncertainties" (1) "that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way" or (2) "that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."[220]

---

218

    *Id.* at 1328.

219

    SAC ¶ 162(a).  The Court in its February 2013 Opinion dispensed with Central States' claims that MetLife's alleged non-disclosure of loss contingencies and legal proceedings related to the state investigations violated FASB ASC 450 and SEC Regulation S-K, Item 103.  *See City of Westland*, 928 F. Supp. 2d at 718 (dismissing these claims because "the state investigations were not pending or threatened litigation").  The SAC contains no new allegations as to those claims.  The Court will not revisit them here.

220

    17 C.F.R. § 229.303(a).

The Court in its February 2013 Opinion concluded that the amended complaint "alleged adequately that MetLife had a duty under Item 303 to disclose the state investigations before August 2011."[221]  It did so on the theory that the "MetLife Defendants reasonably should have expected, before August 2011, that the state investigations would cause MetLife to increase its IBNR reserves."[222]  That holding depended to a substantial degree, if not entirely, on the Court's contemporaneous conclusion that Central States adequately had pleaded either that MetLife did not actually believe its representations regarding the adequacy of its IBNR reserves or that those representations did not rest on a meaningful inquiry – a conclusion that itself was predicated on what the Court at the time mistakenly construed as an allegation that an IBNR reserve "shortfall of $80 million" had been uncovered as a consequence of the 2007 SSA-DMF cross-check.

Given the unraveling of Central States' arguments on the IBNR reserves issue, the Court now must revisit its earlier Item 303 ruling as well.  The operative question is whether the SAC adequately alleges that MetLife reasonably expected during the Class Period that it would incur either fines or future liabilities (or both) that would impact its future financial results.[223]

In light of the Court's conclusion that the SAC alleges no more than that the 2007 cross-check uncovered $80 million in unpaid benefits (not an $80 million shortfall in MetLife's IBNR reserves) – and its concomitant conclusion that Central States has not alleged adequately

---

[221]

      *City of Westland*, 928 F. Supp. 2d at 718.

[222]

      *Id.*  "There was potential also," the February 2013 Opinion noted, "for state fines for failure to comply with unclaimed property laws."  *Id.*

[223]

      There is, of course, no allegation that MetLife failed to disclose *existing* fines or liabilities or fines or liabilities that MetLife *knew* would impact its future financial performance.  The only question, then, is whether MetLife failed to disclose fines or liabilities it *reasonably should have known* were likely to affect its future financial performance.

either that MetLife did not actually believe its representations concerning the adequacy of its IBNR reserves or that those representations did not rest on a meaningful inquiry – it would make little sense for the Court now to hold that MetLife violated SEC Regulation S-K, Item 303, by failing timely to disclose the existence of various state investigations into its death benefits payment practices.  To hold as much, in essence, would punish MetLife for failing to foresee something that Central States has not shown was reasonably foreseeable.

Neither the alleged existence of investigations into MetLife's death benefits payment practices, nor MetLife's internal discussions about using the SSA-DMF more broadly,[224] supports an inference that MetLife expected, or reasonably should have expected, that it would later incur fines or liabilities (or both) that would impact its future financial results materially.  Accepting as true the SAC's allegation that MetLife – in consultation with, or perhaps at the implicit or explicit command of, state regulators – began in summer 2010 "to devise a plan toward making a decision to utilize the SSA-DMF more regularly across its business units," there is no doubt that MetLife reasonably should have expected before August 2011 to use the SSA-DMF more broadly.[225]  But there is an important distinction, relevant here, between MetLife anticipating (1) a change in the scope of its use of the SSA-DMF and (2) incurring, as a consequence of that change, fines or liabilities sufficient to have a material impact on its future financial performance or results.[226]

---

[224]

See SAC ¶ 106 (noting internal discussions regarding the scope of MetLife's use of the SSA-DMF).

[225]

Id.

[226]

See 17 C.F.R. § 229.303(a).

Indeed, if, as the Court has held, there are no allegations that could result in a conclusion that MetLife reasonably should have foreseen that expanded use of the SSA-DMF would materially impact its IBNR reserves, neither is there a basis from which to conclude that it reasonably should have foreseen that its decision to use the SSA-DMF more broadly would result in fines or liabilities (or both) that would materially impact its future financial performance.  In other words, had MetLife's IBNR reserves been sufficient to cover unpaid liabilities revealed during the 2011 SSA-DMF cross-check, it would not have incurred any related fines and/or liabilities and its decision not to disclose the pending state investigations earlier surely would not have violated SEC regulations.  There being no sufficient factual allegations that MetLife did not believe its pre-2011 SSA-DMF cross-check representations concerning the adequacy of its IBNR reserves – or that those representations did not rest on a meaningful inquiry – the Court cannot now logically conclude that a trier of fact reasonably could find that MetLife should have expected that its (ultimately inadequate) IBNR reserves would trigger fines and/or liabilities having a material impact on the Company's future financial performance or results.

Simply put, there is nothing in the SAC from which to infer that MetLife reasonably expected, prior to August 2011, that it would incur fines and/or liabilities – let alone fines and/or liabilities that would impact materially the Company's financial performance – as a result of the state investigations into its death benefits payment practices.  The viability of Central States' Item 303 claim hinges on the already-rejected premise that MetLife misrepresented (within the meaning of the Exchange Act) the adequacy of its IBNR reserves during the Class Period.  Thus, for reasons stated herein, Central States has failed to allege adequately that MetLife's decision not to disclose the state investigations into its death benefits payment practices until August 2011 constituted a violation of SEC Regulation S-K, Item 303.

58

2.    *Loss Causation*

Having found that Central States failed adequately to allege a material misrepresentation or omission, the Court need not discuss loss causation.  Nonetheless, the Court briefly will address that issue here, as it was the basis for dismissing Central States' Exchange Act claims in the February 2013 Opinion.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[227]  "[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"[228]  While loss causation often is a fact specific question appropriate for trial, "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'"[229]  To survive a motion to dismiss under the Exchange Act, then, a plaintiff must "disaggregate those losses caused by the [unrelated events] from disclosures of the truth behind the alleged misstatements."[230]  In doing so,

---

[227]

       *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

[228]

       *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (alteration in original) (emphasis omitted) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

[229]

       *Id.* at 174 (alteration in original) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).

[230]

       *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (internal quotation marks omitted).

the plaintiff must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the alleged] misstatements."[231]

      *a.*      *MetLife's August 2011 Disclosure of Pending State Investigations*

The Court in its February 2013 Opinion called the amended complaint "remarkably misleading" for its failure to mention that the drop in MetLife's stock price following its August 5, 2011 disclosure coincided also with S&P's decision to downgrade the credit rating of the United States for the first time in history.[232]  The Court then concluded that Central States had not pleaded loss causation adequately as to the August 5, 2011 disclosure because it had not "'disaggregate[d] those losses caused by the [downgrade in U.S. credit rating] from disclosures of the truth behind the alleged misstatements'"[233] in such a way that would "'allow a factfinder to ascribe some rough proportion of the whole loss to [MetLife's alleged] misstatements.'"[234]  Instead, the Court said, Central States had "misleadingly attempt[ed] to attribute the entire drop in stock value to the alleged corrective disclosure" and ignored the fact that MetLife's stock price fell only $0.55 between its close at $36.90 on August 4 and its close at $36.35 on August 5.[235]

---

[231]

      *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

[232]

      *City of Westland*, 928 F. Supp. 2d at 714-15.

[233]

      *Id.* at 715 (second alteration in original) (quoting *In re Flag Telecom Holdings*, 574 F.3d at 36).

[234]

      *Id.* (quoting *Lattanzio*, 476 F.3d at 158).

[235]

      *Id.*; *see also* SAC ¶ 135.  According to Central States, MetLife filed its Form 10-Q for the period ending June 30, 2011 – in which it disclosed, for the first time, the existence, breadth and possible consequences of the state investigations into its death benefits payment

Not much has changed in the SAC.  Central States now says that MetLife's August 2011 disclosures merely "*contributed to* the decline of MetLife stock price."[236]  But it has added nothing that would allow the Court "to ascribe some rough proportion of the whole loss to [MetLife's alleged] misstatements.'"[237]  It acknowledges that S&P downgraded the United States' credit rating after the market closed on August 5,[238] but its bare acknowledgment of that fact does nothing to cure the initial flaw in its pleading: the SAC does not attempt to "disaggregate those losses caused by the [downgrade in the U.S. credit rating] from disclosures of the truth behind the alleged misstatements."[239]

Finally, the SAC includes also some new information about *other* insurers, including Prudential and AIG, and the investigations and/or troubles facing those companies.[240]  Whatever relevance these revelations might have in some other context, they shed no light on the question at hand.  The fact that other insurers may have been facing problems similar to those faced by MetLife does nothing to disaggregate the losses, if any, caused by MetLife's August 2011 disclosure from the losses, if any, caused by any other factor(s).

---

[236] practices – on the morning of August 5, before the stock market opened.  *See* SAC ¶ 133.

[237] SAC ¶ 135 (emphasis added).  By contrast, the amended complaint alleged that the disclosures "caused" the decline.  *See* DI 20 ¶ 134.

[238] *Lattanzio*, 476 F.3d at 158.

[239] *See* SAC ¶ 137.

[240] *In re Flag Telecom Holdings*, 574 F.3d at 36.  Central States' attempt to downplay the significance of S&P's decision, *see* SAC ¶ 137 n.10, is unpersuasive.  It falls on deaf ears.

*See* SAC ¶ 138.

As before, Central States has provided no basis to suggest that the market considered investigations into MetLife's accounting practices to be material or the cause of a drop in the Company's stock price.  And as before, the "market upheaval" caused by S&P's decision to downgrade the United States' credit rating – not to mention MetLife's mostly stable stock performance during the relevant period – renders Central States' allegations "insufficiently plausible to withstand a motion to dismiss."[241]

b.   *MetLife's October 2011 Disclosure of After-Tax Charges*

The Court's February 2013 Opinion dispensed with Central States' claims regarding MetLife's October 6, 2011 Form 8-K – which disclosed, among other things, that the Company would take a nine-figure hit against income to increase its IBNR reserves as a consequence of its first-ever cross-check of the SSA-DMF against its group life insureds – for similar reasons.[242] Specifically, the Court concluded that Central States had not distinguished the decline in MetLife's share price from similar declines in the share prices of other insurance companies over the same period.[243]  Noting that MetLife's stock price "traded in lockstep" with other life insurers' and that this "lockstep trading decreases the prospect that the loss was caused by the alleged disclosure," the Court rejected the sufficiency of Central States' loss causation allegations.[244]

---

[241]

*City of Westland*, 928 F. Supp. 2d at 715 (citing *Lentell*, 396 F.3d at 174).

[242]

*Id.* at 715-16.

[243]

*Id.* at 716.

[244]

*Id.* (finding those allegations insufficient to withstand a motion to dismiss).

The SAC remedies this deficiency.  Unlike the amended complaint, the SAC alleges that MetLife's share price declined 6.1 percent from its October 6 closing price to its October 7 closing price, while the S&P 500 and S&P 500 Insurance Indices each declined by substantially less – 0.81 percent and 3.1 percent, respectively.[245]  These additional allegations are adequate to plead that MetLife's October 6, 2011 Form 8-K – and not some marketwide phenomenon – caused the additional decline in MetLife's share price beyond the declines experienced by its peers.

MetLife's October 6 announcement that it would take two other charges unrelated to the SSA-DMF does not counsel in favor of a different result.  The other charges were smaller: one, related to damage from severe storms including Hurricane Irene, was for $80-$100 million, much of which previously was anticipated; the other, related to a September 1, 2011 liquidation plan for Executive Life Insurance Company of New York, was for $40 million.[246]  Central States adequately has pleaded that at least a portion of the decline in MetLife's share price from October 6 to October 7 was caused by the Company's announcement that it would take an after-tax charge of at least $115 million to increase its reserves in the wake of its expanded use of the SSA-DMF.

Nevertheless, the fact that Central States adequately has pleaded that MetLife's October 6, 2011 Form 8-K caused a statistically significant decline in the Company's stock price is legally immaterial for Section 10(b) and Rule 10b-5 purposes because Central States cannot tie the losses it suffered as a result of that decline to an actionable misrepresentation or omission.  Indeed, as discussed herein, Central States adequately has pleaded only one legally sufficient misrepresentation or omission: that some or all of the mortality ratios MetLife reported during the

---

[245]  SAC ¶ 147.

[246]  *Id.* ¶ 140.

Class Period were inaccurate.  But – even assuming, *arguendo* and contrary to the Court's earlier conclusion, that the SAC alleges facts sufficient to justify a finding that MetLife acted with *scienter* in misrepresenting its mortality ratios – Central States does not allege that MetLife's October 6 Form 8-K, which addressed only the $117 million charge to increase MetLife's IBNR reserves, revealed anything about those ratios.  Nor does Central States allege that MetLife's subsequent announcement regarding increased mortality ratios – an announcement that in any event occurred outside the Class Period[247] – impacted its stock price.

Central States' loss causation allegations with respect to MetLife's October 6 Form 8-K are facially plausible.  Yet they are untethered to a misrepresentation or omission actionable under Section 10(b) and Rule 10b-5.  Accordingly, they are insufficient to withstand the motions to dismiss.[248]

B.    *Section 20(a) Claims*

Section 20(a) imposes joint and several liability on control persons for underlying violations of the Exchange Act.[249]  To state a claim under Section 20(a), a plaintiff must allege both a primary violation of the Exchange Act and control over the primary violator.[250]  Central States has

---

247

     *See id.* ¶¶ 154-155.

248

     *See City of Westland*, 928 F. Supp. 2d at 716; *see also In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-md-2017 (LAK) (S.D.N.Y. Sept. 10, 2015).

249

     *See* 15 U.S.C. § 78t.

250

     *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 413-14 (S.D.N.Y. 2013).

failed to allege a primary violation of the Exchange Act.  Accordingly, its claims under Section

20(a) are dismissed.[251]

III.    *Securities Act Claims*

Central States alleges also violations of Sections 11, 12(a)(2), and 15 of the Securities

Act based on losses allegedly traceable to two public offerings of MetLife common stock – one on

August 3, 2010 and one on March 4, 2011.[252]   The Court granted in part and denied in part

defendants' motions to dismiss these claims in its February 2013 Opinion.[253]

The Securities Act claims in the SAC have not changed materially, if at all, from

those in the amended complaint, and there is no reason to revisit the Court's earlier dismissal of

Central States' Section 12(a)(2) claims.[254]   Nor is there need to re-evaluate the Court's partial

---

251

See *Rombach*, 355 F.3d at 177-78 (noting that a Section 20(a) claim – which is "necessarily predicated on a primary violation of securities law" – "must also be dismissed" where "the district court properly dismissed the primary securities claims against the . . . defendants").

252

See SAC ¶ 211.  Central States alleges Section 11 violations against all defendants except Kandarian and Mullaney.  It alleges Section 12(a)(2) violations against all defendants except Goldman Sachs and Citigroup as to the August 3, 2010 offering.  And it alleges Section 15 violations against all MetLife Defendants except Castro-Wright.

253

See *City of Westland*, 928 F. Supp. 2d at 722.

254

The Court dismissed Central States' Section 12(a)(2) claims because it found that no defendant had "'solicited the purchase of securities out of a desire to (a) serve their own interests or (b) serve the interests of the securities' owner.'" *Id.* at 719-20 (quoting *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010)).  The SAC adds no allegations that point to a contrary conclusion.

65

dismissal of Central States' Section 11 and 15 claims.  With respect to Central States' remaining Section 11 and 15 claims, the foregoing analysis requires their dismissal in most, but not all, respects as well.

A.      *Section 11 Claims*

Section 11 "prohibits materially misleading statements or omissions in registration statements filed with the SEC."[255]  To state a claim under Section 11, a plaintiff must allege, among other things, that a registration statement "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading."[256]  This language, of course, is quite similar to the wording of Rule 10b-5.  It is, then, no surprise that Section 11 of the Securities Act "prohibit[s] some of the same conduct" as Section 10(b) of the Exchange Act.[257]  Nevertheless, there are important (and, for present purposes, relevant) distinctions between Sections 10(b) and 11.  Foremost among them is that Section 11 plaintiffs, unlike Section

---

[255]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see also Omnicare*, 135 S. Ct. at 1323.

[256]

15 U.S.C. § 77k; *see also Omnicare*, 135 S. Ct. at 1323 (quoting the statutory text); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358-59 (same).

[257]

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) (internal quotation marks omitted) (noting that this "is hardly a novel proposition").

10(b) plaintiffs, "need not allege *scienter*, reliance, or loss causation" in order to state a cognizable claim.[258]  For this reason, among others, Section 11 "give[s] rise to liability more readily" than Section 10(b).[259]

> The Court already has concluded that the SAC fails adequately to allege a material misrepresentation or omission in nearly all of the instances relied upon by Central States. Accordingly, there is no need for the Court to analyze the lion's share of Central States' claims in the Section 11 framework.[260]  Indeed, those alleged violations that either are, or depend upon, Central States' assertion that MetLife misrepresented its financial condition or performance or the adequacy of its IBNR reserves fail under Section 11 for the same principal reason that they fail under Section 10(b) – Central States has not alleged adequately that MetLife made a material misrepresentation or omission.

> That leaves only the matter of MetLife's allegedly misstated mortality ratios.  As noted above, the SAC adequately alleges that these ratios were inaccurate and therefore "untrue" for purposes of the securities laws.[261]  While that did nothing to save Central States' Section 10(b)

---

[258]

     *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

[259]

     *Id.* at 359-60.

[260]

     *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (noting that Sections 10(b) and 11 each require private securities plaintiffs to "identify a materially misleading statement made by the defendants").

[261]

     15 U.S.C. § 77k; 17 C.F.R. § 240.10b-5(b).

claim in light of that statute's *scienter* requirement, Section 11 has no such requirement.[262]   As Central States adequately has pleaded that MetLife's stated mortality ratios were untrue, it has stated a sufficient Section 11 claim in that one respect.[263]

This conclusion is entirely consistent with the Court's Section 10(b) analysis.  Based on the allegations in the complaint, mortality ratios appear to be readily quantifiable by comparing actual or reported deaths with expected deaths.  The SAC alleges, in effect, that they are the product of a simple mathematical calculation – that they are, in other words, "determinate, verifiable" facts, not statements of opinion or belief.[264]  The SAC pleads facts that, if true, would be sufficient to show that MetLife's reported mortality ratios were inaccurate during all or part of the Class Period.  After *Omnicare*, no more is required under Section 11.

B.   *Section 15 Claims*

Section 15 is the Securities Act equivalent of Section 20(a) of the Exchange Act: it imposes joint and several liability on control persons for underlying violations of the Securities Act.[265]  "Thus, the success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to

---

262

       *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

263

       As before, the Court assumes, *arguendo*, that Central States has alleged adequately that MetLife's stated mortality ratios were material – that is, that "there is a substantial likelihood that a reasonable shareholder would consider [such ratios] important in deciding how to [act]."  *Hutchison*, 647 F.3d at 485 (second alteration in original) (internal quotation marks omitted); *see also Basic, Inc.*, 485 U.S. at 231-32.

264

       *Omnicare*, 135 S. Ct. at 1326.

265

       *See* 15 U.S.C. § 77o.

68

demonstrate primary liability under [S]ections 11 and 12."[266]

Pursuant to the foregoing analysis, the Section 15 claims in the SAC survive these motions only to the extent they depend upon Central States' Section 11 claim regarding MetLife's allegedly inaccurate mortality ratios.  The Section 15 claims are dismissed in every other respect.[267]

*Conclusion*

The defendants' motions to dismiss the SAC [DI 85, 86] are granted to the extent that (1) all claims under the Exchange Act and Rule 10b-5, (2) all claims under Section 12 of the Securities Act, and (3) all claims under Sections 11 and 15 of the Securities Act except those based upon the alleged misstatements of mortality ratios are dismissed.  They are denied in that remaining respect.

SO ORDERED.

Dated:          September 11, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[266]

> *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358; *see also First Jersey Sec., Inc.*, 101 F.3d at 1472 ("In order to establish a *prima facie* case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant . . . .").

[267]

> *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358, 366 (affirming the district court's dismissal of a Section 15 claim where the plaintiffs' Section 11 and 12 claims were properly dismissed).