UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF WESTLAND POLICE AND FIRE
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similarly Situated,

                          Plaintiff,

          -against-                                                          12-cv-0256 (LAK)

METLIFE, INC., et al.,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


          Appearances:


Armen Zohrabian                          Elliot Greenfield
David A. Rosenfeld                       Anna A. Moody
Darren J. Robbins                        Maeve L. O'Connor
Samuel H. Rudman                         DEBEVOISE & PLIMPTON LLP
Shawn A. Williams
David W. Hall                            *Attorneys for Defendants MetLife, Inc., C.*
Thomas C. Michaud                        *Robert Henrikson, William J. Wheeler, Peter*
ROBBINS GELLER RUDMAN & DOWD LLP         *M. Carlson, Steven A. Kandarian, William J.*
                                         *Mullaney, Sylvia Matthews Burwell, Eduardo*
*Attorneys for Plaintiff*                *Castro-Wright, Cheryl W. Grisé, R. Glenn*
                                         *Hubbard, John M. Keane, Alfred F. Kelly, Jr.,*
                                         *James M. Kilts, Catherine R. Kinney, Hugh B.*
                                         *Price, David Satcher, Kenton J. Sicchitano,*
                                         *and Lulu C. Wang*

Timothy E. Hoeffner
John J. Clarke, Jr.
Constance Tse
DLA PIPER LLP (US)

*Attorneys for Defendants Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., HSBC Securities (USA) Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Wells Fargo Securities, LLC*

LEWIS A. KAPLAN, *District Judge.*

The principal issue in this putative class action[1] is

"whether MetLife, Inc. ('MetLife' or the 'Company') misled investors (1) with respect to its financial performance and position because certain reserves underlying its financial statements failed adequately to take account of incurred but not reported ('IBNR') death benefit claims with respect to group life insurance policies, and (2) by making allegedly deceptive statements concerning those reserves."[2]

The Court twice has dismissed substantial portions of Central States' claims.[3]  The matter again is

---

[1]   The case is brought by Central States, Southeast and Southwest Areas Pension Fund ("Central States") on behalf of an alleged class of "all purchasers of the common stock of MetLife, Inc. . . . between February 2, 2010 and October 6, 2011, inclusive (the 'Class Period')," Third Amended Complaint ("TAC") [DI 94, Ex. A] ¶ 1, and "all persons who purchased or acquired MetLife common stock pursuant or traceable to [MetLife's] August 3, 2010 public offering of 75 million shares of its common stock and MetLife's March 4, 2011 public offering of 68.5 million shares of its common stock, respectively," TAC ¶ 2.  Central States allegedly purchased shares of MetLife common stock on August 3, 2010, March 3, 2011, and March 4, 2011.  TAC ¶ 250.

[2]   *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc. (Westland II)*, 129 F. Supp. 3d 48, 64 (S.D.N.Y. 2015).

[3]   *See Westland II*, 129 F. Supp. 3d 48; *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc. (Westland I)*, 928 F. Supp. 2d 705, 714-16 (S.D.N.Y. 2013).

before the Court on defendants' motions to dismiss the third amended complaint ("TAC").[4]  In substance, the TAC contains only one new allegation.  As discussed below, that allegation is significant.

*Background*

I.      *Parties*

"The principal defendant here is MetLife, a multinational insurance company.  Also named are (1) a number of individuals who were MetLife executives during all or part of the Class Period (the 'Executive Defendants'), (2) MetLife directors (the 'Director Defendants'),[5] and (3) several securities firms that underwrote certain MetLife securities during the relevant period (the 'Underwriter Defendants')."[6]

II.     *Insurance Reserves and Accounting*

The Court previously provided general background information on principles of accounting, the insurance industry, and IBNR reserves.

> "Generally accepted accounting principles ('GAAP') typically require a corporation to measure and report its financial performance and position by considering pertinent economic events when they happen, not by waiting for cash inflows or outflows to clear the books.  To ensure compliance with these principles—that is, to assure 'that recognition [is] given to income when it is earned, and . . . to expenses when they are incurred,' 'irrespective of when payment is made or received'—corporations

---

[4]     DI 96; DI 99.

[5]     The Court refers to the Executive Defendants and Director Defendants collectively as the "Individual Defendants."

[6]     *Westland II*, 129 F. Supp. 3d at 55.

generally eschew cash-based accounting for accrual-based accounting, which provides 'a more realistic view' of a given company's financial performance and position by requiring the company to account for future expected cash inflows and outflows, in addition to accounting for already-completed cash flows.  In addition, accrual-based accounting deters unscrupulous companies from misrepresenting their financial condition by, among other things, failing to reflect expenses or known liabilities that have been incurred, but that, for one reason or another, have yet to be paid.   As the late Judge Clark wrote, 'the fundamental aim of accrual accounting . . . is to match revenues with the expenses incurred in producing such revenues.'

"MetLife, as a publicly held company, of course reports its financial performance and condition on an accrual basis.  Insofar as its policy-based liabilities are concerned, that fact probably does not have a dramatic impact on its reporting of such liabilities in those instances in which the insured loss occurs, the policyholder claim is made, and the claim is paid in the same accounting period.  In other cases, however, significant periods of time may pass between the event creating the insurer's liability and the eventual payment of a claim.  And in some circumstances, no claim may be made for a long time, as for example where the loss-creating event is unknown to the insured or the beneficiary or where the existence of insurance coverage is not discovered for some time.

"Whatever the reasons for the lack of temporal coincidence between the liability-creating event and the payment of any eventual claim, GAAP requires insurers to maintain loss reserves—estimates of what they will have to pay to cover insured losses incurred during a given period—regardless of whether claims have yet been made.  These loss reserves, increases in which are charges against income for the periods in which the increases occur—must account for both known and IBNR claims.  Reserves for known claims are 'set aside to cover estimated losses based on reported claims' and are thus relatively easy to predict.  IBNR reserves, on the other hand, are 'extremely conjectural' because they are 'set aside to cover losses for which claims have not been reported but must be estimated.'  Accordingly, IBNR reserves 'may need adjustment as time passes and their accuracy can be tested in retrospect.'

"As the Second Circuit has said, it is 'difficult [to] calculat[e] and monitor . . . the accuracy of loss reserves established by insurance companies.'  Nevertheless, GAAP does require insurers to make 'a reasonable estimate of IBNR liabilities.'  And yet, GAAP does not specify 'a precise actuarial method' for estimating or setting those reserves.

"As relevant to this case, then, the accuracy of a company's loss reserves—that is, the degree to which the loss reserves correspond to, or vary from, the insurance obligations that ultimately will be paid out in relation to the claims, known and unknown, covered by the reserve in question—implicates the accuracy of its

financial statements.  If loss reserves are too low and later must be increased (resulting in a charge against income), earnings will have been overstated in SEC filings and financial statements.  If reserves are too high and later are decreased (resulting in an increase in income), the excess will have resulted in an understatement of income during the period or periods in which it existed."[7]

*Facts and Prior Proceedings*

I.      *The SSA-DMF and MetLife's IBNR Reserves*

"[T]he controversy at hand . . . focuses importantly though not exclusively on Central States' contention that MetLife, during the relevant period, overstated its earnings and its financial strength by maintaining IBNR reserves insufficient to cover life insurance benefits payable in respect of the death of MetLife insureds covered by group life insurance policies for whom no death benefit claims had been received.  That claim depends in substantial part upon MetLife's use (or alleged non-use) of the Social Security Administration Death Master File (the 'SSA-DMF'), which is a 'database of [all] deaths recorded in the United States.'"[8]

The TAC, as its predecessors, alleges that

"MetLife used the SSA-DMF as early as the mid-1990s to identify—and to halt payments to—deceased annuity recipients, but that it did not then use the database to identify deceased persons whose lives were insured by MetLife ('life insureds'). It was not until 2007, the complaint alleges, that MetLife for the first time compared the SSA-DMF against its roster of individual—as opposed to group—life insureds in order to identify those individual insureds who had died but for whom death benefit claims had not been submitted.  This cross-check allegedly uncovered $80 million in unclaimed individual life insurance benefits that were due to the deceased life insureds' beneficiaries or, in the absence of identifiable beneficiaries, to various states under abandoned property laws."[9]

Whereas the second amended complaint ("SAC") contained no allegation regarding the sufficiency

of MetLife's IBNR reserves to cover the $80 million in unclaimed benefits, the TAC alleges that

---

[7]         *Id.* at 55-57 (footnotes omitted).

[8]         *Id.* at 57 (quoting TAC ¶ 4).

[9]         *Id.* at 57-58 (footnote omitted).

6

MetLife in 2007 increased IBNR reserves for its *individual* life insurance business by $25 million in order to account for unreported claims discovered during the 2007 SSA-DMF cross-check.[10]   In other words, the TAC alleges that the Company's IBNR reserves were insufficient to cover approximately 31 percent of the newly discovered claims.   MetLife allegedly did not at that time "cross-check the SSA-DMF against its roster of *group* life insureds—a cross-check that, plaintiff argues, would have exposed MetLife's IBNR reserves as inadequate."[11]

> "Central States alleges that MetLife and its officers, directors or representatives in the years that followed repeatedly and materially overstated the Company's financial condition and performance—including income, operating earnings, and earnings per share—as a result of MetLife's failure adequately to reserve for death benefits due to beneficiaries of group life insurance policies whose insureds the SSA-DMF identified as deceased but for whom MetLife had not received claims for benefits. These misstatements allegedly included, among other things, misleading (but more qualitative) assertions about MetLife's 'solid underwriting,' its 'disciplined approach to risk and expense managements,' and its 'excellent mortality results' as well as assurances not only that its methods for fixing IBNR reserves complied with generally accepted accounting principles ('GAAP'), but also that such reserves were sufficient to cover future claims.   Many of these allegedly misleading statements, Central States says, were contained in MetLife press releases, presentations, conference calls, and public filings during the Class Period.   Central States alleges also that MetLife was too cavalier in dismissing as 'without merit' various state investigations into its accounting practices.   One of the consequences of these alleged misstatements, Central States avers, is that MetLife stock traded at 'artificially inflated prices' during the Class Period.   When those stock prices fell after MetLife's alleged misstatements came to light in August and October 2011, Central States says it suffered economic harm."[12]

---

[10]

TAC ¶ 87(m).  In fact, this is the only new allegation included in the TAC.

[11]

*Westland II*, 129 F. Supp. 3d at 58; *see* TAC ¶ 175.

[12]

*Westland II*, 129 F. Supp. 3d at 58-59 (footnotes omitted).

II.     *The State Investigations*

"According to Central States, state investigations into MetLife's accounting practices began as early as 2008, when the California Insurance Commission began to look into MetLife's alleged failure to pay some life insurance benefits even after learning that an insured had died.  In September 2009, Central States alleges, Florida and Illinois launched a joint 'Market Conduct Examination' of MetLife's use (or, as the case may be, non-use) of the SSA-DMF.  And in July 2010, Central States says, the New York Attorney General began 'a major fraud probe' into MetLife's alleged practice of retaining and profiting from money held in retained asset accounts that arguably should have been disbursed to beneficiaries or escheated to states.

"On May 19, 2011, MetLife officials testified before the Florida Office of Insurance Regulations.  They acknowledged that the Company had used the SSA-DMF systematically since the 1980s to identify, and to stop payments to, deceased annuitants, but that it had not used the database to identify life insureds whose deaths should have triggered either payments to beneficiaries or, in the absence of identifiable beneficiaries, the start of the escheatment process.

"Four days later, MetLife executives—having been subpoenaed to testify at a hearing into the Company's benefits payment practices—expanded upon that testimony in California, where they acknowledged, among other things, that the Company (1) cross-checked the SSA-DMF against its retained asset account in 2006 and learned of 1,300 matches, resulting in payments to beneficiaries and escheatment to states; (2) cross-checked the SSA-DMF against its roster of individual life insureds in 2007, but had not yet done so for its group life insureds, (3) calculated the dormancy period for escheatment purposes from the date it learned of the death, not the actual date of death, and (4) had decided as early as December 2010 to use the SSA-DMF more broadly (*i.e.*, to cross-check the database against its group life insureds).

"On July 5, 2011, New York officials subpoenaed MetLife for information about its 'practices in identifying and paying out policies for deceased customers.'  The subpoenas stemmed from a concern that life insurers, including MetLife, were using the SSA-DMF to stop annuity payments upon an annuitant's death, but not to pay out death benefits due under life insurance policies, annuity contracts, or retained asset accounts.  This investigation did not end until after the Class Period.

"Notwithstanding the initiation dates of these investigations, Central States alleges, MetLife did not disclose their existence or possible consequences until August 2011—a delay that Central States contends 'violated GAAP and SEC disclosure rules.'  Eventually, Central States alleges, MetLife agreed in April 2012, after the Class Period ended, to pay states 'a total of $500 million to settle claims related to

death benefits.'"[13]


III.     *The ALICO Acquisition and MetLife's Decision to Use the SSA-DMF More Broadly*

"In March 2010—after the state investigations into MetLife's accounting practices began but before they concluded—MetLife announced its intention to purchase the American Life Insurance Company ('ALICO'), an American International Group ('AIG') subsidiary.  The consideration was to consist of $6.8 billion in cash and $8.7 billion in equity, the latter in the form of 78.2 million shares of MetLife common stock, 6.9 million shares of MetLife contingent convertible preferred stock, and 40 million other 'equity units.'  All share amounts were fixed, and the shares were subject to a lockup agreement that provided, among other things, that AIG would not sell any of its MetLife stock until nine months after the deal closed and that it would not sell more than 50 percent of its shares until at least a year after closing.

"On August 2, 2010, MetLife announced that it would sell 75 million shares of common stock at $42 per share to help fund the cash portion of the purchase price. It did so pursuant to an August 3, 2010 registration statement, which incorporated by reference MetLife's Form 10-K for the fiscal year that ended December 31, 2009 and Forms 10-Q for the periods that ended March 31, 2010 and June 30, 2010, and contained representations (or misrepresentations, as Central States alleges) concerning the adequacy of MetLife's IBNR reserves.  MetLife completed its acquisition of ALICO on November 1, 2010 at a total cost of $16.2 billion.

"According to Central States, MetLife subsequently decided—amid discussions with state regulators and while the AIG/ALICO lockup was in effect—to start using the SSA-DMF regularly in all business units, including group life.  And on March 1, 2011, four months after the ALICO acquisition closed and five months before the lockup was scheduled to expire, AIG and MetLife allegedly entered into an agreement that relieved AIG of the lockup restrictions.

"The next day, MetLife announced a public offering of 146.8 million shares of its common stock, priced at $43.25 per share.  Under its terms, but contrary to the terms of the original lockup agreement, AIG completed a secondary offering of all 78.2 million shares of MetLife common stock that it had received for ALICO.  In addition, MetLife completed a follow-on offering of 68.5 million shares of its common stock, the proceeds from which it used to repurchase and cancel the 6.85 million shares of MetLife contingent convertible preferred stock that AIG had

---

[13]      *Id.* at 59-60 (footnotes omitted).

received as compensation for ALICO.  In a concurrent offering, AIG sold also its 40 million MetLife common equity units, leaving it, upon completion of the sale, with none of the MetLife securities it had received for ALICO.

"These offerings were conducted pursuant to a March 4, 2011 registration statement, which incorporated by reference MetLife's Form 10-K for the year that ended December 31, 2010 and its Forms 8-K filed on August 2, 2010, November 30, 2010, March 1, 2011, and March 2, 2011, each of which, Central States says, 'contained false financial statements.'  The March 4, 2011 registration statement contained also (allegedly false) representations about the adequacy of MetLife's IBNR reserves and its 'excellent mortality ratios.'  MetLife announced that the sales were complete on March 8, 2011.

"Central States alleges that AIG's expedited sale of MetLife stock 'was a surprise to analysts and investors' and that it was designed to allow AIG to sell its MetLife shares before MetLife announced publicly that it would use the SSA-DMF to identify additional life insurance liabilities—an announcement that Central States says would have 'risked a steep decline in [MetLife's] stock price and thus, the value of the consideration provided to AIG.'  In effect, Central States contends, MetLife knew that its stock price would decrease, perhaps dramatically, upon its announcement that it would conduct its first-ever cross-check of the SSA-DMF against its roster of group life insureds. But it gave AIG an opportunity to sell its MetLife stock at what Central States says was an artificially inflated price before that happened."[14]

IV.   *MetLife's Stock Price Declines Twice, Allegedly Harming Central States*

"On August 5, 2011, Central States alleges, MetLife in its Form 10-Q for the period ending June 30, 2011 disclosed for the first time the scope and severity of various state 'regulatory investigations into its death benefits practices.'  MetLife acknowledged that '[m]ore than 30 U.S. jurisdictions are auditing MetLife . . . for compliance with unclaimed property laws' and that those investigations 'may result' in administrative penalties, additional payments to beneficiaries and escheatments to states, and changes to MetLife's procedures for identifying and escheating abandoned property.  Further, it admitted that it was 'not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial' and, Central States alleges, it no longer dismissed investigations into its retained asset accounts as being 'without merit.'

---

[14]

*Id.* at 60-62 (footnotes omitted).

"These disclosures allegedly caused MetLife's stock price to decline from $36.90 on August 4 to a low of $34.93 on August 5, closing at $36.35. The stock price fell further to a close of $32.74 on August 8, but that drop coincided with news of much broader impact: Standard & Poor's ('S & P') downgraded the credit rating of the United States for the first time in history after the market closed on August 5.

"On October 6, 2011, MetLife filed a Form 8-K disclosing, among other things, that it would take a $115-$135 million after-tax charge to 'adjust' (*i.e.*, increase) its reserves to account for additional payments owed to beneficiaries identified as a consequence of its first-ever cross-check of the SSA-DMF against its roster of group life insureds. At the same time, MetLife revealed that it would take two smaller charges, one related to damage from severe storms including Hurricane Irene ($80-$100 million) and the other related to a September 1, 2011 liquidation plan for Executive Life Insurance Company of New York ($40 million). These disclosures collectively are alleged to have caused MetLife's stock price to decline from a closing price of $30.69 on October 6 to a closing price of $28.80 on October 7, or 6.16 percent. By contrast, Central States alleges, the S & P 500 and S & P 500 Insurance Indices declined only 0.81 and 3.13 percent, respectively, over the same period. Relying on an event study referred to in the [TAC], Central States alleges that the 6.16 percent decline in MetLife's share price was statistically significant.

"MetLife's financial results for the third quarter of 2011, which were released after the end of Class Period, revealed a 23 percent decrease in operating earnings for insurance products, allegedly due at least in part to the $117 million after-tax charge taken as a result of the SSA-DMF cross-check. Another alleged consequence of the $117 million reserve increase was that MetLife's group life and individual life mortality ratios each climbed to 98.5 percent, a markedly higher figure than those in previous quarters."[15]

V.     *Prior Proceedings*

"This action was commenced in January 2012 . . . on behalf of a class of all purchasers of MetLife common stock during the period February 2, 2010 to October 6, 2011, inclusive. The original complaint alleged claims under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the 'Exchange Act') and Rule 10b-5 thereunder. It was amended some months later to add claims under Sections 11, 12 and 15 of the Securities Act of 1933 (the 'Securities Act'), among other changes. Defendants moved to dismiss.

---

[15]

   *Id.* at 62-63 (footnotes omitted).

"In an opinion dated February 28, 2013 ('[February 2013] Opinion'), the Court granted in part the defendants' motions to dismiss the amended complaint.  It dismissed Central States' Exchange Act claims for failure to plead loss causation and its Section 12(a)(2) Securities Act claims for failure to allege that the defendants had solicited the securities purchases.  It upheld the sufficiency of most of Central States' claims under Sections 11 and 15 of the Securities Act.  Both parties moved for reconsideration.  The Court denied the motions, but granted Central States leave to amend and invited the defendants to incorporate their arguments for reconsideration into motions to dismiss the SAC.  Central States filed its SAC on March 15, 2013, and the MetLife and Underwriter Defendants subsequently moved to dismiss on August 23, 2013.

"Not long after those motions were filed, the Supreme Court granted certiorari in [*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*], which raised questions similar to some of those presented in this case.  Rather than decide defendants' motions to dismiss while *Omnicare* was pending, this Court waited for the Supreme Court to act.  On March 24, 2015, the day *Omnicare* was decided, this Court entered an order (1) affording Central States an opportunity to amend its complaint, (2) denying defendants' motions to dismiss without prejudice to renewal, and (3) seeking supplemental briefing in light of *Omnicare*.  Central States ultimately chose not to amend, and the MetLife and Underwriter Defendants moved to dismiss the SAC on May 21, 2015."[16]

In an opinion dated September 11, 2015 ("September 2015 Opinion"), the Court granted in substantial part defendants' motions to dismiss the SAC.  It dismissed all of Central States' Exchange Act claims—most for failure to plead an actionable misrepresentation or omission[17] and some for failure to plead *scienter*.[18]  It dismissed all of Central States' claims under Section 12 of the Securities Act and substantially all of Central States' claims under Sections 11 and

---

[16]

*Id.* at 63-64 (footnotes omitted).

[17]

*See id.* at 72-77.

[18]

*See id.* at 80.

15 of the Securities Act, the latter for failure to plead an actionable misrepresentation or omission.[19] It upheld Central States' Sections 11 and 15 claims to the extent they were "based upon the alleged misstatements of mortality ratios."[20]

As noted, Central States now has filed the TAC with its one substantial new allegation.[21]  The MetLife and Underwriter Defendants move to dismiss the TAC.

### Discussion

I.    *Legal Standard*

"To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts 'to state a claim to relief that is plausible on its face.'"[22]  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[23]  The Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor."[24]  In addition, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the

---

[19]

      *See id.* at 87-89.

[20]

      *Id.* at 89-90.

[21]

      DI 95.

[22]

      *Westland II*, 129 F. Supp. 3d at 64 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[23]

      *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[24]

      *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[25]

"To plead fraud under the securities laws, a complaint must state with particularity the circumstances constituting fraud and must satisfy also the Private Securities Litigation Reform Act of 1995 ('PSLRA'), which requires, among other things, that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[26]   These "[e]xacting pleading requirements are among the control measures Congress included in the PSLRA" to serve as "check[s] against abusive litigation by private parties."[27]

## II.    Exchange Act Claims

### A.    Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of SEC rules and regulations.[28]   SEC Rule 10b-5, in turn, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances [in] which they

---

[25]

*Id.*

[26]

*Westland II*, 129 F. Supp. 3d at 64-65 (citations omitted) (internal quotation marks omitted).

[27]

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

[28]

15 U.S.C. § 78j(b).

were made, not misleading."[29]  To recover for violations of Section 10(b) and Rule 10b-5, a private

plaintiff "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3)

a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[30]

### 1.    *Material Misrepresentations or Omissions*

To allege adequately a material misrepresentation or omission, a plaintiff must plead

facts that, if true, would be sufficient to show that the defendant either (1) made an untrue statement

of a material fact, or (2) omitted to state a material fact necessary to make whatever statements it

made not misleading.[31]  For purposes of a motion to dismiss, "a plaintiff satisfies the materiality

requirement . . . by alleging a statement or omission that a reasonable investor would have

considered significant in making investment decisions."[32]  Given that materiality is a mixed question

of law and fact, a court should dismiss a complaint on materiality grounds only if the statement or

omission is "so obviously unimportant to a reasonable investor that reasonable minds could not

differ on the question of [its] importance."[33]  As the Court previously held, Central States has alleged

---

[29]

> 17 C.F.R. § 240.10b-5(b).

[30]

> *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal
> quotation marks omitted) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
> 133 S. Ct. 1184, 1192 (2013)).

[31]

> 17 C.F.R. § 240.10b-5(b).

[32]

> *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

[33]

> *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d
> 187, 197 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Goldman v. Belden*,

materiality adequately at this stage in the proceedings.[34]

"In addition to alleging that it is material, a Section 10(b) plaintiff who challenges a *statement* must allege adequately that the statement is 'untrue.'"[35] An untrue statement of fact—as opposed to opinion or belief—"is one that was false *at the time it was made*";[36] "[a] statement believed to be true when made, but later shown to be false, is insufficient."[37]  To plead falsity, a plaintiff "must do more than simply assert that a statement is false—[it] must demonstrate with specificity why that is so."[38]  For a statement of opinion or belief to be actionable as an untrue statement of a material fact, a plaintiff must plead facts to show that the defendant "did not hold the belief [it] professed."[39]

A plaintiff whose claim for relief rests on an *omission* of a material fact

"need not allege falsity to state a legally sufficient claim.  Instead, such a plaintiff must plead facts that, if true, would be sufficient to show that the defendant had a

---

754 F.2d 1059, 1067 (2d Cir. 1985)).

[34]

*Westland I*, 928 F. Supp. 2d at 719 ("Here, the alleged corrective disclosures included the announcement of a nationwide investigation into one of MetLife's important businesses and an increase in reserves that caused operating earnings for insurance products to be down 23 percent for the quarter.  Plaintiff alleges that MetLife's shares dropped in value after the disclosures.  This is sufficient.").

[35]

*Westland II*, 129 F. Supp. 3d at 67.

[36]

*Id.* (internal quotation marks omitted) (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)).

[37]

*Lululemon*, 14 F. Supp. 3d at 571.

[38]

*Westland II*, 129 F. Supp. 3d at 67 (quoting *Lululemon*, 14 F. Supp. 3d at 571).

[39]

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).

duty to disclose the omitted information and failed to do so.  Such a duty may arise expressly, pursuant to a statute or regulation, or implicitly 'as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts.'"[40]

To allege adequately that a defendant omitted to state facts necessary to make a statement of opinion or belief not misleading, a plaintiff must plead facts to "call into question the [speaker's] basis for offering the opinion."[41]  Specifically, a plaintiff "must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[42]  As the Supreme Court has made clear, "[t]hat is no small task for an investor."[43]

> In substance, the TAC
>
> "alleges that the financial statements issued by MetLife during the Class Period were misleading—and thus did not reflect accurately the financial condition and performance of the Company—for three reasons, each of which stems from MetLife's alleged failure to cross-check the SSA-DMF against its roster of group life insureds."[44]

But before enumerating those reasons, it is helpful to make one point abundantly clear.  As the Court wrote previously and as remains true of the TAC:

---

[40]     *Westland II*, 129 F. Supp. 3d at 67 (citations omitted) (quoting *Lululemon*, 14 F. Supp. 3d at 572).

[41]     *Omnicare*, 135 S. Ct. at 1332.

[42]     *Id.*

[43]     *Id.*

[44]     *Westland II*, 129 F. Supp. 3d at 67-68.

> "Central States nowhere claims that MetLife made any statement—true or false—as to what its IBNR reserves actually were.  In other words, there is no suggestion that the Company said its IBNR reserves were $X and that such statement was false because those reserves actually were $Y.  Nor is there any suggestion that such a statement was materially misleading because MetLife did not believe its IBNR reserves actually were $X, that MetLife had no reasonable basis for saying its IBNR reserves actually were $X, or anything of the sort."[45]

The only explicit representations Central States alleges MetLife made about its IBNR reserves relate to the method by which MetLife determines IBNR estimates.[46]  Central States' claims are more subtle than those examples.

First, Central States contends that MetLife's financial statements "were false or misleading because the amount of its allegedly inadequate reserves . . . necessarily was reflected in those statements."[47]

Second, Central States asserts that "MetLife made qualitative statements about its mortality results, its underwriting practices, and its approach to risk and expense management that were false [or] misleading in light of the alleged inadequacy of the Company's IBNR reserves."[48]

---

[45]

     *Id.*

[46]

     *See* TAC ¶ 69.

[47]

     *Westland II*, 129 F. Supp. 3d at 68.

[48]

     In its September 2015 Opinion, the Court

> "conclude[d] that MetLife's characterizing its underwriting as 'solid,' its 'approach to risk and expense managements' as 'disciplined,' and its 'mortality results' as 'excellent,' as well as other such representations are not actionable under the securities laws.  Rather, they are 'merely generalizations regarding [MetLife's] business practices' . . . of the type that the Second Circuit 'consistently [has] held to be inactionable' puffery, in part because they are 'too general to cause a reasonable investor to rely upon them.'" *Id.* at 77.

The Court treats these first two categories of claims together because

> "all of these claims are derivative of the same question: were MetLife's implicit representations regarding the adequacy of its IBNR reserves either (1) untrue statements of a material fact, or (2) omissions of a material fact that rendered the Company's financial statements throughout the Class Period misleading?"[49]

Lastly, "Central States contends that MetLife falsely stated that investigations into its retained asset accounts were 'without merit' and failed timely to disclose the seriousness of state investigations into its death benefits payment practices—a failure that Central States says violated, among other things, SEC Regulation S-K, Item 303."[50]

### a.   The Adequacy of MetLife's IBNR Reserves

In its earlier opinions, the Court concluded that MetLife's implicit representations regarding the adequacy of its IBNR reserves were statements of opinion or belief, not of fact.[51]  That conclusion has not changed.  Accordingly, the Court turns now to the question of whether those implicit representations were material misrepresentations or omissions for purposes of the securities laws.  In other words: has Central States alleged adequately that (1) MetLife did not actually believe that its IBNR reserves were adequate but nevertheless implied that they were, or (2) MetLife's implicit representations regarding the adequacy of its IBNR reserves did not rest on a meaningful

---

The Court finds no reason to revisit its earlier conclusion as to these representations.

[49]    *Id.* at 68.

[50]    *Id.*

[51]    *Id.* ("In its February 2013 Opinion, the Court noted that MetLife's IBNR reserves capture losses for which claims have not been reported but must be estimated so the company can pay future claims.  While these estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief, not of fact.").

inquiry, rendering them misleading to a reasonable investor reading MetLife's financial statements in context?  In view of Central States' new allegation that the 2007 SSA-DMF cross-check revealed a $25 million reserve shortfall, the Court concludes that the answer to both of these questions, for purposes of these motions to dismiss alone, is "yes."

The TAC alleges that running the SSA-DMF against a portion of MetLife's life insurance policies in 2007 uncovered a reserve shortfall of $25 million.  That is a significant difference from the SAC, which was silent as to the effect the 2007 cross-check had on MetLife's IBNR reserves.[52]  It is plausible, therefore, to infer that MetLife knew that its method for setting IBNR reserves over the previous several decades had not accounted adequately for all deceased policy holders and, in consequence, that MetLife knew that its estimated IBNR reserves were insufficient to meet its life insurance policy obligations.  That is sufficient to plead that MetLife did not actually believe the implicit representations it made to investors.  Those allegations are sufficient also to *plead* that MetLife omitted to state material facts rendering its implicit statements about the adequacy of its IBNR reserves misleading.  The $25 million shortfall alleged "call[s] into question" MetLife's basis for offering its IBNR opinions because it suggests that MetLife's statements did not "fairly align[] with the information in . . . [its] possession at the time"[53]—namely that its method for identifying IBNR claims and setting its reserves was inaccurate.

b.      *State Investigations: Alleged Non-Disclosure and Item 303*

The TAC's allegations regarding state investigations into MetLife's accounting

---

[52]      *See id.* at 73-77.

[53]      *Omnicare*, 135 S. Ct. at 1329.

practices essentially are unchanged from those in the SAC.  First, Central States contends that "MetLife repeatedly and falsely claimed in SEC filings throughout the Class Period that an investigation into its retained asset accounts by the New York Attorney General was 'without merit.'"[54] Second, Central States "alleges that MetLife failed timely to disclose in SEC filings throughout the Class Period the seriousness of other states' investigations into its death benefits payment practices and/or its non-use of the SSA-DMF."[55]

### i.      Retained Asset Accounts

In its September 2015 Opinion, the Court concluded that the allegedly untrue or misleading statement with which Central States takes issue "is a statement of opinion or belief about legal compliance."[56]  The Court concluded further that Central States

> "alleged no facts whatsoever regarding the basis for MetLife's opinion—no facts about the inquiry MetLife did or did not conduct into the allegations concerning its retained asset accounts, no facts concerning MetLife's understanding of the legality of its relevant practices, and no facts regarding how MetLife formulated its legal opinion."[57]

Accordingly, the Court held that Central States had not "alleged adequately either that MetLife did not believe that various allegations regarding its retained asset accounts were 'without merit,' or that it omitted to state a fact (or facts) necessary to prevent its view regarding those allegations from

---

[54]      *Westland II*, 129 F. Supp. 3d at 80.

[55]      *Id.* at 80-81.

[56]      *Id.* at 81.

[57]      *Id.* at 82.

misleading reasonable investors reading the Company's financial statements fairly and in context."[58]

The TAC did not buttress these allegations in any way.  In consequence, Central States' retained asset account-related claims are dismissed for the reasons stated previously.[59]

ii.     *Death Benefit Practices and Non-Use of the SSA-DMF*

The TAC "alleges also that 'MetLife failed to disclose loss contingencies and legal proceedings related to a multi-state investigation concerning the Company's use of the SSA-DMF, in violation of,' among other things, SEC Regulation S-K, Item 303."[60]  The relevant question before the Court "is whether the [TAC] adequately alleges that MetLife reasonably expected during the Class Period that it would incur either fines or future liabilities (or both) that would impact its future financial results."[61]

The Court accepts as true, as it must for purposes of this motion, the TAC's allegation that

> "MetLife—in consultation with, or perhaps at the implicit or explicit command of, state regulators—began in summer 2010 'to devise a plan toward making a decision to utilize the SSA-DMF more regularly across its business units[.]'  [Accordingly,]

---

[58]
    *Id.*

[59]
    *Id.* at 81-82.

[60]
    *Id.* at 82; TAC ¶ 163(a).

    In its September 2015 Opinion, the Court declined to revisit its earlier ruling dispensing with Central States' FASB ASC 450 and SEC Regulation S-K, Item 103 claims because "[t]he SAC contain[ed] no new allegations as to those claims."  *Westland II*, 129 F. Supp. 3d at 82 n.219.  Given that the TAC contains no new allegations either, the Court again declines to revisit them.

[61]
    *Id.* at 83.

there is no doubt that MetLife reasonably should have expected before August 2011 to use the SSA-DMF more broadly."[62]

In view of Central States' allegation that the 2007 SSA-DMF cross-check revealed a $25 million reserve shortfall, "the MetLife Defendants reasonably should have expected that the state investigations would cause MetLife to alter its IBNR reserves. . . . Assuming these facts to be true, [Central States] has alleged adequately that MetLife had a duty under Item 303 to disclose the state investigations before August 2011."[63]

In sum, the Court holds that Central States has alleged adequately that MetLife's implicit representations about the adequacy of its IBNR reserves are material misrepresentations or omissions under Rule 10b-5. The Court further holds that Central States has alleged adequately that MetLife omitted to state material facts about state investigations into its accounting practices that it had a duty to disclose under SEC Regulation S-K, Item 303. "But that is not the end of the inquiry under Rule 10b-5."[64]

### 2. *Scienter*

To state a claim under Section 10(b) and Rule 10b-5, a private plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with

---

[62]

*Id.*; TAC ¶ 106.

[63]

*Westland I*, 928 F. Supp. 2d at 718.

[64]

*Westland II*, 129 F. Supp. 3d at 80.

[*scienter*]"[65]—that is, with the "intent to deceive, manipulate, or defraud."[66]   Indeed, it is not sufficient to allege that "a reasonable person *could* infer that the defendant acted with" *scienter*;[67] "rather, such evidence must be 'cogent and compelling.'"[68]  A plaintiff "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[69] Specifically, the Second Circuit has held that a strong inference of *scienter*

---

[65]

    15 U.S.C. § 78u-4(b)(2).

[66]

    *Tellabs*, 551 U.S. 308, 319 (internal quotation marks omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)).

    When the defendant is a corporation, a plaintiff ultimately must prove that an agent of the corporation "committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[67]

    *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quoting *Tellabs*, 551 U.S. at 314).

    The allegations a plaintiff must make to allege sufficiently that a defendant acted with *scienter* are markedly different than those required sufficiently to allege an actionable misstatement or omission.  To allege an actionable misstatement or omission, a plaintiff need allege only facts from which a reasonable person plausibly could infer that the defendant made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made not misleading.  Furthermore, a court draws all reasonable inferences in favor of the plaintiff.  In contrast, to allege *scienter* adequately, "[i]t *does not suffice that a reasonable factfinder plausibly could infer* from the complaint's allegations the requisite state of mind."  *Tellabs*, 551 U.S. at 314 (emphasis added).  An inference of *scienter* must be cogent and compelling, and a court must consider all competing inferences rationally drawn from the complaint.  In other words, a court does not give the plaintiff the same benefit of the doubt when it comes to alleging *scienter* as it does with stating an actionable misstatement or omission.

[68]

    *Westland II*, 129 F. Supp. 3d at 80 (quoting *Tellabs*, 551 U.S. at 324).

[69]

    *ATSI Commc'ns*, 493 F.3d at 99.

> "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."[70]

For a defendant's conduct to qualify as reckless, it is not enough to allege a mere "heightened form of negligence;" the defendant's conduct must have been "highly unreasonable"—that is to say, "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[71]  In the last analysis, "a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."[72]

Central States argues that the TAC satisfies the pleading requirements of the PSRLA, as explained in *Novak*, in two ways.  First, Central States claims that it has pleaded sufficiently that the MetLife Defendants "indisputably had access to, yet consciously ignored, information" revealing the inadequacy of the Company's IBNR reserves, which rendered certain of its public statements false and misleading.[73]  Second, Central States claims that the MetLife Defendants were "motivated

---

[70]

       *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (citations omitted).

[71]

       *S. Cherry St.*, 573 F.3d at 109 (emphasis omitted) (internal quotation marks omitted) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).

[72]

       *Tellabs*, 551 U.S. at 314.

[73]

       DI 102, at 17.

       Central States' first argument encompasses its claims based on failure to disclose the state investigations prior to August 2011 because the viability of those claims hinges on MetLife having made material misrepresentations and omissions regarding the implied adequacy of its IBNR reserves.

to maintain artificial inflation in MetLife's stock price to raise the cash portion of the American Life Insurance Company ('ALICO') acquisition and complete its obligations to American International Group, Inc. ('AIG')."[74]   Neither argument is availing.

>    a.    *Knowledge of or Access to Information*

When a plaintiff contends that a defendant "had access to contrary facts, [the plaintiff] must specifically identify the reports or statements containing this information."[75]   As the Second Circuit has made clear, mere access to "raw data" without more is insufficient to raise a strong inference of *scienter*.[76]

Here, Central States alleges that because the 2007 SSA-DMF cross-check against individual life insurance policies revealed that small inaccuracies in IBNR estimates had accumulated over time to a material amount in that portion of MetLife's business, MetLife knew that similar results would obtain if it performed a cross-check against its group life insurance policies.   Critically, Central States does not allege that MetLife actually performed such a cross-check prior to 2011.   Rather, its allegations depend entirely on the assumption that MetLife knew that whatever the 2007 cross-check revealed about its individual life insurance business would

---

[74]     DI 102, at 21.

[75]     *Novak*, 216 F. 3d at 309.

[76]     *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("Teamsters' broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance. Accordingly, they have not raised an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of Dynex's public statements.").

apply equally to its group life insurance business.  Yet Central States offers no support for that assumption, let alone facts constituting strong circumstantial evidence of the MetLife Defendants' "egregious refusal to see the obvious."[77]  Nowhere does the TAC allege any

> "facts concerning the size of MetLife's IBNR reserves; . . . the relative sizes of MetLife's group and individual life insurance pools and how the $80 million in unpaid individual life insurance benefits revealed as a result of the 2007 SSA-DMF cross-check might have affected what estimated reserves should have been preceding the 2011 SSA-DMF cross-check; MetLife's methodology for calculating its reserves; whether MetLife's methodology accounted for unreported deaths; or the impact of various states' policies for collecting unclaimed benefits."[78]

In these circumstances, the TAC fails to raise "an inference of *scienter* based on knowledge of or access to information demonstrating the inaccuracy of [MetLife's] public statements."[79]

### b.    *Motive and Opportunity*

As senior officers and directors at MetLife, the Individual Defendants had the "opportunity" to commit fraud.[80]  Accordingly, the relevant question is whether Central States has pleaded adequately that they had a motive to do so.

To raise a strong inference of *scienter* based on motive and opportunity, Central States must allege that the Individual Defendants "benefitted in some concrete and personal way

---

[77]

    *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y.1989)).

[78]

    *Westland II*, 129 F. Supp. 3d at 75.

[79]

    *Teamsters*, 531 F.3d at 196.

[80]

    *See Chill*, 101 F.3d at 267.

from the purported fraud."[81]   It is not sufficient to allege "motives possessed by virtually all corporate insiders,"[82] including the "motive to maintain the appearance of corporate profitability" or to increase executive compensation.[83]

Central States argues that it has alleged adequately that the Individual Defendants were motivated to inflate MetLife's stock price in order to (1) raise the cash portion of the ALICO acquisition, and (2) raise cash to satisfy MetLife's "$3 billion obligation" in connection with its stock repurchase.[84]   The problem with Central States' first argument is that it nowhere appears in the TAC and therefore cannot form the basis for a finding of *scienter*.[85]

As to Central States' second argument, it represents a fundamental misunderstanding of the ALICO transaction.   Under the terms of the Coordination Agreement, MetLife agreed to sell 68,570,000 shares of its common stock in order to repurchase from AIG 6,857,000 shares of MetLife contingent convertible preferred stock.   The Coordination Agreement makes clear that the purchase price of the 6,857,000 shares of MetLife preferred stock by definition was equal to the net proceeds of MetLife's sale of the 68,570,000 shares of its common stock.[86]   In consequence, there

---

[81]

       *Novak*, 216 F.3d at 307-08.

[82]

       *Id.* at 307.

[83]

       *Chill*, 101 F.3d at 268.

[84]

       DI 102, at 21-23.

[85]

       *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (explaining that a party may not amend pleadings through a brief).

[86]

       DI 107-1 §§ 1.1, 2.3.

28

is no plausible—must less strong—inference to be drawn that the Individual Defendants were motivated by a need to raise cash for the stock repurchase.  Moreover, the fact that the alleged misstatements and omissions began over three years before the acquisition[87]

> "renders any connection between the events dubious at best.  At most, [Central States] allege[s] a generalized desire to achieve a lucrative acquisition proposal. Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another."[88]

In sum, Central States fails to allege the existence of information—as opposed to raw data—that would demonstrate that the implicit representations made to investors were untrue or misleading.  It has failed also to allege that anyone at MetLife had a motive to mislead investors about the adequacy of its IBNR reserves.  Moreover, competing and plausible inferences arise in addition to those urged by Central States.  For example, one might infer that no one at MetLife thought the representations untrue or misleading because "MetLife determined IBNR reserves differently for its group life insureds than it did for its individual life insureds."[89]  Or one could infer that a reserve increase of $25 million did not raise any red flags because such an adjustment was insubstantial compared to the size of MetLife's IBNR reserves as a whole.  Central States would have the Court infer that the MetLife Defendants were at least reckless.  Based on the allegations in the TAC, however, the Court cannot say that this inference is "at least as compelling as any

---

[87]

Although the Class Period runs from February 2, 2010 until October 6, 2011, the TAC alleges in substance that MetLife's financial statements had been misstated since 2007 when it allegedly performed the SSA-DMF cross-check on individual policies and uncovered $80 million in unpaid liabilities.

[88]

*ECA*, 553 F.3d at 201 (citations omitted) (internal quotation marks omitted) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001)).

[89]

*Westland II*, 129 F. Supp. 3d at 76.

opposing inference of nonfraudulent intent."[90]  Accordingly, Central States has failed to allege facts presenting "cogent and compelling" evidence that the MetLife Defendants implicitly made material misrepresentations or omissions about the adequacy of its IBNR reserves, or omitted to state material facts about the state investigations with *scienter*. In consequence, Central States' Section 10(b) claims cannot survive these motions to dismiss.

       B.       *Section 20(a) Claims*

"Section 20(a) imposes joint and several liability on control persons for underlying violations of the Exchange Act.  To state a claim under Section 20(a), a plaintiff must allege both a primary violation of the Exchange Act and control over the primary violator."[91]  Having failed to allege a primary violation of the Exchange Act, Central States' Section 20(a) claims are dismissed.

III.      *Securities Act Claims*

"Central States alleges also violations of Sections 11, 12(a), and 15 of the Securities Act based on losses allegedly traceable to two public offerings of MetLife common stock—one on August 3, 2010 and one on March 4, 2011."[92]  The Court granted in part and denied in part

---

[90]      *Tellabs*, 551 U.S. at 314.

[91]      *Westland II*, 129 F. Supp. 3d at 87 (citations omitted).

[92]      *Id.*

defendants' motions to dismiss these claims in its February 2013[93] and September 2015 Opinions.[94]
Other than the addition of the new reserve increase allegation, the Securities Act claims in the TAC
have not changed from those in the amended complaint or SAC.  Accordingly, "there is no need
revisit the Court's earlier dismissal of Central States' Section 12(a)(2) claims.  Nor is there need to
re-evaluate the Court's partial dismissal of Central States' Sections 11 and 15 claims."[95]  With
respect to the remaining claims, the Court concludes that Central States has alleged adequately
violations of Sections 11 and 15.

A.     *Section 11 Claims*

Section 11 gives "purchasers [of securities] a right of action . . . for material
misstatements or omissions in registration statements."[96]  "To state a claim under Section 11, a
plaintiff must allege, among other things, that a registration statement 'contained an untrue statement
of a material fact or omitted to state a material fact . . . necessary to make the statements therein not
misleading.'"[97] Although Section 11 "prohibit[s] some of the same conduct" as Section 10(b) of the
Exchange Act, "there are important (and, for present purposes, relevant) distinctions between" the

---

[93]
     *Westland I*, 928 F. Supp. 2d at 716-22.

[94]
     *Westland II*, 129 F. Supp. 3d at 87-89.

[95]
     *Id.* at 88 & n.254.

[96]
     *Omnicare*, 135 S. Ct. at 1323.

[97]
     *Westland II*, 129 F. Supp. 3d at 88 (quoting 15 U.S.C. § 77k).

two.[98]  In particular, "Section 11 plaintiffs, unlike Section 10(b) plaintiffs, need not allege *scienter*,
reliance, or loss causation in order to state a cognizable claim."[99]

   As noted above, the TAC alleges adequately that (1) MetLife omitted to state material
facts about its inquiry into or knowledge concerning its implicit representations with respect to the
adequacy of the Company's IBNR reserves thereby rendering those representations misleading, and
(2) MetLife omitted to state material facts about the pending state investigations prior to August
2011, which it had a duty to disclose under SEC Regulation S-K, Item 303, thereby rendering certain
of its public statements misleading.  That is sufficient to state claims under Section 11 in those
respects.[100]

   The MetLife and Underwriter Defendants argue that these claims nevertheless should
be dismissed for absence of loss causation.  For the reasons stated in the Court's February 2013
Opinion, Central States' Section 11 claims cannot be dismissed on this basis:

> "Plaintiff is not required to allege loss causation in order to withstand a motion to
> dismiss claims under Sections 11 and 12(a)(2).  Loss causation is an affirmative
> defense, the burden of proof for which rests with the defendant.  It is proper,
> however, to dismiss a complaint where 'it is apparent from the face of the complaint
> that the plaintiff cannot recover her alleged losses.' . . . [I]t is not apparent from the
> face of the complaint that plaintiff will be unable to recover based on either the

---

[98]

  *Id.*

[99]

  *Id.* (internal quotation marks omitted) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347, 359 (2d Cir. 2010)).

[100]

  Central States disclaims any allegation of knowing, reckless or otherwise intentional
misconduct for purposes of its Securities Act claims.  TAC ¶ 211 ("The Securities Act
claims . . . are based on strict liability and negligence and are not based on any allegation
that any defendant engaged in fraud or intentional misconduct.").  Accordingly, Central
States cannot state a claim under Section 11 on the basis that MetLife's implicit IBNR
representations were not honestly held.  *Omnicare*, 135 S. Ct. at 1327.  It can proceed only
on an omissions theory.

August 5 or October 6, 2011 disclosures.  While defendants may prove that the drops in stock value were due to other market forces, that possibility is insufficient to defeat claims under Sections 11 and 12(a)(2) on a motion to dismiss."[101]

B.    *Section 15 Claims*

"Section 15 is the Securities Act equivalent of Section 20(a) of the Exchange Act: it imposes joint and several liability on control persons for underlying violations of the Securities Act.  'Thus, the success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under [S]ections 11 and 12.'"[102] Pursuant to the foregoing analysis, the Section 15 claims in the TAC survive these motions to dismiss to the extent they depend upon Central States' viable Section 11 claims described above.

*Conclusion*

The defendants' motions to dismiss the TAC [DI 96, DI 99] are granted to the extent that (1) all claims under the Exchange Act and Rule 10b-5, (2) all claims under Section 12 of the Securities Act, and (3) all claims under Sections 11 and 15 of the Securities Act except those based upon (a) MetLife's alleged omission of material facts about its inquiry into or knowledge concerning its implicit representations about the adequacy of the Company's IBNR reserves, and (b) MetLife's

---

[101]

*Westland I*, 928 F. Supp. 2d at 719 (footnote omitted) (quoting *In re Merrill Lynch Investment Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006)).

[102]

*Westland II*, 129 F. Supp. 3d at 89 (footnote omitted) (quoting *Morgan Stanley*, 592 F.3d at 358).

33

alleged omission of material facts about the pending state investigations are dismissed.  The motions

to dismiss are denied in all remaining respects.

        SO ORDERED.

Dated:        November 10, 2016

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)