UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

CITY OF WESTLAND POLICE AND FIRE
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                         Plaintiff,

      vs.

METLIFE INC., et al.,

                        Defendants.

————————————————————— 

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:12-cv-00256-LAK

CLASS ACTION

MEMORANDUM OF LAW IN SUPPORT
OF LEAD PLAINTIFF AND CLASS
REPRESENTATIVE'S MOTION TO
EXCLUDE THE TESTIMONY OF
PROFESSOR ALLEN FERRELL, PH.D.

**[REDACTED]**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................1

II.     RELEVANT FACTS ...................................................................................................5

III.    LEGAL STANDARDS ...............................................................................................8

        A.      Expert Testimony....................................................................................................8

        B.      Negative Causation ................................................................................................9

IV.     ARGUMENT.............................................................................................................11

        A.      Ferrell's Testimony Does Not Fit Defendants' Burden of Proving
                Negative Causation ..............................................................................................11

        B.      Ferrell's Novel Application of Heteroscedasticity Rests on Data Mining
                and Bias..................................................................................................................12

        C.      Ferrell's Flawed Event Study Methodology Rests on a False Equivalence
                Between a Statistically Nonsignificant Return and Proof of No Causation ..........15

        D.      Ferrell's Event Study Methodology Cannot Disprove Causality ..........................17

        E.      Ferrell's Methodology Ignores Defendants' Burden of Disaggregation ..............19

        F.      Ferrell's Methodology Does Not Account for Leakage .......................................21

        G.      Ferrell's Opinions Invade the Province of the Fact Finder and Court and
                His Attacks on the Event Study in the Complaint Are Irrelevant.........................25

V.      CONCLUSION..........................................................................................................25

1521421_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987)....................................................................................................9

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................................4, 17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   928 F. Supp. 2d 705 (S.D.N.Y. 2013).................................................................................1

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   No. 12-cv-0256 (LAK), 2016 WL 6652731
   (S.D.N.Y. Nov. 10, 2016) ..................................................................................................6

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..............................................................................................8, 9, 18

*Denny v. Westfield State Coll.*,
   669 F. Supp. 1146 (D. Mass. 1987),
   *aff'd*, 880 F.2d 1465 (1st Cir. 1989) ................................................................................14

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................................4, 21

*Estate of Hill v. ConAgra Poultry Co.*,
   No. CIV.A.4:94CV0198-HLM, 1997 WL 538887
   (N.D. Ga. Aug. 25, 1997)...................................................................................................14

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015),
   *aff'd*, 873 F.3d 85 (2d Cir. 2017) ..............................................................................10, 12

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017),
   *cert. denied*, 138 S. Ct. 2679 (2018) ...........................................................*passim*

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................................11

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)..............................................................................................13

**Page**

*In re the Bear Stearns Cos., Inc. Sec.,*
No. 08 MDL 1963 (RWS), 2016 WL 4098385
(S.D.N.Y. July 25, 2016) ...................................................................................21

*In re Countrywide Fin. Corp. Sec. Litig.,*
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................................22

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec.,*
281 F.R.D. 174 (S.D.N.Y. 2012) ..........................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
245 F.R.D. 147 (S.D.N.Y. 2007), *aff'd in part and
vacated in part on other grounds,*
574 F.3d 29 (2d Cir. 2009)...................................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009)...................................................................................21

*In re Initial Pub. Offering Sec. Litig.,*
174 F. Supp. 2d 61 (S.D.N.Y. 2001).....................................................................8

*In re Lehman Bros. Sec. & Erisa Litig.,*
131 F. Supp. 3d 241 (S.D.N.Y. 2015)..................................................................10

*In re Novatel Wireless Sec. Litig.,*
846 F. Supp. 2d 1104 (S.D. Cal. 2012)................................................................12

*In re Parmalat Sec. Litig.,*
375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................................10

*In re Petrobras Sec.,*
862 F.3d 250 (2d Cir. 2017),
*petition for cert. filed*, No. 17-664
(U.S. Nov. 3, 2017).................................................................................4, 17, 18

*In re Vivendi, S.A. Sec. Litig.,*
838 F.3d 223 (2d Cir. 2016)..................................................................................4

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)...............................................................................................9

*Lentell v. Merrill Lynch & Co.,*
396 F.3d 161 (2d Cir. 2005)................................................................................10

- iii -

Page

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007)...................................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)....................................................................................................................17

*McMahan & Co. v. Wherehouse Entm't*,
    65 F.3d 1044 (2d Cir. 1995)................................................................................................2, 9

*NECA-IBEW Health & Welfare Fund v.*
*Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)....................................................................................................9

*Olin Corp. v. Lamorak Ins. Co.*,
    No. 84-cv-1968 (JSR), 2018 WL1901634
    (S.D.N.Y. Apr. 17, 2018)........................................................................................................12

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ................................................................................................22

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)....................................................................................................8

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77k................................................................................................................................. *passim*
    §77k(e) .............................................................................................................................1, 9, 11
    §77l .............................................................................................................................................9
    §77o......................................................................................................................................2, 12
    §78j(b)................................................................................................................................10, 13

Federal Rule of Evidence
    Rule 702 ....................................................................................................................................8

1521421_1

## I.     INTRODUCTION

Under §11 of the Securities Act of 1933 ("Securities Act"), negative causation is an affirmative defense, and its mirror, loss causation, is not an element of plaintiff's claim.  *See* 15 U.S.C. §77k(e); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 719 (S.D.N.Y. 2013).  Damages under §11 are calculated as the difference between the amount paid for a security and its value at time of suit (subject to limitations detailed below) unless a defendant proves that an ascertainable part or all of such depreciations resulted from something other than a registration statement's misrepresentations and omissions.  15 U.S.C. §77k(e).  "When a plaintiff alleges a violation of the Securities Act . . . [t]he burden is then on defendants to prove loss causation, and any difficulty separating loss attributable to a specific misstatement from loss attributable to macroeconomic forces benefits the plaintiff."  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 155 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2679 (2018).

In August 2010, MetLife Inc. ("MetLife" or the "Company") offered 86,250,000 shares of common stock priced at $42.00 per share; while the March 2011 offering included 146,809,712 shares of common stock priced at $43.25 per share.  Ferrell Rpt., ¶¶5-7.[1]  By January 12, 2012, when plaintiff filed the first operative complaint, MetLife's stock price was trading at $35.93 per share, representing a $6.07 decline from the August 2010 offering price and a $7.32 decline from the March 2011 offering price.  Ferrell Rpt., ¶39 & n.54.  The MetLife Defendants, by statute, are liable for this entire decline unless they satisfy their burden of proving that an ascertainable part or all of these declines was caused by something other than the Registration Statements' misrepresentations

---

[1]     "Ferrell Rpt." refers to the Report of Professor Allen Ferrell, dated October 19, 2017, which is attached as Ex. 1 to the Declaration of Daniel J. Pfefferbaum in Support of Lead Plaintiff and Class Representative's Motion to Exclude the Testimony of Professor Allen Ferrell, Ph.D. ("Pfefferbaum Decl.").  All "Ex. __" references are to the Pfefferbaum Decl. unless otherwise indicated.

- 1 -

and omissions.

To meet their burden, the MetLife Defendants retained Allen Ferrell, Ph.D. ("Ferrell").  His October 19, 2017 report states that the MetLife Defendants asked him to analyze the economic evidence relating to the "[p]laintiff's remaining claims in the Complaint" which he understood to be those under §§11 and 15 of the Securities Act.  Ferrell Rpt., ¶15.  While Ferrell admits that "MetLife's stock price declined substantially from the August 3, 2010 and March 3, 2011 offering prices of $42.00 and $43.25" (Ferrell Rpt., ¶39), his attempt at proving the absence of loss causation is fundamentally flawed.

First, Ferrell's novel application of heteroscedasticity – which appears to be a first in any securities case – rests on data mining.[2]  After numerous tests failed to detect heteroscedasticity, he added a volatility index to "find" it in his opening report.  His December 18, 2018 Second Amended Rebuttal report (Ex. 2 ("Amended Rebuttal") abandoned the first test of heteroscedasticity (which also indicates no heteroscedasticity) and suggested using a different test in conjunction with visually inspecting distributions of securities prices to "confirm" the presence of heteroscedasticity.  But the numerous test results Ferrell sets aside all show no heteroscedasticity.

Second, nowhere in Ferrell's October 19, 2017 report or November 30, 2017 rebuttal report (Ex. 3, "Ferrell Rebuttal") does he mention that defendants bear the burden of proof, much less that the burden of proving negative causation is heavy.  *Nomura*, 873 F.3d at 153; *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).  To meet defendants' affirmative burden, Ferrell needed to prove "that 'the risk that caused the loss[es] was [not] within the zone of risk

---

[2]    Ferrell states that heteroscedasticity occurs when the magnitude of the residual returns varies in predictable ways.  Ferrell Rpt., ¶25.

concealed by the misrepresentations and omissions.'" *Nomura*, 873 F.3d at 154.[3]   Further, defendants' negative causation burden requires them to disaggregate, and any difficulty separating loss attributable to a specific misstatement from confounding factors benefits. *Id*. at 155.  His report makes no attempt to do so.

Third, Ferrell's event study based methodology falls far short of proving that something other than the alleged misrepresentations and omissions caused an ascertainable part or all of the declines in MetLife stock price.  Ferrell baselessly eliminates all price declines in MetLife stock that follow partially corrective news if the decline is statistically nonsignificant according to his event study.[4] But his analysis fails to answer the fundamental question of whether his event study failed to detect an effect because none existed or because the event study could not detect it.  It is a fundamental principal of financial statistics that when the statistical test indicates a stock movement is not significant, it does not mean there was no stock movement.  It also does not mean that the stock movement was insignificant.  What it does mean is that the test used to identify the cause of the stock movement was indeterminate.  Nonsignificant means indeterminate.  Ferrell's event study tests failed to identify the causes of the stock movements, they do not disprove that alleged misrepresentations, omissions, and corrective disclosures impacted the stock price, or even provide reliable evidence to that effect.  This flaw in Ferrell's interpretation of the statistical tests undermines the core methodology of using an event study to claim that MetLife's stock performance "cannot be reliably distinguished from its predicted performance based on market and industry factors alone." Ferrell Rpt., ¶39.

---

[3]   Citations and footnotes are omitted and emphasis is added throughout unless otherwise indicated.

[4]   Ferrell's event study purports to measure significance at the 5% level, which he states means that "the probability that the residual return would have occurred in the absence of firm-specific information relevant to investors is 5 percent or less."  Ferrell Rpt., ¶22.

Relatedly, Ferrell's methodology is flawed because the magnitude of a price decline may not be sufficiently large to register as statistically significant, *i.e.*, outside of the largest 5% residual movements.  In that case, the lack of statistical significance does not prove that a corrective event or disclosure did not contribute to share price declines.  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) ("the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price").  And because Ferrell's event study methodology is calibrated to detect only very large price movements, *i.e.*, the top 5% of the largest residual movements in MetLife stock price, it will necessarily fail to detect declines below that threshold.  In other words, Ferrell's test has "limit[ed] statistical power, meaning that only very large-impact events will be detectable."  *In re Petrobras Sec.*, 862 F.3d 250, 278-79 (2d Cir. 2017), *petition for cert. filed*, No. 17-664 (U.S. Nov. 3, 2017).

The Second Circuit highlighted precisely this methodological flaw in *Petrobras*.  *Id.* (citing Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U.L. Rev. 583, 587 (2015)).  Ferrell commits the same error and invites the Court to embrace the same flaw.  This risk is one that Ferrell should have taken into account, not just because defendants bear a heavy burden of proof on negative causation, but because his academic writings recognize that the truth may "gradually 'trickle[]' out into the market" and "[a]s a result, while a single day's abnormal return may not be significant, the cumulative effect on the firm's stock over the entire corrective disclosure period may be."  Ex. 4 at 7.  But his report fails to take this possibility into account even though "to show loss causation, it is enough that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  This

- 4 -

is a particularly troubling methodological flaw in light of the news his report ignores about the State Investigations into MetLife's and the insurance industry's unclaimed property practices.

Fourth, Ferrell's report states that he has "no reason to believe" that MetLife's common stock did not trade in an efficient market (Ferrell Rpt., ¶29) but this opinion rests on mere say so. Ferrell conducts no tests for market efficiency. Instead he merely points to the Complaint's[5] allegations, the substantial daily volume on the New York Stock Exchange ("NYSE") and extensive analyst coverage. Ferrell Rpt., ¶29 nn.33-34.

Finally, Ferrell's report should also be excluded for invading the province of the Court and the jury, as should his irrelevant opinions concerning the event study in the Complaint.

Accordingly, Ferrell's opening and rebuttal reports, as well as the heteroscedasticity opinion in his December 18, 2018 report, should be excluded in their entirety.

## II.     RELEVANT FACTS

Plaintiff alleges and the evidence establishes that MetLife materially misrepresented facts concerning the adequacy of its IBNR reserves and its methodology for setting such reserves. Plaintiff also alleges that the Company's reported financial statements were materially overstated because MetLife failed to account for known deaths, *i.e.*, incurred liabilities resulting in understated reserves and in overstated income and earnings. Moreover, plaintiff alleges that MetLife omitted material facts concerning the risks raised by the State Investigations presented into the Company's death benefits practices, including its use and non-use of the Social Security Death Master File. As the Court noted:

> "[T]he controversy at hand . . . focuses importantly though not exclusively on Central States' contention that MetLife, during the relevant period, overstated its earnings

---

[5]     "Complaint" or "FAC" refers to the Fourth Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 166).

> and its financial strength by maintaining IBNR reserves insufficient to cover life insurance benefits payable in respect of the death of MetLife insureds covered by group life insurance policies for whom no death benefit claims had been received. That claim depends in substantial part upon MetLife's use (or alleged non-use) of the Social Security Administration Death Master File (the 'SSA-DMF'), which is a 'database of [all] deaths recorded in the United States.'"

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-cv-0256 (LAK), 2016 WL 6652731, at *2 (S.D.N.Y. Nov. 10, 2016).   These allegations are much broader than those Ferrell analyzes in his report, which incorrectly restricts plaintiff's claims as alleging that MetLife misrepresented the basis of its IBNR reserves, but not the amount of such reserves.  Ferrell Rpt., ¶33.

While MetLife did not disclose the financial impact of the State Investigations until October 6, 2011, news concerning the State Investigations into MetLife's and the insurance industry's unclaimed property practices entered the marketplace in the preceding months.  *See* §IV.F., *infra.* For example, on August 5, 2011 before the market opened, MetLife filed its Form 10-Q disclosing that the regulatory investigations into its death benefits and unclaimed property practices had expanded to more than 30 jurisdictions and that:

> "It is possible that the audits and related activity may result in additional payments to beneficiaries, additional escheatment of funds deemed abandoned under state laws, administrative penalties, and changes to the Company's procedures for the identification and escheatment of abandoned property.  The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial."

FAC, ¶149. [6]  *Bloomberg* reported on the news.  FAC, ¶150.  Following this news, MetLife stock price declined from a close of $36.90 per share on August 4, 2011 to as low as $34.93 per share on August 5, 2011, closing at $36.35 per share on Friday, August 5, 2011.  FAC, ¶151.  After the

---

[6]   Ferrell claims that the August 5, 2011 disclosure repeated information disclosed on April 25, 2011 (Ferrell Rpt., ¶29) but ignores that MetLife claimed that it had taken "'proactive measures beyond those required by law to improve its ability to make prompt payment of life insurance benefits to the correct beneficiary upon notice of death.'"  Ex. 5.

markets closed on August 5, 2011, the S&P announced its downgrade of the U.S. credit rating (FAC, ¶153) and *Bloomberg* updated its story and noted that AIG had taken a $100 million charge in connection with the State Investigations into the Social Security Death Master File.  FAC, ¶154.

The magnitude and extent of MetLife's misrepresentations and omissions was not disclosed until October 6, 2011, when MetLife disclosed an estimated IBNR reserve increase of $115 million to $135 million

> "to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company."

FAC, ¶156.  On October 7, 2011, MetLife's stock price declined from a close of $30.69 per share on October 6, 2011 to $28.80 per share on October 7, 2011.  FAC, ¶¶24, 163.

Analysts and the media focused on the October 6, 2011 disclosure.  The same day, Credit Suisse issued a report noting the $115-$135 million after-tax charge estimated reserve charge and stating ███████████████████████████████  Ex. 6.  *Zacks Equity Research* published an article titled "'MetLife's Charges to Dampen 3Q Results,'" which discussed the Company's disclosures of a day earlier and attributed "'[t]he bulk of the extraordinary expenses include a post-tax charge of $115-135 million to make necessary alterations to its insurance reserves.'"  FAC, ¶161.  *Reuters* also ran an article titled "MetLife to take up to $275 mln in 3rd-qtr charges," which, among other matters, described the Death Master File investigations and MetLife's statement that "it would take an after-tax charge of $115 million to $135 million to adjust reserves for cases where benefits may be payable," and noted that "MetLife shares, which were the top gainer among S&P insurance stocks on Thursday, fell 2.8 percent to $29.83 in after-hours trading on the news."  Ex. 7 at MET-WL000081234-35.

- 7 -

### III.   LEGAL STANDARDS

#### A.   Expert Testimony

Federal Rule of Evidence 702 governs the admission of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b)      the testimony is based on sufficient facts or data;

> (c)      the testimony is the product of reliable principles and methods; and

> (d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   To be admissible, the court must find that the expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993).   Even if a methodology is sound, expert testimony may be excluded when there is simply too great an analytical gap between the data and the opinion offered.   *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012).   Expert evidence must be helpful in that it "(1) assists the trier of fact in (2) understanding the evidence or determining a disputed fact."   *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 68 (S.D.N.Y. 2001).   "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

A district court is charged with a "gatekeeping" function under Rule 702 to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *Williams*, 506 F.3d at 160.   In addition to Rule 702, indicia of reliability are: whether a theory or technique (a) "can be (and has been) tested"; (b) "has been subjected to peer

review and publication"; (c) has a "known or potential rate of error"; (d) comports with "standards controlling the technique's operation"; and (e) has "'general acceptance'" within a "'relevant scientific community.'" *See Daubert*, 509 U.S. at 593-94.  This list is merely illustrative, and other factors may also be relevant.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'") (emphasis in original) (quoting *Daubert*, 509 U.S. at 593).

### B.    Negative Causation

Under §11's statutory formula, the difference in the amount paid for a security (capped at its offering price) and the value of the security at time of suit (or the price the security was sold for pre-suit or post-suit-pre-judgment subject to certain limitations) is presumed to constitute recoverable damages.  15 U.S.C. §77k(e); *McMahan*, 65 F.3d at 1048.  The Securities Act incentivizes full disclosure through *in terrorem* liability, including by placing a heavy burden on defendants to prove negative loss causation: "The burden to prove negative loss causation is 'heavy,' given 'Congress' desire to allocate the risk of uncertainty to the defendants in [Securities Act] cases.'" *Nomura*, 873 F.3d at 153 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012)).[7]

Section 11 damages may be reduced if a defendant proves that part or all of the decrease resulted

---

[7]    S. Rep. No. 104-98, at 23 (1995) *reprinted in* 1995 U.S.C.C.A.N. 679, 702 ("The Committee amends Section 12(2) to clarify that defendants may raise the absence of "loss causation" as an affirmative defense.  If a defendant in a Section 12(2) action demonstrates that part or all of the decline in the value of the security was caused by factors other than the misstatement or omission alleged in the complaint, the plaintiff may not recover damages based on that portion of the decline. *The defendant must bear the burden of affirmatively demonstrating the absence of loss causation*. This provision does not place any additional burden on plaintiffs to demonstrate that loss causation existed, nor does it deprive investors of Section 12(2) remedies when they have incurred losses caused by inadequate disclosure.  The amendment to Section 12(2) is modeled after Section 11 of the Securities Act, which provides for a similar affirmative defense.").

from something other than the alleged misrepresentations and omissions in the registration statement, *i.e.*, negative causation. *Nomura*, 873 F.3d at 153-54. [8]

*Nomura* makes clear that in assessing whether a defendant reduced the statutory damages award "equal to the depreciation in value of the security not resulting from the material misstatement or omission at issue," the task is "to determine the cause of that loss" beginning "with the presumption that 'any decline in value'" is caused by the defendant's misrepresentations and omissions. *Nomura*, 873 F.3d at 153-54. Defendants may "break that causal link only by proving that 'the risk that caused the loss[es] was [not] within the zone of risk concealed by the misrepresentations and omissions.'" *Id.* at 154 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 589 (S.D.N.Y. 2015) ("The affirmative defense of loss causation requires a defendant to ***prove*** that the loss in the value of the security was proximately caused by events unrelated to the phenomena underlying the alleged misrepresentations."), *aff'd*, 873 F.3d 85 (2d Cir. 2017). In other words, defendants must prove that the subject of the alleged misrepresentations and omissions did not cause any of the actual losses suffered. *Nomura*, 873 F.3d at 154-55; *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss"). And "the relationship between the 'concealed risk' and the consequences of its 'materialization' need not be one-to-one." *Lehman*, 131 F. Supp. 3d at 264.

---

[8]    "While the defendant bears the burden of proof of negative causation under Section 11 (as opposed to the plaintiff under Section 10(b)), 'the negative causation defense in Section 11 and the loss causation element in Section 10(b) are [otherwise] mirror images.'" *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 265 n.152 (S.D.N.Y. 2015).

Importantly, defendants need to rule out each means by which loss causation could be proved, including leakage. In addition to a corrective disclosure, that also includes proving that an allegedly concealed risk did not materialize and cause the decline, and it also includes leakage, *e.g.*, a series of partial disclosures. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

Relatedly, defendants' negative causation burden requires them to disaggregate. "When a plaintiff alleges a violation of the Securities Act . . . [t]he burden is then on defendants to prove loss causation, and any difficulty separating loss attributable to a specific misstatement from loss attributable to macroeconomic forces benefits the plaintiff." *Nomura*, 873 F.3d at 155. Accordingly, where defendants fail to meet their burden of disaggregation, they are liable for the entirety of statutory damages. *Id.* at 153 (refusing to reduce statutory award where defendants failed to disaggregate the macroeconomic financial downturn).

## IV.     ARGUMENT

### A.     Ferrell's Testimony Does Not Fit Defendants' Burden of Proving Negative Causation

Both Ferrell's October 19, 2017 report and his November 30, 2017 rebuttal report do not acknowledge that defendants bear the burden of proving negative causation. Nor does he acknowledge that under §11(e), any decline between the offering price and the value of MetLife's shares at time this action commenced or the price such shares were sold (subject to certain limitations) are presumed recoverable unless defendants prove something other than the alleged misrepresentations and omissions caused the decline in MetLife's stock price. In other words, defendants must prove that the loss in the value of the security was proximately caused by events unrelated to the subject or the phenomena underlying the alleged misrepresentations. *See, e.g.*,

*Nomura*, 873 F.3d at 153-54; *Nomura*, 104 F. Supp. 3d at 586.[9]  As noted above, MetLife therefore bears the heavy burden of proving that the subject of the alleged misrepresentations and omissions did not cause actual losses suffered.  *Nomura*, 873 F.3d at 154-55.

The omission of the heavy burden of proof is telling.  And it underlies Ferrell's flawed methodology which flips defendants' negative causation burden on its head.  Accordingly, Ferrell's report should be excluded because "it applies the wrong legal standard."  *Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968 (JSR), 2018 WL1901634, at *21 (S.D.N.Y. Apr. 17, 2018) (citing cases); *see also In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (excluding defendants' loss causation expert for applying incorrect legal standard).

**B.    Ferrell's Novel Application of Heteroscedasticity Rests on Data Mining and Bias**

On October 7, 2011, MetLife's stock price declined by $1.89.  FAC, ¶163.  The day before, MetLife disclosed an estimated IBNR reserve increase of $115-$135 million:

> "to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company."

FAC, ¶156.  After conducting the requisite market efficiency analysis, plaintiff's expert opined that the October 7, 2011 decline was so extreme that it registered as statistically significant.  Ex. 8

---

[9]    Ferrell's narrow definition of the alleged misrepresentations is inappropriate: "I understand that Plaintiff's claims which remain in this case are those under §§11 and 15 of the Securities Act based upon MetLife's alleged omission of material facts about: 1) 'its inquiry into or knowledge concerning its implicit representations with respect to the adequacy of the Company's [Incurred But Not Reported or "IBNR"] reserves'; and 2) 'the pending state investigations prior to August 2011.'  I refer to these alleged disclosure deficiencies as the 'Alleged Misstatements.'"  Ferrell Rpt., ¶12.

(Rebuttal Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, dated November 30, 2017 ("Feinstein Rebuttal")), ¶¶49-51.[10]

In his first report, Ferrell resorted to data mining to construct an event study purportedly to control for heteroscedasticity. Ferrell Rpt., ¶¶25-27. Only by doing so can he claim that the decline on October 7, 2011 is not statistically significant. However, as indicated by the Breusch-Pagan test proffered by Ferrell, both his and Feinstein's event study did not suffer from heteroscedasticity. *Compare* Ferrell Rpt., Appendix C, ¶¶7-8, *with* Feinstein Rebuttal, ¶¶74, 78. Indeed, as Feinstein explains, Ferrell conducted four tests to detect heteroscedasticity and all four tests failed to detect its presence. Feinstein Rebuttal, ¶78. Only after incorporating an additional exogenous factor, the CBOE's Volatility Index (VIX), into his event study did Ferrell's test appear to detect the heteroscedasticity he sought. But this is classic data snooping, which is condemned in the academic literature:

> To determine whether the observed increase in the size of the residual returns is significantly different such that heteroscedasticity is present, Professor Ferrell conducts *four* Breusch-Pagan tests. All *four* tests failed to detect heteroscedasticity. . . . Rather than accept the results from these four tests, that heteroscedasticity is not present, Professor Ferrell performs two more additional Breusch-Pagan tests. In these additional attempts, Professor Ferrell uses the VIX index to find the

---

[10]   Ferrell's penchant for *ipse dixet* is apparent in his analysis of market efficiency. Market efficiency is critical to the reliability of Ferrell's analysis. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 169 (S.D.N.Y. 2007) (market efficiency "is relevant to loss causation"), *aff'd in part and vacated in part on other grounds*, 574 F.3d 29 (2d Cir. 2009); *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 276 n.10 (3d Cir. 2004) (noting that pre-offering disclosures did not establish truth-on-the-market without evidence of an efficient market to incorporate the information into the stock price). Yet instead of making this threshold showing, Ferrell merely points to plaintiff's Complaint and states he has "no reason to believe" that the market for MetLife is inefficient, noting that MetLife trades on the NYSE with substantial daily volume and extensive analyst coverage. Ferrell Rpt., ¶29 & n.34. It is of no moment that the Complaint alleged market efficiency for claims under §10(b) and the *Basic* presumption, because at the time of his report the Court had dismissed those claims. As such, reliance and loss causation were irrelevant to plaintiff's burden of proof. It was however central to defendants' burden on negative causation, which Ferrell simply fails to prove. He should be excluded for that methodological failure alone.

heteroscedasticity that he sought.  Based on the results of these two additional tests, Professor Ferrell concludes that this provides "strong evidence that heteroscedasticity is present."   It is unsurprising that Professor Ferrell was able to find heteroscedasticity in MetLife's residual returns after applying a battery of tests.

Feinstein Rebuttal, ¶¶78-79 (emphasis in original).

Ferrell's December 18, 2018 Amended Rebuttal report also applied several alternative tests for heteroscedasticity, and Ferrell acknowledges that they gave mixed results.  Amended Rebuttal, ¶¶20-22.  Here, Ferrell eschews the Breusch-Pagan test and the VIX Index, in favor of yet another test to resurrect his assertion of heteroscedasticity.  Ferrell's latest choice of test, the White Test, shows there is no heteroscedasticity present in Feinstein's regression model and event study.[11] Further, running multiple tests until one gives a preferred result if a flawed approach to scientific testing.  Indeed, "the more scrutiny a collection of data is subjected to, the more likely will interesting (spurious) patterns emerge."  Andrew W. Lo & A. Craig MacKinlay, *Data-Snooping Biases in Tests of Financial Asset Pricing Models*, Rev. Fin. Studies, Vol. 3, No. 3, 1990, at 432 (Ex. 9).

Not only is the application of heteroscedasticity to securities cases novel, but the few courts that have analyzed heteroscedasticity have rejected its application to event studies outside the securities litigation context.  *See, e.g.*, *Denny v. Westfield State Coll.*, 669 F. Supp. 1146, 1149 (D. Mass. 1987) (The Court does not find that the possible presence of heteroscedasticity itself detracts from the validity of Dr. Ash's study."), *aff'd*, 880 F.2d 1465 (1st Cir. 1989); *Estate of Hill v. ConAgra Poultry Co.*, No. CIV.A.4:94CV0198-HLM, 1997 WL 538887, at *6 (N.D. Ga. Aug. 25,

---

[11]   On December 15, 2018, plaintiff produced the data underlying Feinstein's event study in connection with his December 13, 2018 Report.  Ex. 23.  That production included a file titled, whiteHet.m, which shows that the White Test detected no heteroscedasticity.

1997) ("Moreover, the Court is aware of several studies that have been admitted into evidence or published in journals in spite of the presence of heteroscedasticity in regression formulas.").

### C. Ferrell's Flawed Event Study Methodology Rests on a False Equivalence Between a Statistically Nonsignificant Return and Proof of No Causation

Contrary to defendants' burden of proof, Ferrell erases all of the declines in MetLife's stock price following news or events that partially reveal the alleged misrepresentations and omissions if a specific one day decline is not statistically significant at the 5% level.[12]  Ferrell Rpt., ¶17 (noting that his event study assessed whether "the Alleged Corrective Disclosures caused MetLife's stock price to decline as Plaintiff asserts, i.e., whether these disclosures can be associated with price drops that can be considered 'statistically significant' and thus different from zero").  In other words, unless a decline in MetLife's stock price is large enough to register as statistically significant on his event study, he assumes that the entirety of that decline is unrelated to the alleged misrepresentations and omissions.

This methodology finds no basis in the statute and fails to meet defendants' burden.  According to Ferrell's own event study, after removing market and industry factors, MetLife's stock price declined by 1.39% on October 7, 2011.  Ferrell Rpt., ¶27, Ex. 1 at 2.  The day before MetLife disclosed, among other matters, a $115-$135 million after-tax charge

> "to adjust reserves in connection with the Company's use of the U.S. Social Security
> Administration's Death Master File and similar databases to identify certain group
> life insurance certificates, individual life insurance policies and other contracts where
> the covered person may be deceased, but a claim has not yet been presented to the
> Company."

---

[12]   Ferrell's event study purports to measure significance at the 5% level, which he states means that "the probability that the residual return would have occurred in the absence of firm-specific information relevant to investors is 5 percent or less."  Ferrell Rpt., ¶22.

Feinstein Rebuttal, ¶44.  Following MetLife's October 6 disclosure, Credit Suisse reported on the disclosure:



Ex. 10.  The following day there was additional analyst and press coverage on this news.  For example, on October 7, 2011, a Bank of America analyst report stated:

**Lowering 2011 operating EPS by $0.20**



Ex. 11.  As detailed above, analysts and the press gave significant coverage to MetLife's reserve increase.

Given that MetLife's stock price closed at $30.69 on October 6, the 1.39% residual decline Ferrell describes in connection with MetLife's stock price decline on October 7, 2011 represents approximately $0.43.  Ferrell Rpt., ¶27, Ex. 1 at 2.  Yet under Ferrell's flawed methodology, and in the face of a clearly material allegation-specific disclosure, he equates a $0.43 residual decline on October 7, 2011, *i.e.*, after removing for industry and market effects, to *zero* because he claims that this decline did not register as statistically significant at the 5% threshold.  *Id.*  As noted above, MetLife is obligated to prove that the subject of the alleged misrepresentations and omissions did not cause actual losses suffered.  *Nomura*, 873 F.3d at 154-55.  Despite analyst and media commentary, Ferrell appears to attribute the entirety of the residual decline simply to random volatility.  But this

does not meet defendants' obligation to prove that all of the decline is attributed to other than the Registration Statement's misrepresentations and omissions.

### D.   Ferrell's Event Study Methodology Cannot Disprove Causality

The absence of statistical significance does not prove the absence of causation. *Barclays*, 310 F.R.D. at 95 ("the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price"). [13] Indeed the Supreme Court has noted that "[a] lack of statistically significant data does not mean that . . . [there is] no reliable basis for inferring a causal link." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011). The Second Circuit's decision in *Petrobras* noted:

> Brav and Heaton caution courts against misinterpreting studies that fail to find statistically significant price changes:  "[W]hile a statistically significant reaction to a firm-specific news event is evidence that information was reflected in the price (absent confounding effects), the converse is ***not true*** – the failure of the price to react so extremely as to be [detectable] does ***not*** establish that the market is inefficient; it may mean only that the" effect size was not large enough to be detected in the available sample.

862 F.3d at 279 n.30 (emphasis in original) (quoting Brav & Heaton, *supra*, 93 Wash. U.L. Rev. at 602).  The law review cited in *Petrobras* highlights the methodological flaw: "Courts err because of their mistaken premise that statistical insignificance indicates the probable absence of a price impact." Brav & Heaton, *supra*, 93 Wash. U.L. Rev. at 587. [14]  As Brav and Heaton note: "It is

---

[13]  Ferrell recognizes the same issue when he analyzes the use of event studies to assess heteroscedasticity.  There he states "the fact that one test does not reject the null hypothesis [of homoscedasticity, *i.e.*, no heteroscedasticity] by itself does not imply the absence of" heteroscedasticity.  Amended Rebuttal, ¶20 n.32.  In the context of his October 19 report, where Ferrell defines the null hypothesis as a zero residual return, the fact that his test does not reject the null hypothesis does not prove that the residual return is in fact zero.  Ferrell Rpt., ¶21.

[14]  As Brav and Heaton's article notes:

> First, an SFES [single firm event study] often has low statistical "power" to detect an economically meaningful price impact, which typically must be at least approximately twice as large as the standard deviation of daily (abnormal) returns for

crucial to understand that statistical significance is simply describing a set of returns that would be unusual to observe if there was no price impact. ***Lack of statistical significance does not tell us that it is more probable than not that there was no price impact.***" *Id.* at 593. Especially so here because the event study Ferrell uses has low power to detect a true effect when it exists. *Id.* Accordingly, there is a serious and unaccounted risk of committing a Type II error: "failing to find an effect that exists." *Id.* While Ferrell does not identify the error rate of his event study,[15] Brav and Heaton noted that a price impact "must be nearly $900 million to be detectable by" event studies for firms of MetLife's size (*i.e.*, the largest 10% by market capitalization). Brav & Heaton, *supra*, 93 Wash U.L. Rev. at 596.

Yet Ferrell maintains that any price declines that are statistically nonsignificant according to his event study proves that something other than the misrepresentations and omissions in the Registration Statements caused the stock price decline. This simply is not in accord with logic or defendants' heavy burden on negative causation.[16]

---

the examined firm. But requiring conventional levels of statistical significance when power is low effectively gives a "free pass" to economically meaningful securities fraud because the SFES simply cannot detect price impacts below a high threshold.

*Id.* at 586.

[15]   *Daubert*, 509 U.S. at 593-94 (asserting that known or potential rate of error is an indicia of reliability).

[16]   Moreover, while Ferrell claims that he assessed statistical significance at the 5% threshold, he actually applies a 2.5% threshold of statistical significance in assessing the days when MetLife had statistically significant negative returns. Ferrell Rpt., Ex. 2. As Ex. 2 to his report makes clear, he assessed only statistically significant negative residual returns of MetLife stock price making a one-tailed test appropriate, yet used a two-tail test. Feinstein Rebuttal, ¶¶83-85. Had he used a one-tail test he would have found approximately 12 other days with statistically significant declines at the 5% threshold of statistical significance. Feinstein Rebuttal, ¶85; *see also* Brav & Heaton, *supra*, 93 Wash. U.L. Rev. at 591 n.21 ("Of course, using a two-tailed test at the same significance level makes it less likely to detect statistical significance against an alternative known to be negative, and this is no doubt what defendants hoped to accomplish when they argued against the one-tailed test.").

**E.      Ferrell's Methodology Ignores Defendants' Burden of Disaggregation**

Ferrell's report makes no mention of defendants' burden to disaggregate by attributing by

amount and source the events unrelated to the alleged misrepresentations and omissions that caused

the decline in MetLife's securities.  *Nomura*, 873 F.3d at 155 ("When a plaintiff alleges a violation

of the Securities Act . . . [t]he burden is then on defendants to prove loss causation, and any

difficulty separating loss attributable to a specific misstatement from loss attributable to

macroeconomic forces benefits the plaintiff.").

Outside his proffered opinion in this case, Ferrell has highlighted the importance of

disaggregation.  In his academic writings on loss causation, Ferrell has noted that an abnormal return

following a corrective disclosure occurring alongside "firm-specific news unrelated to the alleged

fraud" (*i.e.*, a confounding event) "measures the combined effect of the disclosure and the unrelated

firm-specific news."   Ex. 4 at 7.   Accordingly,  Ferrell  should  have  analyzed  confounding

information.  But Ferrell's methodology simply ignores confounding information.  As detailed by

Feinstein in his November 30 Rebuttal Report:

> [I]f a misrepresentation is made alongside countervailing confounding news that
> impacts the stock price in the opposite direction, one might reasonably expect this
> mix of new information to not cause a statistically significant stock price reaction.  In
> these examples, a modest stock price movement, or even no movement at all, may be
> the appropriate stock price reaction. In such cases, the event study finding that the
> stock return was non-significant would not indicate inefficiency.  In fact, in such
> cases,  a non-significant stock price movement would indicate that the stock is
> behaving as it should in an efficient market.

Feinstein Rebuttal, ¶24.

Moreover, in the same article, Ferrell has proposed analyzing intraday data "to disentangle

the confounding effects of the two events."  Ex. 4 at 9.  Yet his report did not assess intraday

movement in MetLife's stock price on days he deemed statistically nonsignificant when there was

news on the subject of the alleged misrepresentations and omissions.  To take an illustrative example

- 19 -

highlighting the problem with Ferrell's methodology, while MetLife's stock price fell from $36.90 on August 4 to a close of $36.35 on August 5, it reached an intraday low of $34.93 after MetLife announced the August 5 disclosure.  FAC, ¶¶151-152.  Ferrell's report ignores the $1.97 difference between the August 4 close and the August 5 intraday low.  Instead, he focuses only on the closing price on August 5.  Ferrell Rpt., Ex. 1 at 1-2.  This failure to analyze intraday data to disaggregate flows from his reports' primary methodological flaw – ignoring that MetLife Defendants' bear the burden of proof on negative causation.

Ferrell also failed to disaggregate the statistically significant -2.5% residual on August 9, 2011.  His report incorrectly attributes a single article about MetLife Taiwan from Dow Jones Chinese Financial Wire at 2:43 AM on August 9, 2011.  Ferrell Rpt., Ex. 2 at 1.  But documents produced in discovery show that on the same day, ███████████████████ ███████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████ Ex. 12.[17]  Professor Ferrell makes no mention of FBR's report and does not parse out the negative residual decline attributable to FBR reporting on its meeting with MetLife executives and unclaimed property from losses attributable to MetLife Taiwan.  *Nomura*, 873 F.3d at 155.

Relatedly, Ferrell's event study also treats industry movements as an independent variable on the assumption that the companies that other insurers in the indices he used are not subject to similar investigations.  Ferrell Rpt., ¶¶20-21 (claiming that a lack of statistical significance in residual return

---

[17]    Asked about this document, William Mullaney, who was then President of MetLife's U.S. Business, confirmed in deposition that "FBR is an analyst that publishes notes on MetLife and other companies" and "Randy Binner is the – was at the time the insurance analyst for FBR.  And I had a meeting with him and probably with some investors.  I don't recall the meeting specifically.  But typically if you went with an analyst and you met with some investors and they would hear what kind of questions you had, they would oftentimes write a report afterward that they would distribute that would summarize the key take-aways from the meeting."  Ex. 13 at 125:13-126:5.

shows that the observed stock return on a particular date can be explained by the independent variables considered in the estimation model).   Indeed, he claims that post-offering decline in MetLife's stock price is attributable to other factors, including adverse changes in industry conditions.  Ferrell Rpt., ¶16.  But the State Investigations into unclaimed property practices were an industry-wide investigation related to the misrepresentations and omissions alleged here.  Ferrell's methodology fails to disentangle insurance industry movements related to the same unclaimed property investigations MetLife was subject to, rendering his industry index not independent of the allegations.

### F.    Ferrell's Methodology Does Not Account for Leakage

Ferrell's methodology is also flawed for failing to account for causation under a leakage theory.   In his academic writing, Ferrell has noted that "there can be 'leakage' of news about the disclosure before the actual official corrective disclosure."  Ex. 4 at 7.  Courts have acknowledged the relevance and viability of leakage as theory of loss causation.  *See Dura*, 544 U.S. at 342 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 n.5 (2d Cir. 2009) ("We do not take issue with the plausibility of Plaintiffs' 'leakage' theory."); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273 n.5 (S.D.N.Y. 2007) (negative causation must account for "the possibility that declines in stock price prior to broad public disclosure may be reflective of leaking of relevant information into the marketplace").

As Judge Sweet has noted, "a leakage theory supported by a plausible mechanism or set of facts showing how the market was gradually alerted to the fraud is a sufficient theory of loss causation." *In re the Bear Stearns Cos., Inc. Sec.*, No. 08 MDL 1963 (RWS), 2016 WL 4098385, at *8 (S.D.N.Y. July 25, 2016).  While Ex. 1 to Ferrell's October 19, 2017 report describes information

- 21 -

concerning the State Investigations into MetLife's unclaimed property practices, he makes no attempt to discern how the gradual dissemination of information concerning the State Investigations may have mitigated the impact of successive stock price declines. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1200 (C.D. Cal. 2008) ("However, corrective information sometimes comes to the market slowly, making it likely other variables will confound loss causation. For example, management could 'leak' information slowly into the market, either innocently (they were only gradually discovering the extent of the misrepresentation themselves) or with an eye to spreading out the losses over time (either to reduce price volatility or, perhaps, even to make ascertaining loss causation more difficult)."); *see also Schleicher v. Wendt*, 618 F.3d 679, 686-87 (7th Cir. 2010) ("[T]ruth can come out, and affect the market price, in advance of a formal announcement.").

The absence of any leakage analysis underscores that Ferrell's methodology fails to meet defendants' burden of proving that an ascertainable part or all of the depreciation in MetLife's stock price resulted from something other than the Registration Statements' misrepresentations and omissions. But his reports do not collectively analyze how corrective information slowly entered the market, which further undermines the ability of his event study to detect price declines tied to the alleged misrepresentations and omissions. *Countrywide*, 588 F. Supp. 2d at 1200. Yet he recognizes in his academic work that:

> Corrective disclosures can occur over a protracted period of time, i.e. the truth gradually "trickles" out into the market. As a result, while a single day's abnormal return may not be significant, the cumulative effect on the firm's stock over the entire corrective disclosure period may be.

Ex. 4 at 7. Instead, Ferrell's analysis of "Event Study Results Following New Allegation-Related and Alleged Corrective Disclosures" only assesses whether certain disclosures individually were followed by statistically significant declines. Ferrell Rpt., Ex. 1.

- 22 -

Further, he ignores numerous days in which news concerning the State Investigations into MetLife and the insurance industry's unclaimed property practices entered the market – albeit not disclosing the financial impact disclosed on October 6, 2011. Illustrative examples between July and October 2011 follow: On July 6, 2011, Scotia Capital published a report, titled "MET Among Lifecos Probed by NY AG," that stated: "MET and eight other included in the latest probe into lifeco practices regarding the payment of life insurance benefits." Ex. 14. The Scotia report also stated: "We do not view these investigations as serious threats to our investment thesis on MET, and they should not have a material impact on EPS or BVPS for any of the companies referred to." *Id.*

On July 17, 2011, the *Buffalo News* published an article noting that regulators were probing insurers' practices (including MetLife's) in connection with asymmetrical use of the SSA-DMF. Ex. 15. In that article, a MetLife spokesman said that MetLife "'has made extensive efforts over the years to locate customers that have lost contact with the company to help ensure that their benefits, including life insurance proceeds, are delivered to them.'" *Id.*

On August 5, 2011, at 2:59 p.m. Eastern, *Dow Jones* reported that AIG booked a $100 million charge in connection with the SSA-DMF and noted that MetLife had testified about their SSA-DMF practices. Ex. 16. By 3:42 p.m. Eastern, *Bloomberg* reported on MetLife's, Prudential's and AIG's disclosures in connection with the State Investigations. Ex. 17. An hour later, at 4:53 p.m. Eastern, *Bloomberg* issued another report, titled "MetLife Says 30 Jurisdictions Auditing Firm on Unpaid Benefits," that added: "State regulators are intensifying a probe into unpaid benefits after Florida Insurance Commissioner Kevin McCarty said in May that insurers may be keeping at least $1 billion in unclaimed funds." Ex. 18.

Citi issued a report on August 5, 2011, titled "Alert: For Death Benefits, Substantial May Not Be Material." Ex. 19. The Citi report stated: "Do not expect any settlement to pose a valuation risk

– As disclosed in MET's 2Q11 10-Q report, it is being audited by 30 different state insurance departments regarding its determination of when policyholders may have died" and noted also that:

> Other life insurers are going through a similar process in which regulators are examining their procedures in establishing if death may have occurred as it relates to both individual life insurance and annuities and if these are similar.  MET went through a similar internal process a few years ago under which it compared its individual business policyholder base to the Social Security Death Master File, which resulted in a net charge of $25M in 4Q07. . . . Notwithstanding the cautionary legal language in the 10-Q that says costs could be "substantial", we do not expect that the current state investigation with its inherent political undertones will result in a financial outcome that is significantly different that MET's earlier review.

*Id.*

On August 6, 2011, *The Wall Street Journal* published an article noting that "[i]nsurers have been under scrutiny from state insurance regulators and other officials, including New York's attorney general, who have been examining whether the industry has adequately ensured payouts on policies of some deceased customers."  Ex. 20.  A *Wall Street Journal* article on August 8, 2011 stated that "AIG is the latest insurer, after MetLife Inc., Nationwide Mutual Insurance Co. and others, to beef up efforts to ensure payments on life-insurance policies of deceased customers."  Ex. 21.

On August 9, 2011, ███████████████████████ that discussed meeting with MetLife executives and the unclaimed property investigations.  Ex. 12.

On September 3, 2011, the *National Underwriter* published an article titled "Under Siege," which mentioned that MetLife, Prudential and AIG were subject to "a probe by California and Florida into the claims-paying procedures of life insurance companies [that] has turned into a nationwide effort to shake loose any and all unclaimed death benefits that have accumulated over the last several decades."  Ex. 22.  The article concluded that "[w]hat started as a forensic auditing

- 24 -

situation in a single state has now become a nationwide problem for the entire industry, with no easy end in sight." *Id.*

Though Ferrell recognizes in his academic work that the truth may gradually trickle into the market rendering subsequent declines statistically insignificant (Ex. 4 at 7) his report fails to account for this possibility. As a result, Ferrell cannot meet defendants' burden of disproving loss causation via leakage.

### G.  Ferrell's Opinions Invade the Province of the Fact Finder and Court and His Attacks on the Event Study in the Complaint Are Irrelevant

Ferrell's lay and legal testimony should also be excluded. For example, his analysis of whether "the Alleged Corrective Disclosures" included information that could or could not have been disclosed invades the province of the jury. Ferrell Rpt., ¶¶28, 30. So too with his opinion that MetLife could not have disclosed information announced in August 2011 by Prudential and AIG. Ferrell Rpt., ¶31. Further, Ferrell's October 19, 2017 report analyzes whether the event study in plaintiff's Complaint proved that MetLife's stock price declined in a statistically significant manner on August 6, 2011 and October 7, 2011. Ferrell Rpt., ¶¶10-11, 13, 17-18. But his opinions on the event study are irrelevant because plaintiff proffered an expert reports from Feinstein that did not rely on it. Feinstein Rebuttal, ¶76.

## V.  CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court exclude Ferrell's

opinions contained in his October 19, 2017 and November 30, 2017 reports, and his heteroscedasticity opinion contained in his December 18, 2018 report.

DATED:  February 1, 2019                    Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SHAWN A. WILLIAMS
                                            AELISH M. BAIG
                                            DANIEL J. PFEFFERBAUM
                                            JASON C. DAVIS
                                            ARMEN ZOHRABIAN


                                                   s/ DANIEL J. PFEFFERBAUM
                                            _____
                                                 DANIEL J. PFEFFERBAUM

                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)
                                            shawnw@rgrdlaw.com
                                            aelishb@rgrdlaw.com
                                            dpfefferbaum@rgrdlaw.com
                                            jdavis@rgrdlaw.com
                                            azohrabian@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            ROBERT M. ROTHMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            rrothman@rgrdlaw.com

                                            Lead Counsel for Plaintiff

1521421_1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 1, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM
ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: dpfefferbaum@rgrdlaw.com

**Mailing Information for a Case 1:12 cv 00256 LAK City of Westland Police and Fire Retirement System v. Metlife, Inc. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Norman Bolus**
  jbolus@maynardcooper.com,jatkinson@maynardcooper.com

- **John J Clarke , Jr**
  john.clarke@dlapiper.com,DocketingNewYork@dlapiper.com

- **Richard J. Davis**
  rdavis@maynardcooper.com,emcpherson@maynardcooper.com

- **Elliot Greenfield**
  egreenfield@debevoise.com,rashanies@debevoise.com,dbrockner@debevoise.com,dimamura@debevoise.com

- **Maeve L. O'Connor**
  moconnor@debevoise.com,mao-ecf@debevoise.com,dbrockner@debevoise.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,9858910420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **John Vukelj**
  john.vukelj@dlapiper.com,john-vukelj-8235@ecf.pacerpro.com,DocketingNewYork@dlapiper.com,new-york-docketing-7871@ecf.pacerpro.com

- **Shawn Anthony Williams**
  swilliams@rgrdlaw.com,ptiffith@rgrdlaw.com,AFrame@rgrdlaw.com,tcraig@rgrdlaw.com,2028828420@filings.docketbird.com,aelishb@rgrdlaw.com,smorris@rgrdl

- **Armen Zohrabian**
  azohrabian@rgrdlaw.com,kmccormack@rgrdlaw.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,chavayh@hbsslaw.com,nicolleg@hbsslaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Thomas          C. Michaud
,