UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                                     :

CITY OF WESTLAND POLICE AND FIRE     :
RETIREMENT SYSTEM, Individually and on Behalf of  :
All Others Similarly Situated,                        :
                                                     :

                Plaintiff,                       :
                                                       :

            -against-                    :     12 Civ. 0256 (LAK) (OTW)
                                                        :

METLIFE, INC., et al.,                          :
                                                     :

                Defendants.                 :
                                                     :
---------------------------------------------------------------------x

 

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
<u>TO EXCLUDE THE TESTIMONY OF PROFESSOR ALLEN FERRELL, PH.D.</u>**

Maeve O'Connor
Elliot Greenfield
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants MetLife, Inc.,
C. Robert Henrikson, William J. Wheeler,
Peter M. Carlson, Steven A. Kandarian,
William J. Mullaney, Sylvia Mathews Burwell,
Eduardo Castro-Wright, Cheryl W. Grisé,
R. Glenn Hubbard, John M. Keane, Alfred F.
Kelly, Jr., James M. Kilts, Catherine R.
Kinney, Hugh B. Price, David Satcher,
Kenton J. Sicchitano and Lulu C. Wang*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT .......................................................................................................... 2

I.    FERRELL'S TESTIMONY MEETS THE REQUIREMENTS OF RULE 702. .............. 2

II.   PLAINTIFF'S ASSERTIONS REGARDING THE LEGAL STANDARD FOR
      LOSS CAUSATION ARE NOT A BASIS TO EXCLUDE FERRELL'S
      TESTIMONY ................................................................................................ 5

      A.    Plaintiff's Legal Arguments Are Not a Basis to Exclude Testimony. ................... 5

      B.    Plaintiff's Position Is Contrary to Second Circuit Law. ........................................ 6

III.  THE COURT SHOULD REJECT PLAINTIFF'S FALSE ASSERTIONS
      REGARDING HETEROSCEDASTICITY ................................................................ 9

      A.    Heteroscedasticity Is Not a "Novel" Issue, Nor Is "Novelty" Relevant. .............. 10

      B.    Plaintiff Misstates the Tests Ferrell Conducted. ................................................... 11

      C.    Plaintiff Does Not Support Its False Accusations of "Data Snooping" with
            Any Evidence ........................................................................................................ 13

IV.   PLAINTIFF'S OTHER CRITICISMS OF FERRELL'S REPORT
      ARE ALSO MERITLESS. ......................................................................................... 15

      A.    Ferrell Correctly Describes the Surviving Section 11 Claims. ............................. 15

      B.    Ferrell Does Not Invade the Province of the Jury. ............................................... 16

      C.    Plaintiff's Criticism Regarding Disaggregation and Leakage
            Are Misguided. ...................................................................................................... 16

      D.    Plaintiff's Market Efficiency Criticism Is Baseless and Moot. ............................ 18

CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

### CASES

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ...................................................................... 8, 9

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018) ................................................................ 4, 8, 17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................9

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  No. 12 Civ. 0256, 2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016) ................... 15, 16

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48, 82 (S.D.N.Y. 2015) ......................................................16

*Denny v. Westfield State College*,
  669 F. Supp. 1146, 1149 (D. Mass. 1987). ...................................................11

*Estate of Hill v. ConAgra Poultry Co.*,
  No. 4:94CV0198, 1997 WL 538887 (N.D. Ga. Aug. 25, 1997)...........................11

*Fed. Hous. Fin. Agency v. Nomura Holding America, Inc.*,
  873 F.3d 85 (2d Cir. 2017) ................................................................ 8, 9, 17

*In re Barclays Bank PLC Sec. Litig.*,
  No. 09 Civ. 1989, 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017)................... 1, 7, 9

*In re Barclays Bank PLC Sec. Litig.*,
  No. 17-3293-cv, 2018 WL 6040846 (2d Cir. Nov. 20, 2018) ................... 1, 7, 8, 9

*In re the Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
  No. 08 MDL 1963, 2016 WL 4098385 (S.D.N.Y. July 25, 2016) .......................18

*In re Federal Home Loan Mort. Corp. (Freddie Mac) Sec. Litig.*
  281 F.R.D. 174, 179-81 (S.D.N.Y. 2012).......................................................10

*In re Novatel Wireless Sec. Litig.*,
  846 F. Supp. 2d 1104 (S.D. Cal. 2012) ..........................................................6

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ....................................................................9, 19

*In re Pfizer Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) ........................................................................6

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010) ................................................................................17

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137, 119 S. Ct. 1167 (1999) ..................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27, 131 S. Ct. 1309 (2011) ......................................................................8

*Olin Corp. v. Lamorak Ins. Co.*,
No. 84 Civ. 1968, 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018)...........................6

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) ...................................................................................3

**RULES**

Fed. R. Evid. 702 ...............................................................................................2, 3

Fed. R. Civ. P. 26(a)(2)(B)....................................................................................14

Defendants MetLife, Inc. ("MetLife" or the "Company")[1] and the Individual Defendants[2] (collectively, the "MetLife Defendants" or "Defendants") submit this memorandum in opposition to Plaintiff's motion to exclude the testimony of Allen Ferrell (Dkt. No. 258).

## PRELIMINARY STATEMENT

Although Plaintiff purportedly seeks to exclude the testimony of Defendants' economic expert, Allen Ferrell, under *Daubert* and Rule 702, it devotes almost its entire brief to making faulty and unsupported assertions regarding the legal standard for demonstrating negative loss causation for Section 11 claims, rather than attempting to demonstrate that the methodology underlying Ferrell's economic analysis is unreliable.  Not only are Plaintiff's arguments regarding the applicable legal standard wholly irrelevant to the admissibility of Ferrell's testimony, but they have been definitively rejected by the Second Circuit.  *See In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989, 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017), *aff'd*, No. 17-3293-cv, 2018 WL 6040846 (2d Cir. Nov. 20, 2018) ("*Barclays*").  Remarkably, Plaintiff fails even to mention *Barclays*.

In the few pages in which Plaintiff does address Ferrell's methodology, Plaintiff offers only baseless – and ridiculous – assertions concerning Ferrell's opinion regarding "heteroscedasticity," a condition related to changes in stock price volatility that both parties agree must be accounted for when present in order to conduct a reliable event study.  Ferrell notes that the presence of heteroscedasticity is obvious on visual inspection of the data and describes the results of formal diagnostic tests he performed that demonstrate its presence at a

---

[1]  For purposes of this motion, the term "MetLife" includes MetLife, Inc., its subsidiaries and/or affiliates, or any of them.

[2]  The "Individual Defendants" are C. Robert Henrikson, William J. Wheeler, Peter M. Carlson, Steven A. Kandarian, William J. Mullaney, Sylvia Mathews Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R. Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr., James M. Kilts, Catherine R. Kinney, Hugh B. Price, David Satcher, Kenton J. Sicchitano and Lulu C. Wang.

greater than 99 percent confidence level.  Plaintiff cannot admit that heteroscedasticity is present in the data, however, because doing so would require the exclusion of its own economic expert (who failed to account for it) and, more importantly, summary judgment in favor of Defendants on the basis of loss causation.  Instead, Plaintiff tries to portray heteroscedasticity as a "novel" issue – a suggestion that is both false and irrelevant.  In addition, although Ferrell performed only *two* diagnostic tests in his Section 11 report and only *one* test in his Section 10(b) report, Plaintiff accuses Ferrell of having performed an endless series of tests until he obtained the desired result, which Plaintiff alternatively refers to as "data snooping" or "data mining."  That accusation is silly and should be rejected.

Plaintiff's remaining criticisms – challenging Ferrell's description of the surviving Section 11 claims (which was quoted directly from this Court's decision), his statement that MetLife could not have disclosed certain events at the time of the public offerings (to the extent they had not yet occurred), his purported failure to address certain disaggregation and leakage theories (which are legally and factually unsupported) and his reliance on the efficiency of the market for MetLife's common stock (to which the parties have stipulated) – are all without merit.

## <u>ARGUMENT</u>

## I.   **FERRELL'S TESTIMONY MEETS THE REQUIREMENTS OF RULE 702.**

Ferrell's testimony unquestionably meets all of the requirements of Rule 702, which governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3]

Ferrell is an eminently qualified expert in the field of corporate finance. Ferrell is an economist and the Greenfield Professor of Securities Law at Harvard Law School. (Ex. 29, "Ferrell § 11 Report" ¶¶ 1-3, App. A.)[4] He earned a Ph.D. in Economics (fields in econometrics and finance) from the Massachusetts Institute of Technology and a J.D. from Harvard Law School. (*Id.*) He regularly publishes articles on topics related to securities litigation, event studies and securities markets, and he has testified as an expert in numerous litigations, on behalf of plaintiffs, defendants and the federal government. (*Id.*) Ferrell's testimony has been relied on by courts and has never been excluded.

Ferrell's opinions are based on a reliable methodology that is grounded in economic principles. Ferrell opined on issues of loss causation and damages in connection with Plaintiff's Section 11 and Section 10(b) claims. He did so primarily by conducting event studies, which are statistical analyses of MetLife's stock prices and relevant market and industry indices, an approach that the Second Circuit has called "standard operating procedure in federal securities litigation," *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013), and that Plaintiff referred to as the "gold standard" (FAC ¶ 164).

Ferrell reliably applied economic principles and event study methodology. An event study isolates the stock price movement attributable to a company (as opposed to external market

---

[3]   Although Plaintiff's Notice of Motion also cites Federal Rules of Evidence 401, 403 and 701, Plaintiff's memorandum does not mention them. (Dkt. No. 258.) Accordingly, this memorandum addresses only Rule 702.

[4]   Citations to "Ex. __" refer to the exhibits to the Declaration of Maeve O'Connor in support of the MetLife Defendants' motion for summary judgment. (Dkt. 274.)

forces) by means of a regression analysis. (Ferrell § 11 Report ¶¶ 19-20.) The portion of the daily stock price movement that is not predicted by the performance of the broader market and relevant industry on a given day is called the "residual return" or "abnormal return." (*Id.*) The residual return can be attributed to company-specific news only if it is "statistically significant" – *i.e.*, it falls outside the range of typical residual returns, which reflect random price fluctuations. *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018).

As set forth in greater detail in the MetLife Defendants' motion for summary judgment, the event study analysis in this case is complicated by the fact that the range of residual returns is not uniform throughout the relevant time period – a condition referred to as "heteroscedasticity" (also spelled "heteroskedasticity"). (Dkt. No. 260 at 12-15.) For most of the relevant period, changes in the market and industry indices on a given day accurately predict the change in MetLife's stock price on that day – meaning relatively small residual returns. (*Id.* at 13-14.) However, after Standard & Poor's historic downgrade of the credit rating of the United States on August 5, 2011, which resulted in a period of dramatically increased volatility, the range of MetLife's residual returns was substantially larger. (*Id.*) This effect is so strong that it is obvious even to a layperson on visual inspection of the residual returns (*id.* at 13, Fig. A), and formal diagnostic tests for heteroscedasticity demonstrate its presence at a greater than 99 percent confidence level (*id.* at 14).[5]

Because heteroscedasticity is present, Ferrell did not use the simplest form of regression analysis, an "ordinary least squares" ("OLS") regression, as that methodology assumes there is no heteroscedasticity and can yield invalid conclusions regarding statistical significance when

---

[5]     Diagnostic tests "are used to determine whether the null hypothesis of homoscedasticity [*i.e.*, the absence of heteroscedasticity] can be rejected. In other words, they assess whether one can rule out homoscedasticity with a high degree of statistical confidence." (Ex. 33, "Ferrell § 10(b) Rebuttal" ¶ 20 n.32.) For simplicity, this brief refers to proving or demonstrating the presence of heteroscedasticity, rather than rejecting the null hypothesis of homoscedasticity.

heteroscedasticity is present.  (*Id.* at 14-15.)  Instead, Ferrell conducted his event studies using "generalized least squares" ("GLS") regressions, which Plaintiff's expert, Steven Feinstein, agrees "is a generally accepted and widely used analysis technique that provides proper estimates of regression coefficients and standard errors when there is a possibility that heteroskedasticity is present."  (*Id.* at 15; Ex. 34 at 25 n.42.)

Ferrell's event studies demonstrate that (*i*) there was no statistically significant price reaction following either of the two alleged corrective disclosures, and (*ii*) all of the statistically significant price declines occurred on days when no information related to the alleged misrepresentations was disclosed.  Accordingly, Ferrell concluded that the economic evidence does not support attributing any decline in MetLife's stock price to the alleged misrepresentations.  (Ferrell § 11 Report ¶ 16; Ex. 31, "Ferrell § 11 Rebuttal" ¶ 5; Ex. 33, "Ferrell § 10(b) Rebuttal" ¶¶ 6, 9.)

## II.   PLAINTIFF'S ASSERTIONS REGARDING THE LEGAL STANDARD FOR LOSS CAUSATION ARE NOT A BASIS TO EXCLUDE FERRELL'S TESTIMONY.

### A.   Plaintiff's Legal Arguments Are Not a Basis to Exclude Testimony.

Plaintiff devotes the bulk of its brief to making erroneous assertions regarding the standard for demonstrating negative loss causation under Section 11, rather than attempting to demonstrate that Ferrell's methodology is unreliable.  (Mem. 1-5, 9-12, 15-25.)[6]  Ferrell is an economist, and his opinions are drawn from the application of economic principles.  On the basis of those opinions, Defendants moved for summary judgment on the ground (among others) that the alleged misrepresentations did not cause any decline in MetLife's stock price as a matter of law.  To the extent Plaintiff contends that Defendants have not met their legal burden of

---

[6]   Citations to "Mem." refer to the memorandum of law in support of Plaintiff's motion to exclude Ferrell's testimony.  (Dkt. No. 262.)

demonstrating negative loss causation, Plaintiff should attempt to make that argument in opposing Defendants' motion for summary judgment. It is not a basis to exclude Ferrell's expert testimony.

Plaintiff's primary authority makes this exact point. *See Olin Corp. v. Lamorak Ins. Co.*, No. 84 Civ. 1968, 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018). (Mem. 12.) In *Olin*, Judge Rakoff states that "the testimony of a party's expert must be evaluated within the context of that party's own theory of the case" and that the mere "possibility" that such theory "may be legally or factually deficient" is not justification for precluding the testimony. *Id.*, at *21 (citing *In re Pfizer Sec. Litig.*, 819 F.3d 642, 659, 661 (2d Cir. 2016)) (denying motion to exclude expert testimony calculating insurance policy limits under approach not yet addressed by the court). Ferrell's economic testimony is entirely consistent with Defendants' legal arguments regarding that defense (and Second Circuit law, as discussed below), and Plaintiff's contrary views – which, far from being endorsed by this Court, have been rejected by the Second Circuit – are not a basis to exclude Ferrell's testimony.[7]

### B.    Plaintiff's Position Is Contrary to Second Circuit Law.

Plaintiff's position on the legal standard for negative loss causation is not only irrelevant to its motion to exclude Ferrell's testimony but also contrary to the law in this Circuit. Plaintiff's various arguments simply restate the same basic assertion – unsupported by any authority – that demonstrating the lack of a statistically significant stock decline following the disclosure of allegedly corrective information is insufficient to meet a defendant's burden under Section 11.

---

[7]     Nor does *In re Novatel Wireless Securities Litigation* support Plaintiff's argument. 846 F. Supp. 2d 1104 (S.D. Cal. 2012). (Mem. 12.) In *Novatel Wireless* – unlike here – the defendants' expert purportedly "offered an incorrect legal opinion" as to whether a corrective disclosure must reveal that a fraud has occurred. *Id.* at 1107. Here, Ferrell does not offer a legal opinion; as an economist, he opines that "economic evidence" does not support the attribution of any decline in stock price to the alleged misrepresentations. Indeed, Plaintiff perversely criticizes Ferrell for *not* offering legal opinions. (*See, e.g.*, Mem. 2, 11, 12, 19.)

(*See*, *e.g.*, Mem. 3-4, 15-19, 22.)  That is not the law.  Plaintiff's counsel made the exact same argument in the *Barclays* case, and it was emphatically rejected by both the District Court and the Second Circuit.

In *Barclays*, the District Court held that the defendants "provided sufficient evidence to establish the negative loss causation affirmative defense under Section 11" by demonstrating that there was no statistically significant price decline following any of the three alleged corrective disclosures, and that all of the statistically significant price declines occurred on days when no allegedly corrective information was disclosed.  2017 WL 4082305, at *19, *22, *25 (S.D.N.Y. Sept. 13, 2017).  The court found the lack of a statistically significant price decline to be "persuasive" and "compelling" evidence that the misrepresentations did not cause the alleged loss.  *Id.*, at *20, *25.

The Second Circuit affirmed the District Court's decision and made clear it was not a close call:  "We agree with the District Court that Barclays ***resoundingly*** established its affirmative defense of negative loss causation."  *Barclays*, 2018 WL 6040846, at *4 (emphasis added).  The Court held that the defendants' event study, which demonstrated that price declines following the disclosure of allegedly corrective information were not statistically significant, was "***conclusive proof*** regarding negative loss causation."  *Id.* at *4-*5; *see also id.* at *5 (event study  demonstrating no "statistically significant market reaction" satisfied defendants' negative causation burden).

The *Barclays* decisions reflect the same straightforward interpretation of event studies that the Second Circuit has consistently followed in the context of Section 10(b) claims.  Put simply, if the residual return on a given day is not statistically significant – *i.e.*, it is indistinguishable from background noise (random fluctuations) – then the defendant has carried

its burden of establishing that it cannot be attributed to company-specific factors.  *See*, *e.g.*, *Ark. Teachers*, 879 F.3d at 481 n.5.  Ferrell's conclusion from an economic standpoint is entirely consistent with the Second Circuit's legal perspective:  because there is no statistically significant decline, "the economic evidence does not support Plaintiff's claim that the Alleged Misstatements caused MetLife's stock price to decline during the Relevant Period."  (Ferrell § 11 Report ¶ 16.)

In a stunning – and telling – omission, Plaintiff does not even mention *Barclays*.  The cases that Plaintiff does choose to cite, to the extent they are relevant, are consistent with *Barclays* and do not support Plaintiff's contrary position.  ***First***, Plaintiff cites *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S. Ct. 1309 (2011), incorrectly suggesting that the Supreme Court has weighed in on this issue.  (Mem. 17.)  In fact, when the text that Plaintiff omits is replaced, it is clear that the Supreme Court was discussing medical testing, not loss causation or event studies.  *See Matrixx*, 563 U.S. at 40, 131 S. Ct. at 1319 ("A lack of statistically significant data does not mean that ***medical experts have*** no reliable basis for inferring a causal link ***between a drug and adverse events***.") (emphasis added to text omitted by Plaintiff); *see also id.* (noting that medical experts consider multiple factors in assessing causation given that statistically significant data are not always available or ethically obtainable).

***Second***, Plaintiff repeatedly cites and quotes language from *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 873 F.3d 85 (2d Cir. 2017) and *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336 (2d Cir. 1987), stating the basic fact that Defendants have the burden of proving negative causation under Section 11 and describing that burden as "heavy." (Mem. 1, 2, 3, 4, 9, 10, 11, 12, 16, 19, 20.)  Nothing in those decisions is contrary to *Barclays*; in

fact, the *Barclays* decision quotes the same language.  *Barclays*, 2018 WL 6040846, at *2 (quoting *Nomura*, 873 F.3d at 154 and *Akerman*, 810 F.2d at 341).

 ***Third***, Plaintiff cites decisions stating that the lack of a statistically significant price impact does not disprove market efficiency in Section 10(b) cases.  (Mem. 4, 17-18 (citing *In re Petrobras Sec.*, 862 F.3d 250, 279 (2d Cir. 2017); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015).)  Whatever the import of those cases on issues of market efficiency, they do not address the legal standard for demonstrating negative loss causation under Section 11.  Unlike market efficiency, loss causation unquestionably ***does*** require a statistically significant price decline in response to an alleged corrective disclosure.

 As the court stated in *Barclays*, the loss causation element of Section 10(b) and the negative causation defense of Section 11 are "mirror images."  2017 WL 4082305, at *20 n.29 (citation omitted).  The burden of proof switches sides, but the evidence needed to meet that burden does not change.  For a Section 10(b) claim, the plaintiff bears the burden of proof and can meet its burden by demonstrating a statistically significant decline in the stock price following a corrective disclosure (and, if relevant, disaggregating the effects of any confounding information).  For a Section 11 claim, the defendant bears the burden of proof and, as the Second Circuit confirmed in *Barclays*, can satisfy its burden by demonstrating the ***absence*** of a statistically significant stock price decline following the disclosure of allegedly corrective information.

## III. THE COURT SHOULD REJECT PLAINTIFF'S FALSE ASSERTIONS REGARDING HETEROSCEDASTICITY.

 Plaintiff's assertion that heteroscedasticity is a "novel" issue is incorrect (and irrelevant), and its accusation that tests demonstrating the presence of heteroscedasticity were the result of "data snooping" are entirely conclusory and contrary to the evidence.  (Mem. 2, 12-15.)

### A.    Heteroscedasticity Is Not a "Novel" Issue, Nor Is "Novelty" Relevant.

Heteroscedasticity is not, as Plaintiff claims, a "novel" issue – nor would it matter if it were.  (Mem. 2, 12-15.)  As set forth in the MetLife Defendants' summary judgment brief, heteroscedasticity is discussed in every basic econometrics textbook and is even the topic of an entire chapter in *Econometrics for Dummies*.  (Ex. 38.)  Heteroscedasticity is so widely discussed because it violates a fundamental assumption of the simplest and most common form of regression analysis – the OLS regression.  (Dkt. No. 260 at 14-15.)  In particular, as noted above, OLS regressions yield unreliable conclusions regarding statistical significance when heteroscedasticity is present.  (*Id.*; Ferrell § 10(b) Rebuttal ¶¶ 13-14.)

Whether heteroscedasticity frequently arises in the context of securities litigation is completely irrelevant, as the objective of "*Daubert*'s gatekeeping requirement" is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  Because economists consider heteroscedasticity to be a crucially important issue that must be accounted for when it arises in the field, they must account for it in the courtroom as well.

In any event, Plaintiff's assertion that heteroscedasticity has not arisen in the context of securities litigation is wrong.  (Mem. 14.)  In *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation* – a case that Plaintiff itself cites (Mem. 8) – the court found the plaintiff's event study to be "deeply flawed" in part because it failed to account for heteroscedasticity in circumstances nearly identical to the present case.[8]  281 F.R.D. 174, 179-81 (S.D.N.Y. 2012).  (Dkt. No. 260 at 17.)  Moreover, despite ignoring heteroscedasticity in this

---

[8]    As in *Freddie Mac*, Plaintiff's expert relies on a "placid" period of relatively low volatility and then drawing incorrect conclusions regarding the statistical significance of stock price movements during a "stormy" period of higher volatility.  *Id.* at 179.

case, Plaintiff's own expert raised the issue of heteroscedasticity in a securities litigation as recently as 2014.  In *Fosbre v. Las Vegas Sands Corp*, Feinstein performed a GLS regression – **the same methodology used by Ferrell in this case** – and stated that "GLS is a generally accepted and widely used analysis technique that provides proper estimates of regression coefficients and standard errors when there is a possibility that heteroskedasticity is present." (Ex. 34 at 25 n.42.)  Notably, Feinstein employed a GLS regression based on the mere "possibility" that heteroscedasticity was present and without presenting the results of any diagnostic tests confirming its presence.

Neither of the cases that Plaintiff cites regarding heteroscedasticity involved an event study or has any relevance to this case.  *Estate of Hill v. ConAgra Poultry Co.* is a 22-year-old decision from the District of Georgia addressing allegations that the defendants misweighed the plaintiffs' chickens.  No. 4:94CV0198, 1997 WL 538887, at *6 (N.D. Ga. Aug. 25, 1997).  In that case – unlike here – the defendants failed to explain how heteroscedasticity impacted plaintiffs' regression analysis.  *Id.* at *5.  *Denny v. Westfield State College*, a 32-year-old employment discrimination case, mentions heteroscedasticity only in passing, noting only that the plaintiffs' expert "admitted that this defect was probably present to some degree, but suggested that its effect was not significant."  669 F. Supp. 1146, 1149 (D. Mass. 1987).  Here, by contrast, Ferrell demonstrates that heteroscedasticity is present, accounts for it by using a GLS regression and explains in detail how it renders Feinstein's event study fundamentally unreliable.

### B.    Plaintiff Misstates the Tests Ferrell Conducted.

Unable to escape the importance of heteroscedasticity, Plaintiff misstates and exaggerates the number of diagnostic tests for heteroscedasticity that Ferrell performed in an effort to create the false impression that Ferrell performed test after test after test until, at long last, he finally

obtained the result he sought.  Nothing could be further from the truth.  In fact, Ferrell performed

a grand total of *two* diagnostic tests in connection with the Section 11 claims and only *one*

diagnostic test in connection with the Section 10(b) claims.  Those tests conclusively

demonstrate the presence of heteroscedasticity – an undeniable fact Plaintiff seeks to avoid

through false accusations and diversions.  The Court should reject those tactics.

      In Ferrell's Section 11 report, he critiqued an event study that Plaintiff presented in its

second, third and fourth amended complaints (the "Complaint Event Study") – the only event

study that Plaintiff had disclosed at the time – noting that it failed to include an industry index

for the financial sector or to account for heteroscedasticity.  (FAC ¶¶ 164-65 & n.26; Ferrell § 11

Report ¶¶ 23-26, App. C ¶¶ 1-9.)  *First*, Ferrell performed a Breusch-Pagan test, a commonly

used test for heteroscedasticity.  (Ferrell § 11 Report App. C ¶7.)  Because the Complaint Event

Study used two different estimation periods (one year and 120 days), Ferrell performed the test

for each period, both with and without an industry index for the financial sector.  (Ferrell § 11

Report App. C, Ex C-2.)  Plaintiff mischaracterizes this as "four tests" (Mem. 13); in fact, it was

a single test, run on variations of the event study that Plaintiff alleged.  (Ferrell § 11 Report App.

C ¶ 8 & n.14.)  *Second*, because the volatility of MetLife's residual returns increased

dramatically after the August 5, 2011 S&P downgrade – when the entire market experienced a

dramatic surge in volatility, Ferrell performed a Breusch-Pagan test that incorporated a standard

index reflecting market volatility, the "VIX," which demonstrated that heteroscedasticity is

present to a greater than 99 percent confidence level.[9]  (Ferrell § 11 Report App. C ¶ 9, Ex. C-2.)

In response, Feinstein disavowed any responsibility for the Complaint Event Study and refused

---

[9]    The average level of the VIX abruptly doubled after the S&P downgrade.  (Ferrell § 11 Report App. C ¶ 9.)

to defend it.  (Ex. 30, "Feinstein § 11 Rebuttal" ¶ 76.)  Plaintiff now calls its Complaint Event Study "irrelevant."  (Mem. 5, 25.)

In connection with the Section 10(b) claims, which were the subject of separate expert reports submitted a year later than the Section 11 reports, Feinstein conducted his own event study and did not even mention heteroscedasticity, despite the fact that Ferrell had identified it over a year earlier.  In rebuttal, Ferrell – now addressing Feinstein's event study for the first time – performed a *single* diagnostic test that demonstrates that heteroscedasticity is present, again at a greater than 99 percent confidence level. (Ferrell § 10(b) Rebuttal ¶ 21.)  Plaintiff's statement that, in his Section 10(b) report, Ferrell "applied several alternative tests for heteroscedasticity" and "acknowledges that they gave mixed results" is pure fiction.  (Mem. 14.)

### C.   Plaintiff Does Not Support Its False Accusations of "Data Snooping" with Any Evidence.

Plaintiff's bogus accusation of "data snooping" or "data mining" is premised on misstating and mischaracterizing the tests that Ferrell conducted.  (Mem. 12-14.)  Even if Plaintiff's mischaracterizations of Ferrell's tests were true, however, Ferrell's process would not approach the level of "data snooping."  The idea of "data snooping" is that when one tests for heteroscedasticity at a 95 percent confidence level (for example), there is a 5 percent chance of a false positive – *i.e.*, a 5 percent chance that the test indicates heteroscedasticity when it is not present.  In theory, if one were to run enough tests, a false positive would occur eventually.  But Plaintiff's accusations of "data snooping" are entirely conclusory and contradicted by the evidence.

Here, heteroscedasticity is apparent upon visual inspection of the pattern of residual returns, referred to in the literature as the "eyeball test."  (Ex. 35 at 116.)  To formally test for heteroscedasticity, Ferrell conducted *two* diagnostic tests in his Section 11 report and *one*

diagnostic test in his Section 10(b) report.  In both reports, the diagnostic tests demonstrate the presence of heteroscedasticity to a greater than ***99 percent*** confidence level – indicating that the chance of a false positive was less than ***1 percent***.  (Ferrell § 11 Report Ex. C-2; Ferrell § 10(b) Rebuttal ¶ 21.)  The suggestion that those few completely standard tests amount to data snooping is ludicrous.  Plaintiff offers no analysis supporting its accusation, and Feinstein simply declares – also without any analysis – that the "far more reasonable conclusion" is that the heteroscedasticity Ferrell detected "is the result of data snooping."  (Mem.  12-14; Feinstein § 11 Rebuttal ¶ 80.)

In yet another last ditch attempt to avoid the heteroscedasticity that undermines its claims of loss causation, Plaintiff states in a footnote that subsequent to serving Feinstein's Section 10(b) report, it produced computer code for a test that, if executed, purportedly would fail to detect heteroscedasticity.  (Mem. 14 n. 11.)  Even setting aside the fact that such a production is not a timely or proper means of disclosure, the delivery of computer code does not convey Feinstein's opinions, much less "the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B).  Under the Federal Rules, Plaintiff cannot avoid even a mention of heteroscedasticity in its Section 10(b) report – a year after Ferrell raised the issue – and then seek to rely on a bit of belatedly produced computer code, devoid of any stated opinion.[10]

---

[10]   Furthermore, merely pointing to a diagnostic test that failed to detect the heteroscedasticity does not mean that heteroscedasticity is absent; it simply means that test failed to detect it.  (Ferrell § 10(b) Rebuttal ¶ 20 n.32.)  A positive test with a high degree of statistical confidence, on the other hand, demonstrates conclusively that heteroscedasticity is present.  (*Id.*)  In particular, the Breusch-Pagan test only detects a specific form of heteroscedasticity, whereas the White test is a general diagnostic test and detects any form of heteroscedasticity.  (*Id.* ¶ 20.)  When a White test and Breusch-Pagan test provide different results, one should rely on the White test due to its generality.  (*Id.* ¶ 20 n.34.)  This is analogous to medical testing in which, for example, an MRI may detect what an x-ray did not.

These feeble tactics reveal a simple truth:  Plaintiff has no substantive answer to the fact

that heteroscedasticity is present and, as a result, Feinstein's event study is fundamentally flawed

and unreliable.

## IV.   PLAINTIFF'S OTHER CRITICISMS OF FERRELL'S REPORT ARE ALSO MERITLESS.

### A.   Ferrell Correctly Describes the Surviving Section 11 Claims.

Plaintiff's assertions that its Section 11 claims "are much broader than those Ferrell

analyzes in his report" and that Ferrell "incorrectly restricts plaintiff's claims" are demonstrably

false.  (Mem. 6.)   Plaintiff specifically takes issue with Ferrell's statement that:

> I understand that Plaintiff's claims which remain in this case are
> those under §§ 11 and 15 of the Securities Act based upon
> MetLife's alleged omission of material facts about: 1) "*its inquiry
> into or knowledge concerning its implicit representations with
> respect to the adequacy of the Company's [Incurred But Not
> Reported or "IBNR"] reserves*"; and 2) "*the pending state
> investigations prior to August 2011*."

(Mem. 12 n.9 (quoting Ferrell § 11 Report ¶ 12).)   But Ferrell's description of the remaining

Section 11 claims directly quotes the Court's most recent decision addressing those claims:

> [T]he TAC alleges adequately that (1) MetLife omitted to state
> material facts about *its inquiry into or knowledge concerning its
> implicit representations with respect to the adequacy of the
> Company's IBNR reserves* thereby rendering those representations
> misleading, and (2) MetLife omitted to state material facts about
> *the pending state investigations prior to August 2011*, which it
> had a duty to disclose under SEC Regulation S-K, Item 303,
> thereby rendering certain of its public statements misleading.

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.* ("*Westland III*"), No. 12 Civ. 0256,

2016 WL 6652731, at *15 (S.D.N.Y. Nov. 10, 2016) (emphasis added); *see also id.* at *16.

It is Plaintiff – not Ferrell – that ignores the Court's prior holdings and attempts to

resuscitate claims that were dismissed years ago and are no longer part of the case, including

claims based on affirmative misstatements (as opposed to omissions), claims that MetLife's

15

IBNR reserves or financial statements did not comply with GAAP and claims that MetLife

violated Item 103 of SEC Regulation S-K or ASC 450. (Dkt. No. 284 at 1, 8, 15-16, 19-24.)  *See*

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 82 n.219 (S.D.N.Y.

2015) ("The Court in its February 2013 Opinion ***dismissed Central States' claims based on***

***MetLife's alleged GAAP, Regulation S-K Item 103, and ASC 450 violations***. The SAC contains

no new allegations as to those claims.  The Court's analysis of those points remains

unchanged.") (emphasis added); *Westland III*, 2016 WL 6652731, at *11 n.60 ("Given that the

TAC contains no new allegations either, the Court again declines to revisit" those claims.); *id.* at

*15 n.100 ("Central States disclaims any allegation of knowing, reckless or otherwise intentional

misconduct for purposes of its Securities Act claims.  Accordingly, Central States cannot state a

claim under Section 11 on the basis that MetLife's implicit IBNR representations were not

honestly held.  ***It can proceed only on an omissions theory***.") (citations omitted) (emphasis

added).

### B.    Ferrell Does Not Invade the Province of the Jury.

Ferrell's statements that certain events could not have been disclosed in the August 2010

or March 2011 public offerings to the extent they had not yet occurred – specifically, MetLife's

actuarial analysis of the results of the 2011 DMF cross-check and announcements by Prudential

and AIG in August 2011 – do not invade the province of the jury.  (Mem. 25.)  Those statements

are common sense and subject, like calendar dates, to judicial notice.

### C.    Plaintiff's Criticism Regarding Disaggregation and Leakage Are Misguided.

Plaintiff does not – and cannot – cite any authority for its incorrect assertion that

Defendants bear the burden of "attributing by amount and source the events . . . that caused the

decline in MetLife's securities."  (Mem. 19.)  Plaintiff's theory appears to be that Defendants are

required to affirmatively identify the causes of MetLife's stock price decline during the relevant

period.  That is incorrect:  Defendants are required to establish only that the decline "was not caused by the alleged misstatement or omission."  *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010).  Plaintiff's citation to *Nomura* is off base.  *Nomura* involved mortgage-backed securities, which are not traded on a stock exchange, and therefore no event study could be conducted.  873 F.3d at 100.  In the absence of an event study, the court held that the defendants failed to disaggregate losses caused by "a specific misstatement" as opposed to "macroeconomic forces" – specifically, the 2008 financial crisis.  *Id.* at 153-55.  Here, by contrast, Defendants have the benefit of an event study that isolates stock price movements attributable to the company from those caused by market and industry forces.  *See Ark. Teachers*, 879 F.3d at 481 n.5.

Plaintiff's related suggestion that Ferrell should have disaggregated the impact of confounding information by analyzing intraday stock prices likewise is devoid of any legal authority, nor does Plaintiff actually identify any such "confounding information."  (Mem. 19-20.)  Plaintiff notes, for example, that MetLife stock declined during the trading session on August 5, 2011 before rebounding to close down only $0.65 (which even Feinstein admits is not statistically significant), but Plaintiff does not identify any purportedly confounding information that became known to the market in the middle of that trading day.  Similarly, Plaintiff states that on August 9, 2011, a day on which there was a statistically significant decline, FBR Capital Markets issued a note regarding MetLife, but Plaintiff does not identify any information in that note, let alone new information, that could have caused the stock price decline.  (Mem. 20.)  The

FBR note hardly mentions the state inquiries, noting that the issue "has fizzled out somewhat" and "settlements thus far have been modest."[11]

Plaintiff's assertion that Ferrell failed to account for the "leakage theory," which refers to a gradual disclosure of corrective information, is similarly misguided.  Although some courts have acknowledged leakage as a concept, courts have rejected attempts to quantify damages under this theory.  *See In re the Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, No. 08 MDL 1963, 2016 WL 4098385, at *6-*9 (S.D.N.Y. July 25, 2016) (reviewing cases).  More importantly, in this case, there is no evidence that leakage actually occurred.  Indeed, the residual return of MetLife's stock price was ***positive*** after (*i*) two states announced they had subpoenaed MetLife to testify at public hearings regarding their use of the Death Master File ("DMF"), (*ii*) MetLife employees publicly testified that the Company had not systematically used the DMF in its life insurance business, a partial DMF cross-check in 2007 had identified $80 million in unclaimed benefits and a broader DMF cross-check was underway and (*iii*) MetLife addressed the state inquiries in its August 5, 2011 Form 10-Q.  (Ferrell § 11 Report Ex. 1.) Plaintiff lists a series of news reports from July 6, 2011 through September 3, 2011, but it fails to identify any new information disclosed in any of those reports that would constitute "leakage" of corrective information.  (Mem. 23-25.)

### D.    Plaintiff's Market Efficiency Criticism Is Baseless and Moot.

Plaintiff's criticism of Ferrell's reliance on the efficiency of the market for MetLife stock is bizarre and also irrelevant, as Feinstein expresses the same opinion, and the parties have formally ***stipulated*** that MetLife stock trades in an efficient market.  (Ex. 32, "Feinstein § 10(b)

---

[11]    The full discussion of the state inquiries on page 10 in FBR's 19-page report is as follows:  "The unclaimed property issue has fizzled out somewhat.  The company has complied with information and testimony requests from the states.  This issue has not gotten much media attention due to the complicated nature of the issue, and by extension, has become less of a focus for state regulators and treasurers.  In addition, the settlements thus far have been modest."  (Ex. 1 to Decl. of Carolina Kupferman, filed concurrently.)

Report" ¶ 21; Dkt. No. 239.)  In any event, it is not "*ipse dixit*."  (Mem. 5, 13 n.10.)  As noted

above, a central point of the *Petrobras* opinion, which Plaintiff cites, is that a market efficiency

opinion does not always require an event study and, at least in some cases, can rely on other

*Cammer* factors.  862 F.3d at 279.  The common stock of MetLife – one of the 50 largest

companies in the S&P 500 – is a perfect example, as it is traded on the New York Stock

Exchange, with substantial daily trading volume (averaging more than 4% of its approximately

one billion shares outstanding during the relevant period) and is covered by numerous securities

analysts who regularly publish reports.  (Ferrell § 11 Report ¶ 29 & n.34.)  Ferrell's opinion that

MetLife stock trades in an efficient market is based on these undisputed facts.  (*Id.*)

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion to exclude the

testimony of Allen Ferrell.

Dated:  New York, New York
   March 1, 2019      DEBEVOISE & PLIMPTON LLP

          By: /s/ Maeve O'Connor
          Maeve O'Connor (*moconnor@debevoise.com*)
          Elliot Greenfield (*egreenfield@debevoise.com*)

          919 Third Avenue
          New York, New York 10022
          Tel: (212) 909-6000
          Fax: (212) 909-6836

          *Attorneys for Defendants MetLife, Inc., C. Robert*
          *Henrikson, William J. Wheeler, Peter M. Carlson, Steven*
          *A. Kandarian, William J. Mullaney, Sylvia Mathews*
          *Burwell, Eduardo Castro-Wright, Cheryl W. Grisé, R.*
          *Glenn Hubbard, John M. Keane, Alfred F. Kelly, Jr.,*
          *James M. Kilts, Catherine R. Kinney, Hugh B. Price,*
          *David Satcher, Kenton J. Sicchitano and Lulu C. Wang*